**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| MCKESSON CORPORATION and SUBSIDIARIES, <br><br> *Plaintiff*, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> *Defendant.* | Case No. 3:25-CV-01102-N |

**BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.  Preliminary Statement.................................................................................................... 1

II.  Legal Standards........................................................................................................... 5

    A.  Summary Judgment ........................................................................................ 5

    B.  Review of Agency Decisions......................................................................... 7

        1.  In Excess of Statutory Authority................................................... 7

        2.  Arbitrary and Capricious................................................................ 8

III.  Background................................................................................................................. 9

    A.  Statutory Language and Early Interpretations Thereof........................................... 9

    B.  Treasury Regulations .................................................................................... 10

    C.  Introduction of CWI in 1986....................................................................... 12

    D.  Background on the SBC Rule ...................................................................... 14

        1.  Background on the Issue................................................................ 14

        2.  SBC Regulations and Case Law .................................................. 18

IV.  Procedural Background............................................................................................. 23

V.  Argument .................................................................................................................. 25

    A.  The SBC Rule Is Contrary to Section 482 ................................................. 25

        1.  Section 482 Requires Application of the Arm's-Length Standard to "Clearly Reflect the Income" of Controlled Taxpayers ............................ 25

            a)  Section 482 Has an Established Reading, Developed Over Nearly a Century, and Requires Application of the Arm's-Length Standard in "Every Case" .................................................. 25

            b)  The Arm's-Length Standard Has an Established Meaning and Requires a Comparison to What Unrelated Parties Would Do ........................................................................... 29

            c)  Unrelated Parties Do Not Share SBC Costs, Directly or Indirectly, and Treasury Has Never Shown That They Do ........... 31

i

(1) Treasury Has Never Presented or Referenced Any Evidence That Unrelated Parties Ever Share SBC ........... 31

(2) Treasury's "Evidence" Is Merely a Hunch ....................... 33

d) The SBC Rule Is Inconsistent with the Arm's-Length Standard, and Therefore with Section 482, and Must Be Invalidated ................................................................... 34

2. CWI Cannot Save the SBC Rule as a Substantive Matter ....................... 34

a) CWI Does Not Apply .................................................... 35

b) Even if CWI Were Relevant, Treasury and the IRS are Limited to the Arguments Made When the Regulation was Published .................................................................. 37

B. The SBC Rule Does Not Reflect Reasoned Decisionmaking and is Therefore Arbitrary and Capricious ....................................................... 38

1. Treasury Reached an Irrational, Unfounded Conclusion Regarding Arm's-Length Conduct ............................................... 38

2. The SBC Rule is Contrary to the Evidence That Was Before Treasury ..................................................................... 40

3. Treasury Failed to Adequately Respond to Significant Comments .......... 41

C. 28 U.S.C. § 2401 Does Not Bar Any of McKesson's Claims ............................. 42

VI. Conclusion ................................................................................................. 44

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*3M Co. v. Commissioner*,
154 F.4th 574 (8th Cir. 2025), *rev'g* 160 T.C. 50 (2023) ......................................................4

*Abbott v. Biden*,
70 F.4th 817 (5th Cir. 2023) ......................................................................................8

*Advance Cloak Co. v. Commissioner*,
B.T.A.M. (P–H) ¶ 33,078 (1933) ........................................................................2, 25

*Altera Corp. v. Commissioner*,
145 T.C. 91 (2015)..................................................................................................2, 21

*Altera Corp. v. Commissioner*,
926 F.3d 1061 (9th Cir. 2019) .......................................................................... *passim*

*Altera Corp. v. Commissioner*,
941 F.3d 1200 (Mem.) (9th Cir. 2019) ..................................................................3, 23

*Altera Corp. v. Commissioner*,
141 S.Ct. 131 (Mem.) (2020)...............................................................................23, 24

*Americans for Beneficiary Choice v. U.S. Dep't of Health & Hum. Servs.*,
795 F. Supp. 3d 895 (N.D. Tex. 2025) .......................................................................6

*Amin v. Mayorkas*,
24 F.4th 383 (5th Cir. 2022) ....................................................................................40

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...............................................................................................5, 6

*Asiatic Petroleum Co. v. Commissioner*,
31 B.T.A. 1152 (1935), *aff'd*, 79 F.2d 234 (2d Cir. 1935) .......................................26

*Baldwin–Lima–Hamilton Corp. v. United States*,
435 F.2d 182 (7th Cir. 1970) ...................................................................................29

*Barford v. Commissioner*,
194 F.3d 782 (7th Cir. 1999) ...............................................................................27, 29

*Bausch & Lomb Inc. v. Commissioner*,
933 F.2d 1084 (2d Cir. 1991)....................................................................................27

*BNSF Ry. Co. v. Fed. R.R. Admin.*,
62 F.4th 905 (5th Cir. 2023) ....................................................................................38

*Bragdon v. Abbott*,
    524 U.S. 624 (1998)........................................................................................................28

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..........................................................................................................6

*Chamber of Com. of U.S. v. SEC*,
    85 F.4th 760 (5th Cir. 2023) ....................................................................................41, 42

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)......................................................................................................2, 7

*Commissioner v. First Sec. Bank of Utah*,
    405 U.S. 394 (1972), *aff'g* 436 F.2d 1192 (10th Cir. 1971) .............................1, 5, 26

*Cont'l Equities, Inc. v. Commissioner*,
    551 F.2d 74 (5th Cir. 1977) ...........................................................................................27

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
    45 F.4th 846 (5th Cir. 2022) ......................................................................................8, 37

*Davis v. United States*,
    282 F.2d 623 (10th Cir. 1960) .......................................................................................27

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020)..............................................................................................................6

*Eli Lilly & Co. v. United States*,
    372 F.2d 990 (Ct. Cl. 1967) ...........................................................................................29

*Flood v. Kuhn*,
    407 U.S. 258 (1972)........................................................................................................28

*Ford Motor Co. v. Tex. Dep't of Transp.*,
    264 F.3d 493 (5th Cir. 2001) ...........................................................................................7

*Frank v. Int'l Canadian Corp.*,
    308 F.2d 520 (9th Cir. 1962) .........................................................................................22

*Horsehead Resource Dev. Co. v. Browner*,
    16 F.3d 1246 (D.C. Cir. 1994).......................................................................................40

*INS v. Cardoza–Fonseca*,
    480 U.S. 421 (1987)........................................................................................................29

*Judulang v. Holder*,
    565 U.S. 42 (2011)............................................................................................................8

*Koppers Co. v. Commissioner*,
  2 T.C. 152 (1943) ..................................................................................................26

*Krim v. BancTexas Grp., Inc.*,
  989 F.2d 1435 (5th Cir. 1993) ................................................................................6

*Lamar, Archer & Cofrin, LLP v. Appling*,
  584 U.S. 709 (2018) ..............................................................................................28

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ........................................................................................ *passim*

*Louisiana v. U.S. Dep't of Energy*,
  90 F.4th 461 (5th Cir. 2024) ........................................................................9, 40, 41

*Louisiana Env't Action Network v. EPA*,
  382 F.3d 575 (5th Cir. 2004) ................................................................................38

*Lufkin Foundry & Mach. Co. v. Commissioner*,
  468 F.2d 805 (5th Cir. 1972) ..................................................................................1

*Lyons v. Katy Indep. Sch. Dist.*,
  964 F.3d 298 (5th Cir. 2020) ..................................................................................6

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
  60 F.4th 956 (5th Cir. 2023) ................................................................................41

*Michigan v. EPA*,
  576 U.S. 743 (2015) ........................................................................................ *passim*

*Mid–Continent Cas. Co. v. Bay Rock Operating Co.*,
  614 F.3d 105 (5th Cir. 2010) ..................................................................................7

*Mississippi Poultry Ass'n, Inc. v. Madigan*,
  31 F.3d 293 (5th Cir. 1994) ....................................................................................8

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .......................................................................................... *passim*

*Pierce v. Underwood*,
  487 U.S. 552 (1988) ..............................................................................................28

*Reid v. State Farm Mut. Auto. Ins. Co.*,
  784 F.2d 577 (5th Cir. 1986) ..................................................................................7

*Seagate Tech., Inc. v. Commissioner*,
  80 T.C.M. (CCH) 912 (2000) ...........................................................................2, 18

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943).................................................................................................4, 37

*Sorensen Communications v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014)........................................................................................40

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ...........................................................................................9

*Tenn.-Ark. Gravel Co. v. Commissioner*,
    B.T.A.M. (P-H) ¶ 38,240 (1938), *rev'd on other grounds*, 112 F.2d 508 (6th
    Cir. 1940) .......................................................................................................................26

*Texaco v. Commissioner*,
    98 F.3d 825 (5th Cir. 1996) ...........................................................................................27

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) ..........................................................................................37

*Texas Oil & Gas Ass'n v. EPA*,
    161 F.3d 923 (5th Cir. 1998) .........................................................................................40

*Thompson v. Goetzman*,
    337 F.3d 489 (5th Cir. 2003) ...........................................................................................8

*United States v. Larionoff*,
    431 U.S. 864 (1977).......................................................................................................34

*Watt v. Alaska*,
    451 U.S. 259 (1981).......................................................................................................29

*Wilson v. United States*,
    530 F.2d 772 (8th Cir. 1976) .........................................................................................27

*Xilinx, Inc. v. Commissioner*,
    125 T.C. 37 (2005).............................................................................................. *passim*

*Xilinx, Inc. v. Commissioner*,
    598 F.3d 1191 (9th Cir. 2010), *aff'g* 125 T.C. 37 (2005) ....................................2, 19

**Statutes**

Administrative Procedure Act (5 U.S.C.):
    § 706(2)(A) .....................................................................................................................7
    § 706(2)(C).......................................................................................................................7

Internal Revenue Code (26 U.S.C.):
  § 482 ........................................................................................................................35
  § 482 (2012)........................................................................................................10, 12
  § 6532(a)................................................................................................................42
  § 7421(a)................................................................................................................43

Internal Revenue Code of 1954,
  68A Stat. 162 .........................................................................................................26

Judiciary and Judicial Procedure (28 U.S.C.)
  § 2201.....................................................................................................................43
  § 2401.........................................................................................................42, 43, 44
  § 2501.....................................................................................................................43

Revenue Act of 1928, Section 45
  ch. 852, 45 Stat. 791, 806......................................................................................10

## Regulations

Treas Reg. (26 C.F.R.)
  § 1.482....................................................................................................................30
  § 1.482–1(b)...........................................................................................................13
  § 1.482–1(b)(1) .....................................................................................2, 11, 19, 29
  § 1.482–1(b)(1) (1968)...........................................................................................27
  § 1.482–1(b)(1) (2012)...........................................................................................27
  § 1.482–1(c)(2) ......................................................................................................30
  § 1.482–1(d)(1) ......................................................................................................30
  § 1.482–2(d)(4) (1968)...........................................................................................11
  § 1.482–4(f)(2)(i) (1994) .......................................................................................14
  § 1.482–7................................................................................................................15
  § 1.482–7(a)(3) (2003)...........................................................................................20
  § 1.482–7(c) ...........................................................................................................35
  § 1.482–7(d)(2) (2003)...........................................................................................15
  § 1.482–7(d)(2)(i) (2003).......................................................................................19

Treas. Reg. 74, art. 45 (1929) ......................................................................................10

Treas. Reg. 77, art. 45 (1933) ......................................................................................10

Treas. Reg. 86 (1935):
  art. 45–1 ................................................................................................................10
  art. 45–1(b).......................................................................................................2, 10

## Other Authorities

Ackerman et al., *The IRS's FSA on Compensatory Stock Options: Straying from
  the Arm's Length Standard, Cost Sharing Rules*, 8 Tax Mgmt. Transfer
  Pricing Rep. 935 (2000)........................................................................................17

Brief for the Appellant (the IRS), *Altera Corp. v. Commissioner*,
926 F.3d 1061 (9th Cir. 2019) (Nos. 16–70496, 16–70497), 2016 WL
3537355.............................................................................................28, 36

Brief for the Appellant (the IRS), *Xilinx, Inc. v. Commissioner*,
598 F.3d 1191 (9th Cir. 2010) (Nos. 06–74246, 06–74269), 2007 WL 708301 .....................39

Brief for the Appellee (Altera), *Altera Corp. v. Commissioner*,
926 F.3d 1061 (9th Cir. 2019) (Nos. 16–70496, 16–70497), 2016 WL
4751419...................................................................................................33

Brief for Amici Curiae Cisco Systems, Inc. et al. Supporting Petitioner (Altera),
*Altera Corp. v. Commissioner*,
No. 19–1009 (U.S. Mar. 12, 2020), 2020 WL 1659335 .........................................22

Brief for Former Foreign Tax Officials as Amici Curiae Supporting Petitioner
(Altera), *Altera Corp. v. Commissioner*,
No. 19–1009 (U.S. Mar. 13, 2020), 2020 WL 1289824 .........................................22

Charles W. Calomiris, *Expensing Employee Stock Options* (American Enterprise
Institute, Working Paper No. 114, 2005)...................................................16

Christine A. Botosan & Marlene A. Plumlee*, Stock Option Expense: The Sword of
Damocles Revealed*, 15 Accounting Horizons 311 (2001).........................................16

Compensatory Stock Options Under Section 482, 67 Fed. Reg. 48,997 (July 29,
2002) .......................................................................................19

FASB, *Statement of Financial Accounting Standards No. 123: Accounting for
Stock–Based Compensation* (Oct. 1995) (revised 2004) .........................................16

Fed. R. Civ. P. 56(a) .......................................................................5

H.R. Rep. No. 83–1337 (1954)...............................................................26

H.R. Rep. No. 99–426 (1985)..............................................................12, 13

H.R. Rep. No. 99–841 (1986)...............................................................13

I.R.S. Chief Couns. Adv. 201044006 (Nov. 5, 2010), 2010 WL 4384169 ..................................43

I.R.S. Field Serv. Adv. 200003010 (Oct. 18, 1999), 2000 WL 46753 .........................................16

I.R.S. Field Serv. Adv. 3267 (Aug. 1, 1997), 1997 WL 33314828 ...............................................16

I.R.S. Gen. Leg. Adv. Mem. AM–2025–001 (Jan. 15, 2025), 2025 WL 307351 ...................14, 34

I.R.S. Gen. Leg. Adv. Mem. AM–2007–007 (Mar. 23, 2007), 2007 WL 923092 .................13, 14

I.R.S. Informal Field Serv. Adv. 1993–4549 (June 9, 1993), 95 TNT 17–38 ...............................16

I.R.S. Int. Rev. Man. 34.5.2.2(5) (Dec. 21, 2012) .....................................................................43

I.R.S. Notice 88–123, 1988–2 C.B. 458 ................................................................... *passim*

I.R.S. Notice CC–2012–012 (June 1, 2012), 2012 WL 2029785 ...................................43

James V. Delong, *The Stock Options Controversy and the New Economy*,
   COMPETITIVE ENTERPRISE INSTITUTE (June 2002) ...................................................15

Marc M. Levey & William Garofalo, *IRS Takes a Hard Line on Cost-Sharing
   Agreements*, 11 J. of Int'l Tax'n 6 (2000).................................................................17

Patricia Gimbel Lewis & Neal M. Kochman, *Option Wars: Upping the Ante for
   Cost Sharing Arrangements*, 31 Tax Mgmt. Int'l J. 547 (2002)................................17

Patricia Gimbel Lewis & Neal M. Kochman, *The Final Word on Stock Options in
   Cost Sharing Arrangements*, 32 Tax Mgmt. Int'l J. 651 (2003)...............................17

Petition for a Writ of Certiorari, *Altera Corp. v. Commissioner*,
   141 S.Ct. 131 (Mem.) (2020) (No. 19–1009), 2020 WL 749131 .............................3

Rev. Rul. 56–381, 1956–2 C.B. 953 ........................................................................43

Settlement Stipulation, *Seagate Tech., Inc. v. Commissioner*,
   T.C. No. 15086–98 (Aug. 2, 2001) ..........................................................................18

Stipulation of Facts, *Altera Corp. v. Commissioner*,
   Nos. 6253–12, 9963–12 (T.C. May 22, 2013), 2013 WL 5890761..................................31, 39

T.D. 6952, 1968–1 C.B. 218....................................................................................11

T.D. 8632, 1996–1 C.B. 85......................................................................................18

T.D. 9088, 2003–2 C.B. 841-43.................................................................... *passim*

## I.    Preliminary Statement

This case challenges a transfer pricing regulation (the "SBC rule")[1] issued by the Treasury Department ("Treasury")[2] and the IRS in 2003 under section 482 of the Internal Revenue Code.[3]  This regulation has been the subject of immense controversy because it requires related parties engaged in cost sharing arrangements ("CSAs") to share stock-based compensation ("SBC") expense despite no evidence that unrelated parties – or parties "at arm's length" – would ever do so.  Because the regulation here plainly violates the arm's-length standard, which has been the interpretive cornerstone of section 482 for nearly a century, the SBC rule is invalid.

Section 482 of the Code governs transfer pricing, or the pricing of transactions between related parties.  Since the enactment of the predecessor to section 482 in 1928, courts and the IRS have interpreted section 482 to require application of the arm's-length standard.  *See*, *e.g.*, *Commissioner v. First Sec. Bank of Utah*, 405 U.S. 394 (1972), *aff'g* 436 F.2d 1192, 1198 (10th Cir. 1971) ("The test for allocations under § 482 is arm's length dealing with an uncontrolled taxpayer."); *Lufkin Foundry & Mach. Co. v. Commissioner*, 468 F.2d 805, 807 n.2 (5th Cir. 1972) ("[T]he technique used [to arrive at the true net income of a controlled taxpayer] is the application of the standard of an uncontrolled taxpayer dealing at arm's length with another

---

[1] As discussed below and as identified specifically in the Complaint, ECF 1, at ¶ 1 n.5 (App. Ex. 8), Treasury issued several substantially similar iterations of the SBC rule during the tax years at issue in this case.  We refer to these iterations collectively as the "SBC rule."

[2] Both Treasury and the IRS, an agency of Treasury, are involved in preparing and issuing Treasury Regulations.  For ease of discussion, we generally refer to "Treasury" when discussing the preparation and issuance of Treasury Regulations, and to the "IRS" when discussing tax enforcement actions.

[3] Unless otherwise noted, all "section" or "Code" references are to the Internal Revenue Code of 1986, as amended (the "Code"), Title 26 U.S.C., and all "Treasury Regulation" or "Treas. Reg." references are to the Treasury Regulations, 26 C.F.R., in effect at all relevant times.

1

uncontrolled taxpayer."); *Advance Cloak Co. v. Commissioner*, B.T.A.M. (P–H) ¶ 33,078 (1933) (the purpose of section 482's original predecessor "is to place transactions between related trades or businesses owned or controlled by the same interests upon the same basis as if such businesses were dealing at arm's length with each other"); Treas. Reg. 86, art. 45–1(b) (1935); Treas. Reg. § 1.482–1(b)(1) ("[t]he standard to be applied *in every case* is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.") (emphasis added).  The arm's-length standard is the cornerstone of the entire U.S. transfer pricing regime.

The SBC rule deviates from the arm's-length standard and is one of the clearest examples of agency overreach in the tax law.  Taxpayers have repeatedly challenged the IRS's authority to mandate the sharing of SBC.  In *Seagate Tech., Inc. v. Commissioner*, 80 T.C.M. (CCH) 912, 914 (2000), the IRS admitted in the Tax Court that it did not have "evidence or knowledge of an actual arm's length transaction where stock option costs were shared," and therefore it conceded, under then-applicable regulations, that the taxpayer was not required to share SBC.  And in *Xilinx, Inc. v. Commissioner*, 598 F.3d 1191 (9th Cir. 2010), *aff'g* 125 T.C. 37 (2005), the Ninth Circuit held, after extensive fact-finding and expert testimony in the Tax Court, that the IRS could not require controlled parties to share SBC under the arm's-length standard.  After the IRS attempted to evade this judicial oversight by adopting the SBC rule at issue in this case, the Tax Court in *Altera Corp. v. Commissioner*, 145 T.C. 91 (2015), unanimously held – in a 15–0 decision of the full court – that the SBC rule was invalid.

On appeal in *Altera*, a divided Ninth Circuit panel reversed the unanimous Tax Court only by giving undue deference to the IRS's regulatory maneuver under "step two" of *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  *See Altera Corp. v. Commissioner*, 926 F.3d 1061, 1087 (9th Cir. 2019) ("Treasury's understanding of its power to

2

use methodologies other than a pure transactional comparability analysis was reasonable, and we defer to its interpretation under *Chevron*.").  The Ninth Circuit's decision was wrong under *Chevron* – it mischaracterized the arm's-length standard as optional, relied on Ninth Circuit precedent that had long been abandoned by the time of the *Altera* case, and accepted the IRS's revisionist litigating positions rather than reviewing the meager justifications actually offered by Treasury at the time the SBC rule was issued.  The Ninth Circuit strained to reach a government-favorable result and relied on the shortcut of *Chevron* step two to do so.  *See* Petition for a Writ of Certiorari at 19, *Altera Corp. v. Commissioner*, 141 S.Ct. 131 (Mem.) (2020) (No. 19–1009), 2020 WL 749131, at *19 ("The Ninth Circuit's decision expands *Chevron* beyond its breaking point."); *Altera Corp. v. Commissioner*, 941 F.3d 1200, 1209 (Mem.) (9th Cir. 2019) (Smith, J., dissenting) ("Treasury's interpretation is not entitled to deference, and it conflicts with the plain language of the statute.").

The Supreme Court's recent decision in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), forecloses that shortcut.  Courts must now exercise independent judgment and determine the *best* reading of section 482 using the ordinary tools of statutory interpretation.  Under *Loper Bright*, this is a straightforward case.  Treasury may not call a non-arm's-length result "arm's length" by regulatory fiat.  Section 482 authorizes allocations only when necessary to clearly reflect income or to prevent tax evasion, and Treasury's own regulations state that the standard to be applied in *every case* is the result that would be obtained between parties dealing at arm's length.  The SBC rule not only fails to apply that standard, it overrides it.  Therefore, the SBC rule is invalid and cannot be applied to require McKesson to share the costs of SBC that parties at arm's length would not share.

The SBC rule also fails the "reasoned decisionmaking" standard of administrative law. *See Loper Bright*, 603 U.S. at 395 (citing *Michigan v. EPA*, 576 U.S. 743 (2015); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)). Treasury and the IRS have never shown that parties at arm's length would share SBC, and they had no such evidence at the time the SBC rule was first issued in 2003. And when commenters provided evidence that uncontrolled parties do not share SBC costs, Treasury simply insisted that it continued to believe otherwise. That is not reasoned decisionmaking. Treasury has never offered a compelling reason why, despite the total lack of evidence that parties at arm's length would share these costs, related parties should nonetheless be required to do so. And Treasury should not be permitted to walk away from the arm's-length standard – which under its own regulations must apply "in every case" – to justify this rule, nor should it be permitted to retroactively redefine the meaning of this term. Treasury cannot replace evidence with insistence nor salvage a flawed regulation by relying on theories it did not invoke when it promulgated the regulation. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). For these reasons as well, the SBC rule must be set aside as a matter of law.

This court would not be the first to strike down, under *Loper Bright*, a section 482 regulation that produced results inconsistent with the statutory language – and that purported to override prior court decisions. The Eighth Circuit's recent decision in *3M Co. v. Commissioner*, 154 F.4th 574 (8th Cir. 2025), *rev'g* 160 T.C. 50 (2023), resolved another long-running transfer pricing dispute over Treasury's rulemaking authority, holding that the IRS could not tax U.S. persons under section 482 on "blocked income" that such persons were legally prevented from receiving. The court found that the "best reading" of section 482 was informed by the Supreme

4

Court's *First Security* decision, 405 U.S. 394, and that Treasury's blocked income regulation produced results that did not clearly reflect the taxpayer's income. Stating that "[s]tatutes trump regulations," the court applied *Loper Bright* to reverse a Tax Court decision in which a seven-judge plurality had strained to defer to Treasury's regulation under *Chevron*. *3M* provides the precise framework to decide the instant case: courts (including the Supreme Court in *First Security*) have for nearly a century interpreted section 482 as requiring application of the arm's-length standard. By requiring parties to share SBC costs that parties at arm's length do not share, the SBC rule produces results that do not clearly reflect income, as mandated by the plain language of section 482, and therefore the regulation is invalid.

The SBC rule and its predecessors have been subject to near-unanimous taxpayer opposition since at least the 1990s. Far from policing tax abuse, the SBC rule requires related parties to do something that unrelated parties would never do. Not surprisingly, taxpayers have won in court three times on this issue – twice in the Tax Court, once in the Ninth Circuit – with only the Ninth Circuit's aberrational *Altera* decision keeping the rule alive. Only the IRS and a handful of academic commentators continue to believe that the SBC rule is a valid exercise of Treasury's rulemaking authority. Treasury and the IRS still cannot show that anyone would share SBC at arm's length, yet maintain that the SBC rule is consistent with the arm's-length standard. It's time to finally let the invalid rule go, for good. *Loper Bright* requires that result.

## II.    Legal Standards

### A.    Summary Judgment

This Court may grant summary judgment on a claim if the record shows that there is no genuine issue of material fact and that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party on the issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id*. at 247–48.

On a motion for summary judgment in an Administrative Procedure Act ("APA") case, "summary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Americans for Beneficiary Choice v. U.S. Dep't of Health & Hum. Servs.*, 795 F. Supp. 3d 895, 901 (N.D. Tex. 2025) (internal quotation omitted). This review is "limited to 'the grounds that the agency invoked when it took the action.'" *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (internal citation omitted).

Where "the movant bears the burden of proof at trial, the movant 'must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor.'" *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020). If the movant successfully carries this burden at the summary judgment stage, the burden then shifts to the nonmovant to show that the court should not grant summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The nonmovant must set forth specific facts that show a genuine issue for trial; only a genuine dispute over a material fact will preclude summary judgment. *Anderson*, 477 U.S. at 248. The nonmovant cannot rely on conclusory allegations, improbable inferences, or unsupported speculation. *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993). Rather, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. In ruling on a summary judgment motion, a court must review the facts and draw all reasonable

6

inferences in favor of the nonmoving party. *See Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

When the parties cross-move for summary judgment, the court must review "each . . . motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Mid–Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110 (5th Cir. 2010) (quoting *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001)).

In the instant case, there are no genuine issues of material fact and the parties have agreed to file cross-motions for summary judgment for this Court to decide the sole issue of whether Defendant is entitled, pursuant to the SBC rule, to include SBC in McKesson's cost pools for the tax years at issue.

B.      Review of Agency Decisions

Courts review agency actions under the APA, which directs courts to "hold unlawful and set aside" agency actions that are, as relevant here, "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(C), (A).

1.      *In Excess of Statutory Authority*

The Supreme Court's recent decision in *Loper Bright* significantly changed how courts review agency interpretations of statutes. Previously, *Chevron* required courts to defer to an administrative agency's interpretation of a "silent or ambiguous" statute if it was "based on a permissible construction of the statute," even if the courts disagreed with it. 467 U.S. at 843 and n.11 (instructing that a court must defer to a reasonable administrative construction of an ambiguous statute even if it was not "the reading the court would have reached").

7

No more.  Under *Loper Bright*, a court may not defer to an administrative agency's interpretation of an ambiguous statute.  603 U.S. at 400–01, 412–13.  Instead, a court must "use every tool at [its] disposal to determine the best reading of the statute[.]"  *Id.* at 400.  If an interpretation "is not the best, it is not permissible."  *Id.*

*Loper Bright* recommitted courts to exercising their independent judgment to discern the best meaning of a statute, regardless of how an administrative agency might have construed or applied it.  Courts must employ all tools at their disposal, including canons of statutory construction, to determine the best meaning of a statute.  *See id.*; *Thompson v. Goetzman*, 337 F.3d 489, 502 n.44 (5th Cir. 2003) ("[T]he meaning of a statute is ascertained by 'employing traditional tools of statutory construction,'" including the canons of statutory construction) (internal quotation omitted); *Mississippi Poultry Ass'n, Inc. v. Madigan*, 31 F.3d 293, 307 (5th Cir. 1994) (same).

> 2.      *Arbitrary and Capricious*

Arbitrary and capricious review functions to "ensur[e] that agencies have engaged in reasoned decisionmaking."  *Judulang v. Holder*, 565 U.S. 42, 53 (2011).  Review under the arbitrary and capricious standard is "'not toothless,' but rather has 'serious bite.'"  *Abbott v. Biden*, 70 F.4th 817, 826 (5th Cir. 2023) (quoting *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 856 (5th Cir. 2022)).

In reviewing whether an agency action is arbitrary and capricious, the court evaluates whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43 (internal quotation omitted).  Agency action is considered arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its

8

decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*; s*ee also Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013–14 (5th Cir. 2019) (similar).  If the administrative record does not contain a reasoned analysis, the court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (internal citation omitted).  "Bare acknowledgement" of concerns "is no substitute for reasoned consideration." *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024).

Under *Loper Bright*, "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency" a court must "recogniz[e] constitutional delegations, fix the boundaries of the delegated authority, and ensur[e] the agency has engaged in reasoned decisionmaking within those boundaries."  603 U.S. at 395 (citing, e.g., *Michigan*, 576 U.S., and *State Farm,* 463 U.S., as supplying the "reasoned decisionmaking" standard) (internal quotations omitted).  While a court may still consider an agency's interpretation of a statute as potentially persuasive guidance in determining what the statute means, it is the court – and not the agency – that has expertise in parsing statutory language and must make the final call.  *See id.* at 401–02.

**III.    Background**

> A.        Statutory Language and Early Interpretations Thereof

At the center of this case is the interpretation of section 482, which, during the years at issue, provided:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or

> clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

26 U.S.C. § 482 (2012).

Section 482 was first enacted as section 45 of the Revenue Act of 1928.  Ch. 852, 45 Stat. 791, 806.  It then consisted of a single sentence, which was substantially the same as the first sentence in the above quotation.  Although this section was eventually redesignated as section 482 of the Code, for almost sixty years, it remained essentially unchanged in substance.  *See* Complaint, ECF 1, at ¶¶ 16–18.

From among the earliest judicial interpretations of section 45, and even before the issuance of any Treasury regulations implementing that section, courts recognized that the statutory language required reference to the arm's-length standard.  *See* Complaint, ECF 1, at ¶ 14.  Thereafter, courts, including the Supreme Court and the Fifth Circuit, have continuously interpreted section 482 as requiring reference to the arm's-length standard.  *See id.* at ¶ 19.

B.    Treasury Regulations

In 1935, Treasury first promulgated regulations under section 45 of the Revenue Act of 1928 (the "1935 Regulations").[4]  Treas. Reg. 86, art. 45–1 (1935).  Those regulations explicitly adopted the arm's-length standard.  Treas. Reg. 86, art. 45–1(b) (1935) ("The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.").

---

[4] Regulations initially issued under section 45 merely repeated the statute verbatim.  *See, e.g.*, Treas. Reg. 74, art. 45 (1929); Treas. Reg. 77, art. 45 (1933).

10

The 1935 Regulations remained in effect, with only minor changes not relevant to the matter at issue, through the codification process of the 1954 Internal Revenue Code and until the 1960s. In 1966, Treasury proposed new regulations under section 482, which were finalized in 1968 (the "1968 Regulations"). T.D. 6952, 1968–1 C.B. 218. Those regulations made no change to the 1935 Regulations' directive that the arm's-length standard "be applied in every case." The 1968 Regulations addressed for the first time CSAs in the context of section 482. Consistent with the arm's-length standard, they prohibited the IRS from making allocations with respect to a CSA "except as may be appropriate to reflect each participant's arm's length share of the cost and risks of developing the property." *Id.* at 234 (codified at Treas. Reg. § 1.482–2(d)(4) (1968)). The 1968 Regulations further provided that, "[i]n order for the sharing of costs and risks to be considered on an arm's length basis, the terms and conditions [of a CSA] must be comparable to those which would have been adopted by unrelated parties similarly situated had they entered into such an arrangement." *Id.*

The arm's-length standard still governs the IRS's allocations under section 482. The arm's-length standard is now, and was during the years at issue, codified at Treasury regulation section 1.482–1(b)(1):

> In determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result). However, because identical transactions can rarely be located, whether a transaction produces an arm's length result generally will be determined by reference to the results of comparable transactions under comparable circumstances.

11

C.    Introduction of CWI in 1986

In 1986, Congress added a second sentence to section 482, which is often referred to as the "commensurate with income" or "CWI" standard, to address the valuation of intangible transfers. During the years at issue, this second sentence provided: "In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." 26 U.S.C. § 482 (2012).[5]

In enacting the CWI standard, Congress retained unaltered the first sentence of section 482 and did not indicate an intent to depart from the arm's-length standard. CWI was intended to address a narrow concern: the pricing of related-party transfers of "high-profit potential intangibles" using industry-standard "safe harbor" financial metrics where limited comparable transactions were available. *See* H.R. Rep. No. 99–426, at 423–24 (1985). Congress perceived that parties might transfer a potentially valuable intangible to an affiliate and rely on, for example, an industry-standard royalty rate for a purported "arm's length" royalty to be charged by the transferor, despite the transferred intangible having more than standard profit potential. *See id*. Congress was concerned that, due to information asymmetry between taxpayers and the IRS, the IRS must be permitted to look at subsequent (or "ex-post") performance to determine the accuracy of the taxpayer's initial pricing. Congress thus enacted CWI to better inform what the arm's-length price might have been at the time of the transfer – not to redefine the meaning

---

[5] While we discuss the history of the CWI standard given its invocation in the *Altera* litigation and internal IRS guidance, the CWI standard by its terms does not apply to intangible development costs, or IDCs, to be shared under a CSA, and therefore cannot justify the SBC rule. *See* discussion at V.A.2.a), *infra*.

of "arm's length."  *See* I.R.S. Gen. Leg. Adv. Mem. AM–2007–007 (Mar. 23, 2007), 2007 WL

923092 ("AM 2007-007"), discussed *infra*.

By adding CWI, Congress "intend[ed] to make it clear that industry norms or other

unrelated party transactions do not provide a safe-harbor minimum payment for related party

intangibles transfers."  H.R. Rep. No. 99–426, at 425.  Congress's purpose in enacting CWI was

thus a narrow one:  in the limited context of "transfers or licenses" of intangibles, the IRS was

permitted to reference the income of the transferred/licensed intangibles in determining whether

the associated transfer price "clearly reflected income," and thus complied with the arm's-length

standard.  *See* AM 2007–007 (stating that the CWI standard should inform "profits attributable to

the intangible the taxpayer would reasonably and conscientiously have projected at the time it

entered into the controlled transaction"); *see also* Treas. Reg. § 1.482–1(b) (noting that, to

clearly reflect income, the arm's-length standard must be applied "in every case").

Congress acknowledged, however, that "many important and difficult issues under

section 482 are left unresolved" following the enactment of CWI, and it requested therefore that

Treasury undertake a comprehensive study of transfer pricing.  H.R. Rep. No. 99–841, at II–638

(1986).  The resulting study concluded that "Congress intended the commensurate with income

standard to be consistent with the arm's length standard," and committed that the standard "will

be so interpreted and applied by the Internal Revenue Service and the Treasury Department."

I.R.S. Notice 88–123, "A Study of Intercompany Pricing under Section 482 of the Code," 1988–

2 C.B. 458 (the "Treasury White Paper").  Treasury explained that the purpose of CWI is, in the

absence of appropriate comparables, "to ensure that each party [to a related-party transaction]

earns the income or return from the intangible that an unrelated party would earn in an arm's

length transfer of the intangible."  *Id.*  Thus, while CWI provided a separate basis for the IRS to

13

determine an arm's-length price, it did not eliminate the requirement that the eventual result must

reflect a result that would be reached by parties dealing at arm's length. *Id.*

The IRS has repeatedly acknowledged this view in subsequent guidance. In AM 2007–

007, for example, the IRS explained its interpretation of CWI as follows:

> Certain passages in the Committee Reports arguably might be construed as an invitation to the Treasury and IRS to interpret the CWI standard in a manner that would depart from the arm's length standard. However, in the authoritative study undertaken pursuant to the Conference Report – the [Treasury White Paper] – the expert agencies reaffirmed the primacy of the arm's length standard for transfer pricing. The final regulations adopted in 1994 mandate that the IRS must apply CWI periodic adjustments consistently with the arm's length standard.

*Id.*; *see also* Treas. Reg. § 1.482–4(f)(2)(i) (1994) (mandating that adjustments made under the

CWI standard "shall be consistent with the arm's length standard and the provisions of § 1.482–

1."); *but see* I.R.S. Gen. Leg. Adv. Mem. AM–2025–001 (Jan. 15, 2025), 2025 WL 307351.[6]

    D.        Background on the SBC Rule

        1.       *Background on the Issue*

---

[6] In I.R.S. Gen. Leg. Adv. Mem. AM–2025–001 (Jan. 15, 2025), 2025 WL 307351, the IRS purported to "clarif[y] and update" aspects of AM 2007–007. That guidance acknowledges that the purpose of section 482 is to "place controlled taxpayers on parity with uncontrolled taxpayers" and that the CWI standard "achieves a result consistent with the general [arm's-length standard]." However, the guidance appears to adopt, for the first time in published guidance, some of the arguments made by the IRS in the *Altera* litigation. *See, e.g., id.* at 7 ("Courts have recognized the IRS's authority is broader than adjusting prices for consistency with the result of arm's length bargaining in transactions between uncontrolled parties . . . ." (citing *Altera*, 926 F.3d). It is not clear whether the IRS will continue to assert the view that CWI trumps the arm's-length standard when convenient for the IRS, notwithstanding the conflict with its own regulations, the weight of longstanding authorities, and the settled expectations views of taxpayers. These justifications, however, cannot support the SBC rule, as Treasury did not rely on these novel arguments in issuing the SBC rule in 2003. *See* discussion at V.A.2.b), *infra*.

14

This case relates to the costs that must be shared among parties to a "qualified" CSA (a "QCSA")[7] governed by Treasury regulation section 1.482–7. As relevant here, CSAs are agreements under which parties agree to share the costs and risks of the development of one or more intangible assets in proportion to the expected benefits that each party will receive from the future exploitation of those assets.

This case concerns whether, in the context of CSAs, parties must share SBC. To align the incentives of employees with their employers, many companies offer SBC to their employees (a term the regulation defines broadly, to include any compensation in the form of stock, stock options, or other forms of equity, *see* Treas. Reg. § 1.482–7(d)(2) (2003)). This objective is achieved by offering selected employees a proprietary interest in the company and a stake in its future growth through stock options and other forms of employee equity ownership. SBC thus provides recipients with both an incentive and a reward for enhancing the company's market value.

SBC is unlike other compensation paid to employees and other costs borne by corporations. Indeed, for many years prior to the issuance of the SBC rule, academics and policymakers debated whether SBC must be treated as an expense for accounting purposes at all. *See*, *e.g.*, James V. Delong, *The Stock Options Controversy and the New Economy*, COMPETITIVE ENTERPRISE INSTITUTE (June 2002) (collecting authorities). Unlike other forms of compensation, granting SBC does not require the direct outlay of cash or other assets by a company, but merely shifts ownership of the company from pre-existing shareholders to new ones. Charles W.

---

[7] For ease of discussion, we use the term "CSA" in a general, non-technical sense to describe arrangements for sharing development costs among related parties. In discussing the requirements and operation of Treasury regulation section 1.482–7, however, we use the term "QCSA" to refer to that term as defined in the regulation.

15

Calomiris, *Expensing Employee Stock Options* (American Enterprise Institute, Working Paper No. 114, 2005).  And its incentivizing effects for recipient employees may actually increase a company's value, at least in some cases, by encouraging talented employees to stay at the company and increase share value.  *See id.*  Commentators therefore hotly contested the Financial Accounting Standards Board ("FASB")'s Statement No. 123, first recommending (in 1995), and then requiring (in 2004), that expenses associated with SBC be included in the reported earnings of companies.  FASB, *Statement of Financial Accounting Standards No. 123: Accounting for Stock–Based Compensation* (Oct. 1995) (revised 2004); Christine A. Botosan & Marlene A. Plumlee*, Stock Option Expense: The Sword of Damocles Revealed*, 15 Accounting Horizons 311 (2001) (stating that FASB Statement No. 123 "is one of the most controversial accounting standards ever issued by the [FASB]").

Beginning in the 1990s, as commentators debated whether SBC was an expense at all, the IRS increasingly asserted that controlled taxpayers engaged in a CSA were required to share SBC to achieve an arm's-length result under the 1968 Regulations.  *See, e.g.*, I.R.S. Field Serv. Adv. 200003010 (Oct. 18, 1999), 2000 WL 46753 (requiring CSA participants to share stock option costs based on either grant date value or exercise date value); I.R.S. Field Serv. Adv. 3267 (Aug. 1, 1997), 1997 WL 33314828 (requiring CSA participants to share stock option costs based on grant date value); I.R.S. Informal Field Serv. Adv. 1993–4549 (June 9, 1993), 95 TNT 17–38 (requiring the sharing of stock option costs under a CSA).  The IRS stated that compensation for researchers is "no less a cost when incurred in the form of . . . stock options, than when incurred in cash," and speculated that parties at arm's length would be unwilling to enter CSA-type arrangements in which such costs were not shared.  *See* I.R.S. Field Serv. Adv. 200003010, 2000 WL 46753.

Contemporary commentators, however, recognized a defect in the IRS's approach:  it was based on Treasury's unsupported "perception of arm's-length behavior," rather than evidence of how unrelated parties would behave at arm's length.  *See*, *e.g.*, Patricia Gimbel Lewis & Neal M. Kochman, *The Final Word on Stock Options in Cost Sharing Arrangements*, 32 Tax Mgmt. Int'l J. 651, 654 (2003) ("The absence of empirical evidence supporting the inclusion of stock option costs in arm's length CSAs remains problematic" and "strain[s] the arm's length standard."). Commentators pointed to at least four reasons why parties at arm's length would generally *not* share SBC, contrary to Treasury's unfounded perception that they would.  First, building on the views of academic commentators, they argued that SBC is not truly a "cost" for which parties would seek or grant reimbursement.  Second, they noted the weak connection between the value of SBC and the services of research employees, since the value of SBC depends on the stock price of the issuer, not the value of the intangible being developed.  Third, they argued that, because each party in a CSA has some control over the value of its own stock and option prices, unrelated parties might be incentivized to manipulate the value of SBC.  And fourth, they noted the difficulty in valuing SBC at the time of its grant to an employee.  *See, e.g.*, Patricia Gimbel Lewis & Neal M. Kochman, *Option Wars: Upping the Ante for Cost Sharing Arrangements*, 31 Tax Mgmt. Int'l J. 547, 555 (2002); Ackerman et al., *The IRS's FSA on Compensatory Stock Options: Straying from the Arm's Length Standard, Cost Sharing Rules*, 8 Tax Mgmt. Transfer Pricing Rep. 935 (2000); Marc M. Levey & William Garofalo, *IRS Takes a Hard Line on Cost-Sharing Agreements*, 11 J. of Int'l Tax'n 6 (2000).  Because of these concerns, commentators explained, it was not surprising that Treasury had not provided any evidence that parties at arm's length would share SBC.  *See* Lewis & Kochman*,* 31 Tax Mgmt. Int'l J. at 555.

17

In 1998, the IRS's contention that SBC must be shared under a CSA to comply with the arm's-length standard was challenged in the Tax Court.  *Seagate Tech.*, 80 T.C.M. (CCH) 912.  The IRS admitted that it did not have "evidence or knowledge of an actual arm's length transaction where stock option costs were shared."  *Id.* at 914.  In light of this admission, the IRS conceded the SBC cost-sharing issue in full.  *See* Settlement Stipulation, *Seagate Tech., Inc. v. Commissioner*, T.C. No. 15086–98 (Aug. 2, 2001).

        2.      *SBC Regulations and Case Law*

In 1995, Treasury promulgated revised regulations related to CSAs, effective for taxable years beginning on or after January 1, 1996 (the "1995 Regulations").  T.D. 8632, 1996–1 C.B. 85.  The 1995 Regulations implemented the arm's-length standard by focusing on the definition of shared "intangible development costs" ("IDCs"), but made no mention of SBC as an IDC to be shared.  *See* Complaint, ECF 1, at ¶ 23.

Even though the 1995 Regulations made no mention of SBC, the IRS continued to assert in taxpayer audits that SBC amounts should be included as IDCs under a CSA.  This was the subject of the *Xilinx* case, which concerned the taxpayer's 1997–1999 taxable years.  In *Xilinx*, the IRS did not argue that any comparable transactions existed in which unrelated parties agreed to share SBC but nonetheless maintained that its approach was consistent with the arm's-length standard.  125 T.C. at 54.

Through extensive factfinding and reliance on expert witnesses, the Tax Court in *Xilinx* found that (1) unrelated parties do not explicitly share costs attributable to SBC and (2) the IRS "did not present any credible evidence that unrelated parties implicitly share" amounts attributable to SBC.  *Id.* at 59.  As to the first point, experts for both sides, including the only expert witness proffered by the IRS, testified that parties "don't . . . explicitly [share SBC costs]

because . . . it would be hard for the parties to agree on a measurement . . . and it may . . . [leave them] open to . . . potential disputes." *Id.* at 58.  The Tax Court concluded that "rational profit-maximizing unrelated parties would not cede . . . control over costs or be willing to accept such a high degree of uncertainty relating to costs." *Id.* at 60.  As to the second point, the court labeled as "specious and unsupported" the IRS's theory that unrelated parties "negotiate terms that implicitly compensate . . . [development] costs not directly shared or reimbursed." *Id.* at 60. Accordingly, the Tax Court found that the IRS's imposition of such a cost-sharing requirement on controlled taxpayers was inconsistent with the arm's-length standard and thus was arbitrary and capricious.  *Id.* at 62.

On appeal, the Ninth Circuit affirmed the Tax Court's decision, holding that the arm's-length standard requires "controlled parties to share only those costs uncontrolled parties would share."  *Xilinx*, 598 F.3d at 1196.  The Ninth Circuit concluded that the IRS's position denied the taxpayer "tax parity with an independent taxpayer."  *Id.* at 1196.

While the *Xilinx* litigation was ongoing, Treasury embarked on a rulemaking exercise aimed squarely at converting its litigating position on SBC into regulations.  On July 29, 2002, Treasury released proposed regulations, Compensatory Stock Options Under Section 482, 67 Fed. Reg. 48,997 (July 29, 2002), followed by final regulations on August 26, 2003 (the "2003 Regulations"), T.D. 9088, 2003–2 C.B. 841, regarding the treatment of SBC in CSAs.  The 2003 Regulations expressly identified SBC as a cost that must be shared, effective for SBC granted on or after the effective date of the 2003 Regulations.  *Id.* (codified at Treas. Reg. § 1.482–7(d)(2)(i) (2003)).  The 2003 Regulations purported to coordinate the regulations for CSAs with the general arm's-length standard outlined in Treasury regulation section 1.482–1(b)(1).  Treasury explained:

19

> A qualified cost sharing arrangement produces results that are consistent with an arm's length result within the meaning of §1.482–1(b)(1) if, and only if, each controlled participant's share of the costs (as determined under paragraph (d) of this section) of intangible development under the qualified cost sharing arrangement equals its share of reasonably anticipated benefits attributable to such development (as required by paragraph (a)(2) of this section) and all other requirements of this section are satisfied.

Treas. Reg. § 1.482–7(a)(3) (2003).  SBC was included as a cost "determined under paragraph (d)," and so by regulatory fiat a CSA that requires the sharing of SBC was simply declared to be arm's length.  Subsequent revisions and amendments by Treasury to the cost-sharing regulations after the adoption of the SBC rule did not affect the substance of the rule.  Treasury offered no further discussion or reasoning, identified no additional evidence supporting the rule's consistency with the arm's-length standard, and did not request further substantive comments on the SBC rule.  *See* Complaint, ECF 1, at ¶¶ 33–39.

Treasury received many comments regarding its 2002 proposed regulations that provided evidence that unrelated parties dealing at arm's length in comparable transactions do not agree to share amounts attributable to SBC, and argued, on that basis, that the SBC rule was inconsistent with the arm's-length standard.  Among other evidence, many of the commenters informed Treasury that they knew of no transactions between unrelated parties in a CSA, service agreement, or other contract that required one party to pay or reimburse the other party for amounts attributable to SBC, and that they could find no such agreements upon multiple searches of the Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system.  *See* Complaint, ECF 1, at ¶ 30.

In response to these comments, Treasury stated in the preamble to the 2003 Regulations that "[it] and the IRS continue to believe that requiring [SBC] to be taken into account for purposes of [CSAs] is consistent with the legislative intent underlying section 482 and with the

20

arm's length standard."  T.D. 9088, 2003–2 C.B. 841, 842.  Treasury stated that the absence of evidence of any arm's-length transactions in which unrelated parties share amounts attributable to SBC did not make the SBC rule inconsistent with the arm's-length standard.  *Id.*  Treasury responded to the economic analysis provided by commenters by reiterating its belief that the SBC rule is consistent with the arm's-length standard.  *Id.*

Treasury's "belief" might be less charitably described as a "hunch."  At the time the 2003 Regulations were proposed and finalized, Treasury did not have evidence of any comparable transactions between unrelated parties in which SBC costs were shared, nor did it have any expert opinions, articles, or empirical data to support a determination that SBC would be shared between parties at arm's length.  *See* Complaint, ECF 1, at ¶¶ 28–29.  And we are not aware that Treasury has ever attempted to support such a determination with evidence, other than in the *Xilinx* litigation, where the Tax Court found that the IRS's own expert "did not present any credible evidence that unrelated parties implicitly share" amounts attributable to SBC.  *See Xilinx*, 125 T.C. at 54.

The newly promulgated SBC rule was quickly challenged in *Altera*.  145 T.C. at 133 (challenging the regulations in effect for taxable years ending in 2004 through 2007).  There, the Tax Court, in a 15–0 decision, held that the SBC rule was invalid under the APA because it "lack[ed] a basis in fact, Treasury failed to rationally connect the choice it made with the facts found, Treasury failed to respond to significant comments when it issued the final rule, and Treasury's conclusion that the final rule is consistent with the arm's-length standard [wa]s contrary to all of the evidence before it."  *Id.* at 133 (citing *State Farm*, 463 U.S. at 43).

In a divided opinion that relied on step two of the now overruled *Chevron* doctrine, the Ninth Circuit reversed the unanimous decision of the Tax Court.  *Altera*, 926 F.3d at 1067.  The

21

majority's decision was a weak endorsement of the SBC rule and an expansive application of *Chevron* deference.  The opinion relied heavily on a single case, *Frank v. Int'l Canadian Corp.*, 308 F.2d 520, 528–29 (9th Cir. 1962), to characterize the arm's-length standard as "flexible" and "fluid," despite the fact that *Frank* had not purported to apply the arm's-length standard at all, and had not been followed in later Ninth Circuit transfer pricing jurisprudence.  The majority then adopted the IRS's view that this "flexible" and "fluid" standard, as informed by the enactment of CWI, allowed Treasury to dispense with an analysis of comparability under the "arm's length standard."  *See Altera*, 926 F.3d at 1078–79.  The court permitted the IRS to make this argument – and then deferred to it under *Chevron* – even though Treasury had not relied on this newly discovered justification during the rulemaking process that resulted in the 2003 Regulations, and the IRS cited it for the first time in litigation.  *Altera*, 926 F.3d at 1087 (the majority "justifies Treasury's resort to the commensurate with income standard . . . to conclude that Treasury may jettison the arm's length standard altogether–a justification Treasury never provided and one which does not withstand careful scrutiny.") (O'Malley, J., dissenting).

The Ninth Circuit's *Altera* decision was widely criticized, particularly for the inconsistency of its holding with the arm's-length standard.  *See, e.g.,* Brief for Former Foreign Tax Officials as Amici Curiae Supporting Petitioner (Altera) at 5–6, *Altera Corp. v. Commissioner*, No. 19–1009 (U.S. Mar. 13, 2020), 2020 WL 1289824 (in supporting Altera's petition for certiorari, criticizing the Ninth Circuit for "countenanc[ing] a departure from the worldwide understanding of what the arm's-length standard means"); Brief for Amici Curiae Cisco Systems, Inc. et al. Supporting Petitioner (Altera) at 12, *Altera Corp. v. Commissioner*, No. 19–1009 (U.S. Mar. 12, 2020), 2020 WL 1659335 (arguing that the Ninth Circuit abandoned the arm's-length standard by allowing the IRS to ignore comparable transactions – the "touchstone

of the arm's-length principle" – and instead endorsing a "purely internal" approach that "greatly upsets" international transfer pricing consensus). In dissent, Judge O'Malley faulted the majority's reasoning, arguing that CWI had not permitted Treasury to "jettison the arm's length standard altogether" and that Treasury had not previously stated that it was applying a new, "purely internal" method of allocation under the arm's-length standard as a justification for the SBC rule. *See Altera*, 926 F.3d at 1087 (O'Malley, J., dissenting). Stating that the majority had "suppl[ied] a reasoned basis for the agency's action that the agency itself has not given," Judge O'Malley would have found that Treasury had not engaged in "reasoned decisionmaking" in issuing the SBC rule, and that the Ninth Circuit's prior decision in *Xilinx* mandated finding that parties at arm's length would not share SBC. *Id.* at 1087–88.

A subsequent petition for rehearing en banc was denied. *Altera*, 941 F.3d. 1200 (Mem.). Three Ninth Circuit judges wrote separately to dissent from the denial, stating that "Treasury promulgated a tax rule with no reasoned basis for its decision, pursuant to an explanation that ran contrary to the evidence before it" and "Treasury's actions in this case are the epitome of arbitrary and capricious rulemaking." *Id.* at 1202 (Smith, J., dissenting). The taxpayer's further petition for certiorari was also denied. *Altera Corp. v. Commissioner*, 141 S.Ct. 131 (Mem.) (2020).

## IV.    Procedural Background

McKesson did not share amounts related to SBC on any of its timely filed returns for the years at issue. *See* Complaint, ECF 1, at ¶¶ 47–49, 57–59; Answer, ECF 21, at ¶¶ 47–49, 57–59 (App. Ex. 9). The IRS audited McKesson's tax returns for these years. *See* Complaint, ECF 1, at ¶¶ 50, 60; Answer, ECF 21, at ¶¶ 50, 60. With respect to McKesson's FY07–FY09 and FY10– FY12 years, the IRS issued Notices of Proposed Adjustment ("NOPAs") on July 27, 2015, and

July 27, 2017, respectively, contending that McKesson should have included SBC in its cost pools for those years. *See* Complaint, ECF 1, at ¶¶ 50, 60; Answer, ECF 21, at ¶¶ 50, 60. For McKesson's FY07–FY09 tax years, McKesson paid the full amount of the tax purportedly due for these years in June 2016, then timely filed refund claims for the amounts in September 2016. *See* Complaint, ECF 1, at ¶¶ 52–54, 56; Answer, ECF 21, at ¶¶ 52–54, 56. Similarly, with respect to McKesson's FY10–FY12 years, McKesson paid the amounts purportedly due for these years in April 2018 and timely filed refund claims in May 2018. *See* Complaint, ECF 1, at ¶¶ 62–64, 66; Answer, ECF 21, at ¶¶ 62–64, 66.

McKesson's refund claims referenced the Ninth Circuit's *Xilinx* and the Tax Court's *Altera* decisions as supporting its refund claims. At the time of the claims, however, the *Altera* case was on appeal at the Ninth Circuit, and thus the IRS did not immediately deny McKesson's refund claims. The *Altera* case was finally resolved on June 22, 2020, when the Supreme Court denied a petition for certiorari filed by the taxpayer. *Altera*, 141 S.Ct. 131 (Mem.). In July 2021, the IRS, relying solely on the SBC rule, proposed to disallow McKesson's refund claims, and advised McKesson of its right to request a conference with the IRS Independent Office of Appeals ("IRS Appeals"). *See* Complaint, ECF 1, at ¶ 69; Answer, ECF 21, at ¶ 69. McKesson filed a formal protest regarding the proposed denial of its refund claims with the IRS on September 7, 2021, but the issue was not resolved by IRS Appeals. *See* Complaint, ECF 1, at ¶ 70; Answer, ECF 21, at ¶ 70. McKesson thereafter executed IRS Form 2297, Waiver of Statutory Notification of Claim Disallowance, which treated McKesson's claims as having been formally disallowed on May 8, 2023. *See* Complaint, ECF 1, at ¶ 71; Answer, ECF 21, at ¶ 71. This began the two-year period ending on May 8, 2025, during which McKesson could file suit.

24

McKesson filed this suit on May 2, 2025.  *See* Complaint, ECF 1, at ¶ 71; Answer, ECF 21, at ¶ 71.

## V.   Argument

### A.   The SBC Rule Is Contrary to Section 482

#### 1.   *Section 482 Requires Application of the Arm's-Length Standard to "Clearly Reflect the Income" of Controlled Taxpayers*

The SBC rule's substantive requirement cannot be squared with the long-recognized meaning of section 482, the statute it purports to implement.  For almost a century, section 482 has been uniformly understood to embody a simple rule: when controlled parties engage in a transaction, to "clearly reflect the income" of such controlled parties, their income and expenses should be allocated in the same way that they would have been allocated between parties dealing at arm's length.  The SBC rule requires controlled parties to a CSA to share SBC costs in every case without any showing that uncontrolled parties in a comparable situation would ever do so.  Accordingly, this Court should hold, under *Loper Bright*, that the best reading of section 482 prohibits Treasury and the IRS from requiring controlled parties to share SBC costs in violation of the arm's-length standard.

##### a)   Section 482 Has an Established Reading, Developed Over Nearly a Century, and Requires Application of the Arm's-Length Standard in "Every Case"

The arm's-length standard was first articulated by the Board of Tax Appeals, the predecessor of the U.S. Tax Court, in an opinion predating the first implementing Treasury regulations, in which it concluded that the "purpose" of section 482's original predecessor "is to place transactions between related trades or businesses owned or controlled by the same interests upon the same basis as if such businesses were dealing at arm's length with each other." *Advance Cloak*, B.T.A.M. (P–H) ¶ 33,078 (1933).  Subsequent early judicial decisions embraced

25

and affirmed this conclusion, with the Board of Tax Appeals declaring it "obvious" that section 45 was designed "to place a controlled taxpayer on a parity with an uncontrolled taxpayer for purposes of determining tax liability, . . . in order clearly to reflect petitioner's true income." *Tenn.–Ark. Gravel Co. v. Commissioner*, B.T.A.M. (P–H) ¶ 38,240 (1938), *rev'd on other grounds*, 112 F.2d 508 (6th Cir. 1940) (confirming that the principal purpose of the section "was to clearly reflect income" but reversing the Board of Tax Appeals on factual grounds); *see also Asiatic Petroleum Co. v. Commissioner*, 31 B.T.A. 1152, 1159 (1935) (reallocating income because the sale at issue "clearly was not an arm's length transaction"), *aff'd*, 79 F.2d 234 (2d Cir. 1935); *see also Koppers Co. v. Commissioner*, 2 T.C. 152, 157 (1943) (reversing the IRS's adjustments because the transaction in question reflected "what would have passed between [the taxpayer] and an uncontrolled corporation in a similar transaction").

The arm's-length standard was taken up by Treasury in its initial transfer pricing regulations, in which it explained Congress's purpose in enacting section 45 as follows:

> The purpose of section 45 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining, according to the standard of an uncontrolled taxpayer, the true net income from the property and business of a controlled taxpayer. . . . The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

Article 45–1(b), Regulations 86 (1935).

This common understanding remained unchanged after section 45 was codified and redesignated as section 482 of the Internal Revenue Code of 1954. Aug. 16, 1954, ch. 736, 68A Stat. 162; H.R. Rep. No. 83–1337, at 4304 (1954). In construing section 482, the Supreme Court stated that "[t]he purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer . . . ." *First Sec.*

26

*Bank of Utah*, 405 U.S. at 400 (citing the 1968 Regulations).  Courts of Appeals have consistently reached the same conclusion.  *See, e.g., Cont'l Equities, Inc. v. Commissioner*, 551 F.2d 74, 80 (5th Cir. 1977) (holding that the purpose of section 482 "is to place controlled taxpayers in the same position as uncontrolled taxpayers"); *Wilson v. United States*, 530 F.2d 772, 777 (8th Cir. 1976) ("In making reallocations under [section 482], the standard to be applied is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer."); *Davis v. United States*, 282 F.2d 623, 626 (10th Cir. 1960) ("The question then presented is whether the taxable net income of [the petitioners] . . . was other than it would have been had they . . . been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.") (internal quotations omitted).  And Treasury continued to interpret the statute to implement the arm's-length standard "in every case."  *See* Treas. Reg. § 1.482–1(b)(1) (1968).

This understanding of section 482 as requiring application of the arm's-length standard to "clearly reflect the income" of controlled taxpayers continued following the statute's recodification and amendment in the Internal Revenue Code of 1986.  *See Barford v. Commissioner*, 194 F.3d 782, 787 (7th Cir. 1999) ("[T]he critical test under I.R.C. § 482 is whether the transaction has the same terms that independent parties dealing at arm's length would have made."); *Texaco v. Commissioner*, 98 F.3d 825, 830 (5th Cir. 1996) (finding that "[section] 482's goal [is] achieving tax parity between controlled and uncontrolled taxpayers"); *Bausch & Lomb Inc. v. Commissioner*, 933 F.2d 1084, 1085 (2d Cir. 1991) ("Section 482 empowers the Commissioner to determine the taxable income of the commonly controlled entities as if they had conducted their affairs in the manner of unrelated entities dealing at arm's length."); *see also* Treas. Reg. § 1.482–1(b)(1) (2012).

In short, section 482 has long been understood to require application of the arm's-length standard in every case. This is not a controversial view. Judge O'Malley, dissenting in *Altera*, summarized the longstanding, uniform view of section 482 as follows: "It is undisputed that the first sentence of the statute requires an arm's length analysis; even the majority agrees with that longstanding principle." *Altera*, 926 F.3d at 1098 (O'Malley, J., dissenting). And the IRS itself, in its principal brief in *Altera* in the Ninth Circuit, stated that "[i]mplicit in [the first sentence of section 482] is the recognition that, in order to clearly reflect income, commercial transactions between commonly controlled entities should be priced as though the parties had been dealing at arm's length (*i.e.*, the arm's-length standard)." Brief for the Appellant (the IRS) at 49–50, *Altera Corp. v. Commissioner*, 926 F.3d 1061 (9th Cir. 2019) (Nos. 16–70496, 16–70497), 2016 WL 3537355, at *49–50. There can be no serious disagreement that section 482 requires application of the arm's-length standard.[8]

---

[8] Several canons of statutory construction and related doctrines – (1) the prior-construction canon; (2) the acquiescence canon; and (3) the consistency doctrine – confirm that this is the best reading of section 482.

Under the prior-construction canon, because Congress repeatedly reenacted the first sentence of section 482 in "materially" the same form after settled judicial and administrative interpretations applying the arm's-length standard, it is presumed to have adopted that established meaning. *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."); *see also Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 721–22 (2018) ("When Congress use[s] the materially same language in [a more recent enactment], it presumptively [is] aware of the longstanding judicial interpretation of the phrase and intend[s] for it to retain its established meaning.").

Under the acquiescence canon, because section 482 has been consistently interpreted for decades as incorporating the arm's-length standard and Congress has repeatedly left the statutory text in place, it is presumed to have accepted that settled construction. *See Pierce v. Underwood*, 487 U.S. 552, 567 (1988) (enactment of "a statute that had in fact been given a consistent judicial interpretation . . . generally includes the settled judicial interpretation."); *Flood v. Kuhn*, 407 U.S. 258, 283–84 (1972) ("We continue to be loath . . . to overturn those cases judicially when Congress, by its positive inaction, has allowed those decisions to stand for so long and, far (continued…)

28

    b)   The Arm's-Length Standard Has an Established Meaning and Requires a Comparison to What Unrelated Parties Would Do

The arm's-length standard requires a comparison to what would have transpired in arm's-length circumstances.  Accordingly, the SBC rule must be supported by evidence of what parties operating at arm's length would do under similar circumstances.

Courts have long recognized that applying the arm's-length standard depends on comparable analysis and other evidence of unrelated-party behavior.  *See, e.g., Barford*, 194 F.3d at 787 ("[T]he critical test under I.R.C. § 482 is whether the transaction has the same terms that independent parties dealing at arm's length would have made."); *Baldwin–Lima–Hamilton Corp. v. United States*, 435 F.2d 182, 185 (7th Cir. 1970) ("The test . . . is whether the controlled taxpayers would have realized the same income from their sales transactions if they had conducted them at arm's length."); *Eli Lilly & Co. v. United States*, 372 F.2d 990, 998 (Ct. Cl. 1967) ("Crucial to this argument, of course, is the assertion of comparability between sales to International and to the aforesaid bulk purchasers. However, those sales were not sufficiently comparable to establish an arm's-length criterion.").

Indeed, Treasury's transfer pricing regulations are largely dedicated to prescribing guidance for comparability analysis.  *See, e.g.*, Treas. Reg. § 1.482–1(b)(1) ("A controlled

---

beyond mere inference and implication, has clearly evinced a desire not to disapprove them legislatively.").

Finally, under the consistency doctrine, an agency interpretation that conflicts with its earlier view is entitled to considerably less deference than a longstanding, consistently held position. Thus, any argument by the Defendant that the arm's-length standard is not required under section 482, which would conflict with its longstanding view and the interpretive approach articulated in the preamble to the 2003 Regulations, would warrant diminished deference.  *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view.") (citing *Watt v. Alaska*, 451 U.S. 259, 273 (1981)).

29

transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances . . . ." and "whether a transaction produces an arm's length result generally will be determined by reference to the results of comparable transactions under comparable circumstances."); Treas. Reg. § 1.482–1(c)(2) (in determining the "best method" for a transfer pricing analysis, "the two primary factors to take into account are the degree of comparability between the controlled transaction (or taxpayer) and any uncontrolled comparables, and the quality of the data and assumptions used in the analysis."); Treas. Reg. § 1.482–1(d)(1) (prescribing standards for determining comparability, which "must be evaluated considering all factors that could affect prices or profits in arm's length dealings"). All of the transfer pricing methods prescribed in Treasury regulations are intended to establish arm's-length pricing, either through the use of comparable transactions or through a determination of comparable profits, and all of these methods require evidence of what unrelated parties do in comparable circumstances. *See generally* Treas. Reg. § 1.482. As a result, some form of the word "comparable" appears approximately 774 times in the section 482 regulations. *See id*. As noted in the Treasury White Paper, "[t]he arm's-length standard has always "rel[ied] in one way or another on comparables." Treasury White Paper at 468.

The same canons of statutory construction discussed above apply with equal force here. *See* note 8, *supra*. Although Congress amended section 482 to add the CWI standard, it left the first sentence untouched and did not state, expressly or by implication, that CWI was meant to modify or displace the arm's-length standard embedded in that sentence. Accordingly, Congress should be understood to have retained the arm's-length standard's established meaning; namely, a comparison to what would have transpired in arm's-length circumstances.

30

Defendant should not be permitted to argue, as it did in *Altera*, that the arm's-length standard does not require a comparability analysis at all, and may be satisfied without any evidence, analysis, or other support for what parties at arm's-length do in similar circumstances. This argument defies common sense and would break the long-recognized link between the "clear reflection of income" language in section 482 and the arm's-length standard, which requires an analysis of what parties at arm's length actually do.

        c)        Unrelated Parties Do Not Share SBC Costs, Directly or Indirectly, and Treasury Has Never Shown That They Do

                (1)        Treasury Has Never Presented or Referenced Any Evidence That Unrelated Parties Ever Share SBC

The preambles to the 2002 proposed regulations and the 2003 Regulations did not set forth any evidence that unrelated parties in a CSA would share SBC costs, and the administrative record is similarly devoid of such evidence. That absence of evidence is underscored by the IRS's stipulations in prior litigation, albeit not binding on this Court, that Treasury had no evidence showing that unrelated parties in CSAs in fact shared SBC costs. Stipulation of Facts at ¶¶ 59–61, 63–68, *Altera Corp. v. Commissioner*, Nos. 6253–12, 9963–12 (T.C. May 22, 2013), 2013 WL 5890761.

Indeed, all the evidence supplied by commenters in the administrative record points the opposite way. In response to the proposed regulations in 2002, Treasury received written comments from thirteen commenters uniformly arguing that the SBC rule was inconsistent with the arm's-length standard. Specifically, Treasury received several comments providing evidence that unrelated parties dealing at arm's length in comparable transactions did not agree to share amounts attributable to SBC. Many of the commenters informed Treasury that they and their member companies knew of no transactions between unrelated parties in a CSA, service agreement, or other contract that required one party to pay or reimburse the other party for

31

amounts attributable to SBC. *See, e.g.*, American Electronics Association Comment Letter (Oct. 28, 2002) (App. Ex. 1) ("AEA Comments"); Baker & McKenzie LLP Comment Letter on behalf of Software Finance and Tax Executives Council (Nov. 5, 2002) (App. Ex. 2) ("SOFTEC Comments"); Ernst & Young, LLP on behalf of Global Competitiveness Coalition (Oct. 28, 2002) (App. Ex. 3) ("GCC Comments"); KPMG LLP Comment Letter (Oct. 28, 2002) (App. Ex. 4) ("KPMG Comments"); PricewaterhouseCoopers LLP Comment Letter (Oct. 28, 2002) (App. Ex. 5) ("PwC Comments"). Some commenters further indicated that they could find no such agreements upon multiple searches of the Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system. *See, e.g.*, AEA Comments. Several commenters identified agreements between unrelated parties dealing at arm's length in which SBC was not shared or reimbursed, including the U.S. Government's own practices with respect to cost-reimbursement contracts with unrelated parties. *See, e.g.*, AEA Comments; KPMG Comments; PwC Comments.

Several of the commenters also identified economic- and accounting-based evidence and analysis supporting the conclusion that unrelated parties dealing at arm's length did not share amounts attributable to SBC, including: (1) model accounting procedures on cost sharing from the Council of Petroleum Accountant Societies ("COPAS"), which recommend that stock options should not be shared under joint operating agreements because they are difficult to accurately value (*see* Financial Executives International Comment Letter (Mar. 18, 2003) (App. Ex. 6)); (2) economic analyses by multiple commenters finding that unrelated parties would not agree to share or reimburse amounts attributable to SBC because its value is speculative, potentially large, and completely outside the control of the parties (*see* AEA Comments; GCC Comments; PwC Comments; SOFTEC Comments; and (3) a detailed economic analysis concluding, among other things, that there is no net economic cost to a corporation or its shareholders from the issuance of

SBC and that the decision to issue SBC does not factor into a company's pricing decisions (*see* Professor Joseph A. Grundfest Comment Letter (Oct. 30, 2002) (App. Ex. 7); SOFTEC Comments).[9]

(2)    Treasury's "Evidence" Is Merely a Hunch

The preamble to the 2003 Regulations refers to Treasury's "belief" that parties negotiating at arm's length would agree to share SBC costs.  Treasury introduced a hypothetical to illustrate this result:

> For example, assume that two parties are negotiating an arrangement similar to a QCSA in order to attempt to develop patentable pharmaceutical products, and that they anticipate that they will benefit equally from their exploitation of such patents in their respective geographic markets.  Assume further that one party is considering the commitment of several employees to perform research with respect to the arrangement.  That party would not agree to commit employees to an arrangement that is based on the sharing of costs in order to obtain the benefit of independent exploitation rights unless the other party agrees to reimburse its share of the compensation costs of the employees.

T.D. 9088, 2003–2 C.B. 841, 843.

In applying the hypothetical in the context of SBC, Treasury's sole basis for the SBC rule appears to have been a statement of mere belief: "Treasury and the IRS believe that if a significant element of that compensation consists of [SBC], the party committing employees to the arrangement generally would not agree to do so on terms that ignore the [SBC]."  *Id.*  As part of this litigation, Defendant produced the administrative record relating to the promulgation of the SBC rule.  A review of that record confirms that it contains no evidence bearing on Treasury's asserted view that unrelated parties in CSAs would share SBC costs.

---

[9] For a more detailed discussion of the written comments submitted by commenters, *see* Brief for the Appellee (Altera) at 19–23, *Altera Corp. v. Commissioner*, 926 F.3d 1061 (9th Cir. 2019) (Nos. 16–70496, 16–70497), 2016 WL 4751419 at *19–23.

33

Treasury has already attempted to prove this hunch once, in the *Xilinx* litigation, in which the Tax Court found that "unrelated parties do not explicitly share costs attributable to [SBC]" and that the IRS "did not present any credible evidence that unrelated parties implicitly share" amounts attributable to SBC.  125 T.C. at 59.  Merely stating that something is true does not, unfortunately, make it true, and in any event does not serve as the basis for the reasoned decisionmaking required of a regulator.  Treasury's unsupported belief cannot support the SBC rule.

d)      The SBC Rule Is Inconsistent with the Arm's-Length Standard, and Therefore with Section 482, and Must Be Invalidated

"For regulations, in order to be valid, must be consistent with the statute under which they are promulgated."  *United States v. Larionoff*, 431 U.S. 864, 873 (1977); *see also Loper Bright*, 603 U.S. at 412 ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority.").  Treasury's promulgation of the SBC rule despite the absence of evidence, and abundant contrary evidence, that arm's-length parties would ever share SBC costs under a CSA is contrary to section 482's well-established meaning and therefore must be invalidated.

2.      *CWI Cannot Save the SBC Rule as a Substantive Matter*

Based on Defendant's argument in *Altera*, repeated in an internal IRS guidance memorandum published last year, *see* Gen. Leg. Adv. Mem. AM–2025–001 (Jan. 15, 2025), 2025 WL 307351, Defendant might argue in this case that CWI provides necessary statutory justification for the SBC rule.  But the CWI standard neither applies in this context, nor does it override the arm's-length standard or allow a result that is the opposite of the result reached by unrelated parties.  Thus, it cannot save this regulation.

34

a)    CWI Does Not Apply

The CWI standard by its terms does not apply to IDCs to be shared under a CSA. Instead, by its express terms, CWI applies to any "transfer (or license)" of intangible property. 26 U.S.C. § 482.  The distinction is critical, because "transfers or licenses" and "cost sharing arrangements" receive different treatment under the transfer pricing rules of section 482.  While CWI may apply to the initial transfer of an intangible as part of a CSA, it cannot apply to the ongoing sharing of IDCs as part of a CSA, which is not itself a "transfer" or a "license" of the intangible itself.

An example may clarify this distinction.  Suppose parties to a CSA begin joint development of a new, as-yet-undiscovered intangible.  Both agree to share costs in exchange for the right to exploit the potential intangible that may result from their joint research activity. These costs are allocated to each party by way of shared "cost pools," and no payments are actually made between the parties.  Income from any resulting intangible is thereafter allocated to each party pursuant to the benefit share specified in the CSA.  Thus, there is no "transfer" or "license" of anything; the parties simply earn their respective shares of the intangible's income as a result of their development activity.  In contrast, suppose one of the parties to the CSA makes available a pre-existing intangible that it hopes to further develop jointly with the other CSA participant.  The contribution of such an intangible to the CSA is considered a "platform contribution" and requires the non-contributing party to pay the contributing party for its share of the intangible, either in the form of a one-time payment or an ongoing license fee.  *See* Treas. Reg. § 1.482–7(c).  This transaction, in contrast to the prior example, is the sort of "transfer" or "license" to which CWI was intended to apply.  This view conforms to Congress's narrow purpose in enacting CWI, which was to address the use of industry-standard "safe harbors" in

35

reaching purportedly arm's-length prices for transferred intangibles.  CWI was not intended to apply to the allocation of ongoing IDCs, and would be inappropriate to use for that purpose.

But even if the CWI standard could apply to IDCs to be shared under a CSA, it cannot justify the SBC rule.  In *Altera*, the IRS argued that the arm's-length standard was more "flexible" than had previously been understood, and did not require a comparison to what parties at arm's length would do.  *See* Brief for Appellant (the IRS) at 69–72, *Altera*, 926 F.3d 1061 (Nos. 16–70496, 16–70497), 2016 WL 3537355, at *69–72.  This "purely internal" arm's-length standard was statutorily authorized, the IRS argued, by CWI.  *See id.*  The Ninth Circuit found that Treasury had "reasonably interpreted congressional intent in the 1986 amendments as permitting it to dispense with a comparable transaction analysis" and that, while Treasury's view "may not have been the only possible interpretation of Congress's intent," it was reasonable enough to defer under *Chevron*.  *See Altera*, 926 F.3d at 1078.[10]

This conclusion was wrong under *Chevron*.  But even if it were possible to construe section 482, the arm's-length standard, and CWI in this way, it is certainly not the "best" interpretation of the statute – and thus this argument must fail under *Loper Bright*.  In enacting CWI, Congress did not free the IRS from its obligation to apply the arm's-length standard, and Treasury itself emphasized in the Treasury White Paper that "Congress intended the commensurate with income standard to be consistent with the arm's length standard."  Treasury White Paper at 459.  Congress intended CWI as a tool to inform, rather than supplant, the arm's-

---

[10] As this quotation makes clear, the *Altera* majority (and many academic commentators) mischaracterized the taxpayer's argument in that case as saying that evidence of comparable *transactions* is the only way to satisfy the arm's-length standard.  The taxpayer in *Altera* did not argue this, and we do not either.  Transactional comparability is just one way to establish what parties at arm's length do or would do, but is not the only way.  Treasury and the IRS have never provided any evidence, transactional or otherwise, that parties at arm's length would ever share SBC.

length standard, in situations where the taxpayer had better access to pricing information than the IRS. *See id*. In that situation, CWI allows the IRS to look at the income attributable to the intangible as evidence of an arm's-length price, in order to determine whether the result clearly reflected the taxpayer's income. In this case, there is no information disparity between the taxpayer and the IRS — SBC is not a cost that taxpayers share at arm's length. CWI, therefore, cannot justify the SBC rule, because parties at arm's length would not share SBC. CWI does not provide a separate ground for a finding that simply would not be observed in an arm's-length transaction.

b)      Even if CWI Were Relevant, Treasury and the IRS are Limited to the Arguments Made When the Regulation was Published

It is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan*, 576 U.S. at 758 (*citing Chenery*, 318 U.S. at 87). "'[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself," not reasons developed post hoc." *Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022) (quoting *State Farm*, 463 U.S. at 50). In the preamble to the 2003 Regulations – the only time that Treasury has attempted to justify the SBC rule outside of litigation – Treasury maintained that the SBC rule is consistent with the arm's-length standard. Treasury did not contend that the CWI standard allowed it to ignore the arm's-length standard or had altered the arm's-length standard in any way. It certainly did not contend that CWI made official a "flexible" and "fluid" definition of the arm's-length standard that permitted the IRS to dispense with a comparability analysis, and Treasury left unaltered its own regulations prescribing guidance on comparability. Defendant cannot now rely on CWI to alter the arm's-length standard. *See Data Mktg. P'ship*, 45 F.4th at 856 ("[T]he fact that an agency provided a

37

post hoc rationalization is relevant evidence that the action is arbitrary and capricious."). As discussed above, the SBC rule is inconsistent with the arm's-length standard and is thus invalid.

> B. The SBC Rule Does Not Reflect Reasoned Decisionmaking and is Therefore Arbitrary and Capricious

The SBC rule also fails the "reasoned decisionmaking" standard set forth in longstanding Supreme Court jurisprudence, *see State Farm*, and under the APA. *Loper Bright*, 603 U.S. at 371 (citing *Michigan*, 576 U.S. at 750). Under this standard, the SBC rule is not the result of reasoned decisionmaking because Treasury (1) reached an irrational, unfounded conclusion regarding arm's-length conduct; (2) rejected the contrary evidence provided by commenters in the absence of any factual basis for its own view; and (3) failed to respond to significant comments. Any of these shortcomings, much less all of them combined, renders the SBC rule arbitrary and capricious and, thus, invalid under the APA.

> 1. *Treasury Reached an Irrational, Unfounded Conclusion Regarding Arm's-Length Conduct*

To satisfy the standard of reasoned decisionmaking, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 910 (5th Cir. 2023) (quoting *State Farm*, 463 U.S. at 43). By contrast, agency action is arbitrary and capricious if it is "without substantial basis in fact." *Louisiana Env't Action Network v. EPA*, 382 F.3d 575, 582 (5th Cir. 2004) (internal citation omitted).

A central flaw in the promulgation of the SBC rule is that Treasury asserted conclusions about arm's-length conduct without identifying any factual basis to support them. In the preamble to the 2003 Regulations, Treasury described the focus of the regulations as "reaching results consistent with what parties at arm's length generally *would do* if they entered into [CSAs] for the development of high-profit intangibles." T.D. 9088, 2003–2 C.B. 841, 842–43

(emphasis added).  To that end, Treasury asserted that parties dealing at arm's length in a CSA would "ensure through bargaining that the arrangement reflected all relevant costs," among which it included SBC costs.  *Id.* at 843.  But it did not identify or reference a single transaction in the preamble in which unrelated parties shared or charged for SBC, nor did it cite any expert analysis, study, survey, paper or report that might support its assertion.  Having offered no evidence supporting its position, Treasury likewise did not provide any theoretical explanation for why unrelated parties would agree to share any amounts related to SBC.  The administrative record demonstrates that Treasury had no such empirical evidence or theoretical analysis.  Indeed, while not binding on this Court, in *Altera*, the IRS stipulated that the conclusions underpinning the SBC rule were not supported by either real-world transactions or expert analysis.  Stipulation of Facts at ¶¶ 59–61, 63–68, *Altera Corp. v. Commissioner*, Nos. 6253–12, 9963–12 (T.C. May 22, 2013), 2013 WL 5890761.

The preamble to the 2003 Regulations also recited the proposition that "[p]arties dealing at arm's length" who agree to share the costs of developing intangibles "generally would not distinguish between [SBC] and other forms of compensation."  T.D. 9088, 2003–2 C.B. 841, 843.  But Treasury again failed to identify any factual support in the preamble for that assertion.  The administrative record similarly demonstrates that Treasury had no such evidence.

In short, because Treasury identified no factual basis for its conclusions about arm's-length conduct, it necessarily failed to establish any rational connection between the facts found and the choice it made.  Unsupported assertions and "economic assumptions" about how unrelated parties "generally" bargain cannot substitute for evidence or reasoned analysis in the transfer pricing context.  *See* Brief for the Appellant (the IRS) at 29, *Xilinx, Inc. v. Commissioner*, 598 F.3d 1191 (9th Cir. 2010) (Nos. 06–74246, 06–74269), 2007 WL 708301,

39

(admitting that "clearly, this is an instance in which the arm's-length result is determined on the basis of an economic assumption rather than comparability analysis"). Treasury may not rest its rulemaking on speculation and conclusory statements, and such conjecture is not entitled to deference. *Louisiana*, 90 F.4th at 477 ("We cannot affirm agency action on the basis of 'conclusory' statements."); *Sorensen Communications v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) ("[D]eference . . . must be based on some logic and evidence, not sheer speculation."); *Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994) ("[S]peculation is an inadequate replacement for the agency's duty to undertake an examination of the relevant data and reasoned analysis."). Because Treasury failed to rationally evaluate whether arm's-length parties would share amounts attributable to SBC, the SBC rule is arbitrary and capricious and not in compliance with law.

> 2.      *The SBC Rule is Contrary to the Evidence That Was Before Treasury*

A rule is arbitrary and capricious if the agency has "offered an explanation for its decision that runs counter to the evidence before the agency." *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *State Farm*, 463 U.S. at 43). "Total failure to consider important evidence is a basis for setting aside agency action." *Amin v. Mayorkas*, 24 F.4th 383, 394 (5th Cir. 2022) (internal citation omitted).

That is precisely the defect here. During the notice and comment period, commenters supplied overwhelming evidence that unrelated parties would not agree to share SBC costs. That evidence included examples of agreements in which unrelated companies did not share SBC costs, results of surveys and SEC queries reporting no such agreements, statements from tax professionals that they knew of no such agreements, federal government contracting regulations that prohibit treating SBC as a cost in cost-plus contracts, and detailed economic analyses explaining why unrelated parties do not share SBC costs. On the other side of the evidentiary

40

ledger, Treasury offered no evidence at all that might establish that unrelated parties share amounts attributable to SBC.

In the face of substantial evidence that parties in arm's length agreements do not (and would not) share amounts attributable to SBC, and in spite of the complete absence of supporting evidence, Treasury announced factual conclusions contrary to the evidence in the administrative record yet consistent with its desired outcome. This is the antithesis of reasoned decisionmaking.

### 3. Treasury Failed to Adequately Respond to Significant Comments

Federal agencies must "articulate a satisfactory explanation for [their] action[s] . . . ." *State Farm*, 463 U.S. at 43. "That requires the agency to consider all relevant factors raised by the public comments and provide a response to significant points within." *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023). "Comments are 'significant,' and thus require response, only if they raise points 'which, if true . . . and which, if adopted, would require a change in an agency's proposed rule.'" *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023). A rulemaking is arbitrary and capricious if an agency "ducks the hard questions" raised by the public or "bur[ies] its head in the sand." *Id.* at 973. An agency cannot say "[b]asically nothing" and rest on "bare acknowledgement[s]" of comments to satisfy the APA's requirements. *Louisiana*, 90 F.4th at 473.

Here, Treasury failed to adequately respond to public comments in a manner that demonstrates reasoned decisionmaking. Whereas Treasury marshaled no evidence in the administrative record to support its assertions regarding the arm's length treatment of SBC in cost sharing situations, commenters provided abundant evidence demonstrating that arm's-length parties would not agree to share SBC costs in those circumstances. Commenters' central concern, as summarized by Treasury in the preamble to the 2003 Regulations, was that the SBC rule would be inconsistent with the arm's-length standard in the absence of "evidence that parties

41

at arm's length take [SBC] into account in similar circumstances."  T.D. 9088, 2003–2 C.B. 841, 842.  Since the evidence submitted by commenters constituted the only evidence in the record regarding arm's-length conduct in similar circumstances, it follows that this evidence should have been treated as highly relevant to the issue before Treasury.

Nevertheless, Treasury failed to respond in a reasoned manner to the significant comments submitted by commenters.  Instead, it dismissed the uniformly contrary evidence provided by commenters by insisting that "[t]he uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA."  *Id.*

Treasury did not explain which "characteristics" of controlled transactions were missing from the transactions cited by commenters.  At best, Treasury merely acknowledged the numerous substantive comments from taxpayers regarding the SBC rule.  That does not come close to meeting the APA's requirements for meaningfully addressing "significant" points raised by commenters.  *Chamber of Com.*, 85 F.4th at 774.  This fundamental APA violation requires that the SBC rule be invalidated.

C.    28 U.S.C. § 2401 Does Not Bar Any of McKesson's Claims

Defendant states in its Answer that McKesson's challenge to the "procedural validity" of the SBC rule is barred under 28 U.S.C. § 2401 ("§ 2401(a)").  This is wrong, because the specific procedural rules relating to tax suits are provided by the Code.  McKesson timely filed suit pursuant to section 6532(a) of the Code and is permitted to contest its tax liability on the basis that the SBC rule is an invalid exercise of Treasury's rulemaking authority.  The IRS has long recognized this point, stating in guidance that "[t]he [IRS] and the Department of Justice

42

should be advised that the general six-year period of limitation for bringing claims against the Government in 28 U.S.C. §§ 2401 and 2501 does not apply to tax refund suits."  I.R.S. Int. Rev. Man. 34.5.2.2(5) (Dec. 21, 2012); *see also* Rev. Rul. 56–381, 1956–2 C.B. 953; I.R.S. Chief Couns. Adv. 201044006 (Nov. 5, 2010), 2010 WL 4384169; I.R.S. Notice CC–2012–012 (June 1, 2012), 2012 WL 2029785.

The peculiarities of the Code mandate this result.  Unlike other areas of administrative law, pre-enforcement challenges to tax regulations are generally prohibited under the Anti-Injunction Act (the "AIA").[11]  26 U.S.C. § 7421(a).  Instead, taxpayers wishing to challenge the validity of a tax regulation must generally take a position on a tax return, wait for an IRS examination and assertion of a deficiency, and then either challenge the deficiency in Tax Court or pay the asserted tax and sue for a refund, as McKesson has done here.  This process may take many years, particularly where – as here – a taxpayer files a refund claim that may be dependent on the resolution of a specified contingency.  § 2401(a)'s general limitations period is inappropriate in this context, where the Code provides more specific rules tailored to the idiosyncrasies of the tax law.

Defendant has acknowledged this point in prior cases, yet seeks now to reopen this issue. In *Altera*, the Ninth Circuit invited supplemental briefing on whether the six-year statute of limitations under § 2401(a) "applies to this case."  Defendant, represented on appeal by the Department of Justice, acknowledged the taxpayer's compliance with the procedural requirements of the Code in light of the constraints imposed by the AIA, and stated that it would be "unfair to argue . . . that [the taxpayer's] procedural APA claims are time-barred."  Thus,

---

[11] Pre-enforcement tax challenges are likewise barred under the AIA's close cousin, the tax exception to the Declaratory Judgment Act.  28 U.S.C. § 2201.

Defendant stated that "it is the Commissioner's position that the six-year statute of limitations that is generally applicable to procedural challenges to regulations under the APA, *see* 28 U.S.C. § 2401(a), does not apply in this case."

Defendant was right the first time.  Under the tax law, § 2401(a) does not apply to this case either.

## VI.    Conclusion

For nearly a century, the IRS and courts have interpreted section 482 as requiring application of the arm's-length standard to "clearly reflect the income" of controlled taxpayers. The SBC rule requires parties engaged in CSAs to share SBC despite no evidence that parties at arm's length would ever do so.  The SBC rule conflicts with the arm's-length standard, and therefore – under the guidance of *Loper Bright* – it conflicts with the best reading of section 482 and is invalid.  Additionally, the SBC rule fails the "reasoned decisionmaking" standard under administrative law, because Treasury and the IRS have never offered a compelling reason why, despite the total lack of evidence that parties at arm's length would share SBC, related parties should nonetheless be required to do so.  And the IRS should not be permitted to retroactively justify the SBC rule with novel interpretations of section 482.  For all of these reasons, the court should find that the SBC rule is invalid, and that the IRS erred in including SBC in McKesson's cost pools for the tax years at issue.  McKesson respectfully requests this Court grant its motion for summary judgment.

44

Dated: May 8, 2026.


**NORTON ROSE FULBRIGHT LLP**

_____

Elizabeth "Ellie" Norris
State Bar No. 24099138
ellie.norris@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
Tel: (214) 855-8074
Fax: (214) 855-8200


**COVINGTON & BURLING LLP**

Kevin Otero*
N.Y. Bar No. 4325114
kotero@cov.com
30 Hudson Yards
New York, NY 10001
Tel: (212) 841-1000
Fax: (212) 841-1010

Joseph Sullivan*
D.C. Bar No. 1644205
jsullivan@cov.com
One CityCenter
850 Tenth Street
Washington, DC 20001
Tel: (202) 662-6000
Fax: (202) 662-6302

*admitted pro hac vice

_Attorneys for Plaintiff_
_McKesson Corporation and Subsidiaries_

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on May 8, 2026, I caused the foregoing document to be filed with the Clerk of Court of the United States District Court for the Northern District of Texas using the Court's CM/ECF system.


Dated: May 8, 2026.

_____
Elizabeth "Ellie" Norris