**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

MCKESSON CORPORATION
and SUBSIDIARIES,

*Plaintiff,*

v.                                              Case No. 3:25-CV-01102-N

UNITED STATES OF AMERICA,

*Defendant.*

**APPENDIX TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

This appendix is submitted in support of Plaintiff's Motion for Summary

Judgment and Brief in Support filed by Plaintiff contemporaneously herewith.

Dated: May 8, 2026.


**NORTON ROSE FULBRIGHT LLP**

_____

Elizabeth "Ellie" Norris
State Bar No. 24099138
ellie.norris@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
Tel: (214) 855-8074
Fax: (214) 855-8200


**COVINGTON & BURLING LLP**

Kevin Otero*
N.Y. Bar No. 4325114
kotero@cov.com
30 Hudson Yards
New York, NY 10001
Tel: (212) 841-1000
Fax: (212) 841-1010

Joseph Sullivan*
D.C. Bar No. 1644205
jsullivan@cov.com
One CityCenter
850 Tenth Street
Washington, DC 20001
Tel: (202) 662-6000
Fax: (202) 662-6302

*admitted pro hac vice

_Attorneys for Plaintiff_
_McKesson Corporation and Subsidiaries_

## CERTIFICATE OF SERVICE

I certify that, on May 8, 2026, I caused the foregoing document to be filed with the Clerk of Court of the United States District Court for the Northern District of Texas using the Court's CM/ECF system.


Dated: May 8, 2026.


_____

Elizabeth "Ellie" Norris

# Exhibit 1

# American Electronics Association Comment Letter (Oct. 28, 2002)



**Advancing the Business of Technology**

*REG-106359-02*
**REGULATIONS UNIT**
**CC:ITA:RU**

NOV 0 4 2002

**ROOM 5226**
*Giblen/Beck*

October 31, 2002

Drafters of Notice of Proposed Rulemaking REG106359-02
Internal Revenue Service
1111 Constitution Avenue, NW
Washington, DC 20224-0002

To Whom It May Concern:

We discovered that there was a factual error in the original comments AeA filed with you on
Notice of Proposed Rulemaking REG106359-02 regarding the Treatment of Employee Stock
Options for Qualified Cost Sharing Arrangements. We respectfully request that you replace our
original submission, with this corrected version enclosed, with eight copies.

Additionally, please find enclosed an outline (along with eight copies) of the proposed AeA oral
comments for the public hearing scheduled for November 20, 2002.

We apologize for our error and thank you for accepting our corrected re-submission. Please feel
free to contact me with any questions or concerns.

Sincerely,

Caroline Graves Hurley
Tax Counsel and Director Tax Policy
AeA - Advancing the Business of Technology
Tel: (202) 682-4454   Fax: (202) 216-2662
Caroline_Hurley@aeanet.org

Enclosures

601 Pennsylvania Avenue, NW, North Building, Suite 600 / Washington, DC 20004 / P: 202.682.9110 / F: 202.682.9111
www.aeanet.org        American Electronics Association

IRS - 0013956

APP00001

# COMMENTS ON THE PROPOSED REGULATIONS

# ON THE TREATMENT OF EMPLOYEE STOCK OPTIONS

# FOR QUALIFIED COST SHARING ARRANGEMENTS



**Advancing the Business of Technology**

(American Electronics Association)

**October 28, 2002**
(Corrected version filed October 31, 2002)

*AeA – Comments on Proposed Regulations on Stock Options and Cost Sharing*
*October 28, 2002*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 2

SUMMARY OF COMMENTS ..................................................................................... 3

COMMENTS ............................................................................................................... 7

I.    INCONSISTENCY WITH ARM'S LENGTH STANDARD .................................. 7

   A.   History of Cost Sharing/Stock Option Issue ............................................. 8

     *Brief History* ................................................................................................ 8

     *IRS and Taxpayer Positions* ...................................................................... 10

   B.   Evidence from True Arm's Length Dealings .......................................... 12

     *Government Contracting Regulations* ........................................................ 12

     *Private Sector Agreements* ......................................................................... 14

   C.   Economic Contribution Analysis ........................................................... 19

     *Defects of Exercise-Date Valuation* ......................................................... 19

     *Defects of Grant-Date Valuation* .............................................................. 21

II.   ANTI-COMPETITIVE EFFECTS ..................................................................... 23

   A.   Double Taxation of U.S. Companies ...................................................... 24

   B.   Impact on U.S. Job Market .................................................................... 26

   C.   Secondary Effects on U.S. Industry ....................................................... 27

   D.   Other Effects on U.S. Treasury .............................................................. 28

III.  CONCLUSION AND RECOMMENDATIONS ................................................. 28

IRS - 0013958

APP00003

*AeA – Comments on Proposed Regulations on Stock Options and Cost Sharing*
*October 28, 2002*

## INTRODUCTION

AeA submits these comments on behalf of itself and its member companies in response to the request of the Treasury and the Internal Revenue Service (IRS) in Notice of Proposed Rulemaking REG106359-02 for comments on proposed regulations (Proposed Regulations) relating to the treatment of stock-based compensation for purposes of qualified cost sharing arrangements (QCSAs).

*Advancing the business of technology, AeA (the American Electronics Association) is the nation's largest high-tech trade association.* AeA has more than 3,000 member companies that span the high-technology spectrum, from software, semiconductors and computers to Internet technology, advanced electronics and telecommunications systems and services. AeA has been the accepted voice of the U.S. technology community since 1943.

*The overwhelming majority of AeA's member companies issue non-statutory stock options to their employees.* The high-tech industry was the first in the U.S. economy to distribute stock options to its entire workforce, from entry-level positions up to top executives. Stock options help employers attract and retain qualified workers by giving them a financial stake in the future of the companies for which they work. It can rightly be said that stock options are a key engine of growth and innovation in the U.S. economy.

*Many AeA member companies also rely on QCSAs to facilitate the development of their intangible property.* The high-tech industry is notable for its global scale, where even the newest and smallest players face competition from companies around the world. In response, most high-tech companies have established research, manufacturing and distribution operations in several countries, at times as a result of cross-border mergers or acquisitions. These companies have found cost sharing to be an indispensable tool for managing global intangible property rights in a way that has, until the current conflict with the IRS over stock options, avoided contentious and costly disputes with tax authorities over arm's length licenses and royalties.

2

APP00004

*AeA – Comments on Proposed Regulations on Stock Options and Cost Sharing*
*October 28, 2002*

The Proposed Regulations would require companies to increase the pool of intangible development costs to be shared under their QCSAs by an amount based on the valuation of employee stock options under one of two methods. As a general rule, companies would use a valuation method based on the spread at exercise ("*exercise-date valuation*"). Certain public companies listed on a U.S. stock exchange would be able to elect to apply an economic model to value the options when granted ("*grant-date valuation*") in conformity with the alternative valuation allowed by U.S. generally accepted accounting principles ("U.S. GAAP"), which is typically reported in companies' financial statement footnotes.

The IRS has raised the stock option issue related to QCSAs many times over the past decade in litigation, letter rulings and other forums. The IRS position has changed significantly from time to time, shifting between various grant-date and valuation-date methodologies. Most recently, the IRS has made a motion for summary judgment based on a position similar in some respects to the Proposed Regulations' exercise-date method in Tax Court litigation with Xilinx Inc. (docket #4142-01). In the interest of full disclosure, we note that Xilinx is a member of the AeA and AeA has submitted an amicus brief to the U.S. Tax Court on this issue in connection with the *Xilinx* litigation.

AeA commends the IRS and Treasury for turning at last to the rigorous procedures of notice-and-comment rulemaking in its attempt to resolve this important issue. *However, AeA believes that the approach of the Proposed Regulations is fundamentally flawed because it violates the international arm's length standard, which is the very foundation of transfer pricing law and policy.* As a result of this defect, a number of anti-competitive effects on U.S. industry can be foreseen if the regulations were to be finalized in the proposed form.

## SUMMARY OF COMMENTS

### Arm's Length Standard

*Although the Proposed Regulations purport to be consistent with the arm's length standard, it is clear to AeA that they do not produce an arm's length result.* The

3

APP00005

*AeA – Comments on Proposed Regulations on Stock Options and Cost Sharing*
*October 28, 2002*

central inquiry should be what costs independent parties would share under the same circumstances, and how they would measure and share these costs. Actual commercial dealings and sound economic reasoning both demonstrate that independent parties would not share amounts based on a valuation of employee stock options under either of the allowed methods.

Evidence from actual commercial dealings shows conclusively that independent parties do not agree to share or reimburse any amount for another party's employee stock options beyond the amount such options are "in the money" when granted (known as "*intrinsic value*"). A stock option's intrinsic value, which is the difference between the option's exercise price and the market price of the underlying stock at the time of grant, is the measure of compensation expense related to employee stock options that is currently adopted by most companies for purposes of U.S. GAAP. This treatment of stock options is demonstrated in a wide variety of contracts between unrelated parties and is, in fact, compelled by Federal government contracting regulations for transactions between the U.S. military and private contractors amounting to billions of dollars annually.

Sound economic reasoning also demonstrates that neither exercise-date nor grant-date valuation of employee stock options is arm's length. Independent parties would not agree to use exercise-date valuation for cost sharing purposes because the payments would be dependent on stock market fluctuations that are uncertain in time and amount, not directly related to the joint development activity and entirely out of the control of the paying party. Independent parties would not agree to use grant-date valuation either because the economic models (such as Black-Scholes) designed to value market traded options are highly speculative and inaccurate when applied to employee stock options due to their very long terms and their strict vesting and exercise restrictions. Moreover, the grant of at-the-money employee stock options does not, in any way, reduce corporate cash flow; but merely represents potential dilution of shareholders' ownership in the event employee efforts increase the value of the shares. No independent company would

4

APP00006

agree to share "costs" based on the value of potential benefits to another company's shareholders.

### Anti-Competitive Effects

*Due to their inconsistency with the arm's length standard, the Proposed Regulations would have a number of anti-competitive effects on U.S. industry.* Many U.S. multinationals will suffer double taxation when foreign tax authorities disallow deductions for cost sharing payments paid by the local subsidiary to its U.S. parent to the extent the payments are based on stock option valuations. Conversely, the Proposed Regulations would create an opportunity for some foreign multinationals to receive U.S. tax deductions for stock options that would not otherwise be available to them under their home country law. Both the double-taxation effect and the new foreign benefit would be greatly magnified if the IRS and Treasury extend the principles of the Proposed Regulations to other areas of transfer pricing besides cost sharing.

It is significant to note that the Proposed Regulations would only provide unwarranted benefits to foreign companies to the extent they perform research and development or other stock-compensated activities outside of the United States. By the same token, the Proposed Regulations would also create a powerful incentive for U.S. companies to move key research jobs offshore.

Secondary effects on U.S. industry can also be foreseen. Some U.S. high-tech companies would find the treatment of stock options for cost sharing required by the Proposed Regulations to be so onerous that they would discontinue offering options to all but the most senior executives. Others would become so embroiled in international tax disputes due to new uncertainty in cost sharing that they would find their businesses seriously disrupted. The negative impact on employee morale and business operations would severely damage the international competitiveness of U.S. industry in general, and AeA member companies disproportionately.

Lastly, the Proposed Regulations may adversely impact the Treasury in other, unexpected ways. For one thing, the Treasury is likely to find extra resources will be

IRS - 0013962                    APP00007

*AeA – Comments on Proposed Regulations on Stock Options and Cost Sharing*
*October 28, 2002*

needed to deal with the international tax controversies generated. In addition, Treasury should expect to find that private contractors will have a strong incentive and rationale to request changes in government contracting regulations to allow them to charge out employee stock options in military procurement contracts – for, if the U.S. government truly believes parties at arm's length compensate others for their employee stock options, should it not do so itself?

*In summary, we believe the Proposed Regulations should be withdrawn both because they contravene the arm's length standard, which is central to U.S. international tax policy, and because their direct and indirect effects will undermine the competitiveness of U.S. industry.*

6

APP00008

## COMMENTS

### I.    Inconsistency with Arm's Length Standard

*The arm's length standard is the foundation and guiding principle for all transfer pricing matters worldwide.* In the United States, the arm's length standard has governed whether transactions between related parties "clearly reflect income" since the first set of Treasury Regulations for the U.S. income tax were promulgated in 1934. The arm's length standard has been re-affirmed in every revision of the regulations since that time, has been extensively debated and affirmed in the U.S. Congress, and has been upheld and extended by numerous court decisions.

Internationally, the arm's length standard has been broadly adopted in the domestic laws of nearly every country worldwide, is embedded in each and every bilateral tax treaty that the United States has concluded with other countries, and is continuously studied and refined in Guidelines issued by the Organization for Economic Cooperation and Development ("OECD Guidelines").[1] The OECD Guidelines make clear that cost sharing – or "cost contribution arrangements" ("CCA") to use OECD terminology – are no exception to the arm's length standard:

> For the conditions of a CCA to satisfy the arm's length principle, a participant's contributions must be consistent with what an independent enterprise would have agreed to contribute under comparable circumstances given the benefits it reasonably expects to derive from the arrangement.

OECD Guidelines, para. 8.8.

To the credit of the IRS and Treasury, the Proposed Regulations recognize the centrality of arm's length standard. Proposed section 1.482-7(a)(3) explicitly refers to the rule of the existing Treasury Regulations providing that the arm's length standard applies

---

[1] *Transfer Pricing Guidelines For Multinational Enterprises And Tax Administrations*" (adopted July 1999, supplemented March 1996 and September 1997).

IRS - 0013964                    APP00009

"in every case,"[2] but goes on to provide that the results of a QCSA will not be considered to be arm's length unless costs are determined and shared in the way it requires. As a result, this apparent affirmation of the arm's length standard amounts to mere lip service to the extent the requirements of the Proposed Regulation deviate from the arm's length standard.

*Under international principles, the IRS and Treasury cannot simply declare what is, and is not, arm's length by fiat.* As the above quotation from the OECD Guidelines makes clear, the central inquiry must be what costs independent parties would share under the same circumstances, and how such parties would measure and share these costs. In this inquiry, evidence of actual arm's length dealings is the most significant and persuasive if it is available and reliable. In the absence of extrinsic evidence, it is necessary to turn to sound economic reasoning regarding the likely behavior of independent parties under the hypothesized circumstances. In the following sections, we will demonstrate that the approach of the Proposed Regulations is neither supported by the available evidence nor consistent with sound economic reasoning.

### A. History of Cost Sharing/Stock Option Issue

#### Brief History

*A brief history is useful to provide context and to help frame the issue.* Both independent parties and affiliated groups have relied on co-development or cost sharing agreements as a means to jointly develop intangible property for separate use or exploitation. Cost sharing is a relatively simple and effective way to manage intangible property rights and is an effective alternative for difficult and contentious cross-license and royalty arrangements that would otherwise be required. Cost sharing has been explicitly recognized by Treasury Regulations since 1968. *See* provisions that are now preserved at Treas. Reg. § 1.482-2A(d)(4).

---

[2] Treas. Reg. 1.482-1(b)(1) ("In determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer")

IRS - 0013965                    APP00010

By 1986, Congress became concerned that U.S. companies were taking advantage of the difficulties of finding comparable licenses to systematically understate royalties received from related parties. In order to give the IRS additional tools to combat perceived abuses, Congress amended section 482 to require that consideration for intangible property transferred in a controlled transaction be commensurate with the income attributable to the intangible. Tax Reform Act of 1986, Public Law 99-514. Congress made clear that the commensurate with income standard was meant to supplement the arm's length standard, not replace it.

Legislative history indicates that Congress recognized that cost sharing was a viable alternative to licensing that should be simpler and less contentious, and so did not intend to preclude the use of cost sharing among related parties provided the cost sharing allocation "reasonably reflect the *actual economic activity* undertaken by each [party]" and each party is "expected to bear its portion of *all* research and development costs. . . ." H.R. Rep. No. 99-841, at II-638 (1986) (emphasis added).

The final cost sharing regulations, promulgated in 1995, addressed these Congressional concerns by requiring that the participants share "the costs of development of one or more intangibles in proportion to their shares of *reasonably anticipated benefits* from their individual exploitation of the interests in the intangibles assigned to them under the arrangement," and specifying that it is necessary for the parties to share "*all* costs ... related to the intangible development area." Treas. Reg. § 1.482-7(a)(1) & (d)(1) (emphasis added).

AeA believes that the existing regulations are consistent with the arm's length standard and appropriately address Congress' "commensurate with income" concerns. AeA does not dispute that the "reasonably anticipated benefits" formulation is consistent with the arm's length standard. Rather, the dispute centers around whether at-the-money employee stock options give rise to any additional compensation that is related to the intangible development area and, if so, how to measure and account for such additional compensation. Until now, the regulations have not specifically addressed the issue of employee stock options, but have provided general guidance suggesting that U.S. GAAP,

9

applied consistently, may be used to measure revenues and expenses. *See* Treas. Reg. §§ 1.482-7(i)

### IRS and Taxpayer Positions

IRS positions have widely diverged from time to time. Non-binding written guidance has recognized that, in the absence of specific regulations, "any reasonable method" of accounting for employee stock options should be allowed as long as it is consistently applied.[3] *IRS litigating positions have been roughly consistent with one or the other of the two methods allowed by the Proposed Regulations.* For example, in its litigation with Seagate Technology, Inc., the IRS ultimately relied exclusively on a grant-date valuation theory to defend against the taxpayer's motion for summary judgment.[4] After settling *Seagate*, the IRS has again reversed course in its current litigation with Xilinx, Inc., contending now that its exercise-date theory warrants summary judgment.[5]

By contrast, taxpayers have, for the most part, taken a single, consistent position on the stock option issue. *Taxpayers have consistently concluded that there should not be an inclusion of any additional amount in the R&D cost pool to account for employee stock options except to the extent the options were in-the-money on the grant date.* Two mutually reinforcing principles are the foundation of the taxpayers' position: first, taxpayers believe that independent parties negotiating at arm's length would not agree to share or reimburse amounts based on the other party's stock options; and, second, this treatment of at-the-money options is consistent with the accounting method that most

---

[3] *See, e.g., Industry Directive on Stock Options and Cost Sharing Agreements* issued by Thomas W. Wilson, Jr., IRS Industry Director for Communications, Technology and Media on January 25, 2002. *See also* FSA 200003010.

[4] *See* Respondent's Memorandum of Facts and Law In Support of His Objection to Petitioner's Motion for Partial Summary Judgment on the Section 482 Cost Sharing Stock Option Issue, *Seagate Technology, Inc. v. Commissioner*, T.C. Docket No. 15086-98 (July 31, 2000).

[5] *See* Respondent's Cross-Motion for Partial Summary Judgment on the I.R.C. § 482 Cost Sharing Stock-Based Compensation Issues and supporting Brief, *Xilinx Inc. v. Commissioner*, TC Docket No. 4142-01 (March 5, 2002).

IRS - 0013967

APP00012

companies have adopted for U.S. GAAP and believe to most accurately reflect their true financial condition.

This second principle deserves some elaboration. Most U.S. taxpayers account for stock options for cost sharing in precisely the same way they account for them in their audited financial statements, electing to apply the rules of Accounting Principles Board Opinion No. 25 ("APB 25") to account for stock option compensation. APB 25 generally provides that compensation expense is measured at the grant date in the amount of the spread between the option price and the quoted market price of the underlying stock (*"intrinsic value"*). This compensation expense is then recognized over the period that the employee provides services, generally the vesting period of the option. We discuss why most companies choose to adopt the intrinsic value method rather than use a grant-date valuation for GAAP reporting purposes in section C below.

In short, the appropriate question concerning a particular method of accounting for stock options is whether it recognizes and measures expense in the same way as independent parties would in arm's length dealings. There are at least three accounting methods that need to be considered:

- *Intrinsic Value:* Spread between option's exercise price and underlying stock's value when the option is granted – consistent with most taxpayers' current practice for purposes of both R&D cost sharing and U.S. GAAP reporting;

- *Grant-date Valuation:* Generally, amount determined by an economic model to be the "fair value" of the option when granted – available to some taxpayers by election under the Proposed Regulations and used by small minority of companies for U.S. GAAP reporting; and

- *Exercise-date Valuation:* Spread between option's exercise price and the stock's value when the option is exercised – consistent with the Proposed Regulations' general rule and largely consistent with U.S. tax accounting principles.

Other methods, such as foreign GAAP, may also be reasonable and consistent with the arm's length standard. In any case, whatever accounting method that a taxpayer adopts and consistently applies for cost sharing purposes should be considered on its own merits. The controlling principle should be consistency with the arm's length standard –

11

APP00013

not consistency with GAAP or tax accounting principles. Even if political pressures force U.S. GAAP to change so that expensing of employee stock options is required, arm's length parties would continue to refuse to share or reimburse others' stock options except to the extent they have intrinsic value on the grant date.

## B. Evidence from True Arm's Length Dealings

There is no evidence to suggest that third parties dealing at arm's length agree to share costs that include unmeasurable and unpredictable stock option costs. The IRS has admitted that it has not found any such evidence in the *Xilinx* litigation.[6] *Moreover, there is strong evidence demonstrating that independent parties actually and actively exclude stock option costs from arm's length arrangements.* In the following sections, we discuss well-known evidence from government contracting regulations and introduce compelling new evidence from private sector co-development and joint venture agreements.

### Government Contracting Regulations

The U.S. military contracts with private contractors for billions of dollars worth of research and development services each year. These contracts are governed by the Federal Acquisition Regulation ("FAR"). 48 C.F.R. § 1.101 et seq. Due to the uncertainties involved in contract performance, many military contracts are structured as so-called "cost-reimbursement contracts" *See* 48 C.F.R. § 16.301-307. For example, many are "cost-plus-incentive-fee contracts" which provide for an initially negotiated fee to be adjusted later by a formula based on the relationship of total allowable costs to total target costs. 48 C.F.R. § 16.304.

In fact, "cost-sharing contracts" are another type of cost-reimbursement contract used in military procurement; the FAR describes these contracts as follows:

---

[6] *See* Memorandum Brief in Support of Respondent's Notice of Object to Petitioner's Supplement to Partial Summary Judgment Motion With Respect to the Stock Option Issue, *Xilinx Inc. v. Commissioner*, TC Docket No. 4142-01 (September 11, 2002) at 34-36.

12

APP00014

*AeA – Comments on Proposed Regulations on Stock Options and Cost Sharing*
*October 28, 2002*

(a) Description. A cost-sharing contract is a cost-reimbursement contract in which the contractor receives no fee and is reimbursed only for an agreed-upon portion of its allowable costs.

(b) Application. A cost-sharing contract may be used when the contractor agrees to absorb a portion of the costs, in the expectation of substantial compensating benefits.

48 C.F.R. § 16.303. The cost-sharing type of contract is particularly well suited for those contractors that would be retaining title to some of the intangibles developed in the course of the contract. *See* 48 C.F.R. 27.302(b).

Part 31 of the FAR provides the principles and procedures for all situations where payments may be based on contractor costs, including all types of cost-reimbursement contracts. *See* 48 C.F.R.§ 31.103. *The provisions of the FAR governing accounting for compensation specifically exclude amounts that are "based on changes in prices of corporate securities or corporate security ownership, such as stock options, stock appreciation rights, phantom stock plans, and junior stock certificates."* 48 C.F.R. § 31.205-6(i). If this language leaves any doubt, the following subsection removes it by specifying that "any compensation that is calculated, or valued, based on changes in the price of corporate securities is unallowable." 48 C.F.R. § 31.205-6(i)(1). Thus, under this regulation, the U.S. government is not allowed to share or reimburse contractors for their employee stock options based either a grant-date valuation (which is "calculated" based expected stock price changes) or an exercise-date valuation (which is "valued" based on actual stock price changes).

The IRS is well aware of these provisions of the FAR. A Field Service Advisory issued in 2000 discussed them at length and raised the following objections:

> The unallowability of such stock option costs under FAR does not negate that stock options are compensation costs, nor suggest that parties at arm's length would ignore the stock option compensation of researchers in cost sharing or services agreements. The reason FAR generally disallows certain stock option compensation is based on administrative concerns that companies could manipulate the time between grant and exercise of the stock options to coincide with a period of major performance of Government cost-type contracts. Opposite administrative concerns are present for tax purposes, namely, that a failure to take account of stock option costs on some reasonable

13

APP00015

*AeA – Comments on Proposed Regulations on Stock Options and Cost Sharing*
*October 28, 2002*

basis would facilitate an inappropriate manipulation of the income of commonly controlled parties to such arrangements.

FSA 200003010 (citation omitted).

This analysis misses the key point. AeA *is* troubled by the inconsistency between the FAR provisions and the Proposed Regulations. Indeed, if these regulations are finalized in this form, AeA may well urge that the Office of Federal Procurement Policy to consider making similar revisions to the FAR. However, we do not raise these FAR provisions merely to demonstrate the inconsistency, but rather because they are powerful evidence of actual arm's length dealings. *The FAR provisions are significant because they demonstrate that thousands of private companies have entered into cost-reimbursement contracts with the U.S. military on terms that did not include any compensation for employee stock options.*

AeA believes that the FAR evidence is extremely powerful in light of the great number of contracts involved, including – in all likelihood – a number of cost-sharing contracts. Unfortunately, because the actual contracts negotiated under the FAR are highly confidential to the companies involved, we could not review them in greater detail. It is for this reason that we turn, in the next section, to private sector agreements for which additional information is available.

### Private Sector Agreements

*Several AeA member companies have reviewed their co-development and joint venture agreements, and have found none which provided any compensation for employee stock options.* For those few agreements that were ambiguous on the issue of stock options, the companies investigated the invoices and accounting records relating to the agreements and found that in no case were any costs associated with the value of the stock options charged out. One or more of these member companies would be willing to discuss these agreements with the IRS and Treasury provided they can receive assurances that the information discussed would be kept confidential and their proprietary business information would not be disclosed.

14

APP00016

*AeA – Comments on Proposed Regulations on Stock Options and Cost Sharing*
*October 28, 2002*

Since the details of member companies' agreements cannot be publicly revealed, we conducted several searches of materials publicly filed with the Securities and Exchange Commission ("SEC"). Again, we found no evidence that either grant-date or exercise-date valuations of stock options were shared or reimbursed in any arm's length co-development or joint venture arrangements. Most of the management discussions and exhibits attached to SEC filings were entirely silent on issue although some explicitly provided that costs would be determined under U.S. GAAP. Since the companies used APB 25 to account for stock options, no amount beyond the intrinsic value of the options on grant date would be shared under such provisions.

*In our search of publicly available documents, we came across one arrangement that is particularly illuminating on the GAAP accounting issue: a "Collaboration Agreement" between Amylin Pharmaceuticals Inc. ("Amylin") and Hoescht Marion Roussel Inc. ("HMR") (now known as Aventis Pharma) dated March 31, 1997.*[7] This agreement is illustrative; we are confident that an exhaustive search of SEC materials would uncover many similar examples. Amylin is a small company that conducts proprietary research and development on potential pharmaceutical products. Due to its very small size and limited operations, each of Amylin's third-party agreements is material to its operations and therefore required to be disclosed under SEC rules. Although portions of key agreements have been granted confidential treatment by the SEC, the greater part of Amylin's network of agreements are fully disclosed and provide an unusually detailed view of arm's length co-development arrangements.

Concurrent with the Collaboration Agreement, Amylin and HML entered into a "License and Option Agreement" under which Amylin was granted exclusive worldwide rights to a series of orally active compounds in order to evaluate their ability to improve cardiovascular risk factors associated with atherosclerosis. Under the terms of the License and Option Agreement, Amylin is responsible for conducting the preclinical

---

[7] Attached to Amylin Pharmaceuticals Inc., Form 10-Q (March 31, 1997), available (with all attachments) at the SEC's Edgar website at http://www.sec.gov/Archives/edgar/data/881464/0000936392-97-000714.txt.

15

APP00017

evaluation and clinical development of candidate compounds; and HML will have a one-time option, upon completion of Phase II clinical trials, to elect to collaborate with Amylin in the continuing development and commercialization of the compounds in a 50:50 cost-and-profit sharing arrangement.

The Collaboration Agreement only takes effect if and when HML exercises this option.[8] If HML exercises the option, Amylin will continue to be responsible for developing and registering the product candidates, and HML will be responsible for manufacturing and marketing. Amylin and HML will assume equal responsibility for all past and future research and development, manufacturing, and commercialization expenses and will share equally in any operating profits from commercialization. If HML does not exercise the option, Amylin will remain responsible for all past and future research and development and will retain all development and commercialization rights, and HML will be entitled to a royalty based on any future net sales. In such case, Amylin will be free to collaborate with other companies on the development, manufacture, and commercialization of these compounds.

Section 3.11 of the Collaboration Agreement provides the accounting rules for determining all revenues and expenses in computing the 50:50 split of operating profits and losses. While accounting for stock options is not specifically referenced, the agreement contains very detailed provisions regarding the application of U.S. GAAP:

> Except as specifically provided in this Agreement, each Party agrees to determine Net Sales, Royalty-Bearing Sales, Allowable Expenses, Research and Development Expenses, Pre-Marketing Expenses and all other costs and expenses hereunder with respect to the Products *using its standard accounting procedures, consistent with United States Generally Accepted Accounting Principles*, to the extent practical, as if such Products were solely owned products of the Party. *The Parties also recognize that such procedures may change from time to time* and that any such changes may affect the definition of Net Sales, Royalty-Bearing Sales, Allowable Expenses, Research and Development Expenses, Pre-Marketing Expenses and such other costs and

---

[8] To date, the HML option remains outstanding because Phase II clinical trials have not yet begun. *See* Amylin Pharmaceuticals Inc., Form 10-K405 (December 31, 2001) at page 6.

IRS - 0013973                    APP00018

*AeA – Comments on Proposed Regulations on Stock Options and Cost Sharing*
*October 28, 2002*

expenses. The Parties agree that, *where such changes are economically material to either Party, adjustments shall be made to compensate the affected Party in order to preserve the same economics as reflected under this Agreement under such Party's accounting procedures in effect as of the date on which the activity in question* (for example, Research, Development, marketing or manufacturing) *first commences* under this Agreement.

Collaboration Agreement, Section 11(b) (emphasis added). The subsection continues by specifying that any change that affects R&D expenses by 5% or more will considered "economically material."

*Upon close analysis, these detailed provisions have the effect of requiring Amylin to use the intrinsic value method to account for stock options, even if it were to adopt grant-date accounting using Black-Scholes or other valuation models for purposes of U.S. GAAP.* Initially, the provision requires Amylin to use "*its* standard accounting procedures" consistent with U.S. GAAP to account for R&D costs. In its SEC Form 10-K for the year ended December 31, 1997, Amylin disclosed that it had elected to follow APB 25 to account for its employee stock options.[9] Its most recent Form 10-K confirms that the election to follow APB 25 remains in effect.[10] Accordingly, the Collaboration Agreement clearly requires Amylin use the intrinsic value method of APB 25 to account for employee stock option cost in its R&D effort to date.

In the event Amylin changes its accounting procedures in the future and adopts a grant-date valuation method using Black-Scholes or another valuation model (either voluntarily or as required by changes in applicable U.S. GAAP rules), then the provisions regarding "economically material changes" in accounting procedures would come into play. A rough indication of how these provisions would apply can be gleaned from the financial data disclosed in Amylin's financial statement and footnotes, as shown in the following chart:

---

[9] Amylin Pharmaceuticals Inc., Form 10-K405 (December 31, 1997), Exhibit 13.1 at page 6.

[10] Amylin Pharmaceuticals Inc., Form 10-K405 (December 31, 2001) at page F-8.

17

APP00019

*AeA – Comments on Proposed Regulations on Stock Options and Cost Sharing*
*October 28, 2002*

| Amylin Pharmaceuticals, Inc. (per Form 10-K406, December 31, 2002) | | | |
|---|---|---|---|
| ($000) | **2001** | **2000** | **1999** |
| Reported Net Loss (using intrinsic value method) | -80,470 | -49,546 | -32,258 |
| Pro Forma Net Loss (using "fair value" method) | -71,972 | -44,043 | -30,899 |
| Pro Forma Stock Option Expense | 8,498 | 5,503 | 1,359 |
| Reported R&D Expenses | 49,601 | 33,807 | 19,181 |
| Reported General and Administrative Expenses | 20,469 | 10,716 | 7,920 |
| Total Operating Expenses | 70,070 | 44,523 | 27,101 |
| Pro Forma Stock Option Expense / Reported Operating Expenses | **12.1%** | **12.4%** | **5.0%** |

This analysis demonstrates that the percentage change in R&D expense if the "fair value" method were adopted would significantly exceed the 5% materiality threshold over the three year period 1999-2000, stabilizing at around 12%. Therefore, section 11(b) of the Collaboration Agreement would require Amylin to make adjustments "to preserve the same economics as reflected" in the initial year of the Agreement. It is important to note that this provision is self-executing – it does not call for re-negotiation of the agreement. *Accordingly, the Collaboration Agreement would require Amylin to continue to use the intrinsic value method of APB 25 for purposes of determining the equalization payment it would receive from HML even if it were to change its stock option accounting method for U.S. GAAP reporting.*

The degree of comparability between the Amylin-HML Collaboration Agreement and a typical intercompany QCSA is relatively high:

- The intangible property involved is a major component of Amylin's overall business, as is typically the case in a QCSA.

- Because the Collaboration Agreement provides for 50:50 sharing of both profits and losses at the operating profit level, it automatically insures that reasonably anticipated benefits are proportionate to the cost sharing ratio.

- Since HML will only exercise its option to enter into the Collaboration Agreement if it makes the assessment that Amylin's improvements to HML's

IRS - 0013975    APP00020

proprietary compounds make collaboration more valuable than receiving arm's length royalties, there are no significant buy-in issues to cloud the comparison.

- There are no other ancillary transactions, such as equity investments or supply contracts between the parties, that could complicate the comparison.[11]

Thus, for all its complexity, the Collaboration Agreement is very important evidence that parties negotiating a cost-sharing arrangement at arm's length would choose to account for stock options using the intrinsic value method rather than either the grant-date or exercise-date valuation methods of the Proposed Regulations.

### C. Economic Contribution Analysis

To the extent there are any weaknesses in the data on comparable transactions, it is worthwhile to turn to sound economic reasoning for support. The preamble to the Proposed Regulations recognizes the importance of economic analysis, emphasizing that cost sharing agreements must reflect "relative economic contributions" of all participants. However, exercise-date valuation under general rule of Proposed Regulations is not an indicator of relative economic contributions at all, while the grant-date valuation election is little better. *Economic theory bolsters the commercial practice evidence, discussed above, in support of the view that no amount beyond the grant-date intrinsic value of employee stock options would be accepted as a cost to be shared or reimbursed by independent parties negotiating at arm's length.*

#### Defects of Exercise-Date Valuation

Arm's length parties would not agree to use exercise-date valuation for cost sharing purposes because the payments would be dependent on stock market fluctuations that are uncertain in time and amount, not directly related to the joint development activity and entirely out of the control of the paying party. Ease of administration, fairness to

---

[11] This contrasts with Amylin's "Collaboration Agreement" with Johnson & Johnson's Lifescan, Inc. subsidiary, dated June 20, 1995, where both a "Stock Purchase Agreement" and a "Loan and Security Agreement" were executed concurrently. Listed in Amylin's SEC filings as Exhibits 10.17, 10.18 and 10.19, attached to Amylin Pharmaceuticals Inc., Form 10-Q (June 30, 1995).

19

APP00021

*AeA – Comments on Proposed Regulations on Stock Options and Cost Sharing*
*October 28, 2002*

individual taxpayers and tax incentives for businesses are the reasons exercise date valuation is used for U.S. tax accounting purposes. These reasons are simply inapplicable to arm's length dealings.

Exercise-date valuation would measure compensation by the amount of the spread on the exercise date, and recognize the full amount of a deduction at the same time. *There are many reasons why this approach does not measure economic contributions and would not be considered in arm's length negotiations:*

- First, deferring measurement of stock option expense until the exercise date does not provide the level of certainty required by arm's length parties to enter into a long-term arrangement like cost sharing – arm's length parties would not agree to pay such unpredictable amounts subject to volatility of the stock market and influenced by many factors outside their control.

- This exercise-date valuation method would have the effect of each party writing a naked call option on the other party's stock, requiring each to pay off the other without regard to the role of the joint development efforts in the stock's performance – in fact, doing so even in the event that the paying party's business has under-performed and has not realized anticipated benefits from the development program.

- If an employee changes activities (e.g., moves from marketing to research) between grant and exercise dates, the Proposed Regulations' exercise-date method is unable to match stock compensation to the appropriate period and activity.

- Because exercise-date valuation includes any increases in stock value that occurred after vesting, a very large part of the amount can only rightly be considered to reflect the individual employee's subsequent investment decisions.

- The spread-at-exercise value may be extremely large, many orders of magnitude greater than any other conceivable valuation method.

Historically, exercise-date valuation developed in the context of individual income tax disputes and was driven by both administrability and fairness concerns. That is, it was considered unfair to subject the individual employee to tax when he receives stock options, which may have speculative value, but he does not receive any cash with which to pay the tax. As discussed in Section IIA below, the corporate tax deduction is an

20

APP00022

explicit tax incentive to encourage U.S. companies to share the wealth with their employees and encourage risk-taking and entrepreneurship by U.S. workers.

### Defects of Grant-Date Valuation

Using an grant-date valuation model to measure employee stock option expense does not produce an arm's length result either. Economic models (such as Black-Scholes) were designed to value short-term options that are actively traded in equity markets.[12] *These valuation models are highly speculative and inaccurate when applied to employee stock options for many reasons, which can largely be separated in two categories: first, many restrictions on their exercise and transfer and, second, their very long term.*

Free marketability of stock options is the central and key assumption of the Black-Scholes model and related economic valuation models because they are based on the principle of "no-arbitrage" – namely, that there can be no combination of stock positions (e.g., long, short, puts, calls, etc.) that allows some simultaneous purchase of one and sale of another to produce a risk-free profit. Unlike plain-vanilla market-traded options, employee stock options are typically burdened with the many restrictions, including:

- strict prohibitions on sale,
- serious limitations on gift transfer,
- forfeiture if employee loses or leaves job before vesting,
- forced exercise (or forfeiture) if employee leaves job after vesting,
- legal restrictions on dealing in company stock (e.g., insider trading rules), and
- corporate prohibitions on selling company stock short.

Accounting rules governing the use of valuation models for employee stock options under U.S. GAAP (e.g., for footnote disclosures) attempt to account for these restrictions

---

[12] Even in the context of marketable options, the accuracy of Black-Scholes method has increasingly been questioned as it depends on a number of assumptions, any one of which can be a weak reed. At best, the Black-Scholes value might place a high ceiling on the value of employee stock options. *See, e.g.,* Tim Reason, "Stock Options: The Value Proposition", *CFO Magazine*, October 1, 2002.

21

APP00023

in a number of ways; however, none of these adjustments is fundamentally sound as an economic matter, and each introduces a further element of speculation and imprecision:

- While marketable options can be accurately valued based on expected volatility and the risk-free interest rate, the value of non-marketable options would theoretically require knowledge of the employee-optionholder's outlook on the prospects of the stock and his risk prerferences. Because these factors are obviously not readily available and highly speculative, expected volatility and the risk-free interest rate are used instead.

- While volatility is the primary driver of marketable options values to an outside investor or a market maker because of the potential upside benefit is greater, excess volatility actually decreases value to employees due to risk preferences. Accounting standards on how to measure and adjust volatility for employee stock options is lacking; different companies take very different approaches in practice.

- Vesting restrictions reduce value. U.S. GAAP allows the total option expense amount to be reduced by a factor representing the expected employee turnover rate and resulting forfeitures during the vesting period.

- Requirement that employees exercise or forfeit vested options when they leave jobs leads to early exercise, reducing value. Restrictions on transfer and hedging of shares leads to early exercise depending on employee's cash needs. GAAP rules allow the use of the average expected term of employee options rather than their nominal term in an attempt to account for early exercises. However, this is a highly imprecise and unprincipled approach. Among other things, it does not take into accounts that early exercise is more likely if stock value increases rapidly, which further reduces option value.

In addition to these factors, the very long term of employee stock options greatly complicates the valuation exercise. The term of a typical market-traded option is a few months although some are as long as a year or two. By contrast, the typical employee stock option does not even vest for three to four years, but then remains exercisable for five or more years provided the employee remains in his job. The very long term greatly increases the uncertainty of typical volatility measures (short term measures are likely to overstate value) as well as that of other key assumptions (e.g., dividend payout, risk-free interest rate).

22

APP00024

*AeA – Comments on Proposed Regulations on Stock Options and Cost Sharing*
*October 28, 2002*

All of these are among the reasons that most U.S. companies opposed mandatory expensing of option expense using a grant-date valuation model when U.S. GAAP standards being reconsidered about ten years ago, and have chosen to continue to use the intrinsic value method for financial statement reporting ever since that time.Moreover, the grant of at-the-money employee stock options does not, in any way, reduce corporate cash flow; but merely represents potential dilution of shareholders' ownership in the event employee efforts increase the value of the shares. No independent company would agree to share "costs" based on the value of potential benefits to another company's shareholders.Except to the extent they are "in the money" at grant, AeA believes that stock options are not compensation for past work, but are rather an incentive for future performance. Therefore, AeA concludes that the intrinsic value method of accounting for stock options is most consistent with the business objectives of parties entering into an arm's length cost sharing arrangement.

## II.   Anti-Competitive Effects

Due to their inconsistency with the international arm's length standard, the Proposed Regulations can be expected to produce a number of side effects that will damage the competitiveness of U.S. industry and harm the U.S. job market. Many of the largest trading partners of the United States – including Canada, Japan and several European Union countries – appear very unlikely to accept the Proposed Regulations' view of the arm's length standard. We are aware of U.S. companies that have cost sharing arrangements that include participants from each of these countries. *Moreover, the negative effects would be magnified if the IRS and Treasury extend the principles of the Proposed Regulations to other areas of transfer pricing, such as intercompany services.* We strongly believe it is inadvisable to pursue the Proposed Regulations without first seeking harmony within the international community and among different transfer pricing areas.

23

APP00025

*AeA – Comments on Proposed Regulations on Stock Options and Cost Sharing*
*October 28, 2002*

### A. Double Taxation of U.S. Companies

Employee stock options play a key role in the U.S. economy, and are particularly important in the high technology sector. Stock options provide fuel that helps make the sector an engine of growth and innovation. Options motivate employees to give peak performances, and allow them to share the rewards if the enterprise is successful.

U.S. tax treatment of stock options reflects Congressional recognition of the many social benefits employee options provide. At the individual tax level, Congress has created favorable tax regimes for incentive stock options and employee stock purchase plans. *See* I.R.C. §§ 422 & 423. At the corporate level, Congress provides deductions when employees of U.S. corporate taxpayers have income from disqualifying dispositions of incentive stock options or from exercising non-qualified stock options. *See* I.R.C. § 83(h). As Senator George Allen stated in recent Senate debate, successfully opposing proposed changes in the tax treatment of employee stock options:

> In our effort to reform, we must not enact measures that stifle innovation and endanger the American entrepreneurial spirit. Congress should not harm future opportunities for employees to own a part of their company for whom they work. Unfortunately, the Levin-McCain amendment does just that by unjustifiably upsetting the current tax treatment of stock options. It is unnecessary and unwise to change these particular accounting policies.[13]

The Proposed Regulations would, in many cases, have the effect of denying the tax benefits that Congress sought to provide to companies offering stock options to U.S. employees. The purposes of the stock option deduction are to encourage and reward employee ownership and entrepreneurship within the United States.

Whether a foreign corporation – even a foreign affiliate of a U.S.-based multinational – is entitled to a corporate tax deduction for stock options issued to its

---

[13] Statement of Senator George Allen on Senate Floor Regarding Accounting Reform Bill and Stock Options, Cong. Rec. 56735, 6744-46 (daily ed. July 15, 2002).

24

APP00026

employees depends on the tax rules of the foreign country where it operates. Clearly, the decision whether to encourage employee stock ownership and entrepreneurship within its borders is appropriately a matter of domestic tax policy for each country. U.S.-based multinationals take the tax policies of each foreign country where they operate into consideration when deciding whether to extend stock option benefits to local employees.

The Proposed Regulations would turn these policy considerations on their head. Because costs charged out to a foreign participant under QCSA reduce tax deductions otherwise available to the U.S. participant, the Proposed Regulations would have the effect of denying part of the deduction for U.S. employee stock options. As a result, U.S. participants will have to consider *foreign* tax treatment of option-related cost sharing payments before deciding whether to extend stock option benefits to *U.S.* employees.

AeA is confident that a great many foreign countries will reject the premises and results of the Proposed Regulations, based either on domestic tax rules or their views of the arm's length standard. Many of these countries will disallow a deduction for the portion of a cost sharing payment made by a local company that is attributable to U.S. employee stock options, based on one or more of the following principles:

- The local country does not allow deductions for payments to affiliates that violate the arm's length standard, and agrees with AeA that the evidence establishes that independent parties would not agree to share or reimburse amounts based on a valuation of the other party's at-the-money stock options;

- The local country does not allow deductions that relate to employee stock options in any form whatsoever;

- The local country does not recognize any "cost" for employee stock options unless the issuing company acquires the stock or options on the open market; or

- The local country does not allow deductions for stock options granted to employees not subject to the local individual income tax, and would not allow such deductions indirectly through a cost sharing payment either.

If the foreign country disallows the deduction for any of these reasons, the U.S.-based multinational group will not get any deduction whatsoever for stock options issued to U.S. employees, contrary to Congressional intent. Unless the foreign Competent

25

APP00027

*AeA – Comments on Proposed Regulations on Stock Options and Cost Sharing*
*October 28, 2002*

Authority can be convinced that the cost sharing payment is consistent with the arm's length standard in spite of the country's tax rules on stock option deductions, then there will be no relief for the resulting double taxation.

Conversely, the Proposed Regulations may create an opportunity for foreign-based multinationals to obtain a U.S. tax deduction for stock options issued to their employees that was not previously available under their home country tax laws. Where a foreign parent company has a QCSA with its U.S. subsidiary and performs most of the R&D in the parent company's country, the effect of including stock option costs in the cost sharing pool is to increase in U.S. deductible expenses. If the Proposed Regulation is finalized, this unintended side effect would not only deprive the U.S. Treasury of tax receipts, but also provide the same tax incentives intended to encourage U.S. employee stock ownership to foreign QCSA participants. Stock options are becoming increasingly popular internationally, and many foreign groups (particularly, European-based groups) with multiple R&D centers already use cost sharing arrangements to manage their intangible property. These trends may accelerate if companies decide to take advantage of the opportunities created by the Proposed Regulations. As previously noted, the double-taxation effect would be greatly magnified if the IRS and Treasury were to extend the principles of the Proposed Regulations to other areas of transfer pricing besides cost sharing, such as intercompany service charges. If, as seems likely, several of our largest trading partners, such as Canada and Japan, soundly reject the principles of the Proposed Regulations in all transfer pricing areas, the resulting increase in the tax burden on U.S. companies could be truly enormous.

### B. Impact on U.S. Job Market

It is significant to note that the Proposed Regulations would only provide unwarranted benefits to foreign companies to the extent they perform research and development or other stock-compensated activities outside of the United States. By the same token, the Proposed Regulations would also create a powerful incentive for U.S. companies to move key research jobs offshore.

26

APP00028

An unexpected effect of the Proposed Regulations may well be to encourage U.S. multinationals to move R&D activities out of the United States and to replace U.S. personnel with foreign nationals. With the rapid growth of well-educated engineers and other skilled professionals in places like India and China, this possible effect cannot be lightly dismissed.

## C.  Secondary Effects on U.S. Industry

Some U.S. high-tech companies would find the treatment of stock options for cost sharing urged the Proposed Regulations to be so onerous that they would discontinue offering options to all but the most senior executives. Others would become so embroiled in international tax disputes due to new uncertainty in cost sharing that they would find their businesses profoundly disrupted. *The negative impact on employee morale and business operations would severely damage the international competitiveness of U.S. industry in general, and AeA member companies disproportionately.*

The high technology sector leads U.S. industries in providing stock options to the broadest base of rank-and-file employees. In fact, in August 2002, AeA released its own survey of over 525 public companies that found that 84% of high-tech workers in public companies receive stock options. As a result of the high speed of innovation and change, the high technology sector also boasts many of the most volatile issues on the stock market. Furthermore, due to the global reach of technology and the high level of international merger and acquisition activity in the sector, research and development cost sharing plays a particularly important role in the business strategies of high technology companies.

As a result of this combination of characteristics, the Proposed Regulations' position on stock options and cost sharing would have a disproportionately harsh and negative effect on AeA member companies and others in the high technology sector. Under the Proposed Regulations' approach, stock market volatility can result in cost sharing charges that are both very large and extremely unpredictable. To manage the potential exposure, some AeA member companies may find it necessary to discontinue

27

APP00029

offering stock options to the broadest possible employee base, leaving options available only to the most senior executives who have the bargaining power to demand them.

Many other AeA member companies value broad-based stock option programs too highly to allow them to be undermined by adverse tax effects. These companies would have no choice but to dedicate a larger share of their budgets, time and energy to resolving international tax disputes.

### D.  Other Effects on U.S. Treasury

Lastly, the Proposed Regulations may adversely impact the Treasury in other, unexpected ways. For one thing, the Treasury is likely to find extra resources will be needed to deal with the international tax controversies generated. *In addition, Treasury should expect to find that private contractors will have a strong incentive and rationale to request changes in government contracting regulations (i.e., the FAR) to allow them to charge out employee stock options in military procurement contracts.* If the U.S. government truly believes parties at arm's length compensate others for their employee stock options, AeA believes that the government should do so itself. It is altogether possible that, by extending new tax deductions to foreign corporations, and by causing the government to incur new charges on procurement contracts, the Proposed Regulations will have a negative impact on the U.S. Treasury on net.

### III.  Conclusion and Recommendations

The centrality of the arm's length standard to the international tax policy of the United States should be clear from its presence in every bilateral income tax treaty as well as the major U.S. role in formulating the OECD Guidelines. The White Paper draws precisely this conclusion:

> It is equally clear as a policy matter that, in the interest of avoiding extreme positions by other jurisdictions and minimizing the incidence of disputes over primary taxing jurisdiction in international transactions, the United States should continue to adhere to the arm's length standard. If a U.S. policy goal is to discourage other countries from taking extreme positions to the detriment of U.S. businesses, then it is incumbent on those administering and

28

APP00030

adjudicating the U.S. tax system to avoid extreme positions as well. In order to minimize the incidence of double taxation and international tax disputes, it is crucial that all countries strive toward a universal application of arm's length principles.

White Paper, Chapter 7, section B (footnotes omitted).

The approach to stock option accounting advanced by the Proposed Regulations is the sort of "extreme position" that ought to be avoided. If all countries required taxpayers to apply local tax rules to transfer pricing analysis, double taxation and international disputes would be the rule rather than the exception. Withdrawal of the Proposed Regulations is therefore consistent with the international tax policy of the United States.

Strengthening the arm's length standard must remain an tax policy priority if U.S. companies are to be competitive in the global economy. Only if there is broad international consensus on arm's length principles, including the measurement of costs under cost sharing arrangements, can U.S. companies achieve parity with foreign competitors and avoid debilitating disputes with foreign tax authorities. Imposing U.S. tax accounting rules for cost sharing would undercut this worthy goal.

Accordingly, the AeA strongly urges the Treasury to withdraw these Proposed Regulations and requests to testify at the public hearing scheduled for November 20, 2002.

Respectfully Re-submitted,

Dated: **October 31, 2002**

CAROLINE GRAVES HURLEY

Tax Counsel, Director of Tax Policy
**AeA-Advancing the Business of Technology**
601 Pennsylvania Avenue, NW
North Building, Suite 600
Washington, DC 20004
(202) 682-9110

29

APP00031

# Exhibit 2

# Baker & McKenzie LLP Comment Letter on behalf of Software Finance and Tax Executives Council (Nov. 5, 2002)

# BAKER & McKENZIE

ATTORNEYS AT LAW

EUROPE
MIDDLE EAST

| | | |
|---|---|---|
| ALMATY | MADRID | |
| AMSTERDAM | MILAN | |
| BARCELONA | MOSCOW | |
| BERLIN | MUNICH | |
| BRUSSELS | PARIS | |
| BUDAPEST | PRAGUE | |
| CAIRO | RIYADH | |
| FRANKFURT | ROME | |
| GENEVA | ST. PETERSBURG | |
| KIEV | STOCKHOLM | |
| LAUSANNE | WARSAW | |
| LONDON | ZURICH | |

ASIA
PACIFIC

BANGKOK
BEIJING
HANOI
HO CHI MINH CITY
HONG KONG
MANILA
MELBOURNE
SINGAPORE
SYDNEY
TAIPEI
TOKYO

NORTH AND
SOUTH AMERICA

| | | |
|---|---|---|
| BOGOTA | MEXICO CITY | SAN FRANCISCO |
| BRASILIA | MIAMI | SANTIAGO |
| BUENOS AIRES | MONTERREY | SAO PAULO |
| CARACAS | NEW YORK | TIJUANA |
| CHICAGO | PALO ALTO | TORONTO |
| DALLAS | RIO DE JANEIRO | VALENCIA |
| JUAREZ | SAN DIEGO | WASHINGTON, D.C. |

660 HANSEN WAY
PALO ALTO, CALIFORNIA 94304
TELEPHONE (415) 856-2400
FACSIMILE (415) 856-9299

POSTAL OR MAILING ADDRESS
P.O. BOX 60309
PALO ALTO, CALIFORNIA 94306-0309

November 5, 2002

**REGULATIONS UNIT
CC:ITA:RU**

NOV 0 7 2002

**ROOM 5226**
Giblen/Beck

CC:ITA:RU [REG-106359-02]
COURIER'S DESK
INTERNAL REVENUE SERVICE
1111 Constitution Avenue, N.W.
Washington, D.C. 20021

Re:     **Notice of Proposed Rulemaking Regarding Compensatory Stock
        Options Under Section 482**

Ladies and Gentlemen:

On behalf of the Software Finance and Tax Executives Council ("SoFTEC"), we are submitting comments on the notice of proposed rulemaking under section 482, REG – 106359 – 02, published in the Federal Register on July 29, 2002, regarding the application of the rules of section 482 to qualified cost sharing arrangements. These proposed regulations would require that taxpayers include the "cost" or value of stock-based compensation in the pool of costs to be shared under qualified cost sharing arrangements. As discussed below, these proposed regulations are inconsistent with the hallmark of the arm's length standard embodied in section 482, the regulations thereunder, the OECD Transfer Pricing Guidelines, and United States tax treaties. The proposed regulations should be withdrawn. In the alternative, we propose a "stock based compensation safe harbor" approach that would be created within the cost sharing regulations. This safe harbor would be an exception to the arm's length standard and would allow taxpayers to "opt in" and avoid the disputes that have been waged over the past several years regarding whether unrelated parties acting at arm's length would share the stock option value or "costs."

SoFTEC is a non-profit trade association focusing on finance, tax, and accounting issues relevant to the software industry. SoFTEC's membership comprises many of the world's leading software companies. *See* http://www.softwarefinance.org. Over the years, many SoFTEC member companies have entered into qualified cost sharing arrangements in accordance with

APP00032

BAKER & McKENZIE

Internal Revenue Service
November 5, 2002
Page 2

section 482 of the Internal Revenue Code and Treasury Regulation § 1.482-7 and have also entered into joint development agreements with unrelated parties. Over time, SoFTEC members have granted at-the-money stock options to their employees, including personnel involved in research and development activities covered under qualified cost sharing arrangements. Recently, SoFTEC has made a motion to the U.S. Tax Court to file a brief *amicus curiae* in *Xilinx v. Commissioner*, T.C. Dkt. No. 4142-01 (Apr. 4, 2002), which involves the issue of whether taxpayers must include stock option value or "costs" in their cost sharing pools under Treasury Regulation §1.482-7. That motion remains pending.

## I. FOR NEARLY SEVENTY YEARS, THE HALLMARK OF INTERCOMPANY TRANSFER PRICING RULES IN THE UNITED STATES HAS BEEN THE ARM'S LENGTH STANDARD

### A. The Arm's Length Standard Has Long Guided Congress and the Treasury

The Commissioner is authorized under section 482 of the Internal Revenue Code of 1986, as amended, to "distribute, apportion or allocate gross income, deductions, credits or allowances" between related parties "if he determines that such apportionment, allocation or distribution is necessary in order to prevent evasion of taxes or clearly reflect the income of [a controlled party]."

The Commissioner's authority to reallocate income first appeared in section 240(d) of the Revenue Act of 1921. Section 240(d) provided that where two or more related trades or businesses were owned or controlled directly or indirectly by the same interests, the Commissioner could "consolidate the accounts ... in any proper case, for the purpose of making an accurate distribution or apportionment of gains, profits, income, deductions, or capital between or among such related trades or businesses."[1]

The consolidation requirement of section 240(d) was eliminated when the provision was re-enacted in modified form as section 45 of the Revenue Act of 1928.[2] The report accompanying the enactment of section 45 provided that it was to be applied to related party transactions "as may be necessary to prevent evasion (by shifting of profits, the making of fictitious sales, and other methods frequently applied for the purpose of 'milking') and in order to clearly reflect their true tax liability."[3] The Revenue Act included these purposes — "to

---

[1] The provision was altered under the Revenue Act of 1924 to allow taxpayers as well as the Commissioner to request consolidation. The 1926 Act was similar.

[2] H. Rep. No.2, 70th Cong. 1st Sess. (Dec. 7, 1927), 1931-1 C.B. 384, 395; S. Rep. No. 960, 70th Cong., 1st Sess. (May 1, 1928), 1931-1 C-B. 409, 426; *See also Nat'l Securities Corp. v. Commissioner*, 137 F. 2d 600 (3rd Cir. 1943); *Asiatic Petroleum Co. v. Commissioner*, 79 F.2d 234 (2nd Cir. 1935).

[3] House Ways and Means Committee Report on the Revenue Act of 1928, H.R. Rep. No. 2, 70th Cong., 1st Sess. 16-17 (1928).

APP00033

Baker & McKenzie

Internal Revenue Service
November 5, 2002
Page 3

prevent evasion of taxes" and "to clearly reflect income" — in the statutory language, where they remain to this day.

In 1934, the Secretary issued regulations interpreting section 45. Like those of section 482 today, these regulations provided that the arm's length standard governed the application of section 45, so that a controlled taxpayer could be placed

> on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true net income from the property and business of a controlled taxpayer....*The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.* [4]

The essence of the 1934 regulations – requiring controlled taxpayers to deal with each other at arm's length – has been the basic policy behind section 482 and its regulations throughout its history. This overriding premise has remained unchanged through repeated reenactments of the revenue laws, including the Internal Revenue Codes of 1921, 1928, 1939, 1954, and 1986, and Treasury's various pronouncements on, and incarnations of, the section 482 regulations over these many years.

After more than 30 years of only nominal changes in the regulations,[5] Treasury in 1966 issued proposed regulations under section 482 to provide more specific rules for the allocation of income and deductions among taxpayers (the "1966 proposed regulations").[6] The arm's length principle of the section 45 regulations remained unchanged under the 1966 proposed regulations. The proposed regulations articulated how the arm's length standard generally applied to five specific types of transactions between related parties (loans and advances; services; transfers of tangible property; transfers of intangible property; and cost sharing). For each category, the regulation required that the terms of the same transaction type between independent parties be examined to determine whether the transaction between the related parties was at arm's length, *i.e.,* to determine the prices that unrelated parties charged, or would have charged at the time, in independent transactions under similar circumstances.[7] The proposed regulations were adopted in 1968 (the "1968 regulations").[8]

---

[4] Treasury Regulations 86, Under Revenue Act of 1934, Article 45-1 (emphasis added).

[5] *See* Treas. Reg. § 1.482-1, T.D. 6595, 1962-1 C.B. 43 (Apr. 14, 1962) (adoption of the section 45 regulations under Section 482 of the Internal Revenue Code of 1954).

[6] Treasury first issued proposed regulations under section 482 on April 1, 1965. These proposed regulations were withdrawn on August 2, 1966, and a new notice of proposed regulations was published (31 F.R. 10394).

[7] *See* Prop. Treas. Reg. § 1.482-2, 31 F.R. 10394 (Aug. 2, 1966).

[8] T.D. 6952, 1968-1 C.B. 218.

APP00034

BAKER & M<sup>c</sup>KENZIE

Internal Revenue Service
November 5, 2002
Page 4

The next major development occurred in 1986 when Congress enacted the "commensurate with income" standard.[9] Treasury again reaffirmed that the arm's length standard governs intercompany transfer pricing under section 482 in "A Study of Intercompany Pricing Under Section 482 of the Code" (the "White Paper"):[10]

> Congress intended the commensurate with income standard to be consistent with the arm's length standard, and it will be so interpreted and applied by the Internal Revenue Service and the Treasury.

Treasury and the Internal Revenue Service (the "Service") were unambiguous in stating that "the correct application of the commensurate with income standard is premised soundly on arm's length principles."[11]

> Looking at the income related to the intangible and splitting it according to relative economic contributions is *consistent with what unrelated parties do. The general goal of the commensurate with income standard is, therefore, to ensure that each party earns the income or return from the intangible that an unrelated party would earn in an arm's length transfer of the intangible.*[12]

In response to the comments Treasury received on the White Paper, Treasury proposed new section 482 regulations in January 1992 (the "1992 proposed regulations").[13] The 1992 proposed regulations made four changes to the then-current section 482 regulations: (i) amended the scope and purpose of the regulations to reflect the "commensurate with income" standard; (ii) adopted new methods for the transfer of tangible property; (iii) adopted new methods for the transfer of intangible property; and (iv) expanded the guidelines for cost sharing. A year later, on adopting the proposed regulations as temporary regulations, Treasury stated:

> As part of the recommended changes to the scope and purpose of the regulations, the proposed regulations included a statement that a broad principle to be applied in *all* cases was whether uncontrolled taxpayers exercising sound business judgment would have agreed to the same terms in the same circumstances.[14]

---

[9]   Tax Reform Act of 1986, P.L. 99-514, § 1231(e)(1).

[10]  Notice 88-123, 1988-2 C.B. 458, 458.

[11]  *Id.*

[12]  *Id.*, at 472 (footnotes omitted)(emphasis added).

[13]  Notice of Proposed Rulemaking (INTL-0372-88; INTL-0401-88), 57 F.R. 3571 (Jan. 30, 1992), corrected by 57 F.R. 27716.

[14]  Intercompany Transfer Pricing Regulations Under Section 482, T.D. 8470, 1993-1 C.B. 90, 91

APP00035

BAKER & McKENZIE

Internal Revenue Service
November 5, 2002
Page 5

Treasury issued the 1993 temporary regulations to provide taxpayers with immediate guidance on the implementation of the commensurate with income standard. Treasury and the Service again reiterated their position that the commensurate with income standard was consistent with, and equivalent to, the arm's length standard and explained that the 1993 temporary regulations were drafted to remove any doubt about the United States' intent to adhere to the arm's length standard:

> The scope and purpose provisions have been reorganized to make clear that the arm's length standard is the guiding principle for *all* allocations under section 482, and to provide additional guidance for determining comparability under the *arm's length standard.* Section 1.482-1T(a)(1) reaffirms that the purpose of section 482 is to ensure that taxpayers clearly reflect their income by placing a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the controlled taxpayer's true taxable income....
>
> Section 1.482-1T(b)(1) reaffirms that in determining a taxpayer's true taxable income, the standard to be applied is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer (the *arm's length standard*). In this respect, the regulations are consistent with the current regulations and reflect many comments on the proposed regulations, which stressed the importance of adhering to the arm's length standard. *The arm's length standard is satisfied if the results of controlled transactions are consistent with the results that would have been realized had uncontrolled taxpayers engaged in a comparable transaction under comparable circumstances.*[15]

In July 1994, final regulations were issued that were generally consistent with the format and substance of the 1993 temporary regulations, including its expressed adherence to the arm's length standard (the "1994 final regulations").[16] Treasury and the Service again revised the regulation's language to underscore the United States' adherence to the arm's length standard:

> With one exception, the scope and purpose of the regulations (§ 1.482-1(a)(1)) is substantially similar to its counterpart in the 1993 regulations. The final regulations delete the statement that section 482 placed uncontrolled and controlled taxpayers on a parity by determining the controlled taxpayer's true taxable income "in a manner that reasonably reflects the relative economic activity undertaken by each taxpayer." The definition of true taxable income in § 1.482-1(i)(9) already incorporates

---

(emphasis added) (the "1993 temporary regulations").
[15] *Id.*, at 92 (emphasis added).
[16] T.D. 8552, 1994-2 C.B. 93, 98.

APP00036

BAKER & McKENZIE

Internal Revenue Service
November 5, 2002
Page 6

> the notion that, under section 482, the controlled taxpayer should earn the amount of income that would have resulted had it dealt with other controlled taxpayers at *arm's length*. Because a transaction at arm's length naturally would reflect the "relative economic activity undertaken," this definition incorporates that concept, and it is unnecessary to include the additional language in this provision.[17]

It is apparent from this overview (of Treasury Regulations 86 under the Revenue Act of 1934, the section 482 regulations under the 1954 Internal Revenue Code, the 1966 proposed regulations, Treasury's 1988 White Paper, the 1992 proposed regulations, the 1993 temporary regulations, and the 1994 final regulations) that, to date, Treasury has remained steadfast in its adherence to the arm's length standard as the standard governing *all* related party transactions.

**B.    The Arm's Length Standard Is Enshrined in Case Law**

Like the regulations, the case law under sections 45 and 482 has repeatedly reaffirmed that the arm's length standard should be used to determine the "true" taxable income of controlled parties. Thus, in finding that an allocation by the Commissioner under section 45 was unwarranted, the Tax Court – in 1951 – stated in *Grenada Industries*:

> [T]he fact remains that Abar paid and received fair market prices, as though its transactions had been carried on with strangers. No more could be expected of it.[18]

Again in 1960, in holding that the Commissioner's allocation under section 45 was in error, the Tax Court in *Virginia Metal Products* stated:

> There is no evidence in the record to show that the dealings between the two corporate entities of Virginia and Winfield were not at all times at arm's length. In fact, we found them to be at arm's length.[19]

Similarly, as noted by the Fourth Circuit Court of Appeals in *Aiken Drive-In*, section 482 gives the Commissioner the power to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer. The Fourth Circuit Court of Appeals further stated:

> [The Commissioner's] object is to arrive at the true net income of each controlled taxpayer and the technique used is the application of the

---

[17]    *Id.,* at 98-99 (emphasis added).

[18]    *Grenada Industries, Inc. v. Commissioner,* 17 T.C. 231, 256 (1951), *aff'd* 202 F.2d 873 (5th Cir. 1953).

[19]    *Virginia Metal Products, Inc. v. Commissioner,* 33 T.C. 788, 800 (1960), *aff'd in part and rev'd in part on another matter,* 290 F.2d 675 (3rd Cir. 1961).

APP00037

BAKER & McKENZIE

Internal Revenue Service
November 5, 2002
Page 7

standard of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Whenever the lack of an arm's length relationship produces a different economic result from that which would ensue in the case of two uncontrolled taxpayers dealing at arm's length, the Commissioner is authorized to allocate gross income and deductions.[20]

Indeed, as the courts regularly reaffirm, so long as a transaction between related entities is carried out on an arm's length basis, the Commissioner is without authority to invoke section 482 at all.[21] The arm's length standard is the standard by which all actions of taxpayers, and of the Commissioner, are measured.

## II.    THERE IS NO EXCEPTION TO THE ARM'S LENGTH STANDARD FOR COST SHARING ARRANGEMENTS

As both the original 1968 regulations and, later, the 1988 White Paper recognized, "[C]ost sharing arrangements have long existed at arm's length between unrelated parties."[22] Accordingly, related party cost sharing arrangements have always been evaluated under the arm's length standard. When first issued, the 1966 proposed regulations provided a detailed set of cost sharing rules,[23] much like those reflected in the cost sharing provisions of the 1992 proposed regulations and the final regulations under Treas. Reg. § 1.482-7.[24] Although they set forth significant administrative and disclosure requirements and certain empirical criteria for qualified cost sharing arrangements, the 1966 proposed regulations specifically required costs to be shared on an arm's length basis, that is, in the same manner that such costs would be shared between unrelated persons.[25] Furthermore, the Commissioner's discretion to make adjustments to these agreements was limited to adjustments required to reflect arm's length sharing of the risks, benefits, and costs.[26]

When the 1968 regulations were promulgated, however, the Service eliminated the detailed cost sharing rules of the 1966 proposed regulations and opted for the simpler approach

---

[20]    *Aiken Drive-In Theatre Corporation v. United States*, 281 F.2d 7, 9-10 (4th Cir, 1960), *quoting Commissioner v. Chelsea Products, Inc.*, 197 F.2d 620, 623 (3rd Cir. 1952).

[21]    *See, e.g., U.S. Steel Corp. v. Commissioner*, 617 F.2d 942 (2nd Cir. 1980); *Davis v. United States*, 282 F.2d 623 (10th Cir. 1960); *Simon J. Murphy Company v. Commissioner*, 231 F.2d 639 (6th Cir. 1956); *Bausch & Lomb, Inc. v. Commissioner*, 92 T.C. 525 (1989) *aff'd* 933 F.2d 1084 (2nd Cir. 1991); *Virginia Metal Products, supra.*

[22]    White Paper, *supra* note 10 at 493.

[23]    Prop. Treas. Reg. § 1.482-2(d)(4) (1966).

[24]    *Compare* Prop. Treas. Reg. § 1.482-2(d)(4) (1966) *with* Prop. Treas. Reg. § 1.482-2(g) (1992), and Treas. Reg. § 1.482-7.

[25]    Prop. Treas. Reg. § 1.482-2(d)(4)(iv)(1966).

[26]    Prop. Treas. Reg. § 1.482-2(d)(4)(i)(1966).

Baker & McKenzie

Internal Revenue Service
November 5, 2002
Page 8

of Treas. Reg. § 1.482-2(d)(4)(1968). What remained was significant. Section 1.482-2(d)(4) continued to provide for costs and risks to be shared on an arm's length basis and limited the Commissioner's authority to make adjustments to bona fide cost sharing agreements to only those adjustments necessary to reflect an arm's length sharing of risks and costs. Section 1.482-2(d)(4) also specifically provided that "the district director shall not make allocations with respect to such [a bona fide cost sharing agreement] except as may be appropriate to reflect each participant's arm's length share of the costs and risks of developing the property." In the Treasury Department Release that accompanied the 1968 regulations, Treasury explained its rationale for the changes in the cost sharing rules:

> The regulations provide a means whereby the necessity of determining the arm's length charge may be avoided if the parties using the property enter into a bona fide cost sharing arrangement in connection with the development of the intangible property. Detailed rules with respect to the establishment of a bona fide cost sharing arrangement, which appeared in the earlier proposed regulations, have been eliminated in the final regulations. *These rules are replaced by a concise statement of general rules based on arm's length standards.*[27]

Nearly thirty years later, the final cost sharing regulations under Treas. Reg. § 1.482-7 (the "1995 cost sharing regulations") continued to reflect the overriding cannon that the arm's length standard applies to *all* transfer pricing methods.[28]

After adopting the arm's length standard for cost sharing arrangements in its own regulations, the United States successfully exported this view to its global trading partners. The United States Model Income Tax Convention and the Technical Explanation to the Convention explicitly acknowledge that related party cost sharing arrangements, like any other related party transaction, will be respected only if the arrangement satisfies the arm's length standard.[29] The U.S. Model Technical Explanation to Article 9, the operative article of the U.S. Model Tax Convention dealing with transfer pricing issues, provides, *inter alia*, that the arm's length standard governs all transfer pricing issues, including cost sharing arrangements:

> [T]he fact that associated enterprises may have concluded arrangements, *such as cost sharing arrangements* or general services agreements, is not in itself an indication that the two enterprises have entered into a non-arm's-length transaction that should give rise to an adjustment under

---

[27] Treasury Department Release F-1217 (April 16, 1968).

[28] *See* Treas. Reg. § 1.482-1(b)(1).

[29] On September 20, 1996, the Treasury Department amended and restated the United States Model Income Tax Convention (the "U.S. Model Tax Convention") and the Technical Explanation to the U.S. Model Tax Convention (the "U.S. Model Technical Explanation").

APP00039

BAKER & M$^c$KENZIE

Internal Revenue Service
November 5, 2002
Page 9

> paragraph 1. *Both related and unrelated parties enter into such arrangements (e.g., joint venturers may share some development costs). As with any other kind of transaction, when related parties enter into an arrangement, the specific arrangement must be examined to see whether or not it meets the arm's-length standard.* In the event it does not, an appropriate adjustment may be made, which may include modifying the terms of the arrangement or re-characterizing the transaction to reflect its substance.[30]

The OECD Model Tax Convention similarly acknowledges that related party cost sharing arrangements, like any other related party transaction, will be respected only if the arrangement satisfies the arm's length standard. The OECD Model Commentary[31] makes reference to the OECD Transfer Pricing Guidelines.[32] Chapter VIII of these guidelines deals with cost sharing arrangements, which the OECD calls "cost contribution arrangements" or "CCAs." The Guidelines provide that:

> Where a CCA is not consistent with the arm's length principle, the consideration received by at least one other participant for its contribution will be excessive, relative to what independent enterprises would have received. In such a case, the arm's length principle would require that an adjustment be made.[33]

For the conditions of a CCA to satisfy the arm's length principle,

> [A] participant's contributions must be consistent with what an *independent enterprise would have agreed to contribute under comparable circumstances* given the benefits it reasonably expects to derive from the arrangement."[34]

Numerous United States treaties also explicitly acknowledge that related party cost sharing arrangements, like any other related party transaction, will be respected only if the arrangement satisfies the arm's length standard (either in the treaty itself or in Treasury's

---

[30] U.S. Model Technical Explanation, *supra*, note 29, Commentary to Article 9, Paragraph 1 (emphasis added).

[31] Organization for the Economic Cooperation and Development, Commentary to the 1992 OECD Model Convention on Income and Capital (the "OECD Commentary") at C(9)-1 (1995).

[32] Organization for Economic Cooperation and Development, *Transfer Pricing Guidelines for Multinational Enterprises and Tax Administration* (2001) (the "OECD Guidelines").

[33] *Id.* at § 8.26 (emphasis added). *See also* OECD Guidelines, Chapter 8 (F), "Recommendations for structuring and documenting CCAs" at § 8.40 (requiring CCAs to conform to the arm's length principle and identifying conditions normally expected at arm's length).

[34] *Id.* at § 8.8 (emphasis added).

APP00040

BAKER & MᶜKENZIE

Internal Revenue Service
November 5, 2002
Page 10

accompanying technical explanation to the treaty). *See, e.g.*, the United States income tax treaties and related technical explanations with Austria,[35] Denmark,[36] Estonia,[37] Ireland, [38] Italy,[39] Latvia,[40] Lithuania,[41] Netherlands,[42] Slovenia,[43] South Africa,[44] Switzerland,[45] Thailand,[46]

---

[35] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Art. 9 ¶1, May 30, 1996, U.S.-Austria, S. Treaty Doc. No. 104-31, 1996 U.S.T. LEXIS 77; Dept. of Treasury, Technical Explanation of the United States-Austria Income Tax Treaty at 15 (September 19, 1996).

[36] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Art. 9 ¶1, August 19, 1999, U.S.-Denmark, S. Treaty Doc. No.106-12, 1999 U.S.T. LEXIS 167; Dept. of Treasury, Technical Explanation of the United States-Denmark Income Tax Treaty at 29 (Oct. 27, 1999).

[37] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Art. 9 ¶1, January 15, 1998, U.S.-Estonia, S. Treaty Doc. No.105-55, 1998 U.S.T. LEXIS 193; Dept. of Treasury, Technical Explanation of the United States-Estonia Income Tax Treaty at 29-30 (Oct. 27, 1999).

[38] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains, Art. 9 ¶1, July 28, 1997, U.S.-Ireland, S. Treaty Doc. No. 105-31, 1997 U.S.T. LEXIS 98.

[39] Convention for the Avoidance of Double Taxation and Prevention of Fraud or Fiscal Evasion, Art. 9 ¶1, August 25, 1999, U.S.-Italy, S. Treaty Doc. No. 106-11; Dept. of Treasury, Technical Explanation of the United States-Italy Income Tax Treaty at 28 (Oct. 27, 1999).

[40] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Art. 9 ¶1, January 15, 1998, U.S.-Latvia, S. Treaty Doc. No.105-57, 1998 U.S.T. LEXIS 195; Dept. of Treasury, Technical Explanation of the United States-Latvia Income Tax Treaty at 30 (Oct. 27, 1999).

[41] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Art. 9 ¶1, January 15, 1998, U.S.-Lithuania, S. Treaty Doc. No.105-56, 1998 U.S.T. LEXIS 194; Dept. of Treasury, Technical Explanation of the United States-Lithuania Income Tax Treaty at 30 (Oct. 27, 1999).

[42] Convention the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Art. 9 ¶1, December 18, 1992, U.S.-Netherlands, S. Treaty Doc. No.103-6, 1992 U.S.T. LEXIS 194; Dept. of Treasury, Technical Explanation of the United States-Netherlands Income Tax Treaty at 22-25 (Oct. 27, 1993).

[43] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, Art. 9 ¶1, June 21, 1999, U.S.-Slovenia, S. Treaty Doc. No.106-9, 1999 U.S.T. LEXIS 169; Dept. of Treasury, Technical Explanation of the United States-Slovenia Income Tax Treaty at 27 (Oct. 27, 1999).

[44] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains, February 17, 1997, U.S.-South Africa, Art. 9 ¶1, S. Treaty Doc. No. 105-9, 1997 U.S.T. LEXIS 117; Dept. of Treasury, Technical Explanation of the United States-South Africa Income Tax Treaty at 28 (Oct. 7, 1997).

[45] Convention for the Avoidance of Double Taxation with Respect to Taxes on Income, Art. 9 ¶1, October 2, 1996, U.S.-Switzerland, S. Treaty Doc. No.105-8, 1996 U.S.T. LEXIS 74; Dept. of

APP00041

BAKER & MᶜKENZIE

Internal Revenue Service
November 5, 2002
Page 11

Turkey[47] and Venezuela.[48] *See also* the United States' income tax treaties and related technical explanations with Finland,[49] Germany,[50] India,[51] Luxembourg,[52] and Sweden[53] (treaties entered into prior to publication of Treas. Reg. § 1.482-7 and the U.S. Model Tax Convention; United States promises treaty partners that the commensurate with income standard would be interpreted in a manner consistent with, and not as a departure from, the arm's length standard).

The OECD has also recognized that the arm's length standard plays a vital role in promoting international trade:

Treasury, Technical Explanation of the United States-Switzerland Income Tax Treaty at 28-29 (Oct. 7, 1997).

[46] Convention for the Avoidance of Double Taxation with Respect to Taxes on Income, Art. 9 ¶1, November 26, 1996, U.S.-Thailand, S. Treaty Doc. No. 105-2, 1996 U.S.T. LEXIS 71; Dept. of Treasury, Technical Explanation of the United States-Thailand Income Tax Treaty at 29-30 (Oct. 7, 1997).

[47] Agreement for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Art. 9 ¶1, March 28, 1996, U.S.-Turkey, S. Treaty Doc. No. 104-30, 1996 U.S.T. LEXIS 78; Dept. of Treasury, Technical Explanation of the United States-Turkey Income Tax Treaty at 31 (Sept. 19, 1996).

[48] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and on Capital, U.S.-Venezuela, Art. 9 ¶1, January 25, 1999, S. Treaty Doc. No.106-3, 1999 U.S.T. LEXIS 162; Dept. of Treasury, Technical Explanation of the United States-Venezuela Income Tax Treaty at 30 (Oct. 27, 1999).

[49] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and on Capital, Art. 9 ¶1, U.S.-Finland, September 21, 1989, S. Treaty Doc. No.101-11, 1989 U.S.T. LEXIS 209; Dept. of Treasury, Technical Explanation of the United States-Finland Income Tax Treaty at 13 (June 14, 1990).

[50] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital and to Certain Other Taxes, Art. 9 ¶1, August 29, 1989, U.S.-Germany, S. Treaty Doc. No.101-10, 1989 U.S.T. LEXIS 233; Dept. of Treasury, Technical Explanation of the United States-Germany Income Tax Treaty at 22 (June 14, 1990).

[51] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Art. 9 ¶1, September 12, 1989, U.S.-India, S. Treaty Doc. No.101-5, 1989 U.S.T. LEXIS 236; Dept. of Treasury, Technical Explanation of the United States-India Income Tax Treaty at 22 (June 14, 1990).

[52] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, Art. 9 ¶1, April 3, 1996, U.S.-Luxembourg, Sen. Treaty Doc. 104-33; Dept. of Treasury, Technical Explanation of the United States-Luxembourg Income Tax Treaty at 30 (Sept. 19, 1996).

[53] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Art. 9 ¶1, September 1, 1994, U.S.-Sweden, S. Treaty Doc. No.103-29, 1994 U.S.T. LEXIS 218; Dept. of Treasury, Technical Explanation of the United States-Sweden Income Tax Treaty at 21 (June 13, 1995).

APP00042

BAKER & McKENZIE

Internal Revenue Service
November 5, 2002
Page 12

> Because the arm's length principle puts associated and independent enterprises on a more equal footing for tax purposes, it avoids the creation of tax advantages or disadvantages that would otherwise distort the relative competitive positions of either type of entity. In so removing these tax considerations from economic decisions, the arm's length principle promotes the growth of international trade and investment.[54]

## III.  THE PROPOSED REGULATIONS ARE INCOMPATIBLE WITH THE ARM'S LENGTH STANDARD AS IT HAS BEEN UNDERSTOOD FOR NEARLY SEVENTY YEARS

### A.  The Proposed Regulations Arise Out of Several Years of Disputes With Taxpayers Over the Inclusion of Stock Options

Treasury issued the proposed regulations to address a very specific question arising out of the stock market run-up of the 1990s and the increased use of stock options in employee compensation packages. In particular, the Service has been interpreting the cost sharing regulations to require taxpayers to include the "cost" or value of employee stock options in their pool of costs. On audit, in Advance Pricing Agreement negotiations, in docketed Tax Court cases, in published field service advice, and in speeches by Service officials at various tax forums, the Service has taken the position that stock-based compensation constitutes a "cost" that, as such, must be included in related parties' cost sharing pools.[55]

Taxpayers have steadfastly and vehemently disagreed. First and foremost, taxpayers maintained that unrelated parties acting at arm's length did not share such "costs." Taxpayers provided evidence of billions of dollars paid under research and development cost sharing agreements where the United States itself did not reimburse stock option "costs" yet companies willingly participated in such arrangements. The Service, for its part, never produced – and is still yet to produce – any evidence that unrelated parties acting at arm's length in fact do share stock option "costs" in their own cost sharing pools. In Tax Court, the Service has even several times admitted that it has *no evidence* of unrelated parties acting at arm's length ever sharing the "cost" or value of employee stock options.[56] Thus, taxpayers argued, the Commissioner had no

---

[54]  OECD Guidelines, *supra* note 32, at §1.7.

[55]  *See* FSA 200103024 (Oct. 17, 2000) (the 1995 cost sharing regulations); *Seagate Technology, Inc. v. Commissioner*, 80 T.C.M. (CCH) 912 (2000) (1991 & 1992 tax years under the 1968 regulations); FSA 2000003010 (Oct. 18, 1999) (same); 1997 FSA LEXIS 311 (Aug. 1, 1997) (the 1968 regulations); *Adaptec, Inc. v. Commissioner*, T.C. Dkt. No. 3480-01 (1997 tax year under the 1995 cost sharing regulations); *Xilinx, Inc. v. Commissioner*, T.C. Dkt. No. 4142-01 (1995, 1996 & 1997 tax years under both 1968 regulations and 1995 cost sharing regulations).

[56]  *See Seagate, supra*, at 914 (the Service admitting a lack of evidence of arm's length dealings supporting its position); *Adaptec*, T.C. Dkt. No. 3480-01 (Petition and Answer at ¶¶5(d)(19) – (21));

BAKER & M<sup>c</sup>KENZIE

Internal Revenue Service
November 5, 2002
Page 13

authority to make any adjustments under section 482.

The Service has since abandoned its position under the 1968 regulations and recently directed its agents to stop taking the position that stock option "costs" or value must be included in cost sharing agreements in all cases involving the 1968 regulations.[57]  Likewise, the Service conceded the issue and entered into a stipulation of settlement to that end in *Xilinx v. Commissioner.*[58]  Nevertheless, the Service continues to maintain its position under the 1995 cost sharing regulations. The Service continues as well to be unable to show that unrelated parties acting at arm's length include stock-based compensation costs in their cost sharing agreements.

**B.      The Proposed Regulations Represent a Fundamental Departure from the Arm's Length Standard as It Has Been Universally Understood**

Treasury has justified the issuance of the proposed regulations by claiming that they merely "clarify" the 1995 cost sharing regulations. They do not. Instead, they represent a unilateral and fundamental change that ignores the manner by which unrelated parties act at arm's length. The proposed regulations are, therefore, incompatible with the arm's length standard.

The arm's length standard of section 482 has never been based on *a priori* concepts of what the Service thinks taxpayers *should* do; it has been based on what arm's length parties *actually* do. Generally, uncontrolled parties do not negotiate their business transactions based on rigid, preset formulae, but rather on the basis of existing market conditions. Unrelated parties determine their pricing on a case-by-case basis by analyzing the available market data. It is a fact intensive exercise, based on specific circumstances surrounding the developed intangibles, the market, and the taxpayer. The OECD Guidelines conclude that preset formulae "are likely to be arbitrary since they rarely fit exactly the varying facts and circumstances even of enterprises in the same trade or business."[59]  As further recognized: "No specific result can be provided for all situations, but rather the questions must be resolved on a *case-by-case basis, consistent with the general operation of the arm's length principle.*"[60]

To assume that in arm's length dealings, unrelated parties would necessarily, in all markets, and at all times, include their stock option "costs" in a research and development joint venture arrangement is contrary to the basic mechanisms of arm's length dealings. As recognized by the OECD, "predetermined formulae are arbitrary and disregard market conditions, the

---

*Xilinx*, T.C. Dkt. No. 4142-01 (Petition and Answer at ¶¶5(a)(37)-(45), ¶¶5(a)(50)-(54)).

[57] Large and Mid-Size Business Organization, Industry Directive on Stock Options and Cost Sharing Agreements, dated January 25, 2002, reprinted in 2002 TNT 21-45 (Jan. 30, 2002).

[58] *Xilinx v. Commissioner*, T.C. Dkt. No 4142-01 (Apr. 4, 2002).

[59] OECD Guidelines, *supra* note 32, at § 4.107.

[60] *Id.*, at § 8.15 (emphasis added). *See also* §§ 8.5, 8.13 and 8.14.

APP00044

BAKER & McKENZIE

Internal Revenue Service
November 5, 2002
Page 14

particular circumstances of the individual enterprises, and management's own allocation of resources, thus producing an allocation of profits that may bear no sound relationship to the specific facts surrounding the transaction"[61] – nor any notion of an arm's length standard. Assistant Secretary of the Treasury Samuels made the same point in 1994: "[T]he inflexible results obtained under a predetermined formula would not resemble the results under the arm's length standard, where the method used is tailored to the individual facts and circumstances."[62]

Nevertheless, in the newly proposed cost sharing regulations, Treasury has chosen to redefine this long-standing, internationally recognized objective criterion of the arm's length standard by administrative fiat. In sum, Treasury has opted precisely for the type of "one size fits all" fixed formula that it encouraged the international community to reject in the OECD Guidelines. The proposed regulations state that:

> A qualified cost sharing arrangement produces results that are consistent with an arm's length result within the meaning of § 1.482-1(b)(1) *if, and only if, each controlled participant's share of the costs (as determined under paragraph (d) of this section)* of intangible development under the qualified cost sharing arrangement equals its share of reasonably anticipated benefits attributable to such development (as required by paragraph (a)(2) of this section) and all other requirements of this section are satisfied.[64]

Costs under paragraph (d) of the proposed regulations include, of course, stock-based compensation "costs" or value, as measured when the employee stock option is exercised, or alternatively, when it is granted.

There is no evidence arising from the behavior of uncontrolled parties to support the proposition that parties dealing at arm's length currently share the "cost" or value of stock-based compensation under their joint development arrangements. Indeed, whether the issuance of stock options creates a "cost" to the company or to the shareholders in the first place under generally accepted accounting principles has been a matter of some dispute for many years.[65] One of the

---

[61] *Id.*, at § 3.67.

[62] Treasury News Release, "Remarks by Leslie B. Samuels, Assistant Secretary for Tax Policy, Seventh Annual International Tax Institute, George Washington University (Dec. 16, 1994); *See also* Statement of Leslie B. Samuels Assistant Secretary (Tax Policy), Department of the Treasury Before The Committee on Foreign Relations, United States Senate (Oct. 27, 1993).

[63] OECD Guidelines, *supra* note 32, at §1.7.

[64] Prop. Treas. Reg. § 1.482-7(a)(3), 67 F.R. 48997 (emphasis added).

[65] For almost 50 years, mainstream accounting principles have not considered the grant or exercise of employee stock options to constitute a corporate "cost" or expense. See Accounting Research Bulletin No. 43 (1953); Accounting Principles Board Opinion No. 25 (1972); Financial Accounting Standards No. 123 (1995). Recently, however, the Financial Accounting Standards Board in the United States

BAKER & MᶜKENZIE

Internal Revenue Service
November 5, 2002
Page 15

reasons for the lack of arm's length evidence and the accounting debate over the proper treatment of employee stock options is that it is unclear whether the employee stock options are an economic cost of the corporation issuing the options at all.[66] At issuance, the employee stock options create valuable incentive and agency effects that inure to the issuing corporation. Employee stock options align the interest of the employees and the shareholders (*i.e.*, agency effects) and induce employees to work harder (*i.e.*, incentive effects). The issuance of employee stock options has a potentially dilutive cost to the current shareholders, but this potential dilution occurs only if stock prices rise and employees exercise their options. To the extent that the benefit of the incentive and agency effects exceed the dilutive cost of the employee stock options, there is no net cost to the shareholders to grant the stock options. Since the adoption of Statement of Financial Accounting Standards No. 123 in 1995 (which coincided with the promulgation of the 1995 cost sharing regulations), the economic and accounting literature has continued the debate over whether the grant or exercise of employee stock options is an economic cost to either the corporation or the shareholders. The evidence to date shows that the benefits of agency incentive effects at least equals and may exceed the dilutive effect of employee stock options.[67] Thus, employee stock option costs do not appear to have *any* net economic cost to the firm.[68]

Moreover, the exercise date measurement of the stock option inclusion of the proposed regulations is indefensible as a matter of economics.[69] The exercise date measurement depends on the movements of the company's stock price, which may or may not relate to the success or failure of the research development project or the value of the underlying employee services. The effect of measuring the inclusion in the cost sharing pool by the spread on exercise of the options forces the cost-sharing participants to compensate their joint venture partners as if the cost-sharing participant wrote a call option on its joint venture partner's stock. Thus, the cost-sharing

---

and the International Accounting Standards Board have begun to reconsider the treatment of employee stock options for financial statement purposes. To date, neither body has acted to require companies to treat the grant or exercise of employee stock options as a corporate expense.

[66] *See, generally,* Report of Prof. William J. Baumol and Prof. Burton G. Malkiel, "Status of Stock Options in Shared-Cost Contracts," (April 8, 2002), Ex. F to SoFTEC's Brief Amicus Curiae filed in *Xilinx,* T.C. Dkt. No. 4142-01 (April 30, 2002) ("Baumol & Malkiel Report" attached as Exhibit A). Unlike most other corporate expenses, at issuance of the stock option, the corporation does not pay out any assets of the corporation to the employee. In theory, the employee takes less in cash wages when granted stock options; thus, the stock options granted to an employee save the corporation cash. At exercise of the option, the corporation receives the strike price from the employee. Baumol & Malkiel Report at 4-5, 12-13.

[67] Baumol & Malkiel Report, *supra* note 66, at 3-6, 12-15, 25-36; *see also,* Lynn Rees and David Stott, "The Value-Relevance of Stock-Based Employee Compensation Disclosures," *Journal of Applied Business Research* Vol. 17, No. 2 105-116 (Spring 2001);

[68] *See* Baumol & Malkiel Report, *supra* note 66, at 25-36.

[69] *Id.,* at 20-25.

APP00046

BAKER & M<sup>c</sup>KENZIE

Internal Revenue Service
November 5, 2002
Page 16

participant has full exposure to the increases in the joint venture partner's stock price no matter the results of the research development project.[70] This is akin to "shorting" your business partner's stock. There is simply no way that unrelated joint venture partners would agree to take such a risk; in fact, they do not.[71]

Most fundamentally, unrelated parties in the marketplace, acting at arm's length, do not currently include stock option "costs" or value in their joint development agreements, regardless of how or when such "costs" or value are measured. No amount of hypothesizing by the Service or Treasury changes that empirical evidence.

Therefore, rather than "clarifying" the current regulations, the proposed regulations actually are based on unsubstantiated assumptions of arm's length dealings, representing a fundamental change in what it means to reflect the manner by which unrelated parties act at arm's length. The arm's length standard has never been a subjective test; it always has been an objective review of actual market activity – of actual *observable* results – to determine what unrelated parties acting at arm's length do. Section 482 certainly never has been normative and has never attempted to dictate what arm's length parties would do. This concept is reflected as well in the "best method" rule of Treas. Reg. § 1.482-1(c), which recognizes that the determination of an arm's length price must be based on all of the facts and circumstances, not on *a priori* concepts of arm's length behavior. "Thus, there is no strict priority of methods, and no method will invariably be considered to be more reliable than others."[72] Just as there can be no strict priority of methods, there can be no a strict rule concerning what costs must be shared. Although the proposed regulations suggest a mere "amendment" to this best method rule, the amendment will eviscerate it.

### C.    The Proposed Regulations Represent Poor U.S. and International Tax Policy And May, Ultimately, Whipsaw The Service

The proposed regulations represent inappropriate, if not irresponsible, U.S. tax policy. It is shortsighted if not improper for Treasury to abandon the very essence of the arm's length standard as a reaction to the temporary run-up in stock prices the United States experienced in the late 1990s. It is equally inappropriate to redefine by administrative fiat the arm's length standard based on unsubstantiated notions of how unrelated parties should address the sharing of stock-based compensation "costs" and without any sound and reasoned market data. Treasury should not undercut the arm's length standard with a shortsighted and temporary "fix" to a perceived revenue leakage as a result of fleeting market conditions. If Treasury requires taxpayers to include the "costs" or value of stock-based compensation in their cost sharing

---

[70]    *Id.*, at 23-25.

[71]    *Id.*, at 36-45.

[72]    Treas. Reg. § 1.482-1(c)(1); *Cf.* Treas. Dept. Release F-1217, *supra* note 27, at 2.

IRS - 0014016

BAKER & M<sup>c</sup>KENZIE

Internal Revenue Service
November 5, 2002
Page 17

arrangements, *even if* similarly situated independent parties do not do so under similar circumstances – as the Service has admitted repeatedly – then Treasury has, by definition, directly contravened the arm's length standard.

The proposed regulations also represent inappropriate, if not irresponsible, international tax policy. By imposing formulary standards and ignoring the relevant economic facts, the proposed regulations are antithetical to the objective criteria utilized throughout the international community. This unilateral change by the United States will lead to international double taxation. The United States and its treaty partners have consistently subjected cost sharing arrangements to the arm's length standard like any other related party transactions. Among other items, most U.S. Treaties provide that if an adjustment is made in one country in accordance with the arm's length standard, then, in certain circumstances, the second country will make a correlative adjustment to take into account the negative effect of the first country's adjustment.[73] Because the United States has never been able to establish that parties acting at arm's length share stock option "costs," United States treaty partners will likely reject any discussion of possible correlative adjustments.[74] Taxpayers in the United States (as well as the U.S. Competent Authority) would find themselves in the unenviable and untenable position of having to explain why "unrelated parties acting at arm's length" means one thing in the United States and something quite different in the rest of the world.

The proposed regulations therefore create the real risk of placing the Service in a cross-border "whipsaw."[75] If a U.S. taxpayer cost shares with a subsidiary in a treaty jurisdiction and if the U.S. taxpayer includes stock option "costs" or value under the proposed regulations, then, following traditional arm's length principles, the treaty partner may well through Competent

---

[73] *See, e.g.*, Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and on Capital, Art. 9 ¶2, December 31, 1975, U.S.-United Kingdom, TIAS 9682, 1975 U.S.T. LEXIS 605; Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and on Capital, Art. 9 ¶3, September 26, 1980, U.S.-Canada, TIAS 11087, 1980 U.S.T. LEXIS 93; Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and on Capital, Art. 10 ¶2, August 29, 1980, U.S.-Egypt, TIAS 10149, 1980 U.S.T. LEXIS 325.

[74] Louise M. Kauder, "The Unspecific Federal Tax Policy of Arm's Length: A Comment on the Continuing Vitality of Formulary Apportionment at the Federal Level," 60 Tax Notes 1147 (Aug. 23, 1993).

[75] *See* Treasury Department News Release F-1069, "Remarks by the Honorable Stanley S. Surrey, Assistant Secretary of the Treasury, Before the National Foreign Trade Council Convention, The Waldorf-Astoria Hotel, New York, New York, Wednesday, November 1, 1967, 3:00 p.m., EST," at 19 (Assistant Secretary Surrey cautioning that transfer pricing rules have "two sides of the coin" such that one-sided rules create whip-saw potential.); *See also*, Surrey, "Reflections on the Allocation of Income and Expenses Among National Tax Jurisdictions," 10 Law and Policy in Int'l. Business, 409, 414 (1978).

APP00048

BAKER & MᶜKENZIE

Internal Revenue Service
November 5, 2002
Page 18

Authority force the reversal of that inclusion. On the other hand, if a foreign corporation from a treaty jurisdiction cost shares with a U.S. subsidiary, then the corporation may very well push the same stock option "costs" or value into the United States via the U.S. subsidiary. Because the United States will be bound by its own published guidance, it will have to abide by the taxpayer's decision. In the end, the U.S. fisc loses. The whipsaw potential of the non-arm's length proposed regulations "underscores both the need for consistency and the care required in the formulation of appropriate rules."[76]

In sum, the proposed regulations attempt to fit the "square peg" of stock-based compensation "costs" into the "round hole" of the arm's length standard. If promulgated as is, the proposed regulations will not be an amendment to (nor, most certainly, a "clarification" of) the arm's length standard. Rather, they will be directly *contrary* to the arm's length standard. For nearly 70 years, "In determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. *A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result)*."[77] Without any marketplace or real-world evidence that unrelated parties acting at arm's length share stock option "costs" or value, Treasury's proposal represents a formulary apportionment approach to section 482. That approach has been consistently rejected. The proposed regulations should be withdrawn.

## IV. IF NOT WITHDRAWN, THE COST SHARING REGULATIONS SHOULD PROVIDE FOR THE ALTERNATIVE OF A "STOCK-BASED COMPENSATION" SAFE HARBOR

### A. Taxpayers Should Be Given a Choice

SoFTEC recognizes that the Service is intent on amending the current cost sharing regulations in some manner. The Service has wanted taxpayers for some time to include stock-based compensation "costs" in their cost sharing agreements. Because unrelated parties acting at arm's length do not share stock option "costs," however, these proposed regulations should be withdrawn.

If Treasury insists on moving forward and requiring taxpayers to engage in conduct that is not arm's length, the proposed regulations should not "amend" the arm's length standard and jeopardize, among other things, the United States' relations with its treaty partners. Instead, if there is to be some change there should be, at most, a decidedly non-arm's length "stock based

---

[76] *Id*

[77] Treas. Reg. § 1.481-1(b)(1) (emphasis added).

IRS - 0014018

APP00049

BAKER & MℭKENZIE

Internal Revenue Service
November 5, 2002
Page 19

compensation safe harbor" within the cost sharing regulations. As discussed below, taxpayers who "opt in" to this safe harbor would receive benefits that would not be available to taxpayers who do not. If taxpayers wish to minimize the potential for tax controversies arising out of their cost sharing arrangements, then they may "opt in" to the safe harbor and include stock option "costs." If taxpayers wish to exclude stock option "costs" and are prepared to defend their non-inclusion of such "costs" under the arm's length standard, they may "opt out" of the stock-based compensation safe harbor. Taxpayers can then balance the benefits and burdens of utilizing the safe harbor and proceed under the general cost sharing rules of Treas. Reg. §1.482-7. In either case, the decision would be the taxpayers, who would have the ability to plan their related party transactions accordingly.

This represents a "carrot and stick" solution to this issue. The cost sharing regulations should include a stock based compensation safe harbor, with sufficient incentives to encourage taxpayers to utilize the safe harbor. The incentives to utilize the stock-based compensation safe harbor should be two-fold. First, taxpayers who elect this safe harbor will have the benefit of knowing that the Service will not challenge their cost sharing arrangements. Second, if a taxpayer elects to utilize the safe harbor, the taxpayer's cost sharing arrangements for years prior to the effective date of the regulations should not be subject to examination or reallocation under section 482 at all. Taxpayers who opt in to such a non-arm's length safe harbor are giving up quite a bit. If the Service wishes to encourage taxpayers to take advantage of the safe harbor, then it must be willing to provide a substantial enough "carrot" in return. These incentives should make the benefits sufficient for taxpayers to opt in to the new safe harbor thereby substantially improving the responsiveness of the new cost sharing regulations to the stated goal of reducing disputes over the development and exploitation of intangible property between related parties.

Nevertheless, some taxpayers will wish to enter into cost sharing arrangements on terms that they believe to be arm's length terms which do not include stock option costs. These taxpayers have the right to do so under both section 482 and United States tax treaties. The costs that are shared under such arrangements must be on terms that are consistent with the behavior of unrelated parties acting at arm's length, as determined under the general arm's length principles of Treas. Reg. §§ 1.482-1 and 1.482-7.[78] These taxpayers will forego the repose of the safe harbor for stock-based compensation with the full knowledge that the Service may challenge the arrangement.

**B.    The Safe Harbor Regulations Should Be Easily Administered**

If the Service creates a stock-based compensation safe harbor within the cost sharing

---

[78] Safe harbor cost sharing arrangements that include the "cost" of employee stock options in the pool of costs to be shared among controlled affiliates are not uncontrolled transactions and cannot be used by the Service as evidence of arm's length dealing.

APP00050

BAKER & M<sup>c</sup>KENZIE

Internal Revenue Service
November 5, 2002
Page 20

regulations, the safe harbor regulations should be made more simply administrable. The carrot and stick approach that we advocate requires that the "carrot" be sufficiently desirable. All safe harbors involve trade-offs and if the benefits of using the safe harbor are too little, taxpayers will not do so. A taxpayer's decision to utilize the proposed stock-based compensation safe harbor will be based in part on the role that stock options play within the company and the expected future performance of the company's stock. Both of these factors are subject to change over time and therefore, the decision to utilize the stock-based compensation safe harbor should not be irrevocable. Instead, while elections to use the stock-based compensation safe harbor should be binding for some period, taxpayers must be allowed unilaterally to opt out of the safe harbor thereafter at their own discretion.

In addition, the method by which the "cost" or value of stock-based compensation is included in the cost sharing pool should be amended. In a safe harbor context, the measurement and timing methods of Prop. Treas. Reg. § 1.482-7(d)(2)(iii) could perhaps be used – notwithstanding the inherently flawed assumptions required that would make the use of such rules arbitrary, capricious, and unreasonable outside of a safe harbor context. Taxpayers should also be permitted to use any reasonable method to value the costs associated with their stock-based compensation. To the extent that taxpayers elect to value their stock options at grant date under the same terms as for financial statement purposes, the proposed regulations should also allow taxpayers to make an annual determination regarding whether individual employees actually provide services related to the intangible development area. The proposed regulations, which assign stock options to the cost sharing arrangement based on the employees' responsibilities on the grant date, do not result in a clear reflection of intangible development costs.[79] Employees frequently transfer back and forth between positions that involve the development of intangibles and positions that do not, and their position on the grant date can result in an arbitrary allocation of expenses. For financial statement purposes, companies may amortize the "cost" of stock options over the vesting period of the option, matching the "cost" to the services provided by the employees. Permitting taxpayers to make an annual determination will result in a more accurate determination of costs. Thus, under such methodology, a taxpayer is required to include the "cost" in the pool in an amount equal to the financial statement amortization only for options vesting while the employee works in the intangible development area. Taxpayers seeking to reduce the administrative burden of making annual determinations on an employee-by-employee basis should be allowed to elect a one-time determination on the grant date as to whether the employee provides services related to the intangible development area.

## V.    TRANSITION RULES

The final regulations should also include appropriate transition rules involving the treatment of stock options for periods preceding the effective date of the regulations and

---

[79] *See* Prop. Treas. Reg. § 1.482-7(d)(2)(ii).

APP00051

BAKER & MᶜKENZIE

Internal Revenue Service
November 5, 2002
Page 21

permitting taxpayers to conform their existing cost sharing arrangements to the new regulations.

The Treasury Department and the Service should make clear that all taxpayers, regardless of whether they elect the stock-based compensation safe harbor, are not, and will not be, required to include the value or "cost" of employee stock options in their qualified cost sharing agreements for years subject to the 1995 cost sharing regulations, *i.e.* for years preceding the effective date of the final new cost sharing regulations. Treasury should explicitly recognize that the proposed regulations represent a fundamental change to its traditional approach to section 482. In fact, had the Service been able to prove that arm's length parties actually share these costs, it would not have needed these proposed regulations in the first instance. Taxpayers have relied on the known lack of any evidence that unrelated parties actually share stock option costs and any explicit statement in the regulations *requiring* that these costs be shared. For open tax years preceding the effective date of the regulations, the Service faces the risk that Xilinx, or another taxpayer, will prevail in court on the issue of whether arm's length parties share stock option "costs." An adverse court decision under the arm's length standard would effectively preclude the Service from achieving its objective of taxpayers sharing stock option "costs" or value under any theory. Consequently, the Service should use the final regulations as an opportunity to announce that it will no longer litigate this issue with respect to prior years.

As currently proposed, the amendments to the regulations will generally be effective for taxable years beginning on or after the date that final rules are published in the Federal Register. It is not reasonable to expect taxpayers to implement the amended regulations on such short notice.

It will take time for taxpayers to decide whether they wish to conform their cost sharing arrangements under the proposed safe harbor, chance controversy with the Service, or use some alternative means of developing and exploiting intellectual property. It will take time for taxpayers to amend their cost sharing agreements to conform to the proposed safe harbor or to implement other arrangements. Some taxpayers have established complex international structures that they may wish to restructure if they wish to avoid controversy with the Service but keep their related party arrangements arm's length (*i.e.*, not arbitrarily include stock option "costs" in their cost sharing arrangements). This process cannot be done overnight and therefore the final regulations should provide an appropriate transition period. When the current cost sharing regulations were adopted, taxpayers were granted a one-year transition period in which to conform their cost sharing arrangements to the regulations.[80] As a result of the complexities of some taxpayer's structures, some taxpayers may require as long as two years to restructure. Therefore, taxpayers should be granted a two-year period after the finalization of the regulations to conform their existing cost sharing arrangements to include stock option "costs" if they wish to take advantage of the safe harbor being offered, or weigh their litigation risks to either

---

[80]   *See* Treas. Reg. § 1.482-7(l).

APP00052

BAKER & M<sup>C</sup>KENZIE

Internal Revenue Service
November 5, 2002
Page 22

continue their arrangements as currently structured or restructure their international operations to avoid controversy with the Service.

## VI.    CONCLUSION

Requiring taxpayers to include the "cost" or value of employee stock options in a qualified cost sharing arrangement, despite no evidence that arm's length taxpayers engage in similar behavior, is simply incompatible with the arm's length standard. Joint research ventures, joint product development ventures, or joint marketing agreements are all examples of commercial activities that are undertaken at arm's length by unrelated parties every day in the marketplace. The arm's length standard requires no more and no less than that taxpayers conduct their related party cost sharing arrangements in the same manner as unrelated parties. The proposed regulations violate this core principle and, in so doing, contravene the arm's length standard as currently embodied in section 482, the Treasury regulations, the OECD Transfer Pricing Guidelines, and United States income tax treaties.    Consequently, the proposed regulations are of dubious validity and should be withdrawn. If the Service wishes to encourage taxpayers to include stock-based compensation "costs" or value in their related party cost sharing arrangements, then it should encourage taxpayers to do so by creating a non-arm's length administrative safe harbor within the cost sharing regulations, while still recognizing that cost sharing is a real world commercial practice that is subject to general arm's length principles.

*    *    *    *    *

We appreciate the opportunity to submit these comments.

Respectfully submitted,

John M. Peterson, Jr.

Bruce A. Cohen

Rachel Hersey

APP00053

## EXHIBIT A

STATUS OF STOCK OPTIONS IN SHARED-COST CONTRACTS

REPORT OF

PROFESSOR WILLIAM J. BAUMOL

PROFESSOR BURTON G. MALKIEL

April 8, 2002

PADOCS\234190v1

IRS - 0014023

APP00054

## STATUS OF STOCK OPTIONS IN SHARED-COST CONTRACTS

### REPORT OF
### PROFESSOR WILLIAM J. BAUMOL
### AND
### PROFESSOR BURTON G. MALKIEL

### April 8, 2002

We have been asked to describe the implications of economic analysis for the proper treatment of stock options issued by one of two firms that have entered into a cost-sharing agreement, in the assignment of cost responsibility between the two firms under that agreement. The crucial issue, patently, is whether in the absence of an explicit provision on the matter, for tax purposes it should be deemed that those options are to be considered at all in the apportionment of costs under the contract. In addition, we have been asked to analyze, as is the contention of the IRS, that such options should be evaluated in terms of their expected *ex post value or their spread on exercise*, and that this estimated value should be treated for tax purposes as a portion of the total cost that is to be shared between the two firms, in exactly the same manner that the already-shared costs are currently divided under the terms of the agreement.

In particular, we have been asked to consider the following issues:

1. Whether the value of employee stock options can be estimated to a reasonable degree of economic certainty.

2. Whether, to a reasonable degree of economic certainty, there is any measurable economic cost to the firm relating to the grant of employee stock options.

EXHIBIT F

APP00055

3.    Whether, to a reasonable degree of economic certainty, the amount of the section 83 tax deduction taken by a firm relating to the spread upon exercise of its employee stock options constitutes an economic cost to the firm.

4.    Whether, to a reasonable degree of economic certainty, Xilinx's exclusion of the value or "cost" of employee stock options from its agreement to share development costs with its affiliated entities was consistent with arm's-length dealings by unrelated parties in the marketplace.

To analyze these issues, here we will first examine the two primary roles that are played by stock options in the modern firm – these roles having very different implications for the matter at issue. We will also investigate whether there exists a method for evaluation of such stock options that is reasonably reliable and whose results are reasonably unambiguous. Finally, we will comment on the implications of the arm's-length standard, a standard entirely defensible in terms of economic analysis, for the contentions of the IRS and the Commissioner of Internal Revenue.

## Summary of Approaches and Conclusions

We will explore the pertinent issues in three ways: in terms of economic analysis, via a review of relevant earlier studies and, finally, on the empirical evidence, that pertinent to the accuracy of valuation of options and that pertinent to arm's-length contracts in reality.

The analytical material will lay out, with the aid of the economist's approaches, the character and functions of stock options, the nature of any associated costs to the firm, their distinction from costs to current stockholders, and the appropriate role of stock

2

APP00056

options, if any, in a contract between two firms entailing their sharing of the costs of certain activities of one or both of those enterprises. This last item will play a key role in our analysis of the arm's-length evidence pertinent to the IRS contentions.

The examination of earlier studies will investigate two issues, first, whether the evidence those studies provide supports the contention that stock options do constitute a cost. At least equally important, we will also examine whether these studies, as well as the available methods of empirical analysis of options make it possible to obtain accurate and unambiguous estimates of the true values of those options and corresponding estimates of any associated costs.

The empirical materials, together with the analysis of the character of cost-sharing agreements and the pertinence of the issue of stock options to employees, will be used to draw conclusions on three related matters: first, why the arm's-length standard is a defensible basis for analysis of issues such as that before the court, second, whether the logic of the issue does or does not lead to the expectation that firms entering cost-sharing agreements at arm's-length will include stock options as entailing costs to be shared and, third, whether in practice there exists evidence that such inclusion is or is not universal or even usual.

Our analysis will lead us to the following conclusions:

1.    **The value of long-term stock options granted to employees cannot be estimated from the economic evidence with a reasonable degree of certainty.** The disciplines of economics and finance do not provide a method by which the value of long-term employee stock options can be measured with any degree of accuracy, particularly given the long-term nature of such options. The Black-Scholes model, the

3

APP00057

most sophisticated tool available for the purpose, works extraordinarily well for periods up to three months in maturity. But even for exchange traded options, the Black-Scholes model works less well for options with maturities from six months to one year. And for longer periods (Xilinx's employee stock options had ten year lives) it is inherently unreliable and inaccurate for reasons that will be explained.

    2. **There is no measurable net economic cost to a firm related to the grant of employee stock options.** Stock options, when provided to employees generally play at least one of two roles. They can constitute a partial substitute for payment of salary, wages or compensation, and/or they can help to eliminate or at least to alleviate one much studied problem in corporate governance, the possibility of divergence between the interests of the members of corporate management and those of the stockholders. For, by making the real earnings of the recipient of the options contingent on the performance of the firm's equity, stock options can help to align the interests of these two groups. Furthermore, the employee stock options may provide significant beneficial incentive effects. It is important to distinguish between a cost to a given body of stockholders and a cost to their firm. Even though the firm is the property of the body of its stockholders, a newly issued stock option, if it does nothing else, merely redistributes some of the firm's future earnings between the initial holders of its stocks and the new stockholders created by the options. Unlike an increased wage payment that, *ceteris paribus*, reduces the firm's net earnings, a new employee stock option that leaves all else unaffected preserves the firm's earnings unchanged. If there are any added returns that result from an incentive provided by the options they do not constitute a cost offset but a

4

APP00058

net addition to the firm's total future earnings. Where such enhanced earnings are present, all stockholders may benefit from the provision of the options.

To the extent that employees accept lower cash compensation as a result of the grant of employee stock options, such grants help to preserve the firm's cash. To the extent that the employees later exercise their options after a rise in the stock price of the firm, the employees pay the firm the fair market value of the firm's stock price at the time of the option grants. In neither event does the firm incur any direct cost. Even more important, the incentive effects of employee stock options may improve the performance of the firm by causing employees to work harder or more efficiently and to align the interests of management and shareholders.

The grant of employee stock options, however, has a detrimental dilutive effect on the corporation's shareholders. If the shareholders and the marketplace at large were to consider the dilutive effects of employee stock option grants to outweigh the benefits to the firm of such option grants, then the price of the firm's stock would fall and this would indeed result in an economic cost to the firm – an increase in the firm's equity cost of capital. On the other hand, if the shareholders and the market were to consider the positive benefits of the option to outweigh the dilutive effects, then the firm's stock price would not fall but would remain unchanged or possibly even increase. If this latter expectation were in fact shared by shareholders and the marketplace, then the grant of employee stock options would have no cost to the firm because the firm's equity cost of capital would remain the same or even decrease as a consequence of such grants.

The issue whether the grant of employee stock options affects stock prices is inherently empirical. There exists a considerable body of economic literature that

5

APP00059

investigates the effects of employee stock options on the position of stockholders. Though many of these studies are carried out dispassionately and by highly competent investigators, the complexity of the issues they study has prevented them from yielding unambiguous answers. By and large the studies have indicated that beneficial effects of employee stock options equal or exceed the dilutive effects, thus indicating that stockholders do benefit from the grant of employee stock options. However, there is at least one unpublished working paper that has reached the contrary conclusion, though, like many of the other studies, it is characterized by serious imperfections.[1] After dealing with some statistical issues in the treatment of the data, we found that the calculated results of the unpublished working paper were consistent with the remaining body of empirical work.[2] All in all, it is our conclusion that this body of investigation has produced no evidence that the issue of stock options generally has detrimental effects upon stockholders – that is, the empirical analyses show that the beneficial effects of stock options appear at least to equal the dilutive effect on shareholders. Thus, the empirical research to date supports the conclusion that there is no measurable economic cost to shareholders – or to the firm – related to the grant of employee stock options.

3. **The amount of the section 83 tax deduction taken by a firm related to the spread upon exercise of its employee stock options corresponds to no economic cost to the firm.** It is widely accepted by economists that the stock prices generally

---

[1] In the fields of economics and finance, papers accepted for publication in significant journals must first undergo rigorous peer review before being accepted for publication. The peer review process is designed to ensure that the proffered papers do not suffer from defects in theory, logic or statistics.

[2] In reviewing the unpublished working paper, we noted what we believed to be problems in certain statistical aspects of the analysis. After contacting the authors and obtaining their data set, we asked Dr. Atanu Saha to assist us by making certain alterations to and re-running the various regression equations in the unpublished working paper. Dr. Saha's analysis is summarized below and is set forth in full in his economic report.

6

 APP00060

incorporate all pertinent and publicly known information.[3]  Under applicable accounting rules, publicly reporting firms must fully disclose information related to their grants of employee stock options.  Thus, the stock markets must already anticipate the exercise of the "in the money options" (i.e., options with a strike price less than the current market price of the stock) and the dilutive effect of such exercises must be expected already to be reflected in the stock price.  In our judgment the issue of whether there is an economic cost to the firm relating to employee stock options economically must appropriately be measured at the time of option grant.  The problems that arise in attempting to separate the dilutive effects from the incentive effects at the time of exercise are particularly acute.  Indeed, we believe that the spread on exercise is more likely at least in part to reflect any beneficial incentive effects of the employee stock options than any dilutive effect.

4.      **The economic evidence clearly supports the conclusion that Xilinx's exclusion of the value or "cost" of employee stock options from its agreement to share development costs with it affiliated entities was entirely consistent with arm's-length dealing by unrelated parties in the marketplace.**  Economic analysis supports the use of an arm's-length standard for defensible evaluation of any cost and the allocation of its coverage responsibilities among the relevant parties. The unbiased behavior of markets in which transactions are entered into voluntarily distinguishes true economic costs from the accounting fictions that unfortunately often become unavoidable when it is attempted to evaluate costs without reliance upon the guidance of actual market

---

[3]      This statement reflects what is known as the "weak form" of the Efficient Market Hypothesis ("EMH").  Many leading economists have contended under the "strong form" of the EMH that stock prices anticipate all information, regardless of whether the information is publicly available or widely known.

7

APP00061

behavior. For the current issue this means that to determine defensibly whether stock options constitute costs that are to be encompassed in cost-sharing agreements between firms should be investigated on the basis of observation of the pertinent arm's-length transactions. Where two firms engage in a cost-sharing agreement at arm's-length it is not to be expected that rational managements will include stock options as an element of the costs that are to be shared. The most obvious reason is that there is no reliable way to measure the value of those options, much less any cost that can defensibly be associated with them.

But there is more than that. The inclusion of stock options as a cost to be shared, *if the option's "cost" is to be evaluated on the basis of the value of the issuing company's stock at the date the option is exercised*, means that one of the partner enterprises commits itself to an unlimited liability whose future magnitude depends on the stock price of the other party to the agreement. If it were to do so it would in effect be writing a naked call option on the stock of its cost-sharing partner, agreeing to compensate the partner for the value that stock happens to take on some future date, a value and date unknowable at the time of adoption of the cost-sharing agreement. In perhaps simpler terms, this situation is akin to selling short the stock of the firm's business partner. While one would generally hope that one's business partner is successful, under the IRS's contention, the higher the business partner's stock price climbed, the more the other business partner's development "cost" would climb – even if the development project were a complete failure and the stock price rise had nothing to do with the joint development activities.

Even worse, employee stock options often do not vest for a period of years and can remain outstanding for still many additional years. (Xilinx's employee stock options

8

APP00062

vested over four to five years and did not expire for ten years.) The IRS is apparently contending that option exercises in the current year – which necessarily relate to options granted in prior years – somehow are related to the costs of the jointly shared development activities in the current year. As shown by the empirical studies, there is no general and measurable net cost to a firm related to employee stock options. The IRS's exercise date hypothesis has the further insurmountable logical gap of trying to connect the spread on exercise of options granted in prior years to current year development efforts. There is simply no logical or economic basis for such an assertion.

For all these reasons, economic analysis leads us to conclude that it would not be rational for the cost-sharing firms to include stock options in their agreement. There exist many actual joint development cost-sharing agreements that include no such provision, and we have found none in which arm's-length parties actually include the value or "cost" of employee stock options in practice. Even more significant, we understand that the IRS too has conceded that it is unable to find any such example. In sum, the empirical research shows that there is no measurable economic cost related to employee stock options. Even if it were valid to claim that the value of employee stock options is in some sense an economic cost, the best tools of economics and finance are unable to value employee stock options with any degree of accuracy or economic certainty. Economic analysis leads us to conclude that one would not expect unrelated parties dealing at arm's-length to agree to share the value or any purported "cost" of stock options, and that to do so on the basis of an ex post facto spread upon exercise would be particularly risky and irrational. And in practice, consistent with our economic analysis, not a single example can be found where unrelated parties in the marketplace agree to

9

IRS - 0014032

APP00063

share the value or purported costs of employee stock options. At the very least, it must be concluded that Xilinx's actions in excluding the value or "cost" of employee stock options from its cost-sharing arrangement were entirely consistent with the theory and practice of arm's-length dealings by unrelated parties in the marketplace.

### The Two Purposes of Stock Options

There may be many considerations that lead the management of a firm to undertake an issue of stock options to its employees. However, the literature recognizes two primary objectives of such a step and these must be understood if the relation between this action and cost is to be comprehended. The first of these two purposes is to provide the firm a substitute for some part of the compensation the enterprise would otherwise have to provide to the recipient employees. The second purpose is to solve what economic analysis describes as the principal-agent problem –the possible divergence between the interests of the management of a corporation and those of its stockholders.

The first of these purposes is straightforward. For example, consider a firm that is strapped for cash and subject to other financial difficulties. Suppose the firm locates an experienced executive with an outstanding track record in dealing with such problems. Such persons are not obtained cheaply, and the cash poor firm may not feel itself in a position to commit itself to providing the compensation needed to induce this individual to join it. Instead, it can offer that person stock options in lieu of a substantial portion of the compensation demanded. An agreement between the company and the individual can

10

APP00064

then be sought on the quantity of options that will serve as an appropriate equivalent of the foregone compensation.

These options then serve as a substitute for cash payments to the individual in question. But as we will see presently, their status as costs to the firm are very different.

The second of the two primary purposes of the issue of stock options is very different, though such an issue may well be undertaken to serve both objectives. As early as the 1930s, in the classic study of A.A. Berle, Jr. and G.C. Means, *The Modern Corporation and Private Property* (Macmillan N.Y. 1932), it was recognized that the modern corporation is characterized by separation between ownership and management. Unlike the minuscule enterprise that is overseen by its proprietor, the large corporation's managers are, as it were, hired help who, if the arrangements are inappropriate, may choose to pursue their own agenda rather than those of the true proprietors of the firm. A trivial but obvious example is nepotism in hiring. There are also reasons for believing that management benefits from expansion in the volume of the firm's sales or its market share even if it entails some sacrifice of the profits of the enterprise, that are presumably the stockholders' primary concern.

Here, economists speak of the stockholders as the *principals* of the firm and the members of management as the *agents* of those principals. Clearly, without suitable precautionary measures, the principals have good reason for concern about the temptations for the agents, consciously or unconsciously, to give priority to their own interests rather than those of the principals. The recognized way to deal effectively with this dilemma is to modify the nature of the payoffs offered to the agents in such a way

11

APP00065

that brings their interests more closely into line with those of the principals. That is precisely what stock options are designed to do.

Stock options can achieve this result in a straightforward manner. Because the recipient of the options benefits from them only to the extent that the price of firm's stocks rises above its value at the time the options were issued, the recipient members of management are given the incentive to strive as hard as they can to increase the value of those stocks. But that is precisely what serves the interests of stockholders.

### Stock Options, Costs to the Firm and Cost to the Stockholders

Is there a clear-cut cost, or even any net cost to the firm entailed in the issue of stock options to employees of the firm? Before getting to the heart of the matter, it is important to note that the issue of the options for either of the two purposes just described has an inherent offset that is beneficial both to the firm and its stockholders. This is obvious if the options are provided to offer the desired incentives to management – to deal with the principal-agent problem. If the options induce management to work harder – to create better products, to cut costs, to promote sales, or otherwise to contribute to profits and to the value of the securities of the corporation – then they clearly provide a benefit to stockholders. At most, any cost to stockholders that options are said to entail must be lower than that of any equivalent compensation that provides no such incentives.

This is even true of options whose only purpose is as a partial or total substitute for some direct employee compensation payment. The two forms are inherently different from the point of view of the interest of stockholders. The acceptance of options in lieu of direct compensation payment has two offsetting benefits to stockholders. First, it can

12

reduce pressures on the firm's limited supply of cash. Particularly for a firm seriously short of cash or one that can obtain cash only on very disadvantageous terms, this benefit is obvious. But there is a second offsetting benefit to stockholders, whether or not the firm is significantly cash constrained. For an option transfers risk from the firm to the individual who obtains the option. That person has accepted an uncertain future payoff, one dependent on future stock prices, in lieu of a guaranteed stream of payments. The guarantee is a risk that would have been borne by the stockholders if the substitution had not occurred, because so long as the individual continues to be employed he would have to be paid whether the firm prospers or does not. But an option will be exercised and the individual will receive the corresponding payment *only* if the enterprise prospers. If it fails, it is the option holder who bears the corresponding portion of the consequences and the stockholders are relieved completely of this risk.

But these offsets are only part of the story. There are two other considerations that go much further and undermine straightforward cost interpretation. First, there is the possibility that the incentive and agency effects of stock options may be so substantial and favorable to the stockholder that they generally constitute a net benefit rather than a cost. As will be shown here later, much of the evidence is indeed consistent with such a conclusion. Many of the available studies indicate that stockholders predominantly are net beneficiaries when firms choose to issue options to their employees. We must admit here, however, that the empirical evidence is neither unambiguous nor conclusive as to whether there is a net benefit to shareholders from the issuance of employee stock options (i.e., that the beneficial effects exceed the negative dilutive effects by a statistically significant amount). While the preponderance of the empirical investigations do reach

13

APP00067

the conclusion that in general employee stock options offer gains to stockholders, we cannot claim that a statistically significant affirmative net benefit has been shown beyond any reasonable doubt. We are very comfortable in concluding, however, that there is no measurable net economic cost to the firm or its shareholders from the issuance of employee stock options (i.e., to a reasonable degree of economic and statistical certainty, the positive effects of employee stock options are at least equal to the negative dilutive effects to shareholders).

The final consideration here, however, is the most conclusive, though perhaps the least widely recognized. This is the fact that the issuance of employee stock options must be recognized as only constituting a *redistribution* of benefits between initial stockholders and the new prospective stockholders who have obtained this position by their receipt of the options. It does not result in any reduction in the overall size of the firm's total earnings pie. Rather, it only affects the way in which that pie is sliced and divided up among future shareholders. And that is so even if the options lead to absolutely no change in the performance of management and the firm's future prospects. This is markedly different from the effect of, say, a rise in the cash wages of the company's current employees which, if it does not affect their performance, must result in a net reduction of the total profits of the firm. The latter is a cost to the firm in that, without offsetting benefits, it reduces the size of the earnings pie. The stock option issue, in contrast, leads to no such reduction in the earnings of the firm.

The point in all this is that it would be erroneous to take the cost of a direct expenditure such as a cash wage cost to be equivalent to that of an option And there is simply no valid empirical evidence showing that the grant or exercise of an employee

14

APP00068

stock option constitutes a measurable economic cost to the firm. The empirical literature to date shows that the issuance of employee stock options normally either has no measurable cost to the firm or shareholders, or that such an issue actually benefits the firm and its shareholders. It simply cannot defensibly be claimed that the issue of employee stock options is a normal cost to the firm from the empirical research performed to date.

### Can We Measure Option Expense With Any Degree of Certainty?

It is frequently suggested that developments in financial asset pricing theory now make it possible to measure the value of stock option grants with reasonable precision. A remarkable Nobel Prize winning contribution by the late Fisher Black, Myron Scholes and Robert Merton is the construction of an option pricing model—commonly known as the Black Scholes model.[4] This model is now widely used by option traders to price traded options at the Chicago Board Options Exchange and other exchanges. This model does an excellent job of predicting the actual prices at which the most active short-term options actually trade in the market.

#### Some Aspects of Option Pricing Models

Since, in the discussion that follows, it will be necessary to refer back to some aspects of the option pricing model, it will be useful here (and in the appendix—A Primer on Options) to review certain concepts. A call option gives the owner of the contract the right but not the obligation to purchase a share of company stock at a fixed price (the

---

[4]    Both Professors Black and Scholes and Professor Merton cited a paper we wrote with Richard Quandt on the valuation of convertible securities in their Nobel Prize winning articles. William J. Baumol, Burton G. Malkiel, and Richard E. Quandt, "The Valuation of Convertible Securities," *Quarterly Journal of Economics*, Vol. 80, February 1966, pp. 48-59.

15

IRS - 0014038

APP00069

exercise or strike price) on or before a certain date (the expiration date). The buyer of an exchange-traded option pays an amount called the option premium to obtain such a right. The premium (less commission) is given to the option seller (or writer) who takes on the obligation to sell the shares to the option buyer at the exercise price.

Intuitively, we can understand what determines the size of the option premium. Premiums will be larger the longer the time to expiration since more time will be available for an event favorable to the option holder to occur. Premiums will be larger the higher the price of the underlying stock. Obviously an option on a one dollar stock can't be worth more than one dollar (otherwise, you would just buy the stock for one dollar) while a three month option on a hundred dollar stock can be worth five dollars or more. Interest rates also influence option premiums since the option buyer puts up less money than the person who buys the stock outright.

The Crucial Role of Volatility

The most important factor influencing option premiums is the volatility of the underlying shares. Options are worth more if the underlying stock is more volatile. To see why this is so, consider the following example: Suppose we have two stocks currently selling at $30 per share. Suppose that Stock A is very volatile and that in three months time each of five future values is equally likely ranging from a low of $10 to a high of $50. Stock B is less volatile and the equally likely range of future values runs from $20 to $40. Consider now how much a 3 month call option with an exercise price of $30 is worth. At expiration, the option will be worth the difference between the actual stock price and the $30 exercise price. Thus, if the stock sells at $30 or less, the call option expires worthless. But if the stock sells at $40 at the end of the period, the option

16

APP00070

has an "intrinsic" value of $10 since the holder could simultaneously exercise the option at $30 and sell the stock in the open market at $40. We then can see clearly from the exhibit below that in the case where market prices go up, the high volatility Stock A has larger option payoffs than the less volatile Stock B.

The Value of Volatility

| High-Volatility | Stock A | | | |
|---|---|---|---|---|
| Stock price | $10 | $20 | $30 | $40 | $50 |
| Option payoff | 0 | 0 | 0 | 10 | 20 |
| Low-Volatility | Stock B | | | |
| Stock price | $20 | $25 | $30 | $35 | $40 |
| Option payoff | 0 | 0 | 0 | 5 | 10 |

It follows then that option buyers will pay more for options on more volatile stocks. And indeed they do. The standard option pricing formula developed by Black and Scholes takes account of this. The most important variable from which options derive value, according to the Black-Scholes model, is the volatility of the underlying stock.

The Problem of Estimating Volatility

We present in the appendix a discussion of the principles underlying the Black-Scholes option pricing model. While the mathematics behind the model is advanced and complex, the appendix shows that the model is a natural extension of the "binomial option pricing model." The important point to remember is that the future volatility of the underlying stock plays a crucial role in the model and that estimating future volatility

17

is extremely difficult and becomes increasingly even more difficult the further out in time one attempts to estimate volatility. The Black-Scholes option pricing formula can provide reasonably good measures of the value of exchange-traded, short-term put and call options. Variants of this model produce value estimates for short-term (such as one to three months) options that are not only extremely close to one another, but that also track with considerable precision the actual market prices of these instruments. This is so because recent past volatility tends to be reasonably persistent over the short term. It is important to point out, however, that for longer-term (such as six months to one year) exchange-traded options, the Black-Scholes formula can produce a wide range of estimates, and actual market prices of traded instruments vary substantially from their predicted values. Unfortunately, volatility over the longer term is notoriously difficult to estimate and the longer the time the option has to run, the greater the difficulty in arriving at an estimate of its value. This inherent limitation in option pricing models is exacerbated when one moves from so-called "long-term" exchange traded options (i.e., six months to one year) to employee stock options with lives measured in years rather than months. (Xilinx employee stock options were ten year options.)

The problem stemming from the fact that stock volatility is not constant over the longer term has long been recognized by market practitioners. Traders tend to put less reliance on Black-Scholes estimates as the time to expiration increases. The problem is widely recognized and is discussed in texts on option pricing such as the leading text by John Hull:

> Pricing errors caused by a nonconstant volatility increase as the time to maturity of the option increases. A nonconstant volatility has relatively little effect when the time to maturity is small, but its effect increases as the maturity of the option increases. The reason is easy to understand. Just as

18

APP00072

the standard deviation of the stock price distribution increases as we look farther ahead, so the distortions to that distribution caused by uncertainties in the volatility become greater as we look farther ahead.[5]

We see that even for longer-term exchange traded options (i.e., six months to one year), the Black-Scholes formula does not yield precise estimates.

Complications Arising From the Special Features of Employee Stock Options

When one adds the complications that executive stock options do not vest immediately and are subject both to forfeiture and restrictions on the sale of the option stock, it is virtually impossible to put a precise estimate on the option's value. Each of these factors violates the assumptions underlying the Black Scholes model. Moreover, employee stock options generally have durations of five to ten years (the Xilinx options have 10 year lives) and, as noted above, the Black-Scholes formula has considerable difficulty even in pricing the longer-term six month to one year exchange-traded options. Finally, unlike exchange-traded options, employee stock options cannot be sold by the employee, violating one of the key assumptions of the Black-Scholes model.

It is widely recognized in the finance literature that the Black-Scholes model is unsuitable for employee stock option valuation, as noted in a recent article by Richard Friedman:

> Several inherent problems plague the Black-Scholes model in determining employee stock option values. For example, it was developed for European-style options, which are exercisable only at their expiration date with no vesting and transferability restrictions. Almost all U.S. employee stock options can be exercised at any time after vesting (usually by year seven or eight) and are rarely transferable. In addition, employee stock options can almost never be sold or traded, unlike publicly traded options.[6]

---

[5]      John C. Hall, *Introduction to Futures and Options Markets*, 3rd Ed., 1999, Prentice-Hall, Chapter 17 "Biases in the Black-Scholes Model", pp. 382-383.
[6]      Friedman, R., 2001. "What Are My Options Worth?" Article on the web site of MyStockOptions.com.

19

APP00073

Adjusting Black Scholes for the Special Features of Employee Stock Options

It is, of course, possible to attempt to adjust the Black Scholes model to account for many of the special features of employee stock options. Mark Rubinstein has proposed a rather ingenious model to do this.[7] The model, however, uses 16 input variables, many of them difficult to estimate, and a wide range of estimates can be derived from the model. It is particularly important, as Rubinstein expressly states in his article, that he is not attempting to take into account incentive effects of the employee stock options, but rather is merely seeking to value the options granted to the employees. Rubinstein points out that the inherent subjectivity of the estimates required can allow firms to report values half or double those for other similarly situated firms. Rubinstein also considers use of "minimum value" accounting— the primary method suggested by the Financial Accounting Standards Board for private companies. But even use of this minimum value method can lead to demonstrably inconsistent results for similarly situated companies as the terms of the options can easily alter the features of the employee stock option grant in a way that uses zero as the minimum option value.[8]

We conclude that it is impossible to measure the value of options granted to employees with any degree of precision or economic certainty.

Exercise Date Accounting

There is, of course, one valuation approach that would appear to avoid the ambiguities in valuation that have been discussed above. Under this approach, which we

---

[7]    Rubinstein, M., 1995. "On the Accounting Valuation of Employee Stock Options." *The Journal of Derivatives*, pp. 8-24.

20

APP00074

understand to be the approach of the IRS in this case as well as in a January 25, 2002 directive issued by the IRS to its agents, the "cost" would be recorded as the difference between the market and exercise prices on the date at which the executive exercised his or her options.[9] This approach obviously has the advantage of avoiding the inherent limitations of the option pricing models and avoiding the need for estimates of long-term future stock price volatility. The problem with this exercise date method is that while one obtains a precise calculation, it is unclear what this calculation measures. What is clear, however, is that this exercise date calculation does not represent an economic cost to the firm.

As discussed above, employee stock options uniquely are associated with both beneficial and detrimental effects upon shareholders. These effects are inextricably intertwined in that the positive incentive effects arise precisely because the employee stock options transfer ownership to the employees (and hence dilute the holdings of existing equity claimants) if stock prices rise and the options are exercised. Shareholders' willingness to approve employee stock option plans is evidence of an expectation by shareholders that the size of the pie (i.e., the value of the firm) will grow faster than the percentage of the pie owned by current shareholders will shrink. Some researchers have attempted to estimate and separate the expected effects of the stock options, presumably including both the dilutive effects and the agency and incentive effects at the date of grant. Many of them include analysts' long-term earnings growth forecasts as variables in the analysis. But such growth is itself apt to be a consequence of the incentive effects of the employee stock options so that the statistical calculations will

---

[9]    Rubinstein, *op. cite*, p. 19.

21

APP00075

associate the incentive effect with the growth forecasts, leaving only the dilutive effects to be attributed to the options. In other words, the calculation inadvertently attributes to the options all of their detrimental dilutive consequences, but not all of their benefits. The net result is that the calculation is distorted toward giving the appearance that options benefit initial stockholders less than they really do.

But the problem of separating the dilutive effects of employee stock options from their incentive effects becomes even more acute when considering the recording of costs at the time the options are exercised. The IRS's exercise date theory presupposes that the entire increase in stock value is a measure of the "cost" of the options. The empirical research shows, however, that the shareholders' and the market's expectations at the time of grant – ex ante – are that the positive incentive effects will at least equal the dilutive effects. Thus, the increase in stock price is decidedly not the dilutive effect on shareholders – it represents that increase in stock price that was expected at least to offset the dilutive effects of the option grant. If in fact the positive and negative effects are perfectly in balance, there is no net cost to the firm. If, as some of the studies suggest, the positive incentive effects normally outweigh the dilutive effects, then there would be a net benefit rather than a cost to the options. The point is that simplistic use of the spread on exercise as a measure of the economic cost to the firm ignores the fact that at least part of the change in stock price is likely to result from the positive incentive effects of employee stock options. Further, the stock price can also rise for a host of reasons unrelated to employee stock options.

---

[9]    As described below, the IRS exercise date position is not quite this simple, as it is actually based on the amount of the section 83 deduction recorded by the U.S. participant.

22

APP00076

Moreover, we suggest that the spread upon exercise is far more likely to measure the positive incentive effects of the options as well as their economic cost. When employee stock options are substantially "in the money" (by which we mean that the current stock price is well above the option price), a reasonably efficient stock market will expect that the extra shares certainly be issued and so the dilution cost will already be reflected in the stock price. In part, the subsequent increase in stock value will reflect whatever positive incentive and agency effects were created by the option grants themselves. It is certainly not defensible to consider this difference an economic cost to the firm or its shareholders.

Further, there is an obvious break in the logic chain of the IRS's position underlying its exercise date criterion. Employee stock options generally vest over a period of time and can remain outstanding for many years. The Xilinx employee stock options at issue in this case vested over five years and had ten year lives. The IRS contention is that current year spread on exercise – which necessarily relates to options granted in earlier years – is somehow related to the costs of jointly shared development projects in the current year. The problems besetting this approach are obvious. As a simple example assume that in years one through five, Firm A grants stock options to its employees with five year vesting and 10 year life. In years two and three, Firm A's stock price doubles. In year six, Firm A and Firm B enter into a cost-sharing agreement and, as the IRS argues, they agree to share option "costs" on a spread on exercise basis. In year six, Firm A's employees exercise all stock options granted in year one, resulting in a large section 83 deduction for Firm A. Under the IRS position, Firm B would be liable for the section 83 deduction enjoyed by Firm A up to the amount of Firm B's cost-

23

APP00077

sharing ratio as an additional cost of the joint development project – even though the grant and exercise of the options had nothing to do with the joint development effort. Firm B would thus be required to underwrite the rise in stock price in Firm A, even though, by definition, the options were granted five years before the development work began and the run up in stock price occurred two years before the development work began.

The point is that the change in price in Firm A stock may be wholly unrelated to anything connected with the joint development effort with Firm B. For example, Firm A can have an entirely different product, Product A, that is completely outside the scope of the development effort. If suddenly demand for Product A takes off and the firm starts selling huge quantities of the item, then Firm A's stock price may well increase substantially in value for that reason alone. Under the IRS hypothesis, with the voluntary agreement of Firm B, Firm A would charge Firm B for this increase in stock price through the spread on exercise of stock options held by employees working on the joint development effort. Obviously, this rise in stock price would have nothing to do with the joint development effort with Firm B.

Even if Firm A started granting options only at the same time as the joint development project began, the risk to Firm B of entering into a joint development agreement under the IRS exercise date assumption would be sufficient to cause rational firms never to agree to such an arrangement. Specifically, in the IRS exercise date scenario, Firm B essentially writes a naked call option on the stock of Firm A. Writing a naked call option on the stock of Firm A is akin to Firm B selling short the stock of Firm A, its business partner. Firm B has unlimited liability exposure for increases in the stock

24

APP00078

price of Firm A. In other words, the better Firm A does (regardless of whether such success is based on the joint development effort or occurs for wholly unrelated reasons), the more expensive the joint development effort is for Firm B. On the other hand, the empirical research shows that a representative Firm A will have incurred no cost attributable to the employee stock options. Further, Firm A will receive additional cash when its employees exercise their options in an amount equal to the exercise price of the option which equaled the market price of the stock at the date of grant. No rational firm would enter into such a relationship.

Moreover, we understand that under the law, the option holders' decisions as to date of exercise and date of sale of stock will determine the amount of the firm's section 83 deduction. These choices surely do not affect the firm's revenues or costs in one way or another. Consequently, use of the section 83 deduction amount makes no sense as an indicator of any corresponding cost that would be shared in a cost-sharing agreement.

**Empirical Work Attempting to Measure the Effect of Employee Stock Option Grants on Share Prices Has Generally Found that Option Grants Have a Positive Effect and No Net Economic Cost.**

As has been noted above, employee stock options in principle have both positive and negative effects on share prices. They tend to reduce earnings per share when measured on a "fully diluted basis," i.e., accounting for their potential exercise. But they also have beneficial incentive and agency effects. Managers are the agents of shareholders and because both parties are self-interested, there can be serious conflicts between them over the adoption and execution of proper corporate strategy. Managers who are not owners may not have an incentive to conserve the shareholders' capital. These are called agency problems. The use of at-the-money employee stock options,

25

APP00079

which gives executives a significant equity stake in the corporations they manage, tends to ameliorate agency problems by bringing the interests of owners and managers together. This can avoid the wasteful expenditure of corporate resources and promote long-run efficiency, productivity, growth and international competitiveness. While employee stock options put managers in a more favorable risk position than outright owners of common stock, there is no doubt that managers gain from options only to the extent that well informed shareholders benefit as well.

Conceptually, neither the grant nor exercise of employee stock options is a direct cost to the firm. At grant, the employees theoretically are willing to trade off some cash payment for option grants, thus preserving the firm's cash. At exercise, the employees pay cash to the firm in an amount equal to the fair market value of the stock at the time of grant, again increasing the firm's cash. As discussed above, the issue of the options does not reduce the firm's earnings but rather potentially redistributes a portion of the equity claims on the firm from existing shareholders to the option holders. In theory, the existing shareholders are willing to give up some equity to the employees on the presumption that the beneficial incentive and agency effects stemming from the options will cause the firm's value to grow more quickly.

While the issue of employee stock options has no direct cost effect upon the firm and is expected to improve the firm's performance, there none the less is a possibility that the issue of options can indeed produce an economic cost to the firm. This is so because the firm's shareholders and the market may believe that the dilutive effect of employee stock options is greater than the anticipated benefits from the agency and incentive effects. If the shareholders and the market were to believe the detrimental effects to

26

APP00080

outweigh the beneficial effects, then the firm's stock price would fall in response to this expected diminution in the value of the firm. If stock prices declined, then the firm's equity cost of capital would be increased. An increase in the firm's equity cost of capital can legitimately be interpreted to constitute a net economic cost to the firm. On the other hand, if the market anticipated that the beneficial effects of options would equal or outweigh the dilutive effects, then the firm's stock price would remain unchanged or increase above that which would otherwise have prevailed. If the stock price remains unchanged or is increased, then the firm's equity cost of capital remains unchanged or would decrease, with the issue of the options then having no net economic cost to the firm.

Whether the issue of employee stock options then constitutes such an economic cost to the firm is an empirical question that must be examined by study of the effect of employee stock options on stock price. A number of investigators have attempted to measure empirically whether the net effect of employee stock option grants tend to raise or lower stock price in reality. In this section, we briefly review some highlights of the empirical work. We conclude that while these studies produce different estimates of the effect of option grants on share prices, most find a positive effect on shareholder wealth and none of the studies provides convincing evidence that the net effect on share prices is negative.

## Some Methodological Problems

There are some very difficult conceptual and methodological problems involved in all of the analyses we will review. What we seek to determine is whether the value of options granted has a positive or negative influence on share prices. Certainly, we know

27

APP00081

that ordinary expenses tend to depress share prices. For example, if a firm's earnings decline with increased expenses we can expect the stock price to suffer. But we have seen above that the fair value of options granted can only be estimated and the estimates used are far from precise. One method used in the studies is to estimate the value via a Black-Scholes formula as used in the footnotes of the financial statements of the different firms. Unfortunately, since each firm estimates the value of option grants using different assumptions, there can be substantial differences among option expense estimates even for similarly situated firms. Even more fundamentally, the best yardstick available to measure the value of employee stock options – the Black-Scholes option pricing model – cannot and does not measure the value of employee stock option grants with any reasonable degree of precision or economic certainty.

There is an even more serious statistical problem to be overcome. Most of the empirical studies attempt to determine the effect of option expense on share price. For this purpose, a number of the empirical studies have used firms' Black-Scholes based option expense estimates from the firms' FAS 123 footnote disclosures. But as noted earlier, the amount of option expense estimated via the Black-Scholes model depends on the price of the shares. As a result, these empirical studies entail a statistical difficulty known as a "simultaneity problem." Option expense may influence share price but share price also influences option expense. Different studies deal with this problem in different ways. In some studies, option expense is estimated in an artificial way and it is hard to know if the empirical results are simply artifacts of the particular method of estimation.

28

Finally, many of the statistical studies attempt to show the relationship of stock prices to the following explanatory variables: earnings, book value, expected future growth, and the fair value of option grants. If a negative sign is obtained on the option expense variable (i.e., a greater value of options issued is associated with lower stock prices) at least one study has interpreted the result as indicating that options grants depress share prices. But, in reality, all that is being measured is the negative dilutive effect of options. The positive incentive effects are likely to be subsumed by the expected growth variable. Therefore, we can not take any one of these studies as dispositive. Nevertheless, there have been a substantial number of papers written on the subject and fortunately the papers do suggest a tentative conclusion.

## A Review of the Empirical Studies

Below we summarize the major conclusions of the empirical studies that attempt to measure the effect of ESOs on stock prices.

a)    James Brickley, Sanjai Bhagat, and Ronald Lease, "The Impact of Long-Range Managerial Compensation Plans on Shareholder Wealth," *Journal of Accounting and Economics*, Vol. 7, 1985, pp. 115-129.

The authors examine the stock price effect of the announcement of long-range compensation programs. Such an analysis is called an "event study." In long-range compensation programs the authors include stock option plans as well as grants of stock appreciation rights (SARs), restricted stock, etc. No significant immediate effects (over the next two days) either positive or negative are found. There is some uncertainty, however, over the time needed for details of the plan to have reached the market. Therefore, they examine price effects (relative to the market) over longer periods such

29

APP00083

that as from the board approval date to the day after the SEC received news of the plan (the SEC stamp date) and from two days after the SEC stamp date through the day after the shareholder meeting approves the plan. The price effects for these longer periods are positive and statistically significant. The authors conclude that on average, these plans tend to increase shareholder wealth.

b)    Richard Defuseo, Robert Johnson, and Thomas Zorn, "The Effect of Executive Stock Option Plans on Stockholders and Bondholders," *The Journal of Finance*, Vol. XLV, No. 2, June 1990, pp. 617-627.

The authors find that the "event" constituted by an executive stock option plan announcement is followed by *positive* stock price reactions and *negative* bond price reactions. They conclude that executive stock options do improve managerial incentives but also may induce a wealth transfer from bondholders to stockholders as managers take on more risk. To the extent that bond prices decline in response to the announcement, the decrease in bond price implies that there can be an increase in the cost of debt capital for the firm; however, the accompanying stock price increase demonstrates that stockholders believe that the beneficial effects of the stock options outweigh any increased interest costs that will reduce the corporation's earnings .

c)    David Aboody, "Market Valuation of Employee Stock Options," *Journal of Accounting and Economics*, Vol. 22, 1996, pp. 357-391.

Aboody finds that the total value of all options issued has the expectable dilutive effect on share price after netting out of any favorable incentive effects on earnings. But the value of options recently granted (and which have not yet produced favorable incentive effects on earnings) has a positive effect on share prices. In the study, Aboody

30

APP00084

makes his own estimates of the value of options granted. He also uses the FASB method of calculating compensation expense and finds it has no additional explanation power.

d)    Douglas J. Skinner, "Are Disclosures About Bank Derivatives and Employee Stock Options' Value Relevant?" *Journal of Accounting and Economics*, Vol. 22, 1996, pp. 393-405.

This paper criticized the methods employed in the original (1996) Aboody study and led to some of the changes employed in a second study by Aboody, *et. al.* Skinner argues, however, that methodological issues continue to affect all studies that attempt to estimate the value of option grants (current and past) on share value. Skinner suggests that "event studies" are the appropriate method for determining the effect of stock-option grants on share prices.

e)    Lynn Rees and David Stott, "The Value-Relevance of Stock-Based Employee Compensation Disclosures", *Journal of Applied Business Research* Vol. 17, No. 2 (Spring 2001) pp. 105-116.

The paper examines the association between employee stock option compensation expense as stipulated by FAS123 and firm value. The authors conclude that "the incentive benefits derived from ESO [employee stock option] plans outweigh the costs" and that the option forms of employee compensation "is not a typical expense." Employee stock option "expense" as measured by FAS123 affects firm value (i.e., stock price) positively and statistically significantly "in the opposite direction from other income statement expenses."

31

APP00085

f)   David Aboody, Mary Barth, and Ron Kasznik, "SFAS 123 Stock-Based
     Employee Compensation Expense and Equity Market Values," July 2001,
     GSB Standford University Working Paper.

The authors find the expected negative dilution effect of employee stock option grants on stock prices if the incentive effects of options on expected future earnings are included in the analysis as a separate predictor. But if the expected future earnings term is omitted, then SFAS 123 stock-based employee compensation expense has a positive effect on stock prices. Thus, the authors suggest that the net effect of stock options (considering both the negative dilution and positive incentive effects) is positive but statistically insignificant (i.e., no measurable net economic cost to issuance of the options).

g)   Timothy Bell, Wayne Landsman, Bruce Miller, and Shu Yek, "The Valuation
     Implications of Employee Stock-Option Accounting for Computer Software
     Firms," July 2001 Working Paper.

The authors use a sample of 85 computer software firms and conclude that employee stock options are valuable to the shareholders of software companies. They suggest that the appropriate way to determine how market values reflect option grants is by treating them as an (intangible) asset. Most important for the issue considered here, the variable treating employee stock options as an asset has a significantly positive effect on the firm's market value. Indeed, the authors find that "ESO assets" appear to be priced in the market at levels higher than other net assets of the firm.

32

IRS - 0014055

APP00086

h)      J. Core, and D. Larcker, "Performance Consequences of Mandatory Increases

in Executive Stock Ownership," Working Paper, Forthcoming *Journal of*

*Financial Economics*, 2002.

The authors examine the performance of firms adopting "target stock ownership"

plans. These plans are typically mandated by boards to increase executive stock

ownership. They find that firms adopting target ownership plans have lower industry

adjusted returns over the two years prior to adoption. One and two years after the

adoption of the plan, however, they find that firms with these plans outperform a matched

sample of similar firms.

i)      Stephen Hillegeist and Fernando Penalva, "Performance and Valuation

Consequences of Employee Stock Options," Working Paper, January 2002.

Unlike previous studies, the authors find that the fair value of employee stock options

granted during the year has a negative and statistically significant effect on share price.

They find no association, however, between the fair value of outstanding options granted

in prior years and share prices. Their finding that option grants negatively affect share

prices does not continue to hold, however, when the entire data set (including outliers) is

considered, and when a different measure of options expense is used.[10] In any event,

even accepting the Hillegeist and Penalva findings at face value, we cannot interpret their

---

[10]      We were curious why the Hillegeist & Penalva working paper results were inconsistent with all of
the other empirical analyses. Upon inspection of their regression specification and statistical techniques,
we noted several statistical techniques that were questionable. We asked Dr. Atanu Saha of the Analysis
Group to contact Professors Hillegeist and Penalva and to obtain their data set. We then asked Dr. Saha to
re-run their particular Hillegeist and Penalva regressions after correcting the shortcomings we perceived in
their particular specification of the regression equations and the statistical techniques. After adjustment for
these items, the Hillegeist & Penalva regressions are consistent with the other empirical studies and show
that the relationship between estimated option expense and share price is not statistically significant from
zero. In other words, the revised Hillegeist & Penalva regressions show that there is no measurable
economic cost to the issuance of the options. The details of the work performed by Dr. Saha under our
instruction are set forth in his declaration.

33

IRS - 0014056                                              APP00087

study as showing a *net* cost from employee stock option plans. This is so because their analysis shows that future stock performance is enhanced by firms that increase their employee stock option grants. Thus, the *net* effect on shareholder wealth is likely to be positive rather than negative. Indeed, the authors conclude that firms in general are *below* their optimal level of employee stock option grants.

### Conclusion

Numerous investigators have attempted to measure the net effect of employee stock option grants on the firm and its shareholders. The majority of the studies find that employee stock option programs have a positive net effect on share prices. However, considerable measurement and econometric problems affect all the analyses and it is not surprising that some studies are unable to measure any statistically significant effect at all upon share prices (i.e., the employee stock option programs have no measurable effect on share price). The one unpublished study (Hillegeist and Penalva) that appears to find a significant negative effect on share prices from the value of options granted does not provide robust results. In any event, Hillegeist and Penalva find that firms which increase grants experience better future performance. Thus, even accepting their findings at face value, the net effect of employee stock option grants is a positive one for the firm and its shareholders. Thus, the empirical studies performed so far establish that the issue of employee stock options has either no effect or a positive effect on stock price. Thus, the empirical studies establish, at a minimum, that the issue of employee stock options has no general and measurable economic cost to the firm.

34

APP00088

It may be argued that the purely dilutive effect of the issue of a stock option does have a clear opportunity cost because it reduces the price of the firm's shares since it reduces the price below what it otherwise would have been. But the evidence indicates that in general the issue of employee stock options has incentive and agency effects that work in the opposite direction. On average, these incentive and agency effects more than offset the dilutive consequences. Therefore it is clear that any such net opportunity cost must typically be zero or negative. That is, typically there can be no such opportunity cost at all.

An example underscores this point. Assume a firm can either grant an at the money option for 100 shares to an employee or sell a warrant on equivalent terms into the marketplace.[11] If the firm opts to grant the employee stock option, the employee will theoretically take less current cash compensation. As we have discussed, the empirical evidence establishes that the market views the positive incentive and agency effects at least to be equal to the negative dilutive effects. Thus, the stock price does not fall, even though each shareholder's ownership has been diluted. If the firm takes the alternative approach of selling the warrant into the marketplace, the results are not the same. If the warrant is sold, the firm does indeed receive cash. However, this cash receipt will be offset in whole or in part by the current cash compensation foregone by the employee in the other alternative, as the employee will now need to be paid additional cash in lieu of options. The firm's shareholders will also suffer a negative dilutive effect from the sale of the warrant, as they would in the case of the option. However, *the sale of the warrant does not generate the positive incentive and agency effects peculiar to the grant of*

---

[11] For purposes of this example, we will ignore the problems involved in selling an equivalent warrant into the market, including issues relating to vesting, forfeiture and non-transferability.

35

IRS - 0014058

APP00089

*employee stock options.* Thus, the sale of the warrant into the marketplace is less valuable to the current shareholders than the grant of the employee stock options. Put slightly differently, because the firm can grant the employee stock option without decreasing the price of its stock, it can sell an additional warrant or share of stock at the same price at which the warrant or share would have sold if the employee stock option had not been granted. The firm can do both. The grant of the employee stock option does not raise an opportunity cost to the firm.

The IRS may argue that there is an opportunity cost of a different sort, that an employee stock option issued when the price was $10 but exercised when the stock price reached $50 entailed an opportunity cost of $40 to the firm. But that is no different than asserting an "opportunity cost" to the firm of issuing a share at a time when its price was $10 rather than postponing the issue to some future distant date when its price might be $50. Clearly, neither of these entails reasonable substitute choices for the firm. For example, for the firm that needs money today it is not an equivalent choice to obtain it, say, four years later. Indeed, this purported opportunity cost calculation is even more severely damaged by the fact that the rise in stock price may itself well be a partial consequence of the issue of the options.

### On Arm's-Length Evaluation of Costs

There are many cost elements for which data are not readily knowable or where the information is not known at all. There are even cases in which it is unknowable in principle. As a result, accountants frequently and quite justifiably are driven to adopt simplifying proxies that can be used for calculation purposes, even when they

36

APP00090

demonstrably have little or no relation to the underlying reality. A prime example is a fully allocated cost that ostensibly purports to specify which portion of some total outlay that inextricably benefits several outputs of a firm is to be considered the responsibility of each of the different benefiting outputs. Since there is no way of assigning the unassignable, the accountant is driven to adopt some arbitrary criterion, such as the values or the weights of the different products, as the basis for the apportionment of the unassignable costs and calculation of the "full costs" of each of the individual products. Similarly, conventions such as straight line depreciation permit easy workability but may have little relationship between the numbers generated by the calculation and the underlying reality. True values, actual costs and relevant practices of reality, however, cannot be determined in this way. Rather, wherever possible, one must look to actual practice – to the workings of reality to get at such matters. Moreover, it is essential in this search to focus attention on a reality that is not distorted by the interests of the participants. Thus, where assignment of cost responsibility is at issue, and the practices that are followed in that assignment are in question, we are led to look for arm's-length transactions as the most reliable source of the requisite information. Where the parties in question are independent and neither has any interest in biasing matters in favor of the other, one can be confident that the process will not be systematically distorted and that it will not yield distorted information.

The matter here in question is precisely of this variety. The issue is whether the issue of a stock option creates any cost that we can expect to be included in a cost-sharing agreement entered into at arm's-length, and whether in actual practice such possible costs are systematically included or included at all. Reliance on the evidence derived from

37

APP00091

arm's-length transactions relieves us of the need for recourse to arbitrary valuation and costing procedures, and instead bases our inferences on the firm foundation of market experience. We therefore turn to examination of the pertinent inferences that can be drawn from the examination of arm's-length relationships in the relevant arena.

### Stock Options in Arm's-Length Cost-sharing Contracts: the Incentives

There are several reasons why we cannot normally expect cost-sharing contracts entered into at arm's-length to include stock options as generators of costs that are to be shared. This, of course, does not mean that exceptions are impossible. But it does mean that if the empirical evidence is consistent with the analysis, it is illegitimate on the arm's-length standard to claim that such contracts can be deemed implicitly to include costs that are attributable to any issue of stock options by one of the cost-sharing firms. This conclusion, of course, becomes particularly compelling when one cannot even pretend to be able to provide reasonably accurate evaluations of these purported costs, a difficulty the analysis of the preceding section has demonstrated.

The three primary reasons why it is rational for cost-sharing firms to omit stock options from their agreements is easily made clear from our earlier discussion in this statement. The first is the fact that that it is at least arguable that stock options generate no costs at all. As was shown here earlier, the stock options are never a cost to the firm, in the standard sense. At most they constitute a redistribution among old and new stockholders, with no change in the total profits to be allocated among them. In that case, they would constitute a cost to some stockholders with an offsetting benefit to others. But that is not all there is to the story, because the available evidence does not reject the

38

APP00092

hypothesis that the issue of stock options, presumably through its incentive effects, generally serves to increase the profits of the firm, and thereby becomes beneficial to all of the stockholders, as well as the firm.

The second reason for exclusion of stock option considerations from arm's-length cost-sharing agreements follows from the first. Whatever cost, if any, is to be attributed to an issue of stock options, it is patently very different from a direct financial outlay. The qualitative character of the two types of "costs" raises very cogent questions about the proper way to aggregate them. The old problem raised by any attempt to add apples and oranges clearly re-arises here.

The third reason why cost-sharing agreements cannot be expected to incorporate stock-option components stems from the difficulty of evaluating these options, and the inaccurate results that are obtained even from the most sophisticated methods currently available.

All of this means that even if it were believed that such options entail some cost, their inclusion in a cost-sharing agreement might simply make the agreement complex, ill defined and unworkable. Rather than serving as an effective and easily utilized tool beneficial to the participating firms, such a contract would simply invite contention, increase the costs of operation of the agreement, and very likely make its adoption threaten to be more trouble than it is worth. It can only be concluded that it should not be surprising if it turns out to be difficult to find any real arm's-length contracts that include any cost component associated with the issue of stock options. There is very good reason for those who enter into such contracts to avoid the inclusion of any such element.

39

APP00093

But that is not the end of the story because the IRS favors a particular approach to estimation of the purported cost of the options that it takes to be included implicitly in cost-sharing agreements. It will be shown next that this approach makes it even considerably less likely that any rational firms would enter into an agreement that followed the IRS approach to the sharing of the asserted costs of stock options.

As we understand it, the IRS favors the valuation of stock options on the basis of their price at the future date when they are exercised by their recipients. Under such a procedure the cost to the firm of the granting of the options would be based on the difference in the price at the date the options are exercised and the price at the time the options were issued. As discussed above in detail at pages 21 to 25, this exercise date calculation is not a valid measure of any economic cost to the firm and no rational firm would enter into such a relationship.

The most obvious difficulty raised by this approach is the degree to which it compounds the uncertainties for current evaluation of the value of a stock option at the date it is granted. If the costs are not to be reported on this basis transaction by transaction at the dates the options are exercised, but at the date the options are issued, this does indeed entail a marked aggravation of the problems. There is no way in which one can even be certain in advance whether the options will ever be exercised, as surely they will not be if the firm's stock price falls. Even if one can be confident that they will all be utilized at some future dates, those dates are likely to vary from one option holder to another and even one holder may elect to use different portions of his options at different times. The difficulty of foreseeing the prices that will prevail at those dates is equally clear. The bottom line is that the exercise-date approach to valuation vastly

40

IRS - 0014063

APP00094

multiplies the uncertainties and computational problems that would beset any cost-sharing firms that contemplated such a course.

But this, too, is not the end of the story. An agreement made on such terms would commit the firm that undertakes to bear part of these costs to a very risky undertaking. Its future cost-sharing payments would fall due at unpredictable dates and at unpredictable prices. In effect, the contracting firm that undertook to do this would have written a call option on the stocks of the other participant in the cost-sharing arrangement. This is akin to selling short the stock of one's business partner. One can hardly imagine that firms would commonly be willing to enter into such agreement voluntarily and at arm's-length.

### Stock Options in Arm's-Length Cost-Sharing Contracts: Empirical Evidence

Even though it should be recognized that inclusion of stock options in arm's-length cost-sharing arrangements is implausible as a matter of economic theory and analysis, it is still conceivable that it does occur in reality. This possibility requires examination of the available evidence. The evidence is necessarily incomplete, because there is a profusion of such contracts and many of them are treated as proprietary and are consequently not open to general inspection. Yet the pertinent information is far from being totally unavailable. As will be shown next, while its incompleteness does not permit us to judge whether or not there are *ever* any contracts of the sort at issue in which stock options do play a role, we *can* conclude from the evidence that there is a very substantial number of such arm's-length contracts from which consideration of stock options is precluded. Moreover, neither we nor, apparently, *the IRS* have been able to

41

APP00095

find *a single example* in which stock options are given any role of the sort the IRS proposes to assign to them. The empirical evidence thus confirms the economic theory and analysis. Further, on the basis of the available evidence on pertinent arm's-length transactions, from an economic perspective it is simply illegitimate for the IRS to impute to a cost-sharing agreement in which the issue is not mentioned the presumption that stock options are implicitly included in the agreement.

Our empirical evidence rests on contracts for service between the private sector and the federal government of the United States, which are entered into voluntarily and at arm's-length, and in which the government undertakes to reimburse the private firms for the cost incurred in supplying the government with the items provided under the contracts. In particular, we will deal with the billions of dollars of services purchased each year by the government from the private sector and classified as research, development, test and evaluation services ("RDT&E"). We understand that these contracts with the private sector for RDT&E, like all purchases of goods and services by the Executive Agencies of the Federal Government, were governed throughout the years at issue by the Federal Acquisition Regulations System ("FARS").[12]

In purchasing RDT&E or other services from the private sector, the United States Government is precluded from paying for any value of at-the-money options issued by contractors to their employees.[13] The United States Government takes the position that the grant of employee stock options does not constitute an allowable compensation cost

---

[12] 48 C.F.R. §1.101; 48 C.F.R. §31.103. The FARS governed both commercial and military purchases by the United States. 48 C.F.R. §1.101; 48 C.F.R. §31.103.

[13] Section 31.205-6 of the FARS governed compensation for personal services, including RDT&E services, during the years at issue. 48 C.F.R. §31.205-6(a).

42

 APP00096

and prohibits private sector contractors from charging the United States for the value of stock options granted to employees working on RDT&E service contracts (or any other service contract).[14]

The Directorate of Information, Operations and Reports, of the U.S. Department of Defense ("DOD") publishes information each year regarding the DOD's purchases, including reports on annual DOD purchases of RDT&E in contract amounts of more than $25,000. These reports for the years 1990 through 2000 indicate that each year between two and three thousand different firms have been involved in these transactions. The amounts entailed are well in excess of 16 billion dollars per year, or some 200 billion dollars over the decade of the 1990s. Thus, neither the amounts of money involved nor the number of contracting parties can be considered insignificant.

Moreover, the contracts are evidently voluntary, arm's-length arrangements. None of the contracting firms is obligated or required to enter such a contract and thereby to accept its terms. But, despite the explicit exclusion of stock options and any associated costs from the amounts to be reimbursed, this great multitude of suppliers willingly and consistently has accepted those terms.

Perhaps even more telling is the admittedly complete absence of any contrary evidence that has been found by the IRS. The IRS has admitted that its inclusion of the "cost" of employee stock options in the costs to be shared in the shared-cost contracts is not based on any actual transactions between unrelated parties. Further, the IRS has admitted that it possesses no evidence or written contracts (cost-sharing agreements or otherwise) that demonstrate that any unrelated party at arm's-length actually pays for the

---

[14]     48 C.F.R. §31.205-6(i).

43

"cost" of employee stock options issued to or exercised by the employees of the other contracting party. In particular, the IRS has admitted that it possesses no evidence that unrelated parties base payments for employee stock options on the amount of the tax deduction under section 83.[15]

But even if there do exist some such contracts, that surely is hardly enough to show that *standard* arm's-length practice is consistent with the IRS contentions. And economically, standard arm's-length practice, rather than the possibility of exceptional cases, is what is truly the pertinent issue.

### Conclusion

The role of employee stock options is complex and continues to be investigated in the economic literature. Much remains to be learned about the subject. But a good deal is well understood about the topic. We know that their issue can, at least in principle, be beneficial both to the issuing firm and to all of its stockholders. We know, consequently, that they need not entail a cost, as the term is normally and appropriately interpreted. We know that even the value of the employee stock options is not in general accurately and unambiguously determinable. Consequently, a proposal to base the calculation of their purported costs on such a valuation can hardly be expected to provide figures that can pretend to reliability. There is even less logic to a proposal to base evaluation of the purported costs of employee stock options on the spread between the exercise price and the current market price of the stock at the date of exercise, an approach that is wholly indefensible from an economic standpoint. Perhaps most important, the appropriate criterion, the arm's-length standard, has yielded no evidence that supports the IRS

---

[15]    Petition ¶¶ 5.a.(37)-(45) & 5.a.(50)-(54) and Answer ¶¶ 5.a.(37)-(45) & 5.a.(50)-(54).

44

APP00098

position and much evidence that contradicts the contentions that underlie that position. Consistent with our economic analysis, not a single example has been found in which unrelated parties in the marketplace agreed to share the value or purported costs of employee stock options. At the very least, it must be concluded that Xilinx's actions in excluding the value or "cost" of employee stock options from its cost-sharing arrangement were consistent with the theory and practice of arm's-length dealings by unrelated parties in the marketplace.

45

APP00099

## Appendix

## A Primer on Options

a)    Basic Definition

i)    Exchange-traded options

A stock option, just as the name implies, gives the buyer the right (but not the obligation) to buy or sell a common stock (or group of stocks) at a specific price on or before a set date.  For example, a call option on IBM might cost the buyer $10 a share (the option premium) expiring the third Friday in July (the expiration date) with an exercise price of $100 a share (the exercise or strike price).  Thus, for a premium of $10, the buyer of this call option has the right to purchase a share of IBM at $100 at any time up through the third Friday in July.  The seller (or writer) of the option receives the premium and takes on the corresponding potential obligation to sell the share at the contract price.  A put option reverses the situation.  A put on IBM gives the holder the right to sell IBM shares at a specific price.  The seller of the put (called the writer) takes on the potential obligation to buy the shares.

Exchange-traded options exist on the major traded individual stocks as well as on a variety of stock indexes, bonds, and foreign

1

currencies. Options on the S&P 500 index, the NASDAQ 100, and the Dow Jones Industrial Average are traded in Chicago. In addition, options are traded on a variety of smaller capitalization indexes as well as specific industry indexes. The volume of trading in basic options and futures has at times actually exceeded the volume of trading in the underlying assets. Option holders are free to purchase or sell options at any time up until the expiration date.

ii)    Employee stock options

These are call options granted to employees of corporations as a form of incentive compensation designed to motivate the employees and to align their interests with those of the shareholders as a group. The employees benefit only to the extent that the share price increases and thus the well being of the employee is tied directly to that of the shareowner.

The typical procedure is to grant the option with an exercise price equal to the current market price. Thus, if IBM were selling at $100 per share today, the employee stock option would have an exercise (strike) price of $100. Thus far, employee stock options (ESOs) closely resemble those traded on the major options exchanges. But there are major differences between the two types of options.

2

ESOs are typically very long-term instruments with expiration dates often 10 years from the grant date. Few ESOs are exercisable at the time they are granted. ESOs are normally subject to a vesting schedule, typically over a four-year period, before they become exercisable. After the ESOs vest, they can be exercised at any point in time up to the end of the options' life. However, unlike exchange-traded options, ESOs cannot be traded or sold. If the employee leaves the firm or is terminated, the unvested ESOs must be forfeited and the vested ESOs must be exercised (assuming they are in the money) within a short period of time after departure. The tax treatment of ESOs also differs from the treatment of exchange-traded options. Finally, when an employee exercises her ESOs, the firm typically issues new shares in exchange for the employee's cash payment of the exercise price.

b)    Valuation of Options: The Role of Volatility

The process by which options are valued is often misunderstood by the general public. The key element making some options far more valuable than others (other than, of course, the time period to expiration) is the characteristic volatility of the underlying stock. A simple example will

3

APP00102

make the situation clear. Suppose we have two $30 stocks and three-month call options on each, with an exercise (strike) price of $30. But let's assume that one of them tends to be highly volatile (say, a tech stock) and the other far more stable (say, a company selling staple consumer goods). We will assume that future prices in three months will be one of five values – all equally likely.

Exhibit 1 shows the possible future prices for the two stocks under a high and low volatility assumption. We'll assume that the price in three months is equally likely to take on each of the five possible values listed so that on average the price has an expected future price of $30. No greater expected appreciation is assumed for either stock. But for the high-volatility stock, the highest price is higher and the lowest price lower than is the case for the low-volatility stock. Now, I will show that an option on the high-volatility stock is more valuable than an option on the more stable stock.

4

APP00103

Exhibit 1

| High-Volatility Stock | | | | | |
|---|---|---|---|---|---|
| Stock price | $10 | $20 | $30 | $40 | $50 |
| Option payoff | 0 | 0 | 0 | 10 | 20 |
| Low-Volatility Stock | | | | | |
| Stock price | $20 | $25 | $30 | $35 | $40 |
| Option payoff | 0 | 0 | 0 | 5 | 10 |

Upon expiration of the option in three months, the option will be worthless if the stock sells at $30 or below. For example, if the stock sells at $20 in the market, the option holder would certainly not be interested in exercising his option at $30. If the stock is above $30, however, the option is valuable. Suppose, for example, that the price is $40. The option holder could exercise at $30 and simultaneously sell shares received in the market at $40, earning $10 per share. This $10 payoff is called the option's intrinsic value. One can see immediately that for the high-volatility stock, when the stock price does go above the strike price, the value of the option is far greater. In instances where the market price increases, the option holder earns far more when the underlying stock is more volatile. Thus, options on volatile stocks are, other things being equal, more valuable than options on non-stable stocks.

c)    The Binomial Option Pricing Model

Let's now develop a simple binomial model showing how the value of an option could be determined if its possible returns, both when results turn out to be favorable and when they are unfavorable, are known in advance. Assume a stock currently priced at $80 can take only one of two values at the end of the option period, assumed to be one year. It can either go up to $100 or down to $70, as shown in Exhibit 2. Because there are only two possible outcomes, the model is called a "binomial model." Further, assume there is a call option on the stock expiring in one year with a strike price of $80 (the current market price).

As a step in determining the value of an option, we must first show how it can be used to form a hedge against the risks of stock ownership. This will be done by means of an illustration. We will show that with the payoff possibilities as given here, the following portfolio provides a perfect hedge, i.e., it eliminates risk completely.

6

APP00105

Exhibit 2

Binomial Option Pricing



Stock Price                                   Call Option Value

Hedged Portfolio

Buy 2/3 share of stock; write 1 call (sell 1 call)
2/3 to 1 is hedge ratio = amount of stock purchased per call written
If stock goes up: call is exercised, you get (80 − 33 1/3 = 46 2/3)
If stock goes down: you get (46 2/3 = 2/3 of 70)

We consider an investor who forms the following a hedged portfolio. The investor buys 2/3 of a share of stock and writes one call (sells one call) with a strike price of $80, expiring in one year. The ratio of number of shares to number of options in a perfect hedge, in this example, two-thirds to one, is called the "hedge ratio," which is equal to the amount of stock purchased per call written. (I'll show how to calculate the hedge ratio below.) This portfolio in, indeed, perfectly hedged. If the stock goes up to the $100 value, the call is exercised and the investor gets ($80 − 33 1/3 = 46

7

APP00106

2/3). For $80 is the exercise price and $33 1/3 is what it costs the investor to buy the extra 1/3 share he does not own but must deliver in exercise of the contract. If the stock goes down, the investor gets ($46 2/3 = 2/3 of $70), since the investor owns 2/3 share of a $70 stock. So the outcome is the same whatever happens to the price of the stock. Hence, it is riskless, regardless of the price of the option or the future price of the stock.

Let me now explain how to price the option and how to derive the hedge ratio. We have seen that a portfolio of 2/3 share and one call written is perfectly hedged. It has the same value whatever the price of the stock. In a well-functioning market any investment that has a guaranteed payoff cannot earn more than the risk-free rate of interest (which we normally consider to be the U.S. Treasury Bill rate).

We let $C$ = the price of the call option. What is the amount invested in the hedged portfolio? It is $2/3\ (80) - C$. What is the payoff? The payoff, if the stock goes up or down, is 46 2/3. The amount invested can only earn the risk-free rate of interest, which we will denote as $r_F$. Therefore, it must be true that

Amount invested for one year $\times\ (1 + r_F)$ = sure payoff

$[2/3\ (80) - C]\ (1 + r_F) = 46\ 2/3$

IRS - 0014076

We then can solve for C if we know the interest rate. If, for example, the risk-free rate is 10 percent (written as 0.10), the call premium, C must equal \$10.91 as shown in Exhibit 3. The exhibit shows in symbols how the binomial model prices the option at \$10.91.

By introducing some simple notation, we can now easily derive the hedge ration (H). Let $C_U$ and $C_D$ be the (intrinsic) value of the call option at the upper (U) and lower (D) stock prices at the end of the period (20 and 0 in our example). $S_U$ and $S_D$ will be the upper and lower stock prices (100 and 70 in our example). The hedge ratio is easily derived in Exhibit 3 and is shown to be 2/3.

To fine it, we note that whether the stock attains its upper or lower value, the investor's value will be the value of the call option plus the value of the stock, i.e.,

$$C_D + HS_D \text{ or } C_U + HS_U$$

which must be equal if the hedge is perfect. Therefore, solving for H, we obtain the basic formula of Exhibit 3.

9

APP00108

Exhibit 3

Hedge Ratio

$$H = \frac{C_U - C_D}{S_U - S_D}$$

$$H = \frac{20 - 0}{100 - 70} = \frac{20}{30} = \frac{2}{3}$$

Amount invested in hedged portfolio: $H \times S - C$

Amount at end of period: $(HS - C)(1 + r_F)$

Payoff if stock goes up or down: $80 - 33\ 1/3 = 46\ 2/3$

$$46\tfrac{2}{3} = (HS - C)(1 + r_F) = (53\tfrac{1}{3} - C)(1 + r_F)$$

$$53\tfrac{1}{3} - \frac{46\tfrac{2}{3}}{1.1} = C$$

$$53.33 - 42.42 = C$$

$$10.91 = C$$

d)    From the Binomial Model to the Black-Scholes Option Pricing Formula

The binomial model obviously oversimplifies the problem of option pricing by assuming that only two prices are possible at the end of the option period and that they are known in advance. In fact, however, the binomial model is easily extended into multiple time periods. We will assume that in

10

APP00109



any one time period (say a trading day or trading week or month) a stock may either go up or down. We will designate $S^+$ as the state where the price increases and $S^-$ as the state where it decreases.

We'll assume that in the "up" state the price increases by 5 percent and in the "down" state it decreases by 3 percent. Suppose that the initial price was 100, so that the two possibilities in the next period are as shown below.



Then in the next period suppose the price again can either go up 5 percent or down 3 percent. We then have the following possibilities.



11

APP00110

We can then attach probabilities to the various outcomes. If the probability of an up movement or down movement is ½, as is the case with a fair coin, then ¼ of the time we will experience two up movements in a row, similar to the probability of flipping two heads in a row. The probability of two down movements in a row is also ¼ (just as the probability of flipping two tails in a row). The probability of one up and one down is ¼ + ¼ or ½ since there are two ways of such an outcome occurring (up-down) and (down-up). We then can make the following probability table.

| End Price | Probability |
|-----------|-------------|
| 110.25    | ¼           |
| 101.85    | ½           |
| 94.09     | ¼           |

In Exhibit 4 we show a three-period model and the related probability table. The probabilities are then graphed in the figure below the table.

IRS - 0014080

12

APP00111

Exhibit 4



| Event | Probability | Stock Price |
|---|---|---|
| 3 up movements | 1/8 | $100 \times 1.05^3 = 115.76$ |
| 2 up and 1 down | 3/8 | $100 \times 1.05^2 \times .97 = 106.94$ |
| 1 up and 2 down | 3/8 | $100 \times 1.05 \times .97^2 = 98.79$ |
| 3 down movements | 1/8 | $100 \times .97^3 = 91.27$ |



Suppose we wished to divide the periods into even smaller sub-periods. For example, suppose that in each of six sub-periods the stock price can increase by 2½ percent or fall by 1½ percent. We can then graph the probabilities of the price at the end of the period in Exhibit 5 below. Note that as we extend the binomial model into smaller and smaller sub-periods,

13

IRS - 0014081

APP00112

Exhibit 5



the price distribution approaches the familiar bell-shaped curve. As we continue subdividing, the interval in which stock prices are posited to move up or down, the end of period stock price will more and more closely resemble a (log) normal distribution.

The Black-Scholes Pricing Formula (shown in Exhibit 6) appears to be recondite and forbidding and it does require higher mathematics for its derivation. It can be viewed intuitively, however, as simply the logical extension of the binomial model. While the option value does not depend directly on the expected return from the stock, it does so indirectly by including the current stock price (which depends on the company's risk and return characteristics) and crucially on the stock's volatility -- captured in the standard deviation term.

14

APP00113

## Exhibit 6

### Black-Scholes Pricing Formula

$$C_0 = S_0 N(d_1) - Xe^{-rT} N(d_2)$$

where

$$d_1 = \frac{\ln(S_0 / X) + (r + \sigma^2 / 2)T}{\sigma\sqrt{T}}$$

$$d_2 = d_1 - \sigma\sqrt{T}$$

and where

$C_0$ = Current call option value.

$S_0$ = Current stock price.

$N(d)$ = The probability that a random draw from a standard normal distribution will be less than $d$. This equals the area under the normal curve up to $d$.

$X$ = Exercise price.

$e$ = 2.71828, the base of the natural log function.

$r$ = Risk - free interest rate (the annualized continuously compounded rate on a safe asset with the same maturity as the expiration of the option, which is to be distinguished from $r_f$, the discrete period interest rate).

$T$ = Time to maturity of option, in years.

1n = Natural logirithm function.

$\sigma$ = Standard deviation of the annualized continuously compounded rate of return of the stock.

15

IRS - 0014083

APP00114

In particular, valuation of ESOs, as opposed to ETOs, involves an added layer of uncertainty because there is a finite probability of departure (and hence forfeiture); in other words, we are dealing with two stochastic process – the stock price and the employee's employment.

16

APP00115

# Exhibit 3

# Ernst & Young, LLP on behalf of Global Competitiveness Coalition (Oct. 28, 2002)

REG-106359-02
REGULATIONS UN..
CC:ITA:RU

OCT 29 2002

**Washington Council**
**Ξ ERNST & YOUNG**

**ROOM 5226**
Giblen/Beck

■ Ernst & Young LLP
1150 17th Street, NW
Suite 601
Washington, DC  20036

October 28, 2002

**BY HAND**
CC:ITA:RU (REG-106359-02)
Courier's Desk
Internal Revenue Service
1111 Constitution Avenue, N.W.
Washington, D.C.

> **RE:**   Proposed Cost Sharing Regulations Under Section 482, Relating To
> The Treatment Of Stock-based Compensation Expenses (REG – 106359-02)

We are submitting these comments on behalf of the Global Competitiveness
Coalition (the "Coalition"), a broad-based group of U.S. multinational
corporations, in response to the Notice of Proposed Rulemaking published in the
Federal Register on July 29, 2002 (67 Fed. Reg. 48997), relating to the treatment of
stock-based compensation for purposes of the rules governing qualified cost
sharing arrangements and for purposes of the comparability factors to be
considered under the comparable profits method ("the proposed regulations").

The Coalition's fundamental concern is that the proposed regulations depart
from the arm's length principle by arbitrarily requiring related parties to share
stock-based compensation costs, a requirement that the Internal Revenue Service
("IRS") itself has yet to find factual evidence for in cost sharing arrangements
between unrelated parties.  As explained more fully below, in the case of any
proposed change to the regulations under section 482, the rules should satisfy the
arm's length principle and fairly contemplate what unrelated third parties might
view as reasonable and customary.  The proposed regulations would not
implement an arm's length standard because the mandated result ignores the
reality that taxpayers regularly enter into cost sharing arrangements with
unrelated parties without sharing stock-based compensation costs.  There is also
a concern that any departure from international standards of arm's length

APP00116

measurements would administratively abrogate long-standing tax treaty obligations of the United States.

## I.    Overview

The proposed regulations were issued pursuant to section 482,[1] the provision that authorizes the Secretary to allocate gross income, deductions and credits between or among controlled taxpayers in order "to prevent evasion of taxes or clearly to reflect income." The Tax Reform Act of 1986 amended section 482 to require that consideration for intangible property transferred in a controlled transaction be commensurate with the income attributable to the intangible. The applicable legislative history indicates that in adding this "commensurate with income" standard to section 482, the Congress did not intend to preclude the use of bona fide research and development cost sharing arrangements as an appropriate method of allocating income attributable to intangibles among related parties, "if and to the extent such agreements are consistent with the purpose of this provision that the income allocated among the parties reasonably reflect the actual economic activity undertaken by each. Under such a bona fide cost-sharing arrangement, the cost-sharer would be expected to bear its portion of all research and development costs . . ."[2]

The 1986 Act Conference Report also recommended that the IRS conduct a comprehensive study and consider whether the regulations under section 482 (issued in 1968) should be modified in any respect. In response to this directive, Treasury and the IRS issued a study on intercompany pricing (the "1988 White Paper").[3]

Treasury and the IRS published final cost sharing regulations (at Treas. Reg. §1.482-7) in 1995. A cost sharing arrangement is defined as "an agreement under which the parties agree to share the costs of development of one or more intangibles in proportion to their shares of reasonably anticipated benefits from their individual exploitation of the interests in the intangibles assigned to them under the arrangement."[4] The cost sharing regulations generally require that controlled participants in a qualified cost sharing arrangement share intangible development costs in proportion to their shares of the reasonably anticipated benefits attributable to the development of the intangibles covered by the arrangement. Treas. Reg. §1.482-7(d) defines intangible development costs as operating expenses other than depreciation and amortization expense, plus an

---

[1] All references to "section" are to the Internal Revenue Code of 1986, as amended, unless otherwise noted.

[2] H.R. Conf. Rep. No. 841, 99th Cong., 2d Sess. at II-638 (1986) (the "1986 Act Conference Report").

[3] Published as Notice 88-123, 1988-2 C.B. 458.

[4] Treas. Reg. §1.482-7(a)(1).

2

IRS - 0014126

APP00117

arm's length charge for tangible property made available to the cost sharing arrangement. The regulations provide that costs to be shared include all costs relating to the intangible development area, but no explicit guidance is provided on the treatment of stock-based compensation. There was no need to specifically reference stock-based compensation costs because, as a factual matter, there is no evidence that an arm's length transaction between unrelated parties would ever include such costs.

Aside from a few isolated instances where the IRS raised the issue on audit, taxpayers adhered to the arm's length standard and customarily took the position that employee stock options are not included in the cost sharing pool because unrelated third parties would not and have not included such costs. The arm's length standard for measuring cost sharing arrangements is consistent with U.S. tax treaties which do not contemplate including stock options as "costs" to be included in cost sharing agreements.[5] While the treatment of stock-based compensation in cost sharing arrangements was the subject of several IRS Field Service Advices released in 2000,[6] in July 2001, the IRS conceded the issue in one high-profile case under the 1968 regulations.[7]

Treasury's recent focus on cost sharing arrangements arose in the context of Congressional action on corporate inversion transactions. In Treasury's preliminary report on inversions[8] and in subsequent testimony before the House Committee on Ways and Means, Treasury highlighted transfer-pricing issues as a factor in the proliferation of corporate inversion transactions. As noted by (then Acting) Assistant Treasury Secretary for Tax Policy Pamela Olson at a June 6, 2002 hearing before the Ways and Means Committee: "We will revise the current section 482 cost sharing regulations with a view to ensuring that cost-sharing arrangements cannot be used to facilitate a disguised transfer of intangible assets outside the United States in a manner inconsistent with the arm's length standard, as reinforced by the commensurate with income standard."[9] The proposed regulations on stock-based compensation were released in the month following the delivery of this testimony.

---

[5] *See* 1996 U.S. Model Income Tax Treaty Technical Explanation, *reprinted in* 6 Rhoades & Langer, U.S. Int'l Tax'n & Tax Treaties.

[6] FSA 200003010; FSA 200103024.

[7] *See Seagate Technology, Inc. v. Commissioner*, T.C. Memo. 2000-361 (Nov. 27, 2000).

[8] U.S. Treasury Preliminary Report, "Corporate Inversion Transactions: Tax Policy Implications," May 17, 2002.

[9] Statement of Pamela F. Olson, Acting Assistant Secretary for Tax Policy, U.S. Department of the Treasury, Testimony Before the House Committee on Ways and Means, Hearing on Corporate Inversions, June 6, 2002.

3

APP00118

If implemented, the preamble to the proposed regulations indicates that they would provide that stock-based compensation is taken into account in determining the operating expenses treated as a controlled participant's intangible development costs for purposes of the cost sharing provisions; provide rules for measuring the cost associated with stock-based compensation; and provide that the utilization and treatment of stock-based compensation is appropriately taken into account as a comparability factor for purposes of the comparable profits method under Treas. Reg. §1.482-5.

The proposed regulations would also add express provisions "coordinating" the cost sharing rules of Treas. Reg. §1.482-7 with the arm's length standard as set forth in Treas. Reg. §1.482-1. In this regard, Prop. Treas. §1.482-7(a)(3) provides that in order for a qualified cost sharing arrangement to produce results consistent with an arm's length result within the meaning of Treas. Reg. §1.482-1(b)(1), all requirements of Treas. Reg. §1.482-7 must be met, including the proposed treatment of stock-based compensation.

## II.    The Primacy of the Arm's Length Principle

The arm's length principle has been codified in Treasury regulations since 1935, and is now stated in Treas. Reg. § 1.482-(1)(b) as follows:

> "In determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. *A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result)."* (Emphasis added.)

The courts, too, have consistently looked to the business practices of unrelated parties dealing at arm's length as the standard by which to measure related party transactions under section 482.[10]

A. The "commensurate with income" standard does not provide a basis for deviating from the arm's length principle.

---

[10] *United States Steel Corporation v. Commissioner*, 617 F.2d 942 (2d Cir. 1980), *rev'g* T.C. Memo, 1977-140 (court looked to price charged between unrelated parties as indicative of an arm's length standard); *Seagate Technology v. Commissioner*, 102 T.C. 149 (1994) (section 482 regulations attempt to identify the "true taxable income" of each entity based on the taxable income that would have resulted had the entities been uncontrolled parties dealing at arm's length); *Sundstrand Corp. v. Commissioner*, 96 T.C. 226 (1991) (purpose of section 482 is to prevent the artificial shifting of the net incomes of controlled taxpayers by placing controlled taxpayers on a parity with uncontrolled, unrelated taxpayers).

4

IRS - 0014128

APP00119

Significantly, the preamble to the proposed regulations acknowledges the observation in the 1988 White Paper that the Congress intended Treasury and the IRS to apply and interpret the "commensurate with income" standard consistently with the arm's length standard.[11]  Indeed, the 1988 White Paper includes the statement that "the commensurate with income standard is premised soundly on arm's length principles."[12]

B. The current cost sharing regulations properly adhere to the arm's length principle.

In laying the foundation for the cost sharing regulations, the 1988 White Paper included the statement that "a bona fide cost sharing arrangement must reflect an effort in good faith by the participants to bear their respective shares of all costs and risks on an arm's length basis."  Indeed, the current cost sharing regulations are replete with references that indicate reliance on the arm's length principle. For example, the preamble to the current regulations indicate that the "reasonably anticipated" standard governing the measurement of benefits "echoes the best method rule for determining the most reliable measure of an arm's length result under § 1.482-1(c)."  As another example, the cost sharing regulations authorize the IRS to make appropriate allocations to reflect an arm's length consideration if a controlled taxpayer acquires an interest in intangible property from another controlled taxpayer (other than in consideration for bearing a share of the costs of the intangible's development).  Treas. Reg. § 1.482-7(a)(2).

III.    The Proposed Regulations Fail To Implement an Arm's Length Standard

Our concern with the proposed regulations centers on their failure to consider whether unrelated parties entering into a cost sharing arrangement and dealing at arm's length would share the costs of one party's stock-based compensation plan.  In this regard, in recent litigation, the IRS itself was unable to establish a factual basis for the result that the proposed regulations would mandate.[13] Moreover, among Coalition members that have engaged in numerous joint venture agreements with unrelated parties, none entered into arrangements that treat stock-based compensation as a shared cost.  There is no reason to believe or

---

[11] Citing 1988-2 C.B. at 458, 477.

[12] *Id.*

[13] IRS admission in Seagate case -- In a December 6, 1999, response to the company's request for admissions, the IRS acknowledged that "Respondent cannot identify a single arm's-length cost sharing agreement, joint venture, or other similar arrangement in which one unrelated company agreed to pay a second unrelated company for any 'costs' incurred with respect to the second company's grant of at-the-money stock options to its employees."

5

APP00120

evidence to establish that an unrelated party would even agree to such a term. Thus, the proposed regulation's treatment of stock-based compensation as a shared cost manifestly contradicts longstanding practice among uncontrolled parties.

Essentially, the proposed regulations would add new Treas. Reg. §1.482-7(a)(3) to override cost sharing arrangements that would otherwise satisfy the arm's length standard set forth in Treas. Reg. §1.482-7(b)(1). Basically, the proposed "coordination" rule provides that a cost sharing arrangement will meet the arm's length standard if all of the regulatory requirements (including the proposed treatment of stock-based compensation) are met. The mere inclusion of this statement in a regulation should not, however, end the inquiry into whether the proposed substantive rule would reach an arm's length result.

> A. There are valid business reasons why independent parties would not agree to share stock-based compensation costs.

It is not at all clear that stock-based compensation should be viewed as part of a company's normal operating costs in the context of a cost-sharing arrangement. The preamble to the proposed regulations indicates that the definition of stock-based compensation is broad, comprising any compensation provided by a controlled participant to an employee or independent contractor in the form of equity instruments, stock options, or rights in (or determined by reference to) such instruments or options, regardless of whether the compensation ultimately is settled in the form of cash, stock, or other property. Specifically, the preamble states, 'Thus, these proposed regulations are intended to reach such forms of compensation as restricted stock, nonstatutory stock options, statutory stock options (incentive stock options described in section 422(b) and options granted under an employee stock purchase plan described in section 423(b)), stock appreciation rights, and phantom stock." In addition to the fact that the value of such stock-based compensation fluctuates independently of the value of any services, unrelated parties would be reluctant to share this expense because both the timing and amount would be unknown.

> B. The departure from an arm's length standard would also raise concerns about U.S. tax treaties.

The proposed regulations are inconsistent with tax treaties that the United States has entered into with its trading partners. One of the central tenets of U.S. tax treaties is that the results that would have obtained in unrelated party situations should govern the tax results between related parties.[14] Indeed, the Technical

---

[14] MOD-1 § 1.09 1996 U.S. Model Income Tax Treaty: Associated Enterprises (referring to circumstances in which "conditions are made or imposed between the two enterprises in their

6

APP00121

Explanation of Article 9 of the 1996 U.S. Model tax treaty includes the statement that it "incorporates...the arm's-length principle reflected in the U.S. domestic transfer pricing provisions, particularly Code section 482."[15]

We would also note that the "associated enterprises" article of U.S. income tax treaties permits a contracting state to increase the profits of an enterprise that is subject to its taxing jurisdiction and that deals with one or more related persons to reflect the profits that would have resulted from arm's length dealing.[16] Any deviation from the arm's length standard would weaken the U.S. tax treaty network and the protection of U.S. companies from harmful international double taxation.

The proposed regulations are a unilateral revision by the United States of the arm's length standard for cost sharing arrangements (which in many cases would operate to the detriment of the treaty partner). There is no reason to expect that our treaty partners will accept revisions proposed by the IRS on stock-based compensation expenses.

The Global Competitiveness Coalition appreciates the opportunity to provide these comments and requests, should you have any further questions, that you contact David Benson of Ernst & Young LLP at 202-327-5788, or LaBrenda Garrett-Nelson or Francis Grab of Washington Council Ernst & Young at 202-293-7474.

Respectfully submitted,
Global Competitiveness Coalition by:

David Benson
Ernst & Young LLP

LaBrenda Garrett-Nelson
Washington Council Ernst & Young

Francis Grab
Washington Council Ernst & Young

---

commercial or financial relations that differ from those that would be made between independent enterprises").

[15] *See* 1996 U.S. Model Income Tax Treaty Technical Explanation, *reprinted in* 6 Rhoades & Langer, U.S. Int'l Tax'n & Tax Treaties MOD-9.

[16] See, e.g., Article 9 of the U.S. tax treaty with Ireland.

7

IRS - 0014131                                    APP00122

# Exhibit 4

# KPMG LLP Comment Letter
# (Oct. 28, 2002)



REG- 106359-02
**REGULATIONS UNIT**
**CC:ITA:RU**

OCT 3 0 2002

2001 M Street, NW
Washington, DC 20036

Telephone 202 533 3000
Fax 202 533 8500

October 28, 2002

**ROOM 5226**
Giblen / Beck

## VIA ELECTRONIC MAIL AND HAND DELIVERY

Commissioner, Internal Revenue Service
P.O. Box 7604
Ben Franklin Station
Washington, DC  20044

ATTN:    LaNita Van Dyke
CC:ITA:RU (REG-106359-02)
Room 5226

Dear Commissioner:

We respectfully submit the following comments on Treasury Regulations that are proposed to be promulgated under section 482 of the Internal Revenue Code of 1986, as amended (the "Code"), governing compensatory stock options under qualified cost sharing arrangements (the "proposed regulations"). KPMG LLP ("KPMG") submits these comments in its own name and on behalf of leading U.S.-based multi-national corporations. These companies and their affiliates participate in qualified cost sharing arrangements and make significant use of compensatory stock options in their business operations, including compensating employees that develop intangibles.

Our comments are specifically directed to the conflict between the proposed regulations and the arm's length principle of section 482 and the existing definition of a "cost" in the section 482 regulations. We may submit supplemental comments on these or other issues relating to the proposed regulations.

## I.    THE PROPOSED REGULATIONS VIOLATE THE FUNDAMENTAL ARM'S LENGTH PRINCIPLE UNDERLYING SECTION 482

The fundamental principle underlying section 482 is that income and deductions generated by a related party transaction must be determined as if an unrelated party engaged in the same or a comparable transaction (the "arm's length standard"). The section 482 regulations provide that the arm's length standard is to be applied in "every case."[1] Thus, the overriding principle of section 482 is that transactions between related parties must be treated in the same manner as transactions between unrelated parties.

---

[1] Treas. Reg. § 1.482-1(b).

KPMG LLP. KPMG LLP. a U.S. limited liability partnership, is a member of KPMG International, a Swiss association.



Commissioner Internal Revenue Service
October 28, 2002
Page 2

While section 482 permits the Internal Revenue Service ("IRS") to require related parties to allocate income and expenses as if they were unrelated parties, section 482 does not give the IRS the authority to require related parties to allocate income and expenses based on "costs" that do not exist in transactions between unrelated parties. Unrelated third parties do not include compensatory stock options in the pool of "costs" to be shared in cost sharing arrangements and analogous joint ventures. Consequently, the inclusion of such costs in the proposed regulations is not supported by any arm's length third party transactions, violates the arm's length and commensurate with income ("CWI") principles and exceeds the IRS's authority under section 482. Our assertion that third parties do not include compensatory stock options in the pool of costs to be shared is based on the following.

First, the research and experience of our tax and economic services professionals has not disclosed any third party cost sharing or similar arrangements that include compensatory stock options in the pool of costs to be shared – either explicitly by including options or implicitly by adjusting other terms of the cost sharing agreement. Independent parties to a cost sharing agreement would not agree to obligate themselves to share in uncontrollable costs.

Second, our professionals know of a number of joint ventures between unrelated parties that specifically identify costs to be shared and do not include stock option costs. The parties to these ventures consider the impact of stock options during their negotiations and affirmatively agree not to share those "costs." We are also aware of a high-profile media joint venture between two of America's leading companies in which one party is responsible for ongoing computer software development and is reimbursed for a portion of those costs by the joint venture. Those reimbursed software development costs do not include any "costs" associated with stock-based compensation. Moreover, the party bearing the software development costs was not indirectly reimbursed for "costs" associated with stock-based compensation pursuant to other terms of the joint venture. These ventures demonstrate that unrelated parties do not act in accordance with the proposed regulations.

Third, the IRS admitted in the United States Tax Court proceeding *Seagate Technology, Inc. v. Commissioner* that it is not aware of any cost sharing agreements between unrelated parties in which stock option expenses are included in the cost base.[2] During the same proceeding (which the parties ultimately settled), the IRS's own expert also conceded that "unrelated parties are unlikely explicitly to include a measure of the cost of employee stock

---

[2] The Commissioner of Internal Revenue (the "Commissioner") admitted in response to an informal discovery request that he "has not to date identified an arm's length transaction between unrelated parties that [Commissioner] believes supports his position on the cost sharing stock option issue." Petitioner's Motion for Partial Summary Judgment on the §482 Cost Sharing Stock Option Issue, *Seagate Technology, Inc. v. Commissioner,* T.C. No. 15086-98 (filed Feb. 7, 2000) (quoting Exhibit A).

APP00124



Commissioner Internal Revenue Service
October 28, 2002
Page 3

options in the terms of a transaction."[3] Based on these concessions, there is no "arm's length" basis for the treatment of options in the proposed regulations.

Fourth, the proposed regulations are inconsistent with the CWI standard that must be applied to intangible transfers under section 482.[4] As an initial matter, the proposed regulations allow taxpayers to elect to determine the "cost" of compensatory stock options based on a number of factors that are not dependent on the income generated by the developed intangibles.[5] The methods of valuation for compensatory stock options under the proposed regulations depend on factors including the section 83 deduction claimed by the taxpayer and, in many cases, on the value assigned to the options for financial statement purposes.[6] Determining the appropriate valuation method based on variables that do not relate to income generated by the developed intangibles is inherently inconsistent with the best method rule.[7] Moreover, the "cost" of stock options computed under the proposed regulations will lead to cost allocations that do not comport with the CWI standard. If a cost-sharing participant has multiple lines of business or products and its stock price rises because of products that are not covered by the cost sharing arrangement, the "cost" of its compensatory stock options likely will rise. Under the proposed regulations, other participants may be required to bear those "costs." Such a result lowers the apparent profits from sales relating to the cost-shared intangibles and imposes costs on participants that are unrelated to the intangibles developed through cost sharing.[8] The proposed regulations require cost allocations that do not result in a CWI transfer of intangibles and thus fail to reach an arm's length result.

---

[3] Declaration of T. Scott Newlon, *Seagate Technology, Inc. v. Commissioner*, T.C. No. 15086-98 (filed August 1, 2001) (page 31 of Exhibit A). Although the expert report stated that third parties must be including the "cost" of stock options implicitly, no factual evidence was provided to support that position. *Id.* at 28-31.

[4] The Tax Reform Act of 1986, Public Law 99-514, 100 Stat. 2085, 2561 *et seq.*, amended section 482 to require that consideration for intangible property transferred in a controlled transaction be commensurate with the income attributable to the intangible. As stated in the preamble to the proposed regulations, "[s]ection 1.482-7 of the 1995 final regulations implements the commensurate with income standard in the context of cost sharing arrangements."

[5] Prop. Treas. Reg. § 1.482-7(d)(2)(iii).

[6] *See id.*

[7] "The arm's length result of a controlled transaction must be determined under the method that, under the facts and circumstances, provides the most reliable measure of an arm's length result." Treas. Reg. § 1.482-1(c)(1).

[8] The CWI issues arising from the mandatory inclusion of stock options in cost sharing agreements (especially at exercise value) also illustrate why stock options are not included in third party research and development (R&D) and other similar agreements. In an arm's length transaction, a foreign company presumably would not enter into a R&D agreement with a U.S. company in which the R&D costs that the U.S company charged to the agreement were subject to a potential sharp upward revision in future years (due to the "cost" of options subsequently exercised) even though this revision largely would be unrelated to the success or failure of the R&D venture, which leads to the distinct possibility that costs would be sharply increased even though the venture generated substantially less income than anticipated.

APP00125



Commissioner Internal Revenue Service
October 28, 2002
Page 4

Finally, the federal government itself refuses to share, or otherwise bear, the cost of stock options issued by third parties. The Federal Acquisition Regulations System (FARS), which governs contracts for goods and services with all executive departments and agencies, expressly prohibits government contractors from charging for stock-based compensation. The regulations relating to allowable costs for personal compensation apply to "[c]ompensation based on changes in prices of corporate securities or corporate security ownership, such as stock options, stock appreciation rights, phantom stock plans, and junior stock conversions."[9] These regulations specifically state that "[a]ny compensation which is calculated, or valued, based on changes in the price of corporate securities is *unallowable*."[10] Thus, third parties are not permitted to charge the government for stock-based compensation. Similarly, outside the government contract area, companies providing research and development (R&D) services to third parties pursuant to a cost-plus contractual arrangement do not include an allowance for the "cost" of stock options in the fees charged for the R&D services.[11] These regulations and business practices provide further evidence that third parties do not charge the "cost" of compensatory stock options.

## II.   COMPENSATORY STOCK OPTIONS ARE NOT "COSTS" WITHIN THE MEANING OF THE EXISTING SECTION 482 REGULATIONS

For purposes of the cost sharing regulations, costs include "all of the costs incurred by [a] participant related to the intangible development area."[12] A "cost" is generally synonymous with an expense for section 482 purposes.[13] A corporate cost-sharing participant does not incur a cash expense equal to the option spread (the difference between the exercise price and the strike price) when a stock option is issued and does not incur any additional cash expenses when such option is exercised. Indeed, the corporation receives cash when a stock option is exercised and does not make any cash outlays with respect to the option spread.[14] To the extent an economic expense has been incurred, the shareholders of the corporate cost-sharing participant bear that cost because share value is diluted when additional shares are issued.[15] Accordingly, the "cost" of compensatory

---

[9] 48 C.F.R. § 31.205-6(i) (2002).

[10] 48 C.F.R. § 31.205-6(i)(1) (2002) (emphasis added).

[11] *See also* note 8 *supra*.

[12] Treas. Reg. § 1.482-7(d)(2). Costs incurred related to the intangible development area include (i) "operating expenses" as defined in regulation section 1.482-5(d)(3), other than depreciation or amortization expense, and (ii) "the charge for the use of any tangible property made available to the qualified cost sharing arrangement." *Id.* Operating expenses are defined as all expenses not included in the cost of goods sold except for interest expense, foreign income taxes and domestic income taxes. Treas. Reg. § 1.482-5(d)(3).

[13] Under regulation section 1.482-7(d)(1), the intangible development costs to be shared in a qualified cost sharing arrangements generally are defined as operating expenses. *See* note 12 *supra*.

[14] The only cash expense to the corporation relates to the administration of the stock option plan, which is not the subject of the proposed regulations.

[15] While the economic opportunity cost of compensatory stock options may be relevant from a financial accounting perspective, that "cost" is reflected as a charge against income in audited financial statements or disclosed in footnotes to such financial statements (based on the value of those options).

IRS - 0014272



Commissioner Internal Revenue Service
October 28, 2002
Page 5

stock options is borne by the shareholders of the participants and should not be included in the pool of costs to be shared by the participants.

The fact that the stock options must be accounted for in audited financial statements does not mean options are "costs" from a tax perspective. The main objective of financial statements is to assure consistency of treatment between companies so that investors believe they are comparing "apples to apples" in deciding how to allocate their capital and to assure transparency by computing stock option value in a manner that is simple and easy to understand by investors.[16] Yet, for cost sharing purposes where the arm's length standard must be applied, independent parties acting at arm's length in negotiating terms applicable to particular products or product lines will not be constrained by public financial statements.[17] Accordingly, the financial statement treatment of compensatory stock options does not govern unrelated parties and should not dictate arm's length treatment by related parties.

The proposed regulations (1) conflict with the arm's length standard of section 482 by requiring related parties to act in a manner that is inconsistent with unrelated party transactions and by failing to achieve cost allocations that are consistent with CWI and (2) incorrectly treat compensatory stock options as a participant "cost." Based on the foregoing, the proposed regulations should be withdrawn. If you have any questions or require additional information, please contact the undersigned at (202) 533-3000 or Stephen Bates at (415) 743-5422. Thank you for your consideration.

Sincerely,

Steven R. Lainoff
*Partner-in-Charge*
*International Corporate Services*
*KPMG Washington National Tax*

Clark J. Chandler
*Partner*
*Economic Consulting Services*
*KPMG LLP (Washington, DC)*

---

[16] KPMG is not hereby expressing any opinion as to the proper treatment of compensatory stock options for financial accounting purposes.

[17] The IRS's own expert agrees: "[I]n cases where financial accounting conventions lead to inaccurate measures of value, competent business decision makers will not be bound by what is the company's financial accounts. . . . Therefore, the economic analysis of related-party transfer prices should not be bound by the financial accounting figures either." Declaration of T. Scott Newlon, *Seagate Technology, Inc. v. Commissioner*, T.C. No. 15086-98 (filed August 1, 2001) (quoting page 22 of Exhibit A).

APP00127



Commissioner Internal Revenue Service
October 28, 2002
Page 6


cc:  B. John Williams, Jr., Chief Counsel, Internal Revenue Service
     Pamela F. Olson, Assistant Secretary for Tax Policy, Department of the Treasury
     Barbara Angus, International Tax Counsel, Department of the Treasury

APP00128

# Exhibit 5

PricewaterhouseCoopers LLP
Comment Letter (Oct. 28, 2002)

REG - 106359-02
**REGULATIONS UNIT**
**CC:ITA:RU**

From: postoffice@www.qai.irs.gov
Sent: Monday, October 28, 2002 4:51 PM
To: guy.r.traynor@irscounsel.treas.gov
Subject: Comment from Web Site
From: eric.ryan@us.pwcglobal.com
reg=Compensatory Stock Options
category=taxregs
email=eric.ryan@us.pwcglobal.com

OCT 29 2002

**ROOM 5226**
Giblen/Beck

Begin Comment Text --------------------

Printed version to follow (tommorrow).

INTRODUCTION AND SUMMARY OF COMMENTS

PricewaterhouseCoopers LLP (PwC) is pleased to respond to the request of the Treasury and the
Internal Revenue Service (IRS) in Notice of Proposed Rulemaking REG106359-02 for comments
on proposed regulations relating to the treatment of stock-based compensation for purposes of
qualified cost sharing arrangements (the Proposed Regulations). The Proposed Regulations
would require companies to use one of two methods to account for stock-based compensation of
employees for purposes of determining costs to be shared. As a general rule, companies would
use a valuation method that is generally based on the spread at exercise and consistent with the
U.S. corporate tax deduction for many types of stock-based compensation (the general rule).
Public companies traded on a U.S. exchange would be permitted to elect to value the options
at grant using an economic model (such as Black-Scholes) in conformity with the alternative
valuation typically reported in companies financial statement footnotes (the grant-date election).
PwC expects that the IRS and Treasury will receive numerous comments criticizing the Proposed
Regulations on grounds that they are not consistent with the arms length standard. Criticisms can
be made based on evidence from actual arms length dealings, from economic and accounting
perspectives, and by reference to case law, federal legislation or international tax treaties. PwC
agrees that the Proposed Regulations are fundamentally flawed in these respects, but is confident
that other comments will competently address these points. Therefore, although we strongly urge
the IRS and Treasury to withdraw the Proposed Regulations in their entirety, we will limit our
detailed comments here to suggestions to improve the fairness and usefulness of the Proposed
Regulations if the IRS and Treasury are determined to finalize them at this time in spite of
their serious defects. We suggest that, at the least, finalization of Proposed Regulations should
be deferred until greater international consensus and coordination with other transfer pricing
rules can be achieved. These issues are currently being studied by the Organization of Economic
Cooperation and Development (OECD). In order to reduce the incidence of double taxation, it is
crucial that the IRS and Treasury at least wait until an international consensus begins to form.
Likewise, it is not reasonable for the IRS and Treasury to address this issue in a piecemeal
fashion; rather, the implications of these rules on other transfer pricing issues should be fully
considered before finalization. When and if the Proposed Regulations are finalized, they should
be
prospective only and transition rules should be provided. The grant-date election should be

APP00129

2

available to all taxpayers, not just public companies that trade on a U.S. stock exchange, and should be allowed on extended returns. Exercise-date valuation should be fully conformed to tax deduction rules (even for incentive stock options) and pro-ration over the option's vesting period should be allowed. For the grant-date valuation, any reasonable method should be allowed rather than requiring conformity with financial accounting rules alternatively, a minimum value method could be specified.

COMMENTS

A.    The Proposed Regulations Are Not Consistent With the Arm's Length Standard

PwC expects that the IRS and Treasury will receive numerous comments criticizing the Proposed Regulations on grounds that they are not consistent with the arm's length standard. PwC agrees that the Proposed Regulations are fundamentally flawed in this respect, and is confident that other comments will extensively address these points. Because the arm's length standard is the central principle and foundation of international transfer pricing, we believe that promulgating these regulations will lead to numerous international tax disputes and increase the incidence of double taxation to the detriment of U.S. businesses. Therefore, we strongly urge the IRS and Treasury to withdraw the Proposed Regulations in their entirety. PwC fears that there is a strong possibility that the IRS and Treasury will choose to finalize these regulations in spite of their fundamental

flaws. As a result, we feel a duty to our worldwide clients to offer suggestions that will improve the fairness and usefulness of the Proposed Regulations if the IRS and Treasury are not persuaded by the public comments and hearings to withdraw them. While our detailed comments below will be limited to such suggestions, we want to emphasize that the comments are in no way intended to undermine our strong message that the regulations should not be finalized in any form. Before turning to our detailed suggestions, we wish to briefly outline some of the chief reasons why the Proposed Regulations are not consistent with the arm's length standard. The central inquiry in an arm's length analysis of cost sharing arrangements should be what costs independent parties would share under the same circumstances, and how they would measure and share such costs. The evidence from both private sector and government contracts demonstrates that independent parties do not, in fact, agree to share any amounts based on the other party's employee stock options. Far from being surprising, these actual business contracting practices are precisely what would be predicted by sound economic reasoning. An arm's length party would not be expected to agree to reimburse the spread-at-exercise value of another party's employee stock options

because the payments would be dependent on stock market fluctuations that are uncertain in time and amount, and entirely out of the payer's control. Arm's length parties would not be expected to agree to share amounts based on grant-date valuations either because Black-Scholes and the other economic models commonly used to value options are highly speculative and inaccurate when applied to employee stock options, which have much longer terms and many more restrictions than the market-traded options for which the models were designed.

APP00130

3

B.    Treasury Should Reassess Burden Imposed on Taxpayers by the Proposed Regulations

At the outset, PwC would like to comment on the accuracy of the Proposed Regulations estimates of the reporting and record-keeping burden imposed on taxpayers. Based on our experience advising clients that have both cost sharing arrangements and employee stock option plans, we believe that the additional burden imposed by the Proposed Regulations would be significantly in excess of two to seven hours for each affected taxpayer, and the average burden would be significantly in excess of four hours. In our assessment, the initial tasks of designing procedures and systems to comply with the Proposed Regulations will require several days of effort for most affected taxpayers. The decision whether to make the grant-date election or follow the general rule is itself a significant and far-reaching decision that warrants extensive research, thorough modeling and careful consideration of both the tax and financial accounting implications. Systems then need to be put in place to capture relevant information about each employee receiving stock options, including details about the options received and the employee's activities and responsibilities at the time. As for the recurring annual burden of complying with the Proposed Regulations, the necessary procedures are significantly different for each of the two allowed methods:

Under the grant-date election, the most difficult and time-consuming step of the process would be to apply the valuation model each time that an option grant is made. After each option grant, it would be necessary to determine the aggregate value of the options, make applicable adjustments (such as the adjustment for estimated forfeitures), and then determine how much of the adjusted total value is allocable to the cost sharing pool. Thereafter, the total allocated value would simply be amortized into the cost pool each quarter during the vesting period.

Under the general rule, on the other hand, pooling and amortization conventions could not be applied. Instead, each and every exercise of an option by an employee would have to be traced back to the initial option grant, a determination made whether (and to what extent) the employee was involved in cost-shared activities at that time, and the amount of the spread at exercise computed and added to the cost pool for the quarter.

The annual burden on taxpayers would therefore depend critically on the frequency of option grants or exercises (depending on the method) and the complexity of the stock option plans. The upper estimate of seven hours may be accurate for the least complex cases, but it is likely to require significantly more hours each year for most taxpayers. The Proposed Regulations also estimate that the number of taxpayers burdened by these rules to be about 500. Since nearly every taxpayer that participates in a cost sharing arrangement would be affected by the rules,
we feel the actual number may be twice or three times as high. In any case, however, we would warn Treasury not to take the relatively low number of affected taxpayers as an indication of the importance of this issue. The principles of the Proposed Regulations could easily be extended to all areas of intercompany transfer pricing where they would affect taxpayers in the hundreds of thousands. For example, it has been reported that Treasury and IRS are seriously considering adopting a similar approach to employee stock option issues in the update of the regulations on transfer pricing for services, which are expected to be completed during this Treasury business plan year. Lastly, we take issue with the claim of the Proposed Regulations that they would not

APP00131

4

have a significant economic impact on a substantial number of small entities. PwC is aware of many small companies, especially in the high technology sector, that have both cost sharing arrangements and stock option plans and so would be directly affected.

C.    Treasury Should Defer Finalization At Least Until International Consensus and Coordination with Other Transfer Pricing Rules Can be Achieved

1.    International Consensus

Accounting for employee stock options raises very difficult issues that are currently being studied by a number of key international bodies. In fact, the treatment of stock options for transfer pricing purposes is currently being studied by the Organization of Economic Coordination and Development (OECD), which is the most influential voice in the transfer pricing arena. Due to the significant risks of double taxation in this area, it would be very unfortunate if the U.S. Treasury were to promulgate inconsistent rules so soon before the OECD speaks on the issue. Employee stock options play a key role in the U.S. economy, particularly within the small business sector, providing the fuel for growth and innovation. Options motivate employees to give peak performances, and allow them to share the rewards if the enterprise is successful. As Senator Joseph Lieberman said in introducing a bill on stock option accounting in 1993: Equity is America's edge in global competition. It's our secret weapon. Neither the Europeans nor the Japanese have yet learned how to generate the kind of employee creativity and commitment that broad-based employee stock option plans have demonstrated for U.S. companies. Until now, the United States has been at the forefront of encouraging companies to use employee stock options. It would be unfortunate break with this tradition if the U.S. Treasury leads the way in imposing onerous rules relating to stock options that will lead to international double taxation and jeopardize their continued viability as a form of compensation. PwC strongly urges the IRS and Treasury not to finalize the Proposed Regulations before an international consensus begins to form.

2.    Coordination of Transfer Pricing Rules

The arm's length standard applies to all areas of intercompany transfer pricing. We do not believe it is reasonable or prudent for the IRS and Treasury to create rules for the treatment of employee stock options that apply only to cost sharing arrangements, which are only one aspect of intercompany transfer pricing. Adopting transfer pricing rules in such a piecemeal manner is likely to create unfair traps for the unwary or give rise to other unforeseen consequences. Many examples of such unforeseen consequences are possible. Here we provide a single example in an area most closely related to cost sharing: determination of a buy-in royalty for use of pre-existing intangible property. Consider a U.S. company with a cutting-edge product line that reports substantial net margins on its public financial statements. As a result of its high-profile products and strong profit margins, the U.S. company has seen its stock price soar over the past few years and so many long-time employees of the company have exercised their stock options. As a result

APP00132

5

of the stock option deduction, this company has little or no taxable income due to the high number of employees exercising their options at this time (and paying substantial individual income taxes on the income). Now, assume that, in connection with its global expansion, this company were to enter into an R&D cost sharing arrangement with a newly formed foreign affiliate. The Proposed Regulations would require both companies to share future stock option deductions in proportion to their shares of the benefits from the R&D program. Because only the U.S. company owns any pre-existing intangible property, the new foreign affiliate would also have to pay a buy-in royalty to the U.S. parent. Applying the principles of the Proposed Regulations and accounting for employee option spreads at exercise as an expense, the company finds it has had little or no profits for several years and does not expect to have any profits for several years into the future. Under the commensurate with income standard,  profit potential is key to determining the amount of the buy-in royalty no matter what transfer pricing method is used. Assuming the company uses the comparable profits method to determine the buy-in royalty, the result will be a very low royalty rate since expected profits after stock option exercises scarcely cover the routine return for the new affiliate's manufacturing and sales functions. In contrast, if financial accounting standards were used for the transfer pricing analysis, rather than the principles of the Proposed Regulations, the buy-in royalty would be quite substantial in proportion to the strong reported profit margins since the value of employee stock option exercises would be recorded only on the statement of equity and would not affect the company's income statement. Another way to conceptualize this issue is to consider how an independent foreign marketing company that was considering entering into a joint venture with our cutting-edge U.S. company would react if asked to share the spread-at-exercise value of its employee stock options. Suppose further that the foreign venturer was able to overcome its deep misgivings about agreeing to make uncertain future payments that would be dependent on stock market fluctuations. As a quid-pro-quo for agreeing to such an unusual arrangement, the foreign venturer would likely demand that the buy-in royalty it would otherwise be willing to pay the U.S. company being greatly reduced or waived entirely. Otherwise, it would be risking hefty losses if the venture were successful when it would effectively have to pay the U.S. company twice for pre-existing intangibles, once in the form of the buy-in royalty and then again by reimbursing

multiple-year increases in the U.S. company's stock market value when its employees exercise their options. As this example shows, the effects of applying the principles of the Proposed Regulations to other areas of transfer pricing would be quite far-reaching, and often would be detrimental to the U.S. Treasury. The preamble to the Proposed Regulations indicates that the IRS and Treasury are also studying the issue more broadly. PwC believes it is not reasonable or prudent for the IRS and Treasury to finalize these regulations without considering the impact of their principles on all areas of transfer pricing. If the Proposed Regulations are not withdrawn in their entirety, PwC strongly urges the IRS and Treasury to postpone finalization at least until the treatment of employee stock options for all U.S. transfer pricing purposes can be harmonized.

D.     If Not Withdrawn, Regulations Should Be Prospective Only and Should Provide Transition Rules

APP00133

6

The preamble to the Proposed Regulations states: No inference is intended with respect to the treatment of stock-based compensation granted in taxable years beginning before the effective date of the final regulations. Meanwhile, PwC observes that the IRS continues to raise the stock option/cost sharing issue in audits and to litigate the issue in its dispute with Xilinx, Inc. (Tax Court docket #4142-01). In our opinion, the current cost sharing regulations clearly permit taxpayers to apply any reasonable accounting method to determine costs and revenues, provided the method is applied consistently, and specifically sanction the use of U.S. generally accepted accounting principles (U.S. GAAP) for this purpose. Moreover, we believe that it is not appropriate for the IRS to attempt to create new rules for the treatment of stock options in cost sharing by means of audits and litigation; rather, we believe that the current notice-and-comment process is the appropriate way to create broad new rules of this sort. Accordingly, we recommend that the IRS cease pursuing stock-option related adjustments in audits and cases against taxpayers that have consistently applied U.S. GAAP for cost sharing purposes. If the IRS and Treasury are determined to finalize the Proposed Regulations, we urge that they be made entirely prospective in effect. Clear transitions rules are needed to protect taxpayers from adjustments to prior years. At the very least, the second sentence of section 1.482-7(d)(2)(ii) should be revised as follows: Accordingly, all stock-based compensation that is granted after the effective date of this paragraph (d)(2), during the term of the qualified cost sharing arrangement and is related at date of grant to the development of intangibles covered by the arrangement is included as an intangible development cost under paragraph (d)(1) of this section.

E.      If Regulations are Not Withdrawn, Election to use Grant-Date Valuation Method Should be Available to All Taxpayers and Further Liberalized

We commend the IRS and Treasury for introducing an element of flexibility to taxpayers in the Proposed Regulations in the form of the grant-date election. However, if the IRS and Treasury are determined to finalize these regulations in some form, we suggest that further liberalization of the election is needed to make the regulations more fair and useful. Most importantly, the fact that the Proposed Regulation only allows public companies that trade on U.S. exchanges to make the grant-date election unfairly penalizes privatelyheld and foreign companies. We recognize the great difficulty of valuing private company stock options, but strongly believe that this difficulty does not justify favoring U.S. public companies over those that are privately held by allowing only the former companies to make an election with such potentially dramatic tax effects. In any case, the valuation of private company stock, as would be required by the general rule, is itself difficult and contentious; the further difficulties of valuing private company options would be largely mitigated if our comments on minimum value method (Section G below) were to be favorable received. As for foreign public companies, the disparate treatment may provide an additional avenue for such companies to challenge the regulations by invoking tax treaty non-discrimination clauses. We also have two comments regarding the time and manner of making the grant-date election provided by the Proposed Regulations. First, we suggest that the IRS and Treasury reconsider the requirement that the election must be explicitly made in the written cost sharing agreement. This requirement raises difficult questions of enforcement and proof,

7

especially if the agreement is written in a language other than English. It would be more practical for the taxpayer to make the election on its U.S. tax return either under explicit disclosure requirement or, preferably, by its treatment of employee stock options in reporting the results of cost sharing in the first year that they are relevant. Second, we believe that time requirement for making the grant-date election in the Proposed Regulation is more stringent than is reasonable or necessary.  Under the transition rule, there is no compelling reason to disregard elections made by the time that a timely, but extended, return is filed.  The few extra months of stock market information available to the taxpayer would not negatively impact the Treasury in the long run since the election will be binding on the taxpayer for all subsequent years.  It is not fair to cut short the time available to taxpayers for research, modeling and consideration before making such a significant and far-reaching decision.

F.     If Regulations are Not Withdrawn, Exercise-Date Valuation Approach Should be Fully Conformed to Tax Deduction Rules and Pro-Ration Over Vesting Period Should be Allowed

1.     Conformity with Tax Deduction

PwC doubts that any rational argument exists to support the case that exercise-date accounting for employee stock options is consistent with the arm's length standard.  That is, we do not believe that arm's length parties would ever agree to share an uncertain future amount that is dependent on stock market fluctuations, not directly related to their activities and entirely out of their control. Nonetheless, considering the difficulties of valuing options on grant date, we commend the IRS and Treasury for allowing exercise-date accounting.  In fact, we do not fault the Proposed Regulations for choosing exercise-date accounting over grant-date as the general rule since exercise-date accounting is marginally simpler (in that it does not require use of complex valuation models) and is not as speculative (i.e., it does not penalize companies suffering stock market downturns). Many companies may choose exercise-date accounting over grant-date accounting, if a choice becomes required, because its effects on a company's income tax provision under U.S. GAAP appear to be clearer and less onerous.  If the exercise-date method is applied, it is probable that any tax detriment caused by the Proposed Regulations would be reported as on the company's statement of equity rather than its income statement, which is the same treatment required by U.S. GAAP to account for any tax benefits from stock option deductions.  However, to the extent the Proposed Regulation s treatment of stock options differs from their treatment for other U.S. corporate tax purposes, their harmony with U.S. GAAP tax provision rules is similarly diminished.  Therefore, if the Proposed Regulations must be finalized, we recommend that the general rule be more fully conformed to tax deduction rules. Thus, we approve of the wording of the general rule that the amount subject to cost sharing is equal to the amount allowable to the controlled participant as a deduction for federal income tax purposes with respect to that stock-based compensation. Prop. Reg.1.482-7(d)(2)(iii)(A).  On the other hand, we believe that the exception from the general rule for incentive stock options which makes section 421 inapplicable for purposes of the determining the cost pool [Prop. Reg. 1.482-7(d)(2)(iii)(A)(i)], is unwarranted and should be removed if the regulations are finalized. If the exception is removed, incentive stock options would give rise to a compensation expense

APP00135

8

for cost sharing only if the employee makes a disqualifying disposition, and the amount would be based on the spread on the disposition date rather than the exercise date. Removing the exception for incentive stock options would greatly reduce the administrative burden on taxpayers adopting the general rule because they would not be required to apply different rules for different purposes. Although the general rule of the Proposed Regulations cannot be defended on policy grounds of upholding the arm's length standard, a possible policy rationale may be a concern that it is unfair to the Treasury for taxpayers to get a generous deduction for stock options under the tax code while being allowed to apply the miserly rules of U.S. GAAP for cost sharing purposes. Full conformity with the tax deduction rules is consistent with this rationale.

2.      Pro-Ration Over Vesting Period

One reason exercise-date valuation of employee stock options is not consistent with the arm's length standard is that it ignores the economic implications of vesting rules. It is irrational to consider any increases in stock value that occur after the options are fully vested to constitute compensation expense such increases should instead be considered the result of the individual employee's investment decisions. In order to improve the arm's length nature of the Proposed Regulations and reduce likelihood of double tax, we suggest that the IRS and Treasury consider allowing taxpayers to include in the cost pool only a pro-rated amount of the tax deduction relating to the period between grant and vesting dates during which employees were engaged in cost-shared activities. While we recognize that such a rule would increase the burden of complying the regulations, we believe that the extra burden is justified by the increase in fairness.

G.      If Regulations are Not Withdrawn, Any Reasonable Method Should be Allowed for Grant-Date Valuation Election and Minimum Value Method Should be Considered as Alternative

1.      Any Reasonable Method

In previous non-binding written guidance, the IRS has posited that the taxpayer could use any reasonable method to account for stock options in cost sharing arrangements. We believe that the retreat to only two allowable methods under the Proposed Regulations is unwarranted. In particular, we believe that it is unfair to preclude the use of reasonable methods allowed by international accounting standards or use of home country GAAP by cost sharing groups that have foreign parent companies. If the regulations are finalized, we specifically recommend elimination of the requirement that the grant-date valuation method used for cost sharing purposes conform to the fair value of the stock options reflected as a charge against income in audited financial statements or disclosed in footnotes to such financial statements, prepared in accordance with [U.S. GAAP] by or on behalf of the company issuing the publicly traded stock.

If the grant-date election is made available to private and foreign companies, as we recommend above, this approach would introduce an unwarranted requirement that a U.S. GAAP audit be performed. Furthermore, the U.S. GAAP fair value conformity requirement would be

APP00136

9

inappropriate for companies that would use significantly different assumptions to value options granted to employees performing cost-shared R&D activities than for all employees. For example, the forfeiture rate and average life of options granted to such employees may differ greatly.

Neither the IRS nor the company tax department should be bound by the aggregate assumptions adopted by the accountants for purposes of the fair value footnote. Currently, most taxpayers use the intrinsic value method to account for employee stock options for purposes of both cost sharing and U.S. GAAP reporting. PwC believes that this method is, in fact, a reasonable method that properly reflects stock option expense. The intrinsic value method measures the amount of stock-based compensation by the difference between the option's exercise price and the value of

the underlying stock at the time of grant. While it is evident from the market for publicly traded stock options that such options have a time value to the investor in addition to their intrinsic value, we do not agree that the time element of employee stock options constitutes a true expense to the company. The grant of at-the-money employee stock options does not reduce corporate cash flow, and the exercise of such options will not require any outlay of cash either. The grant of such options represents no more than the potential dilution of existing shareholders ownership. This is the same debate that took place when the Financial Advisory Standards Board (FASB) considered requiring companies to treat the fair value of employee stock options as an expense for U.S. GAAP purposes nearly ten years ago. After extensive public comments on the issue, the final rule allows companies to continue to use the historic intrinsic value method if they believe it is appropriate and only requires companies to disclose fair value information in the footnotes to their financial statements. The question of whether the intrinsic value or the fair value method of accounting for options better reflects the company's true financial condition is a question that management of U.S. public companies must consider each time they release GAAP financial statements. Based on its litigating positions and prior guidance, it is apparent that the IRS disagrees with us that the intrinsic value method allowed by U.S. GAAP is a reasonable method for cost sharing purposes. If the IRS and Treasury continue to hold this view after considering the comments and testimony on the Proposed Regulations, then the regulations could be modified to allow any reasonable method of accounting for stock options but specify that a method must include a time value element in order to be considered reasonable.

2.    Minimum Value Alternative

The so-called minimum value method is an alternative approach that the IRS and Treasury should consider if determined to finalize the Proposed Regulations. When the FASB considered accounting for stock options ten years ago, the minimum value method was considered as a possible approach for all companies and was adopted as an alternative to the fair value method for private companies. The minimum value method accounts for stock options time value by assuming the underlying stock will grow at the risk free interest rate. The minimum value is the value derived from the Black-Scholes model when the assumed volatility of the underlying stock approaches zero. Volatility is probably the most controversial and speculative of the variables required by the Black-Scholes model in the context of employee stock options. While the

APP00137

10

short-term volatility of public company stock can be estimated with reasonable accuracy from available market data, such estimates become highly speculative over the much longer terms of employee stock options. Further, a basic assumption of the Black-Scholes model is that volatility is constant over time is challenged by empirical data showing that volatility can change significantly over time and that volatility in latter periods is dynamically affected by actual results in prior periods. Thus, requiring use of the minimum value method rather than allowing any reasonable method for transfer pricing purposes has the advantage of reducing uncertainty and potential for contentious disputes. It also serves the purpose insuring equal treatment of all taxpayers, whether private or public, domestic or foreign, and whatever approach management takes to determine the options fair value under U.S. GAAP rules. If the IRS and Treasury were to promulgate regulations for using the minimum value method, the regulations would need to address the same issues that the FASB addressed with respect to fair value accounting. First, the estimated term of the options should be based on average employee holding periods rather than the options nominal term to account for early exercise. Second, the aggregate value of options issued to relevant employees under the plan should be reduced by a factor based on expected turnover rates to deal with pre-vesting forfeitures. Finally, the regulations could provide guidelines for determining the risk free rate of return by reference to the applicable federal rate (AFR) used for other tax purposes.

  *     *     *     *

PwC encourages the IRS and Treasury to reconsider the Proposed Regulations in light of our comments. We are planning to testify at the public hearing scheduled for November 20, 2002, and would be more than happy to discuss or expand upon these comments if requested.

Respectfully Submitted,

Dated: October 28, 2002  _____

PricewaterhouseCoopers LLP

End Comment Text ----------------------

IRS - 0014572

APP00138

# Exhibit 6

Financial Executives International
Comment Letter ("FEI Comments")
(March 18, 2003)

03-0143

March 18, 2003

Mr. B. John Williams
Chief Counsel
Internal Revenue Service
1111 Constitution Avenue, NW
Washington, DC  20224

Dear B. John:

As a follow up to the discussion at the recent FEI meeting and your March 4, 2003 email, FEI
surveyed Tax Committee members for examples of cost sharing agreements between unrelated
parties that exclude compensatory options from shared costs.

An example, applicable to government contractors, is contained in the Federal Acquisition
Regulations.  The U.S. government does not permit government contractors to seek
reimbursement for stock option costs (FAR 31.205-6(i)(l)).

Joint operating agreements (JOA) are common in the petroleum industry due to the high financial
burdens involved in offshore development.  In that regard, the industry relies heavily on the
Council of Petroleum Accountant Societies (COPAS) in modeling JOA accounting procedures
and auditing the accounting procedures of parties to the JOA agreement.  Attached is COPAS
MFI-37 which recommends against charging stock options (see final paragraph).  Also, attached
is COPAS MFI-19 which is an accounting procedure heavily used by the industry.  Referring to
the top of page 18, employee benefits chargeable to the joint account are those associated with
an established plan that are made available to all employees; thus, costs of benefits available
only to executives, certain employees or groups on a selective basis are not chargeable to the
joint account.

There was a reluctance among committee members to provide copies of actual cost sharing
agreements with third parties, which are highly confidential due to competitiveness concerns.
Even a heavily redacted contract would divulge terms and conditions bargained for with a third
party business partner and would require the partner's agreement to release.  Requests of that
nature have the potential for giving the partner an excuse to raise issues important to it and,
therefore, are frowned on by the business people who would have to agree to the request.

Hopefully, the examples above are sufficient to prove the point that stock options are not taken
into account in cost calculations pursuant to third party cost sharing agreements.  As a matter of
common business practice, no businessman worth his salt would agree to reimburse a cost which
could not be calculated with reasonable certainty and which could escalate dramatically due to
forces outside the cost sharing agreement.

If you have questions, please contact Mark Prysock or me.

Sincerely,

RECEIVED

2003 MAR 21  A 10: 28

JOL/cw
Attachments

OFFICE OF CHIEF COUNSEL



# CHARGEABILITY of INCENTIVE COMPENSATION PROGRAMS

(Formerly known as Interpretation 30)

## MODEL FORM INTERPRETAION        MFI – 37

**Publication/Revision Date --- July 1997**

**Board Approved**

Copyright © 1997 by the Council of Petroleum Accountants Societies, Inc. (COPAS)

# COPAS MODEL FORM INTERPRETATION #37

**ISSUED:**    July 24, 1997

**SUBJECT:**    Chargeability of Incentive Compensation Programs

## PREFACE:

This COPAS Interpretation has been reviewed by the Petroleum Accountants Societies through representation on the Joint Interest Standing Committee and approved by the Board of Directors of the Council of Petroleum Accountants Societies and recommended as a guide in accounting for joint interest operations.

## PROBLEM:

Many companies are implementing Incentive Compensation Programs (ICPs) that motivate and reward employees for contributing to the company's success. The ICPs are often based on increases in profitability and/or productivity of a business unit, or entire company. ICPs are replacing or supplementing annual merit raises. COPAS Accounting Procedures from 1962 through the present and the associated bulletins provide for salaries and wages to be directly charged to the Joint Account, whereas, the Employee Benefits provision of Accounting Procedures and COPAS Interpretation No. 11 include bonuses as part of the employee benefit burden rate. The changing nature of employee compensation has led to a variety of methods being used to charge ICPs. These range from charging the costs directly, to incorporating ICPs within the employee benefits rate, or operator's overhead.

## INTERPRETATION:

ICPs reward employees based on predetermined metrics such as increased production and/or profitability. They are an integral part of salary programs that are designed to motivate employees, increase productivity and promote teamwork. ICPs may include but are not limited to variable pay, pay at risk, pay for performance and gainsharing. COPAS recommends that ICPs paid in cash be directly charged to the Joint Account for employees whose salaries and wages are chargeable, pursuant to the Accounting Procedure/Operating Agreement regardless of whether the employee received a merit/cost of living/general increase. Such programs must be a formally documented policy of the operator.

IRS - 0014137

APP00141

The direct charge to the Joint Account for ICPs should be on the same basis that the employee's salary is charged as described in the applicable Accounting Procedure attached to the Operating Agreement. In administering such ICP charges, it is recognized there may be a timing difference between when the ICP is earned and when it is paid to the employees. A number of different accounting methods may be employed in making such charges to the Joint Account. If an employee is permanently assigned to a particular property(ies), the Operator may choose to charge the entire amount in the month in which payment is made to the employees. Another method is to increase the labor burden by a percentage equal to the ICP, to spread the award evenly over the entire year, and thus not unduly burden any one month's operating cost for a property. This may be done on a prospective basis to properties served in the year the award is paid, even though it was earned in the prior year. Alternatively, the ICP may be charged in the year it is earned on the basis of forecasts, provided there is reasonable conformity or matching of costs between the ICP forecast and the actual award paid.

These methods may also be employed with respect to drilling, construction personnel and Technical Employees, whose time is charged to specific properties/projects; however, it is recommended that the ICP be charged prospectively to all properties/projects served. As a result the ICP is charged only to the extent the employee's salary and wages are directly chargeable to a specific property/project. That portion of their time that is not charged to the Joint account (overhead) also bears an equitable share of the ICP.

Any of the above methods are acceptable, provided the Operator is consistent and reasonable in its application.

COPAS does not recommend directly charging the Joint Account for ICPs in the form of a royalty, overriding royalty, stock or stock option. Typically, operating agreements provide that any excess or subsequently created burdens are to be borne solely by the party which created the burden. This would preclude the charging of most royalty or overriding royalty awards. Stock options do not lend themselves to a reasonable method of calculating value.

COPYRIGHT © 1997 Council of Petroleum Accountants Societies

IRS - 0014138



# 1986 OFFSHORE ACCOUNTING PROCEDURE JOINT OPERATIONS

(Formerly known as Bulletin 25)

## MODEL FORM INTERPRETATION    MFI – 19

**Publication/Revision Date --- September 1987**

**Council Approved**

Copyright © 1987 by the Council of Petroleum Accountants Societies, Inc. (COPAS)

# MODEL FORM INTERPRETATION 19

## ACCOUNTING PROCEDURE
## OFFSHORE JOINT OPERATIONS 1986

### TABLE OF CONTENTS

FOREWORD ........................................................................................................................ 3
SPECIMEN, FORM 606 COPAS – 1986 ....................................................................... 3
INTERPRETATIVE BULLETIN ..................................................................................... 4
I.   GENERAL PROVISIONS ...................................................................................... 14
    1.   Definitions ......................................................................................................... 14
    2.   Statements and Billings .................................................................................... 14
    3.   Advances and Payments by Nonoperators ...................................................... 14
    4.   Adjustments ....................................................................................................... 14
    5.   Audits ................................................................................................................. 15
    6.   Approval by Nonoperators ................................................................................ 15
II.  DIRECT CHARGES ............................................................................................... 15
    1.   Rentals and Royalties ....................................................................................... 16
    2.   Labor .................................................................................................................. 16
    3.   Employee Benefits ............................................................................................ 16
    4.   Material .............................................................................................................. 17
    5.   Transportation ................................................................................................... 18
    6.   Services .............................................................................................................. 18
    7.   Equipment and Facilities Furnished by Operator ......................................... 19
    8.   Damages and Losses to Joint Property .......................................................... 19
    9.   Legal Expense ................................................................................................... 22
    10.  Taxes .................................................................................................................. 23
    11.  Insurance ........................................................................................................... 23
    12.  Communications ................................................................................................ 24
    13.  Ecological and Environmental ......................................................................... 25
    14.  Abandonment and Reclamation ....................................................................... 25
    15.  Other Expenditures ........................................................................................... 25
III. OVERHEAD ............................................................................................................ 26
    GENERAL ................................................................................................................. 27
    1.   Overhead - Drilling and Producing Operations ............................................. 27
    2.   Overhead - Major Construction ........................................................................ 28
    3.   Overhead - Catastrophe .................................................................................... 30
    4.   Amendment Of Rates ........................................................................................ 30
IV.  PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND
    DISPOSITIONS ........................................................................................................ 31
    1.   Purchases ........................................................................................................... 32
    2.   Transfers And Dispositions .............................................................................. 32
    3.   Premium Prices .................................................................................................. 32
    4.   Warranty Of Material Furnished By Operator ............................................... 33
V.   INVENTORIES ....................................................................................................... 34
    1.   Periodic Inventories, Notice And Representation .......................................... 35
    2.   Reconciliation And Adjustment Of Inventories ............................................. 35
    3.   Special Inventories ............................................................................................ 35
    4.   Expense Of Conducting Inventories ................................................................ 35

*This bulletin has been reviewed by the Petroleum Accountants Societies through representation on the Council of Petroleum Accountants Societies.*

Copyright     1988 - Council of Petroleum Accountants Societies

2

IRS - 0014141

APP00145

## FOREWORD

The Petroleum Industry continues to expand its search for additional sources of hydrocarbon reserves and production in offshore waters which has brought about changes in methods of accounting unique to offshore operations. In view of the latest trends and requirements of accounting for the activities of the Petroleum Industry in the offshore environment, the Petroleum Accountants Societies, through representation on the Council of Petroleum Accountants Societies, have recognized these changes as they apply to offshore joint interest accounting and recommend the COPAS-1986 Offshore Accounting Procedure.

Development of the COPAS-1986 Offshore Accounting Procedure was governed by a policy decision to retain provisions of the COPAS-1984 Accounting Procedure except for additions or revisions necessary to recognize conditions unique to offshore operations. This was considered appropriate since COPAS-1984 had been very recently developed and reflected the most recent standards relative to joint interest accounting. As a consequence, a preferred and desirable continuity has been preserved between the two Accounting Procedures for provisions not unique to offshore operations. In keeping with this concept, the interpretative content of this bulletin remains essentially the same as presented in Bulletin No. 22 for COPAS-1984 Accounting Procedure except for additions or revisions reflected in the COPAS-1986 Offshore Accounting Procedure.

This bulletin is to explain, interpret and elaborate on the provisions of the COPAS-1986 Offshore Accounting Procedure and to acquaint the users with the intent which the COPAS-1986 writers attempted to set forth.

It is recommended that this bulletin be used as a guide to joint interest operations accounting in connection with all agreements to which COPAS-1986 is attached.

This bulletin does not replace previously published COPAS Bulletins which pertain to earlier dated COPAS Accounting Procedures and it is not intended that the provisions of the COPAS 1986 Offshore Accounting Procedure replace the provisions of any other Accounting Procedure which is presently a part of any existing agreement, except by agreement of the Parties to such agreements.

The Council is grateful to the COPAS Joint Interest Committee and all of the participating Petroleum Accountants Societies for the work contributed to the finalization of the COPAS-1986 Offshore Accounting Procedure and this bulletin.

3

APP00146

Specimen, Form 606 COPAS – 1986

**EXHIBIT** " "

*Attached to and made part of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# ACCOUNTING PROCEDURE
# OFFSHORE JOINT OPERATIONS

## I. GENERAL PROVISIONS

### 1. Definitions

"Joint Property" shall mean the real and personal property subject to the Agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties of this Agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property. "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

"Shore Base Facilities" shall mean onshore support facilities that during drilling, development, maintenance and producing operations provide such services to the Joint Property as receiving and transshipment point for supplies, materials and equipment; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; other associated functions benefiting the Joint Property.

"Offshore Facilities" shall mean platforms and support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations.

### 2. Statements and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

4

APP00147

## 3. Advances and Payments by Non-Operators

A. Unless otherwise provided for in the Agreement, the Operator may requite the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at _____ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws of the jurisdiction in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

## 4. Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

## 5. Audits

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period folio wing the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

## 6. Approval by Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

## 1. Rentals and Royalties

Lease rentals and royalties paid by Operator for the Joint Operations.

## 2. Labor

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in

5

IRS - 0014144

APP00148

the conduct of Joint Operations.

(2) Salaries and wages of Operator's employees directly employed on Shore Base Facilities or other Offshore Facilities serving the Joint Property if such costs are not charged under Paragraph 7 of this Section II.

(3) Salaries of First Level Supervisors in the field.

(4) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

(5) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

3.  **Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

4.  **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

5.  **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

6.  **Services**

6

APP00149

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraphs i and ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel directly engaged in the operation of the Joint Property shall be charged to the Joint Account if such charges are excluded from the overhead rates.

7.  **Equipment and Facilities Furnished by Operator**
    A.  Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including Shore Base and/or Offshore Facilities, at rates commensurate with costs of ownership and operation. Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation and interest on gross investment less accumulated depreciation not to exceed_____percent (_____%) per annum. In addition, for platforms only, the rate may include an element of the estimated cost of platform    dismantlement. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.
    B.  In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less twenty percent (20%). For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

8.  **Damages and Losses to Joint Property**
All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other causes, except those resulting from Operators gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

9.  **Legal Expense**
Expense of handling, investigating and settling litigation or claims, discharging of liens, payments of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the Agreement or necessary to protect or recover the Joint Property. except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

10.  **Taxes**
All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

11.  **Insurance**
Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted at offshore locations in which Operator may act as self-insurer for Workers' Compensation and Employers' Liability, Operator may include the risk under its self-insurance program in providing coverage under State and Federal laws and charge the Joint Account at Operator's cost not to exceed manual rates

12.  **Communications**
Costs of acquiring, leasing, installing, operating, repairing and maintaining communication systems including radio and microwave facilities between the Joint Property and the Operator's nearest Shore

7

APP00150

Base Facility; In the event communication facilities systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Paragraph 7 of this Section II.

**13. Ecological and Environmental**

Costs incurred on the Joint Property as a result of statutory regulations for archaeological and geophysical surveys relative to identification and protection of cultural resources and/or other environmental or ecological surveys as may be required by the Bureau of Land Management or other regulatory authority. Also, costs to provide or have available pollution containment and removal equipment plus costs of actual control and cleanup and resulting responsibilities of oil spills as required by applicable laws and regulations.

**14. Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

**15. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge the Joint Account in accordance with this Section III.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

    i.  Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

      (    ) shall be covered by the overhead rates.
      (    ) shall not be covered by the overhead rates.

    ii.  Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

      (    ) shall be covered by the overhead rates.
      (    ) shall not be covered by the overhead rates.

**1. Overhead - Drilling and Producing Operations**

As compensation for overhead incurred in connection with drilling and producing operations, Operator shall charge on either:

    (    ) Fixed Rate Basis, Paragraph 1A, or
    (    ) Percentage Basis, Paragraph 1B

A. Overhead - Fixed Rate Basis

    (1)  Operator shall charge the Joint Account at the following rates per well per month:
      Drilling Well Rate $_____ (Prorated for less than a Full month)
      Producing Well Rate $_____

    (2)  Application of Overhead - Fixed Rate Basis for Drilling Well Rate shall be as follows:

8

IRS - 0014147

APP00151

(a) Charges for drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive calendar days.

(b) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except chat no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead - Fixed Rate Basis for Producing Well Race shall be as follows:

(a) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(b)   Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(c) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(d) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(e) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(4) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B.   Overhead - Percentage Basis

(1)  Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent (   %) of cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

(b) Operating

_____ Percent (  %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs land 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2)  Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph lB of this Section III, development shall include all costs in connection with drilling, redrilling, or deepening of any or all wells, and shall also include any remedial operations requiring a period of five (5) consecutive work days or more on any or all wells; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this

9

APP00152

Section III. All other costs shall be considered as Operating except that catastrophe costs shall be assessed overhead as provided in Section III, Paragraph 3.

2.  **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any ocher project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantling for abandonment of platforms and related production facilities, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $ _____.

A.  If the Operator absorbs the engineering, design and drafting costs related to the project:

   (1) _____% of total costs if such costs are more than $ _____ but less than $100,000; plus

   (2)____% of total costs in excess of $100,000 but less than $1,000,000; plus

   (3)____% of total costs in excess of $1,000,000.

B.  If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

   (1)____% of total costs if such costs are more than $ _____ but less than $100,000; plus

   (2) _____ % of total costs in excess of $100,000 but less than $1,000,000; plus

   (3) _____ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

On each project, Operator shall advise Non-Operator(s) in advance which of the above options shall apply. In the event of any conflict between the provisions of this paragraph and those provisions under Section II, Paragraph 2 or Paragraph 6, the provisions of this paragraph shall govern.

3.  **Overhead - Catastrophe**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

   (1)_____ % of total costs through $100,000; plus

   (2)_____ % of total costs in excess of $100,000 but less than $1,000,000; plus

   (3)_____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.  **Amendment of Rates**

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are 'found to be insufficient or excessive.

# IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through 'sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

10

APP00153

1. **Purchases**

   Material purchased shall be charged at the price paid by Operator after deduction of all discounts received, In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**

   Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

   A. New Material (Condition A)

   (1)Tubular Goods Other than Line Pipe

   (a) Tubular goods, sized 2¼ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

   (b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

   (c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

   (d) Macaroni tubing (size less than 2¼ inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

   (2) Line Pipe

   (a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

   (b) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth tinder provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

   (c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

   (d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

   (3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

   (4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs,

11

IRS - 0014150

APP00154

if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2 A (1) and (2).

B.  Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1)  Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2)  Material used on and moved from the Joint Property

(a)  At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b)  At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material.

(3)  Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A. The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.  Other Used Material

(1)  Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2)  Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)  Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe   of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced   at used line pipe prices.

(b)  Casing, tubing or drill pipe used as higher pressure service lines than standard tine pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe.        Upset tubular goods shall be priced on a non-upset basis.

(3)  Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition F Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.  Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.  Pricing Conditions

(1)  Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1,1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A(4). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)  Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.  **Premium Prices**

12

APP00155



Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.   **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers nor their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.   **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator

2.   **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments (shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

A.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

13

                                    APP00156

# ACCOUNTING PROCEDURE OFFSHORE JOINT OPERATIONS

## COPAS 1986
## INTERPRETATIVE BULLETIN

## I.  GENERAL PROVISIONS

### 1.  Definitions

"Shore Base Facilities" are onshore work sites conveniently located to the offshore operation to provide necessary support facilities and services. It functions to minimize the cost of boat travel time and other transportation and handling costs involved in getting personnel, services, equipment and supplies to and from the offshore work site. For more information, refer to COPAS Bulletin No.20, Shore Base Facilities Accounting Guidelines.

"Offshore Facilities" are associated with developed offshore producing fields and subsequent drilling and workover operations. They consist of offshore platforms and facilities located thereon required in the immediate area of the offshore operations site to handle crude, gas and water production; provide accommodations for living quarters, offices, communications material and equipment handling and other facilities requited in offshore operations.

### 2.  Statements and Billings

Charges and credits should be classified to enable nonoperator to meet government requirements and make proper distribution between capital expenditures (segregated by tangibles and intangibles) and operating expenses, and further identified as labor, Material, transportation, contract services, employee benefits, overhead by type and other such classifications as set out in COPAS Bulletin No. 1, Classifications for Use in Summary Form Billings.

The statement should detail Controllable Material as to quantity, description, price, sales tax, condition and other appropriate information for accounting purposes.

The statement should detail any unusual charges and credits applicable to the joint account. Examples of such transactions would be lease rentals, ad valorem taxes, legal expenses, damages, well contributions, audit adjustments and audit expenses. Each Authority for Expenditure (AFE) should be identified by AFE number and further identified by well number, facility, project or other appropriate identification.

### 3.  Advances and Payments by Nonoperators

A.  When the Nonoperators are required by Operator to advance their share of the estimated cash outlay for the succeeding month's operation, the amount of such cash advances paid in excess of actual expenditures shall be adjusted by Operator on the next monthly billing.

B.  Remittances should be made promptly by the Nonoperators in accordance with the terms of the contract. If such remittances are not made timely, interest should accrue monthly on the unpaid

14

APP00157

balance at the prime rate of the stated bank in paragraph B. It is recognized, subject to provisions to the contrary, that the Operator has advanced his money to finance the operations; and, if the remittances by Nonoperator are timely, or if interest payments are made on delinquent accounts, the Nonoperator still enjoys a more favorable financial position. It is suggested that interest applied by Operators when applicable should be accepted without reservation or criticism by Nonoperators who do not remit in accordance with the provisions of the contract. To encourage the enforcement of this provision, any policy by the Operator of placing a notation on his billings to the effect that the interest provision is to be applied is hereby sanctioned. Attention is directed to the maximum contract interest rates permitted by the applicable usury laws.

4. **Adjustments**

The monthly Joint Account billing should be paid as rendered by the Operator. If any item on the Operator's statement is questionable, the payment for such item should be included by the Nonoperator with the remainder of the billing. A request for an adjustment or explanation of the item in question should be directed promptly to the Operator. The Operator should answer such request promptly; and if an adjustment is in order, he should issue a credit (or debit) memorandum or advise the Nonoperator of the corrections on the next monthly billing. A request for adjustment or explanation shall not change the normal two-year formal audit limitation unless agreed to by the Operator.

When the total monthly billing to a particular Nonoperator s account reflects a credit balance, the Operator's check should follow within fifteen (15) days to settle the account, except where inventory and/or ownership adjustments are involved. In these instances some Operators effect distribution after collection of sufficient funds from the Nonoperators.

5. **Audits**

   A. Audits should be initiated and conducted in accordance with COPAS Bulletin No.3, Joint Interest Audits in the Petroleum Industry, Guides to Protocol and Procedures.

   B. A written reply to the initial audit report is required from the Operator within 180 days after receipt of such report. It should be noted that this response time is a contractual obligation and is intended to insure the granting of credit or a complete explanation for denial within that time for a substantial portion, if not all, of the audit exceptions. Rebuttals by the auditor and subsequent responses by the Operator should also be made promptly to avoid long delays in resolving exceptions. It would be expected that such rebuttals and responses would be provided more quickly than the initial audit response.

6. **Approval by Nonoperators**

This provision says that the majority in interest of Nonoperators may approve the Operator's proposal if no other voting provisions are in the Accounting Procedure or the Agreement of which the Accounting Procedure is a part. This provision does not apply to Section III Overhead, Paragraph 4, Amendment of Rates, which requires mutual agreement of the Parties.

15

APP00158

# Exhibit 7

## Professor Joseph A. Grundfest
## Comment Letter (Oct. 30, 2002)



STANFORD LAW SCHOOL

**Joseph A. Grundfest**
*W. A. Franke Professor of Law and Business*

Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305-8610

Tel: 650.723.0458
Fax: 650.723.8229
E-mail: grundfest@stanford.edu

October 30, 2002

CC: ITA:RU (REG-106359-02)
Room 5226
Internal Revenue Service
POB 7604
Ben Franklin Station
Washington, DC 20044

**REGULATIONS UNIT
CC:ITA:RU**

NOV 1 5 2002

**ROOM 5226**
Giblen / Beck

Re: Proposed Treas. Reg. 1.482-7 (REG-106359-02)

   This submission is in response to a request for comment regarding proposed regulations under Section 482 of the Internal Revenue Code relating to the treatment of equity-based compensation, such as stock options, under "qualified cost sharing arrangements" for intangible property (the "Proposed Regulations"). Prop. Treas. Reg. 1.482-7 (REG-106359-02).

   This letter does not address the details of the Proposed Regulations. Nor does it address every policy concern implicated by the Proposed Regulations. Instead, this letter focuses on a small set of observations that are, I believe, fundamental to tax policy in general and that have profound implications for the Proposed Regulations in particular.[1]

   The Department and the Service have long taken the position that the tax treatment of a transaction should be consistent with its underlying economic reality. *See, e.g.,* Notice 2002-70 (Regarding Reinsurance Arrangements). The Department and the Service have recently, for example, attacked tax shelter transactions in which the valuation of an insurance policy is not based on its fair-market value as measured in an arm's-length transaction. *See, e.g.,* Notice 2002-59.

   The same principle should apply to the treatment of equity-based compensation in qualified cost sharing agreements. If independent third parties would, in an arm's-length transaction, change the equilibrium price of a cost sharing arrangement, whether for research and development or for any other purpose, because one of the parties has entered into an equity-based compensation arrangement with its employees, then the economic reality test would support application of a rule that attempts to "price" the impact of the equity-based compensation, at the margin, on the value of the contract at issue. However, if data and theory suggest that such equity-based compensation has no effect on the arm's-length value of such relationships then consistent application of the economic reality test suggests that equity-based compensation arrangements should not enter into the cost-sharing calculus for purposes of Section 482.

---

[1] This letter is prepared at the request of Xilinx, Inc. I am also a member of the board of directors of Oracle, Corp. Both Xilinx and Oracle have interests that could be affected by the Proposed Regulations. The views expressed in this letter are, however, my own. They do not necessarily reflect the views of Xilinx, Oracle, or of my employer, Stanford Law School.

APP00159

The data are overwhelming that the prices at which goods and services transact between independent third parties bear no relationship to the equity compensation structures used by vendors. *See, e.g.*, William J. Baumol and Burton G. Malkiel, Status of Stock-Options in Shared-Cost Contracts (2002). Thus, the prices of cars sold by General Motors do not rise or fall with the number of options granted to employees. Nor does the price of software sold by Microsoft, the price of consulting arrangements offered by IBM, or the price of microprocessors marketed by Intel rise or fall with the size or structure of any of those companies' option grants to employees. And, as the world will soon observe, the price of Coca-Cola will neither rise nor fall because of the company's recent decision to recognize an expense for financial statement purposes in connection with the grant of employee stock options.

This finding is entirely unsurprising. Microeconomic theory teaches that, in equilibrium, prices are set at the point where marginal revenue equals marginal cost. *See, e.g.*, Robert S. Pindyck and Daniel L. Rubinfeld, Microeconomics (5th ed. 2000) at 256 ("The rule that profit is maximized when marginal revenue is equal to marginal cost holds for all firms, whether competitive or not.") The cost of a firm's capital is a function of the riskiness of its individual projects, of overall equity market risk, and of the firm's capital structure. *See, e.g.*, Pindyck and Rubinfeld, *supra*, at 548 ("The company cost of capital is a weighted average of the expected return on the company's stock (which depends on the beta of the stock) and the interest rate that it pays for debt."); Richard A. Brealey and Stewart C. Myers, Principles of Corporate Finance (5th ed. 1996) at 204-206. The cost of capital is most emphatically not a function of the number of shares that a firm has outstanding today, the number of shares that a firm had outstanding a year ago, or the number of shares it might have outstanding a year from now. Because the dominant effect of an anticipated equity-based compensation grant is to dilute the percentage of the enterprise's equity held by current equity-holders in the event optionable shares might in the future be issued if the options are "in the money" at the time of exercise, the option grant has no effect on the firm's aggregate cost of capital. Put another way, the decision to grant options to employees, when that decision is anticipated by the equity market, changes neither the firm's cost of equity nor its cost of debt. It also does not change its operating expenses.

To illustrate this point with a simple example, suppose that a corporation suddenly announces a two for one stock split. The price of each share would drop by half. The number of shares outstanding would, however, double and the firm's market capitalization and its cost of equity capital would not change by one iota. Nor would the price at which the firm enters into any contract with a third party change one whit as a consequence of the split. Suppose also that after the split, the company announced its intention to grant half of the newly split shares to the company's employees according to a plan that was fully disclosed to and anticipated by the market. The pre-existing shareholders would find that their percentage holding of the firm would have dropped, as anticipated, but the price at which the firm transacts with third parties would again remain unchanged and the firm's cost of capital would also remain unchanged.

The mathematics of the situation were explained, to a reasonable first order of approximation, by Yogi Berra. When visiting a pizzeria Yogi was asked if he wanted his pizza cut into four or eight slices. He replied, "Four. I don't think I can eat eight." Y. Berra, The Yogi Book (1998) at 80. There you have it. It makes no difference to the price of the pizza, or to the number of calories Yogi consumes, whether the pizza is sliced into quarters or eighths. Pizzerias do not advertise one price for a large pizza cut into four slices and a different price for the same large pizza cut into eight. Similarly, it makes no difference to the price at which a publicly traded company transacts it goods or services with third parties whether its total equity has a larger or smaller option overhang as a consequence of equity-based compensation arrangements with its employees.

2

IRS - 0014255

APP00160

The observation that option grants have no effect on a firm's "operating expense" as that term is generally understood, is also relevant for present purposes because the regulation at issue specifically states that:

> "Operating expense includes all expenses not included in cost of goods sold except for interest expense, foreign income taxes..., domestic income taxes, and any other expenses not related to the operation of the relevant business activity. Operating expenses ordinarily include expenses associated with advertising, promotion, sales, marketing, warehousing and distribution, administration, and a reasonable allowance for depreciation and amortization."

Treas. Reg. §1.482-5(d)(3).

As clearly stated in the Declaration of Professor Roman L. Weil submitted in Xilinx, Inc. v. Commissioner, U.S. Tax Court, Docket No. 4142-01 (June 3, 2002), the Commissioner's definition of "stock-based compensation" does not constitute an "operating expense" under any accounting or other definition of that term of which Professor Weil is aware. Professor Weil is co-author of a leading text on accounting matters, *see,* Clyde P. Stickney and Romany L. Weil, Financial Accounting (7th ed. 1994), and I concur with his understanding. This understanding is, moreover, consistent with the observation that the arm's-length cost of the transactions here at issue would not be influenced by employee option grants, which also do not constitute "operating expenses."

None of this suggests that the options granted to a company's employees are without economic value. I am happy to recognize the obvious: Employee options do have economic value. That fact does not, however, change the preceding observation that the grant of options is irrelevant to the valuation of any transaction involving the issuer's goods or services. The reason in support of this conclusion is related to the source of the option's value. The economic value of the option arises because of the value of the equity-based dilution that shareholders are willing to absorb in order to provide an equity-based incentive to employees. If, in equilibrium, the grant of an option causes an employee to work harder or smarter to a degree that precisely offsets the value of the option granted, then the grant adds as much equity value to existing shareholders as it costs them in potential dilution. The value of the additional service thus offsets the value of the grant. Put another way, if the Service seeks to recognize the value of the option granted it must also recognize the value of the additional incentive generated by those options.[2] It also follows that even though this incentive relationship has value, it does not change the relationship between marginal cost and marginal revenue as reflected in third party transactions for goods and services.

The fact that many accountants and policy makers urge that income statements recognize an expense upon the grant of an employee option also has no effect on this basic economic logic. Simply put, the income statement is chock full of entries that bear no rational relationship to true

---

[2] No doubt, as is the case in every contingent relationship, employees will, in individual cases, find that they are sometimes overcompensated or undercompensated relative to the value of additional services generated as a consequence of the option grant. If employees are incented to provide services worth more than the value of the options, then the option grant actually reduces labor costs, *ex post*, relative to a comparably valued straight cash grant. If employees are incented to provide services worth less than the value of the options then the arrangement can, *ex post*, appear to increase labor costs relative to the value of a comparably valued straight cash grant. There is, however, no basis to assume, *a pirori*, that these relationships would be out of equilibrium. Accordingly, the rational assumption is to assume equilibrium pricing.

3

APP00161

economic costs. For example, the depreciation rate applied to physical capital often bears no rational relationship to its true economic replacement cost. The income statement is also full of entries that bear no rational relationship to the marginal cost – marginal revenue equilibrium that determine pricing in arm's-length third party transactions. For example, the value of goodwill as reflected in a brand name often shows up nowhere in the income statement. Yet, a material portion of the value of a licensing transaction is often determined by the fair market value of the brand name that has no accounting value at all. Economics texts therefore warn that "economists often think of costs differently than financial accountants" and that accounting costs "can include items that an economists would not include and would not include items that economists usually do include." Pindyck and Rubinfeld, *supra*, at 204. Accordingly, even if it is correct as a matter of accounting principle to recognize an expense attributable to the grant of employee options, it is incorrect to conclude that these options influence the marginal cost – marginal revenue relationship that is, or should be, at the heart of these deliberations.

Therefore, if the objective of the Proposed Regulations is to establish a regime that measures the value of cost-sharing arrangements with reference to the economic reality of the underlying transaction, then options grants need not and should not enter the calculus even if one believes, as I do, that those options have real economic value.

Sincerely,

Joseph A. Grundfest
The William A. Franke
Professor of Law and Business

cc: The Hon. Kenneth W. Dam
   Pamela F. Olson, Esq.

4

# Exhibit 8

# Complaint with Exhibits
# (May 2, 2025)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

MCKESSON CORPORATION
and SUBSIDIARIES,

        *Plaintiff,*

    v.

UNITED STATES OF AMERICA,

        *Defendant.*

Case No. 3:25-CV-01102

## COMPLAINT

APP00163

## INTRODUCTION

1.     McKesson Corporation and Subsidiaries ("McKesson")[1] brings this action for the refund of federal income taxes unlawfully assessed and collected by the Internal Revenue Service ("IRS") for McKesson's taxable years ending March 31, 2007 through March 31, 2012 (collectively, the "years at issue") based on an invalid Treasury regulation.  Specifically, the IRS required McKesson to include amounts related to stock-based compensation ("SBC") in shared cost pools under its cost-sharing arrangements ("CSAs") with foreign affiliates.[2]  The IRS based this determination solely on a regulation promulgated under section 482 of the Internal Revenue Code (the "Code")[3] by the IRS and the U.S. Department of the Treasury ("Treasury")[4] that required related CSA participants to share amounts related to stock-based compensation (the "SBC Rule").[5]

---

[1] McKesson comprises McKesson Corporation and a group of its affiliated U.S. subsidiaries that filed a consolidated U.S. federal income tax return for the years at issue.

[2] Cost-sharing arrangements are agreements under which parties agree to share the costs and risks of the development of one or more intangible assets in proportion to the expected benefits that each party will receive from the future exploitation of those assets.

[3] Unless otherwise specified, all "section" or "Code" references are to the Internal Revenue Code of 1986, as amended (26 U.S.C.), and all "Treasury Regulation" or "Treas. Reg." references are to the Treasury Regulations (26 C.F.R.) issued under the Code.

[4] Both Treasury and the IRS, an agency of Treasury, are involved in preparing and issuing Treasury Regulations.  However, we will generally refer to "Treasury" when discussing the preparation and issuance of Treasury Regulations, and to the "IRS" when discussing tax enforcement actions.

[5] As discussed below, the IRS and Treasury first issued a rule requiring CSA participants to share amounts related to SBC in 2003, as part of a broader set of regulations under section 482. Those regulations were first codified at Treas. Reg. § 1.482-7.  In 2009, the IRS and Treasury released proposed and temporary regulations that did three things:  (1) redesignated the 2003 regulations from Treas. Reg. § 1.482-7 to Treas. Reg. § 1.482-7A, (2) issued temporary regulations effective as of January 5, 2009 that were codified at Treas. Reg. § 1.482-7T, and (3) issued proposed regulations that were identical to the temporary regulations and were finalized in 2011 and codified at Treas. Reg. § 1.482-7.  All three iterations of the SBC Rule contained in these regulations are substantively identical.  *See* Treas. Reg. § 1.482-7A(d)(2) (defining (continued…)

2

APP00164

2. McKesson challenges the SBC Rule as invalid because it departs from the arm's-length standard mandated by section 482, is inconsistent with Congressional intent, and was promulgated in violation of the Administrative Procedure Act ("APA").

3. The principle reflected in the SBC Rule has been the subject of extensive litigation. The rule was first included in regulations in 2003, while the government was litigating *Xilinx*, a case about whether the IRS could require related parties to a CSA to share stock-based compensation under prior regulations under section 482. *See Xilinx, Inc. v. Commissioner*, 125 T.C. 37 (2005). The Tax Court in *Xilinx* held for the taxpayer, finding that unrelated parties in commercial transactions do not share stock-based compensation, and thus the government could not require related parties in comparable transactions to do so under the arm's-length standard of section 482 and its regulations. *Id.* at 62. The Ninth Circuit affirmed on appeal. *Xilinx, Inc. v. Commissioner*, 598 F.3d 1191 (9th Cir. 2010).

4. The SBC Rule in the 2003 regulations explicitly required related parties to share stock-based compensation in CSAs. Those regulations were subsequently challenged in *Altera Corp. v. Commissioner*, 145 T.C. 91 (2015). In *Altera*, the Tax Court again found that there was no evidence that unrelated parties share stock-based compensation. *Id.* at 123–24. The court held (in a 15-0 decision of the full court) that the SBC Rule lacked a basis in fact and was contrary to all the evidence available to Treasury at the time the 2003 regulations were issued, and thus that the SBC Rule failed to satisfy the reasoned decisionmaking standard under *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983) and

---

intangible development costs that must be shared to include stock-based compensation); Treas. Reg. § 1.482-7T(d)(1)(iii) (2009) (same); Treas. Reg. § 1.482-7(d)(1)(iii) (same). All three iterations of the SBC Rule are relevant for purposes of this litigation, but since they are all substantively identical, we refer to them collectively as the "SBC Rule."

3

was invalid under the APA. *Id.* at 133. A divided Ninth Circuit reversed the Tax Court on appeal, relying on "step two" of the analysis previously required by *Chevron, Inc. v. NRDC*, 467 U.S. 837 (1984). *See Altera Corp. v. Commissioner*, 926 F.3d 1061, 1078 (9th Cir. 2019) (concluding that Treasury's interpretation was not "manifestly contrary to the statute" and "therefore permissible under *Chevron*"). *Chevron* has now been overruled by *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), undermining the legal basis for the sole decision for the government on this issue.

5. In 2015, while *Altera* was pending in the Ninth Circuit, the IRS on audit asserted that McKesson was required under the SBC Rule to share stock-based compensation in its CSAs for its taxable years ending March 31, 2007 through March 31, 2009. McKesson agreed to pay the asserted tax amounts to resolve the audit, but then filed refund claims for these amounts, citing the decisions in *Xilinx* and *Altera*.

6. The IRS made the same assertion with respect to McKesson's taxable years ending March 31, 2010 through March 31, 2012 in its next audit cycle. Again, McKesson agreed to pay the asserted amounts to resolve the audit, but then filed refund claims, citing the decisions in *Xilinx* and *Altera*.

7. Following the Ninth Circuit decision in *Altera* and the Supreme Court's denial of a petition for certiorari, the IRS proposed to disallow McKesson's claims on the basis of the SBC Rule. McKesson waived its right to formal notice of the IRS's disallowance of its claim, beginning the two-year period of limitations for filing suit.

8. Treasury and the IRS have never shown that the SBC Rule is consistent with the arm's-length standard required under section 482 of the Code, and Treasury's issuance of the SBC Rule lacked a basis in fact, failed to rationally connect the choice it made with the facts

4

found, and failed to respond to significant comments submitted as part of the rulemaking process. Treasury's conclusion that the final rule is consistent with the arm's-length standard was contrary to all the evidence before it, and thus the SBC Rule is invalid. Therefore, the IRS's disallowance of McKesson's refund claims for the years at issue was erroneous, and McKesson is entitled to recover these overpayments of tax.

## PARTIES

9. McKesson Corporation is a corporation organized and existing under Delaware law, having its principal place of business at 6555 State Highway 161, Irving, TX 75039. McKesson Corporation and its affiliated U.S. subsidiaries ("McKesson" as previously defined) filed a consolidated U.S. federal income tax return for the years at issue.

10. Defendant is the United States of America.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this dispute under 28 U.S.C. § 1346(a)(1) because, for each of the years at issue, McKesson (i) made full payment of the taxes, as required by 28 U.S.C. § 1346(a)(1) and *Flora v. United States*, 362 U.S. 145 (1960); (ii) timely filed its Forms 1120X claims for refund, as required by 26 U.S.C. §§ 6511(a) and 7422(a); and (iii) filed this complaint within the time period prescribed in 26 U.S.C. § 6532(a).

12. Venue is proper in the United States District Court for the Northern District of Texas under 28 U.S.C. § 1402 because McKesson has its principal place of business in this district.

## THE APPLICABLE STATUTE AND REGULATIONS

### Section 482

13. The predecessor to section 482 was adopted as section 45 of the Revenue Act of 1928. It provided in full:

5

In any case of two or more trades or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such trades or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such trades or businesses.

14. Before the issuance of any regulations, cases decided by the Board of Tax Appeals (the predecessor to the current Tax Court) confirmed that the statutory language of section 45 required reference to the arm's-length standard. *See Advance Cloak Co. v. Commissioner*, B.T.A. Memo. 1933-078, 1933 WL 4800 (B.T.A.) ("It appears that the purpose of this section of the income tax statutes is to place transactions between related trades or businesses owned or controlled by the same interests upon the same basis as if such businesses were dealing at arm's length with each other."); *Tennessee-Arkansas Gravel Co. v. Commissioner*, B.T.A. Memo. 1938-240, 1938 WL 8302 (B.T.A.) ("The obvious purpose of section 45 is to place a controlled taxpayer on a parity with an uncontrolled taxpayer for purposes of determining tax liability, and respondent contends that it is necessary in the instant case to allocate $12,000 of the gross income of the Mississippi Company to petitioner in order clearly to reflect petitioner's true income."), *rev'd on other grounds*, 112 F.2d 508 (6th Cir. 1940) (confirming that the principal purpose of the section "was to clearly reflect income" but reversing the Board of Tax Appeals on factual grounds); *Asiatic Petroleum Co. v. Commissioner*, 31 B.T.A. 1152, 1159 (1935) (reallocating income because the sale at issue "clearly was not an arm's length transaction"), *aff'd*, 79 F.2d 234 (2d Cir. 1935).

15. Regulations promulgated in 1934 under then-section 45 explicitly adopted the arm's-length standard. Treas. Reg. 86, art. 45-1(b) (1935) ("The standard to be applied in every

6

case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.").

16. When the internal revenue laws were first codified in the U.S. Code in 1939, section 45 of the Revenue Act of 1928 was codified at 26 U.S.C. § 45.

17. Congress tweaked the wording of section 45, such as to replace "gross income and deductions" with "gross income, deductions, credits, and allowances" in 1943, but these amendments made "no change in existing law."  H.R. Rep. No. 78-871, at 50 (1943).

18. In 1954, Congress recodified former section 45 as section 482 without changing any of the statutory language.  Aug. 16, 1954, ch. 736, 68A Stat. 162; H.R. Rep. No. 83-1337, at 4304 (1954).

19. Thereafter, courts, including the Supreme Court, continued to interpret section 482 as requiring reference to the arm's-length standard.  *See, e.g., Commissioner v. First Sec. Bank of Utah*, 405 U.S. 394, 408 (1972) ("It is well-established law that in analyzing a transaction under § 482, the test is whether the arrangement as structured for income tax purposes by interlocking corporate interests would have been similarly structured by taxpayers dealing at arm's length."); *Cont'l Equities, Inc. v. Commissioner*, 551 F.2d 74, 80 (5th Cir. 1977) (holding that the purpose of section 482 "is to place controlled taxpayers in the same position as uncontrolled taxpayers for both the current and subsequent taxable years").

20. In 1986, Congress added a second sentence to section 482, which provides:  "In the case of any transfer (or license) of intangible property (within the meaning of section 367(d)(4)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible."  26 U.S.C. § 482.

7

21. When it enacted the second sentence of section 482, Congress requested that Treasury undertake a comprehensive study of transfer pricing. The resulting study concluded that "Congress intended the commensurate with income standard to be consistent with the arm's length standard," and committed that the standard "will be so interpreted and applied by the Internal Revenue Service and the Treasury Department." *See* Notice 88-123, "A Study of Intercompany Pricing under Section 482 of the Code," 1988-2 C.B. 458 (the "Treasury White Paper").

**Treasury Regulations Regarding Stock-Based Compensation (the "SBC Rule")**

22. Treasury issued its first set of regulations related to cost-sharing arrangements in 1995 (the "1995 Regulations").

23. The 1995 Regulations required participants in a CSA to "share the costs of development of one or more intangibles in proportion to their shares of reasonably anticipated benefits from their individual exploitation of the interests in the intangibles assigned to them under the arrangement." Treas. Reg. § 1.482-7(a)(1) (1995). The 1995 Regulations defined the costs of developing intangibles as "all costs incurred by that participant related to the intangible development area, plus all of the cost sharing payments it makes to other controlled and uncontrolled participants, minus all of the cost sharing payments it receives from other controlled and uncontrolled participants." Treas. Reg. § 1.482-7(d)(1) (1995). The 1995 Regulations made no mention of stock-based compensation.

24. Even though the 1995 Regulations made no mention of stock-based compensation, the IRS regularly asserted in taxpayer audits that SBC amounts should be included in the shared development costs under a CSA. This was the subject of the *Xilinx* case, which concerned taxable years 1996 through 1999. In *Xilinx*, the government did not argue that any comparable transactions existed in which unrelated parties agreed to share the amounts of

8

stock-based compensation, but nonetheless maintained that applying the terms of the SBC Rule produced an arm's-length result. 125 T.C. at 54.

25. Through extensive factfinding and reliance on expert witnesses, the Tax Court in *Xilinx* found that "unrelated parties do not explicitly share costs attributable to [SBC]" and that the IRS "did not present any credible evidence that unrelated parties implicitly share" amounts attributable to SBC. *Id.* at 59. Accordingly, the Tax Court found that the IRS's imposition of such a requirement on taxpayers was inconsistent with the arm's-length standard articulated in then-existing regulations and thus was arbitrary and capricious. *Id.* at 62.

26. The Ninth Circuit affirmed the Tax Court's decision, holding that the arm's-length standard requires "controlled parties to share only those costs uncontrolled parties would share." *Xilinx*, 598 F.3d at 1196.

27. During the *Xilinx* litigation, Treasury released proposed regulations on July 29, 2002[6] and then final regulations on August 26, 2003[7] (the "2003 Regulations") that explicitly included stock-based compensation as a cost that must be shared, effective for stock-based compensation granted on or after August 26, 2003. Treas. Reg. § 1.482-7A(d)(2)(i).[8] The 2003 Regulations purported to coordinate the regulations for CSAs with the general arm's-length standard in Treas. Reg. § 1.482-1(b)(1). Treasury explained:

> A qualified cost sharing arrangement produces results that are
> consistent with an arm's length result within the meaning of
> §1.482-1(b)(1) if, and only if, each controlled participant's share of

---

[6] 67 Fed. Reg. 48997 (July 29, 2002).

[7] T.D. 9088, 68 Fed. Reg. 51171 (Aug. 26, 2003).

[8] As discussed in note 5, *supra*, the 2003 Regulations were initially codified at Treas. Reg. § 1.482-7, but were redesignated as Treas. Reg. § 1.482-7A in 2009 and remain applicable for periods prior to January 5, 2009. We cite here and throughout to Treas. Reg. § 1.482-7A to distinguish from later regulations codified at Treas. Reg. § 1.482-7, discussed in note 5 and below, which are also relevant to this litigation.

9

> the costs (as determined under paragraph (d) of this section) of intangible development under the qualified cost sharing arrangement equals its share of reasonably anticipated benefits attributable to such development (as required by paragraph (a)(2) of this section) and all other requirements of this section are satisfied.

Treas. Reg. § 1.482-7A(a)(3).

28. At the time the 2003 Regulations were proposed and finalized, Treasury (1) had not identified, was not aware of, and did not have in its possession any written contract between unrelated parties in a CSA that required one party to pay or reimburse the other party for amounts attributable to SBC, and (2) had no evidence of any actual transaction between unrelated parties in a CSA in which one party paid or reimbursed the other party for amounts attributable to SBC. Likewise, Treasury (1) had not identified, was not aware of, and did not have in its possession any written cost sharing agreement, services agreement, or other contract between unrelated parties that required one party to pay or reimburse the other party for amounts attributable to SBC, and (2) had no evidence of any actual transaction between unrelated parties in which one party paid or reimbursed the other party for amounts attributable to SBC.

29. Moreover, at the time the 2003 Regulations were finalized, Treasury did not have in its files any expert opinions, empirical data, or published or unpublished articles, papers, surveys, or reports supporting a determination that the amounts attributable to SBC must be included in the cost pool of a CSA to achieve an arm's-length result, nor any record that Treasury searched any database that could have contained agreements between unrelated parties relating to joint undertakings.

30. In response to Treasury's proposed regulations in 2002, Treasury received many comments arguing that the SBC Rule was inconsistent with the arm's-length standard. Specifically, Treasury received several comments providing evidence that unrelated parties

APP00172

dealing at arm's length in comparable transactions did not agree to share amounts attributable to SBC. Many of the commenters informed Treasury that they knew of no transactions between unrelated parties in a CSA, service agreement, or other contract that required one party to pay or reimburse the other party for amounts attributable to SBC, and that they could find no such agreements upon multiple searches of the Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system. Commenters, however, did identify agreements between unrelated parties dealing at arm's length in which SBC was not shared or reimbursed, including the U.S. Government's own practices with respect to cost-reimbursement contracts with unrelated parties. Commenters also identified economic- and accounting-based analyses showing that unrelated parties dealing at arm's length did not share amounts attributable to SBC.

31. In response to these comments, Treasury stated in the preamble to the 2003 Regulations that "[it] and the IRS continue to believe that requiring stock-based compensation to be taken into account for purposes of [CSAs] is consistent with the legislative intent underlying section 482 and with the arm's length standard." 68 Fed. Reg. at 51172. Treasury reasoned that the absence of evidence of any arm's-length transactions in which unrelated parties share amounts attributable to SBC did not make the SBC Rule inconsistent with the arm's-length standard. *Id.* Treasury responded to the economic analysis provided by commenters by reiterating its belief that the SBC Rule is consistent with the arm's-length standard. *Id.*

32. Treasury stated that "[i]t has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to [the 2003 Regulations]." 68 Fed. Reg. at 51177. Treasury did not explain how this determination was made, nor the exception on which it was based. *See* 5 U.S.C. § 553(d).

11

33.     In 2005, Treasury issued proposed regulations seeking to further clarify and expand the guidance on CSAs generally under Treas. Reg. § 1.482-7 (the "2005 Proposed Regulations").  *See* 70 Fed. Reg. 51116 (Aug. 29, 2005).  The 2005 Proposed Regulations did not propose to substantively alter "the stock-based compensation provisions added in 2003" but merely coordinated those provisions with the conceptual framework of the proposed regulations. 70 Fed. Reg. at 51121.

34.     Treasury then issued new proposed and temporary regulations in 2009.  *See* T.D. 9441, 74 Fed. Reg. 238 (Jan. 5, 2009) (proposed regulations), 74 Fed. Reg. 340 (Jan. 5, 2009) (temporary regulations).  These regulations redesignated the 2003 Regulations from Treas. Reg. § 1.482-7 to Treas. Reg. § 1.482-7A, 74 Fed. Reg. at 352, added temporary regulations with an effective date of January 5, 2009 (the "2009 Temporary Regulations"), *see* T.D. 9441, 74 Fed. Reg. 340 (Jan. 5, 2009) (codified at Treas. Reg. § 1.482-7T (2009)), and proposed new regulations to be codified at Treas. Reg. § 1.482-7.  74 Fed. Reg. 238.  The SBC Rule itself was left substantively unchanged from the 2003 Regulations to the 2009 Temporary Regulations, other than minor revisions to conform with new terminology.  *Compare* Treas. Reg. § 1.482-7A(d)(2) (the 2003 Regulations) *with* Treas. Reg. § 1.482-7T(d)(1)(iii), (d)(3) (the 2009 Temporary Regulations).

35.     Treasury offered no further discussion or reasoning relating to the SBC Rule in 2005 or 2009, identified no further evidence supporting its claim that the SBC Rule is consistent with the arm's-length standard, and requested no further substantive comments on the SBC Rule. *See* 70 Fed. Reg. at 51122.

36.     Treasury stated that the 2009 Temporary Regulations "are being issued without prior notice and public procedure pursuant to the Administrative Procedure Act (5 U.S.C. 553),"

and that "[i]t has been determined also that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to these regulations." 74 Fed. Reg. at 348. Treasury did not explain how this determination was made, nor the exception on which it was based. *See* 5 U.S.C. § 553(d).

37. In 2011, Treasury issued final regulations (the "2011 Final Regulations") in largely the same form as the 2009 Temporary Regulations and with no changes to the SBC Rule. *See* T.D. 9568, 76 Fed. Reg. 80082 (Dec. 22, 2011) (codified at Treas. Reg. § 1.482-7). As with the 2009 Temporary Regulations, Treasury offered no further discussion or reasoning relating to the SBC Rule, identified no further evidence supporting that the SBC Rule is consistent with the arm's-length standard, and requested no further comments on the SBC Rule. The 2011 Final Regulations were generally effective on December 16, 2011.

38. Treasury stated that "[i]t has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to [the 2011 Final Regulations]." 76 Fed. Reg. at 80087. Treasury did not explain how this determination was made, nor the exception on which it was based. *See* 5 U.S.C. § 553(d).

39. Because the 2003 Regulations, the 2009 Temporary Regulations, and the 2011 Final Regulations provide the same substantive rule on stock-based compensation, we refer to them collectively as the SBC Rule.

40. The Tax Court held invalid the SBC Rule contained in the 2003 Regulations. *See Altera v. Commissioner*, 145 T.C. at 133 (challenging the regulations in effect for tax years ending in 2004 through 2007). The Tax Court, in a 15-0 decision, held that Treas. Reg. § 1.482-7A(d)(2), which included SBC as a cost required to be shared, was invalid under the APA because the rule "lack[ed] a basis in fact, Treasury failed to rationally connect the choice it made

13

with the facts found, Treasury failed to respond to significant comments when it issued the final rule, and Treasury's conclusion that the final rule is consistent with the arm's-length standard [wa]s contrary to all of the evidence before it." *Id.* at 133 (citing *State Farm*, 463 U.S. at 43).

41.     In a divided opinion that relied on step two of the now overruled *Chevron* doctrine, the Ninth Circuit reversed the unanimous decision of the Tax Court. *Altera*, 926 F.3d at 1067.

42.     The subsequent petition for rehearing *en banc* was denied. *Altera Corp. v. Commissioner*, 941 F.3d 1200 (Mem.) (9th Cir. 2019). Three Ninth Circuit judges dissented from the denial, stating that "Treasury promulgated a tax rule with no reasoned basis for its decision, pursuant to an explanation that ran contrary to the evidence before it" and "Treasury's actions in this case are the epitome of arbitrary and capricious rulemaking." *Id.* at 1202 (Smith, J., dissenting).

## STATEMENT OF FACTS

### McKesson's Cost Sharing Arrangements and Stock-Based Compensation

43.     McKesson had various CSAs in effect during the years at issue. All relevant CSAs were between McKesson and McKesson Financial Holdings Limited, a company organized and existing under the laws of Ireland ("IP3"), and were entered into for the purpose of research and development with respect to the design and development of intangible assets.

44.     For each McKesson CSA in effect as of January 5, 2009, the parties entered into an Amended and Restated Research and Development Cost Sharing Agreement effective as of January 5, 2009, to comply with the requirements of the transition rule under the 2009 Temporary Regulations. The amended and restated agreements stated that the parties believed that the requirement in the 2009 Temporary Regulations requiring amounts related to stock-based compensation to be shared was invalid. The parties, however, agreed to calculate,

14

APP00176

document, and record the amounts of stock-based compensation in order to later identify SBC related to the CSA.

45. McKesson did not include the stock-based compensation paid to its employees as a shared cost in any of its CSAs during the years at issue. After the Ninth Circuit decided *Xilinx* in 2010, for each McKesson CSA in effect as of April 1, 2010, the parties entered into an Amended and Restated Research and Development Cost Sharing Agreement effective as of April 1, 2010 to clarify the parties' continuing belief that the requirement to share amounts related to SBC was invalid.

46. During the years at issue, McKesson had employee compensation plans through which McKesson issued stock-based compensation to its employees. This stock-based compensation was not included as a shared cost under any of McKesson's CSAs in effect during the years at issue.

**McKesson's FY07, FY08, and FY09 Tax Returns**

47. McKesson timely filed its tax return for the taxable year beginning April 1, 2006 and ending March 31, 2007 ("FY07") on September 30, 2007. As to its CSAs effective for FY07, McKesson did not share amounts related to stock-based compensation.

48. McKesson timely filed its tax return for the taxable year beginning April 1, 2007 and ending March 31, 2008 ("FY08") on December 6, 2008. As to its CSAs effective for FY08, McKesson did not share amounts related to its stock-based compensation.

49. McKesson timely filed its tax return for the taxable year beginning April 1, 2008 and ending March 31, 2009 ("FY09") on October 28, 2009. As to its CSAs effective for FY09, McKesson did not share amounts related to its stock-based compensation.

50. The IRS audited McKesson's FY07, FY08, and FY09 tax returns. On July 27, 2015, the IRS issued a Notice of Proposed Adjustment ("NOPA") on Form 5701 proposing that

15

McKesson include its stock-based compensation in its cost pools under the SBC Rule with respect to each CSA McKesson had with IP3. Relying exclusively on the SBC Rule, the NOPA indicated that $3,976,886 of stock-based compensation should have been included in the cost pool for FY07, $5,337,877 for FY08, and $4,336,826 for FY09. Based on the share of reasonably anticipated benefits expected under the CSAs, the NOPA proposed an adjustment to increase McKesson's income for each year in the amount of $3,897,842 for FY07, $5,257,797 for FY08, and $4,260,093 for FY09.

51. These proposed adjustments increased the tax purportedly owed by McKesson by $779,569 for FY07, $1,051,560 for FY08, and $852,018 for FY09.

52. McKesson paid the full amount of the tax purportedly due for FY07 on or about June 8, 2016.

53. McKesson paid the full amount of the tax due for FY08 on or about June 20, 2016, by applying other overpayments of tax against the amount of tax owed by reason of the SBC rule for FY08. *See* section 7422(d) ("The credit of an overpayment of any tax in satisfaction of any tax liability shall, for the purpose of any suit for refund of such tax liability so satisfied, be deemed to be a payment in respect of such tax liability at the time such credit is allowed.").

54. McKesson paid the full amount of the tax purportedly due for FY09 on or about June 8, 2016.

55. During the audit, McKesson and the IRS agreed to extend the period provided by the statute of limitations to file a refund claim until March 30, 2017, using Form 872.

56. On September 12, 2016, McKesson timely filed refund claims in the amount of $779,569 for FY07 on Form 1120X ("Amended FY07 Tax Return"), *see* Exhibit A (excerpt of

16

Form 1120X incorporated herein by reference), $1,051,560 for FY08 on Form 1120X ("Amended FY08 Tax Return"), *see* Exhibit B (excerpt of Form 1120X incorporated herein by reference) and $852,018 for FY09 on Form 1120X ("Amended FY09 Tax Return"), *see* Exhibit C (excerpt of Form 1120X incorporated herein by reference), for the taxes it paid with respect to the inclusion of stock-based compensation in the cost pools for FY07 through FY09.

**McKesson's FY10, FY11, and FY12 Tax Returns**

57.     McKesson timely filed its tax return for the taxable year beginning April 1, 2009 and ending March 31, 2010 ("FY10") on October 12, 2010.  As to its CSAs effective for FY10, McKesson did not share the amounts related to its stock-based compensation.

58.     McKesson timely filed its tax return for the taxable year beginning April 1, 2010 and ending March 31, 2011 ("FY11") on October 21, 2011.  As to its CSAs effective for FY11, McKesson did not share the amounts related to its stock-based compensation.

59.     McKesson timely filed its tax return for the taxable year beginning April 1, 2011 and ending March 31, 2012 ("FY12") on November 29, 2012.  As to its CSAs effective for FY12, McKesson did not share the amounts related to its stock-based compensation.

60.     The IRS audited McKesson's FY10, FY11, and FY12 tax returns.  On July 27, 2017, the IRS issued a NOPA on Form 5701 proposing to require McKesson to include its stock-based compensation in its cost pools under the SBC Rule with respect to each of McKesson's CSAs with IP3.  Relying exclusively on the SBC Rule, the NOPA indicated that $5,835,258 of stock-based compensation should be included in the cost pool for FY10, $8,543,689 for FY11, and $10,234,901 for FY12.  Based on the share of reasonably anticipated benefits expected under the CSAs, the NOPA proposed an adjustment to increase McKesson's income for each year in the amount of $5,744,569 for FY10, $8,416,224 for FY11, and $10,004,042 for FY12.

17

61. These proposed adjustments increased the tax purportedly owed by McKesson of $2,010,599 for FY10, $2,945,678 for FY11, and $2,000,808 for FY12.

62. McKesson paid the full amount of the tax purportedly due for FY10 on or about April 15, 2018.

63. McKesson paid the full amount of the tax purportedly due for FY11 on or about April 15, 2018.

64. McKesson paid the full amount of the tax purportedly due for FY12 on or about April 15, 2018.

65. During the audit, McKesson and the IRS agreed to extend the period provided by the statute of limitations to file a refund claim until December 30, 2018, using Form 872.

66. On May 11, 2018, McKesson timely filed refund claims in the amount of $2,010,599 for FY10 on Form 1120X ("Amended FY10 Tax Return"), *see* Exhibit D (excerpt of Form 1120X incorporated herein by reference), $2,945,678 for FY11 on Form 1120X ("Amended FY11 Tax Return"), *see* Exhibit E (excerpt of Form 1120X incorporated herein by reference), and $2,000,808 for FY12 on Form 1120X ("Amended FY12 Tax Return"), *see* Exhibit F (excerpt of Form 1120X incorporated herein by reference), for the taxes it paid with respect to the inclusion of stock-based compensation in the cost pools for FY10 through FY12.

**The IRS's Action on McKesson's Refund Claims**

67. After filing a refund claim with the IRS, a taxpayer may initiate a tax refund suit no later than two years after the IRS provides notice of the disallowance of the taxpayer's claim for refund by certified mail or registered mail. Section 6532(a)(1). A taxpayer can file a written waiver of the requirement for the IRS to provide formal notice of the disallowance of taxpayer's refund claim by executing Form 2297. Section 6532(a)(3). The execution of such form begins the two-year period during which the taxpayer may commence its tax refund claim. *Id.*

18

68.     On April 9, 2021, the IRS issued a NOPA on Form 5701 proposing to deny McKesson's refund claims for FY07 through FY12.

69.     On July 13, 2021, the IRS issued McKesson Letter 569 proposing to disallow McKesson's refund claims relying solely on the SBC Rule.  The IRS made no determination that unrelated parties share SBC amounts at arm's length.  The IRS advised McKesson of its right to request a conference with the IRS Independent Office of Appeals ("IRS Appeals").

70.     McKesson filed a formal protest regarding the denial of its refund claims with IRS Appeals on September 7, 2021.  This issue was not resolved by IRS Appeals.

71.     McKesson executed Form 2297, Waiver of Statutory Notification of Claim Disallowance, with respect to its stock-based compensation refund claims on May 8, 2023.  *See* Exhibit I.  The execution of Form 2297 thus began the two-year period ending on May 8, 2025, during which McKesson could file suit.

## THE SBC RULE IS INVALID

72.     This case presents two relevant questions:  1) whether the SBC rule is a valid interpretation of section 482 following *Loper Bright*, and 2) whether Treasury and the IRS properly complied with the APA's reasoned decisionmaking standard and procedural requirements when issuing the SBC rule.

### The SBC Rule is Contrary to the Statute and is Substantively Invalid

73.     Under the APA, courts are required to "decide all relevant questions of law" and to "hold unlawful and set aside agency action" that is "not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

74.     Courts review an agency's interpretation of a statute under the framework set forth in *Loper Bright*.  Under *Loper Bright*, courts must exercise their independent judgment to

19

determine the best reading of a statute, using "every tool at their disposal" to do so. 603 U.S. at 400–01. *Loper Bright* overruled *Chevron*, which provided a two-step test that required courts to defer to agencies' reasonable constructions of ambiguous statutes.

75. The SBC Rule is contrary to section 482 and thus fails the *Loper Bright* test.

76. The first sentence of section 482 provides that "the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." For at least the last 90 years, courts have interpreted this sentence as requiring an analysis of the arm's-length standard—i.e., "whether the arrangement as structured for income tax purposes by interlocking corporate interests would have been similarly structured by taxpayers dealing at arm's length." *First Sec. Bank*, 405 U.S. at 408; *see also Asiatic Petroleum Co. v. Commissioner*, 31 B.T.A. at 1159. Treasury regulations have long confirmed that "the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer." Treas. Reg. 86, art. 45-1(b) (1935); Treas. Reg. § 1.482-1(b)(1).

77. The second sentence of section 482, enacted in 1986, provides that "[i]n the case of any transfer (or license) of intangible property (within the meaning of section 367(d)(4)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." This standard applies only to transfers or licenses of intangibles, and in any case it supplements, but does not supplant, the arm's-length standard. *See* Treasury White Paper, Notice 88-123.

78.     As applied to CSAs, the arm's-length standard requires "controlled parties to share only those costs uncontrolled parties would share." *Xilinx*, 598 F.3d at 1196.  Treasury has failed to establish that uncontrolled taxpayers share stock-based compensation in comparable transactions, and thus the SBC Rule requiring controlled taxpayers to share such amounts conflicts with section 482 and the arm's-length standard.

79.     Based on the above, the SBC Rule is contrary to the statute, not in accordance with the law under 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction under 5 U.S.C. § 706(2)(C), and therefore must be held unlawful and set aside.[9]

### The SBC Rule Is Substantively and Procedurally Invalid Under the APA

80.     Courts must "hold unlawful and set aside agency action" that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Federal "agencies are required to engage in 'reasoned decisionmaking.'"  *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Services, Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).  Under this standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U. S. 156, 168 (1962)).  The agency must also respond to comments that raise significant points—that is, points "relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule."  *Home Box Office, Inc. v. FCC*,

---

[9] Because requiring controlled taxpayers to share SBC amounts is inconsistent with the arm's-length standard, stock-based compensation cannot properly be considered a cost under the general rule of Treas. Reg. § 1.482A(d)(1), Treas. Reg. § 1.482-7T(d)(1) (2009), and Treas. Reg. § 1.482-7(d)(1).

21

567 F.2d 9, 35 n.58 (D.C. Cir. 1977).  Contrary to the IRS and Treasury's claims, the APA

applies to the SBC Rule.  *See Altera*, 145 T.C. at 117.

81.     Treasury justified the SBC Rule on the unsupported assertion that unrelated

parties would share SBC in a hypothetical case.  Treasury did not engage in any factfinding to

determine whether uncontrolled taxpayers share stock-based compensation, nor did it have any

evidence that uncontrolled taxpayers share such amounts.  Because Treasury lacked any

evidence that sharing stock-based compensation was consistent with the arm's-length standard

and failed to engage in any factfinding, the SBC Rule was not the product of reasoned

decisionmaking and is therefore invalid.  *See Altera*, 145 T.C. at 123.

82.     Many comments were submitted to Treasury during the rulemaking process that

showed that unrelated parties do not share SBC amounts.  Treasury failed to directly respond to

those comments and instead argued that the SBC Rule could be consistent with the arm's-length

standard even in the face of these contrary examples.  Treasury's failure to adequately respond to

these comments violated the APA and renders the rule invalid.  *See id.* at 130.

83.     Treasury was presented with significant evidence that parties at arm's length do

not share stock-based compensation, and Treasury downplayed the relevance of that evidence to

the SBC Rule.  Therefore, Treasury's issuance of a rule requiring controlled taxpayers to share

stock-based compensation, which it claimed was consistent with the arm's-length standard, did

not rationally connect the relevant facts to the rule it created and ran "counter to the evidence

before" the agency.  *State Farm*, 463 U.S. at 43.

84.     Based on the above, the promulgation of the SBC Rule was arbitrary and capricious under 5 U.S.C. § 706(2)(A), and therefore must be held unlawful and set aside.[10]

85.     Because the SBC Rule is invalid, the IRS's disallowance of McKesson's refund claims based solely on this invalid regulation was erroneous and an abuse of discretion.

## COUNT I

## FY07 Refund

86.     The allegations set forth in paragraphs 1 through 85 are incorporated by reference in this Count I.

87.     McKesson made a full payment of U.S. federal income tax for FY07.  *See* 28 U.S.C. § 1346(a)(1); *Flora*, 362 U.S. at 150, 177.

88.     Treasury Regulation § 1.482-7A(d)(2),[11] on which the IRS relied to disallow McKesson's refund claim for FY07, is invalid because it conflicts with section 482, and Treasury failed to comply with the Administrative Procedure Act.

89.     Stock-based compensation is not properly included as a shared cost under Treas. Reg. § 1.482-7A(d)(1).

90.     McKesson properly treated the regulation as invalid on the Amended FY07 Tax Return.

---

[10] Because requiring controlled taxpayers to share SBC is inconsistent with the arm's-length standard, stock-based compensation cannot properly be considered a cost under the general rule of Treas. Reg. § 1.482A(d)(1), Treas. Reg. § 1.482-7T(d)(1) (2009), and Treas. Reg. § 1.482-7(d)(1).

[11] As clarified above, this rule was initially codified at Treas. Reg. § 1.482-7, but redesignated as Treas. Reg. § 1.482-7A following later rulemakings and remains effective for periods prior to January 5, 2009.  We cite here to Treas. Reg. § 1.482-7A to distinguish from current Treas. Reg. § 1.482-7, which is applicable to later periods.

APP00185

91. The Amended FY07 Tax Return correctly reflects the tax owed by McKesson for FY07 under the Code.

92. McKesson's claim for refund for FY07 was made in proper form. *See* Treas. Reg. § 301.6402-3(a)(2).

93. The Amended FY07 Tax Return was a timely filed refund claim under section 6511.

94. This action is timely commenced within the applicable period of limitations under section 6532(a).

95. The Amended FY07 Tax Return resulted in an overpayment of tax for FY07 in the amount of $779,569. McKesson demands a refund of this amount plus interest.

**COUNT II**

**FY08 Refund**

96. The allegations set forth in paragraphs 1 through 95 are incorporated by reference in this Count II.

97. McKesson made a full payment of U.S. federal income tax for FY08. *See* 28 U.S.C. § 1346(a)(1); *Flora*, 362 U.S. at 150, 177.

98. Treasury Regulation § 1.482-7A(d)(2), on which the IRS relied to disallow McKesson's refund claim for FY08, is invalid because it conflicts with section 482, and Treasury failed to comply with the Administrative Procedure Act.

99. Stock-based compensation is not properly included as a shared cost under Treas. Reg. § 1.482-7A(d)(1).

100. McKesson properly treated the regulation as invalid on the Amended FY08 Tax Return.

APP00186

101. The Amended FY08 Tax Return correctly reflects the tax owed by McKesson for FY08 under the Code.

102. McKesson's claim for refund for FY08 was made in proper form. *See* Treas. Reg. § 301.6402-3(a)(2).

103. The Amended FY08 Tax Return was a timely filed refund claim under section 6511.

104. This action is timely commenced within the applicable period of limitations under section 6532(a).

105. The Amended FY08 Tax Return resulted in an overpayment of tax for FY08 in the amount of $1,051,560. McKesson demands a refund of this amount plus interest.

## COUNT III

### FY09 Refund

106. The allegations set forth in paragraphs 1 through 105 are incorporated by reference in this Count III.

107. McKesson made a full payment of U.S. federal income tax for FY09. *See* 28 U.S.C. § 1346(a)(1); *Flora*, 362 U.S. at 150, 177.

108. Treasury Regulation §§ 1.482-7A(d)(2) and 1.482-7T(d)(1)(iii), (d)(3) (2009), on which the IRS relied to disallow McKesson's refund claim for FY09, are invalid because they conflict with section 482, and Treasury failed to comply with the Administrative Procedure Act.

109. Stock-based compensation is not properly included as a shared cost under Treas. Reg. § 1.482-7A(d)(1) and Treas. Reg. § 1.482-7T(d)(1).

110. McKesson properly treated the regulation as invalid on the Amended FY09 Tax Return.

25

111. The Amended FY09 Tax Return correctly reflects the tax owed by McKesson for FY09 under the Code.

112. McKesson's claim for refund for FY09 was made in proper form. *See* Treas. Reg. § 301.6402-3(a)(2).

113. The Amended FY09 Tax Return was a timely filed refund claim under section 6511.

114. This action is timely commenced within the applicable period of limitations under section 6532(a).

115. The Amended FY09 Tax Return resulted in an overpayment of tax for FY09 in the amount of $852,018.  McKesson demands a refund of this amount plus interest.

## COUNT IV

### FY10 Refund

116. The allegations set forth in paragraphs 1 through 115 are incorporated by reference in this Count IV.

117. McKesson made a full payment of U.S. federal income tax for FY10.  *See* 28 U.S.C. § 1346(a)(1); *Flora*, 362 U.S. at 150, 177.

118. Treasury Regulation § 1.482-7T(d)(1)(iii), (d)(3) (2009), on which the IRS relied to disallow McKesson's refund claim for FY10, is invalid because it conflicts with section 482, and Treasury failed to comply with the Administrative Procedure Act.

119. Stock-based compensation is not properly included as a shared cost under Treas. Reg. § 1.482-7T(d)(1).

120. McKesson properly treated the regulation as invalid on the Amended FY10 Tax Return.

APP00188

121.  The Amended FY10 Tax Return correctly reflects the tax owed by McKesson for FY10 under the Code.

122.  McKesson's claim for refund for FY10 was made in proper form.  *See* Treas. Reg. § 301.6402-3(a)(2).

123.  The Amended FY10 Tax Return was a timely filed refund claim under section 6511.

124.  This action is timely commenced within the applicable period of limitations under section 6532(a).

125.  The Amended FY10 Tax Return resulted in an overpayment of tax for FY10 in the amount of $2,010,599.  McKesson demands a refund of this amount plus interest.

**COUNT V**

**FY11 Refund**

126.  The allegations set forth in paragraphs 1 through 125 are incorporated by reference in this Count V.

127.  McKesson made a full payment of U.S. federal income tax for FY11.  *See* 28 U.S.C. § 1346(a)(1); *Flora*, 362 U.S. at 150, 177.

128.  Treasury Regulation § 1.482-7T(d)(1)(iii), (d)(3) (2009), on which the IRS relied to disallow McKesson's refund claim for FY11, is invalid because it conflicts with section 482, and Treasury failed to comply with the Administrative Procedure Act.

129.  Stock-based compensation is not properly included as a shared cost under Treas. Reg. § 1.482-7T(d)(1).

130.  McKesson properly treated the regulation as invalid on the Amended FY11 Tax Return.

27

131. The Amended FY11 Tax Return correctly reflects the tax owed by McKesson for FY11 under the Code.

132. McKesson's claim for refund for FY11 was made in proper form. *See* Treas. Reg. § 301.6402-3(a)(2).

133. The Amended FY11 Tax Return was a timely filed refund claim under section 6511.

134. This action is timely commenced within the applicable period of limitations under section 6532(a).

135. The Amended FY11 Tax Return resulted in an overpayment of tax for FY11 in the amount of $2,945,678. McKesson demands a refund of this amount plus interest.

## COUNT VI

### FY12 Refund

136. The allegations set forth in paragraphs 1 through 135 are incorporated by reference in this Count VI.

137. McKesson made a full payment of U.S. federal income tax for FY12. *See* 28 U.S.C. § 1346(a)(1); *Flora*, 362 U.S. at 150, 177.

138. Treasury Regulation §§ 1.482-7T(d)(1)(iii), (d)(3) (2009) and 1.482-7(d)(1)(iii), (d)(3), on which the IRS relied to disallow McKesson's refund claim for FY12, are invalid because they conflict with section 482, and Treasury failed to comply with the Administrative Procedure Act.

139. Stock-based compensation is not properly included as a shared cost under Treas. Reg. § 1.482-7T(d)(1) and Treas. Reg. § 1.482-7(d)(1).

140. McKesson properly treated the regulation as invalid on the Amended FY12 Tax Return.

141. The Amended FY12 Tax Return correctly reflects the tax owed by McKesson for FY12 under the Code.

142. McKesson's claim for refund for FY12 was made in proper form. *See* Treas. Reg. § 301.6402-3(a)(2).

143. The Amended FY12 Tax Return was a timely filed refund claim under section 6511.

144. This action is timely commenced within the applicable period of limitations under section 6532(a).

145. The Amended FY12 Tax Return resulted in an overpayment of tax for FY12 in the amount of $2,000,808. McKesson demands a refund of this amount plus interest.

## PRAYER FOR RELIEF

WHEREFORE, McKesson respectfully requests that the Court enter judgment in its favor and award the following relief:

A. A refund of the overpayments of taxes for tax years FY07, FY08, FY09, FY10, FY11, and FY12 in the amounts set forth above, plus interest as provided by law;

B. Attorneys fees and costs; and

C. Such other legal and equitable relief as the Court deems just and proper.

APP00191

Submitted: May 2, 2025

**NORTON ROSE FULBRIGHT LLP**

*/s/ Ellie Norris*
Elizabeth "Ellie" Norris
State Bar No. 24099138
ellie.norris@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, TX  75201
Tel: (214) 855-8074
Fax: (214) 855-8200

**COVINGTON & BURLING LLP**

Kevin Otero*
N.Y. Bar No. 4325114
kotero@cov.com
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel: (212) 841-1000
Fax: (212) 841-1010

Joseph Sullivan*
D.C. Bar No. 1644205
jsullivan@cov.com
Adam Spiegel*
D.C. Bar No. 90006777
aspiegel@cov.com
One CityCenter
850 Tenth Street
Washington, DC 20001
Tel: (202) 662-6000
Fax: (202) 662-6302

**pro hac vice* applications forthcoming

*Attorneys for Plaintiff*
*McKesson Corporation and Subsidiaries*

30

# **Exhibit A**
# FY07 Refund Claim

APP00193

Form 1120X (Rev. 1-2011)                                                                   Page **2**

**Part II**    **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** in the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** in the instructions, and check here  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

The taxpayer did not include amounts related to stock-based compensation in the pools of intangible development costs on the return as originally filed.

Under audit, the Internal Revenue Service issued a Notice of Proposed Adjustment that revised the cost sharing calculations to include this type of cost

under Treasury Regulations Section 1.482-7(d).

The taxpayer believes this treatment is incorrect and that Regulations Section 1.482-7(d)(3) is invalid. See Xilinx v. Commissioner, 9th Circuit,

No. 06-74246 (3/22/2010) (an arm's-length arrangement does not include sharing of stock-based compensation) and also Altera v. Commissioner,

145 T.C., No. 3 (7/27/2015) (Treasury failed to support its belief that unrelated parties would share stock-based compensation costs, and therefore

its rule is invalid). In addition, the Company believes this regulation is invalid because stock-based compensation does not constitute a "cost"

incurred by the Company under Treasury Regulations Section 1.482-7(d)(1).

Therefore, this Form 1120X removes the audit adjustment to conform to the taxpayer's original filing position.

                                               Form **1120X** (Rev. 1-2011)

# **Exhibit B**
# FY08 Refund Claim

APP00195

Form 1120X (Rev. 1-2011)                                                                                                  Page **2**

**Part II**    **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** in the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** in the instructions, and check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

The taxpayer did not include amounts related to stock-based compensation in the pools of intangible development costs on the return as originally filed.

Under audit, the Internal Revenue Service issued a Notice of Proposed Adjustment that revised the cost sharing calculations to include this type of cost

under Treasury Regulations Section 1.482-7(d).

The taxpayer believes this treatment is incorrect and that Regulations Section 1.482-7(d)(3) is invalid. See Xilinx v. Commissioner, 9th Circuit,

No. 06-74246 (3/22/2010) (an arm's-length arrangement does not include sharing of stock-based compensation) and also Altera v. Commissioner,

145 T.C., No. 3 (7/27/2015) (Treasury failed to support its belief that unrelated parties would share stock-based compensation costs, and therefore

its rule is invalid). In addition, the Company believes this regulation is invalid because stock-based compensation does not constitute a "cost"

incurred by the Company under Treasury Regulations Section 1.482-7(d)(1).

Therefore, this Form 1120X removes the audit adjustment to conform to the taxpayer's original filing position.

Form **1120X** (Rev. 1-2011)

APP 00196

# Exhibit C
FY09 Refund Claim

APP00197

Form 1120X (Rev. 1-2011)                                                                                                          Page **2**

**Part II**  **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** in the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** in the instructions, and check here  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

The taxpayer did not include amounts related to stock-based compensation in the pools of intangible development costs on the return as originally filed.

Under audit, the Internal Revenue Service issued a Notice of Proposed Adjustment that revised the cost sharing calculations to include this type of cost

under Treasury Regulations Section 1.482-7(d).

The taxpayer believes this treatment is incorrect and that Regulations Section 1.482-7(d)(3) is invalid.  See Xilinx v. Commissioner, 9th Circuit,

No. 06-74246 (3/22/2010) (an arm's-length arrangement does not include sharing of stock-based compensation) and also Altera v. Commissioner,

145 T.C., No. 3 (7/27/2015) (Treasury failed to support its belief that unrelated parties would share stock-based compensation costs, and therefore

its rule is invalid).  In addition, the Company believes this regulation is invalid because stock-based compensation does not constitute a "cost"

incurred by the Company under Treasury Regulations Section 1.482-7(d)(1).

Therefore, this Form 1120X removes the audit adjustment to conform to the taxpayer's original filing position.

Form **1120X** (Rev. 1-2011)

APP00198

# **Exhibit D**
# FY10 Refund Claim

APP00199

Form 1120X (Rev. 11-2016)                                                                                           Page **2**

**Part II**   **Explanation of Changes to Items in Part I** (Enter the line number from Part I for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** in the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** in the instructions, and check here  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . ▶ ☐

The taxpayer did not include amounts related to stock-based compensation in the pools of intangible development costs on the return as

originally filed.  Under audit, the Internal Revenue Service issued a Notice of Proposed Adjustment that revised the cost sharing calculations

to include this type of cost under Treasury Regulations Section 1.482-7(d).

The taxpayer believes this treatment is incorrect and that Regulations Section 1.482-7(d)(3) is invalid.  See Xilinx v. Commissioner,

9th Circuit, No. 06-74246 (3/22/2010) (an arm's-length arrangement does not include sharing of stock-based compensation) and also Altera v.

Commissioner, 145 T.C., No. 3 (7/27/2015) (Treasury failed to support its belief that unrelated parties would share stock-based compensation

costs, and therefore its rule is invalid).  In addition, the Company believes this regulation is invalid because stock-based compensation does

not constitute a "cost" incurred by the Company under Treasury Regulations Section 1.482-7(d)(1).

Therefore, this Form 1120X removes the audit adjustment to conform to the taxpayer's original filing position.

Form **1120X** (Rev. 11-2016)

APP00200

# **Exhibit E**
# FY11 Refund Claim

APP00201

| Part II | Explanation of Changes to Items in Part I (Enter the line number from Part I for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** in the instructions.) |

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** in the instructions, and check here . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

The taxpayer did not include amounts related to stock-based compensation in the pools of intangible development costs on the return as

originally filed. Under audit, the Internal Revenue Service issued a Notice of Proposed Adjustment that revised the cost sharing calculations

to include this type of cost under Treasury Regulations Section 1.482-7(d).

The taxpayer believes this treatment is incorrect and that Regulations Section 1.482-7(d)(3) is invalid. See Xilinx v. Commissioner,

9th Circuit, No. 06-74246 (3/22/2010) (an arm's-length arrangement does not include sharing of stock-based compensation) and also Altera v.

Commissioner, 145 T.C., No. 3 (7/27/2015) (Treasury failed to support its belief that unrelated parties would share stock-based compensation

costs, and therefore its rule is invalid). In addition, the Company believes this regulation is invalid because stock-based compensation does

not constitute a "cost" incurred by the Company under Treasury Regulations Section 1.482-7(d)(1).

Therefore, this Form 1120X removes the audit adjustment to conform to the taxpayer's original filing position.

APP00202

# **Exhibit F**
# FY12 Refund Claim

APP00203

Form 1120X (Rev. 11-2016)  Page **2**

| **Part II** | **Explanation of Changes to Items in Part I** (Enter the line number from Part I for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** in the instructions.) |
|---|---|

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** in the instructions, and check here  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ▶ ☐

The taxpayer did not include amounts related to stock-based compensation in the pools of intangible development costs on the return as originally filed. Under audit, the Internal Revenue Service issued a Notice of Proposed Adjustment that revised the cost sharing calculations to include this type of cost under Treasury Regulations Section 1.482-7(d).

The taxpayer believes this treatment is incorrect and that Regulations Section 1.482-7(d)(3) is invalid. See Xilinx v. Commissioner, 9th Circuit, No. 06-74246 (3/22/2010) (an arm's-length arrangement does not include sharing of stock-based compensation) and also Altera v. Commissioner, 145 T.C., No. 3 (7/27/2015) (Treasury failed to support its belief that unrelated parties would share stock-based compensation costs, and therefore its rule is invalid). In addition, the Company believes this regulation is invalid because stock-based compensation does not constitute a "cost" incurred by the Company under Treasury Regulations Section 1.482-7(d)(1).

Therefore, this Form 1120X removes the audit adjustment to conform to the taxpayer's original filing position.

Form **1120X** (Rev. 11-2016)

APP00204

# Exhibit 9

# Answer to Complaint
# (Sept. 12, 2025)

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MCKESSON CORPORATION and SUBSIDIARIES, | ) ) ) | |
| Plaintiff. | ) ) | Case No. 3:25-cv-01102-N |
| v. | ) ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

## UNITED STATES' ANSWER

The United States of America answers the numbered paragraphs of Plaintiff's Complaint as follows. Any allegation not specifically admitted is denied. *See* Fed. R. Civ. P. 8(b)(3).

## United States' Response to the Numbered Paragraphs in the Complaint

### INTRODUCTION

1.      Plaintiff's allegations in Paragraph 1 are legal statements or conclusions to which no response is required. To the extent a response is required, the United States admits that McKesson brings this action for the refund of federal income taxes assessed and collected by the Internal Revenue for its taxable years March 31, 2007 through March 31, 2012, that McKesson was required to include amounts related to stock-based  compensation ("SBC") in shared cost pools under its cost-sharing arrangements ("CSAs") with foreign affiliates, and that Treasury regulations promulgated under Internal Revenue Code ("I.R.C.") § 482 required related CSA participants to share amounts related to stock-based compensation. Denies the remaining allegations in Paragraph 1.

Fn. 1: Admits.

1

APP00205

Fn. 2: Admits.

Fn. 3: Admits.

Fn.4: Admits.

Fn. 5: Admits.

2.      Plaintiff's allegations in Paragraph 2 are legal statements or conclusions to which no response is required. To the extent a response is required, the United States denies.

3.      Plaintiff's allegations in Paragraph 3 are legal statements or conclusions to which no response is required. To the extent a response is required, the United States admits that the SBC Rule was first included in regulations in 2003, but denies that Plaintiff has provided a complete and accurate description of the *Xilinx* case.

4.      Plaintiff's allegations in Paragraph 4 are legal statements or conclusions to which no response is required. To the extent a response is required, the United States admits that Plaintiff accurately describes the requirement for related parties to share stock-based compensation in CSAs, but denies that Plaintiff has provided a complete and accurate description of the holdings of *Altera*, *Chevron*, and *Loper Bright*.

5.      Admits.

6.      Admits.

7.      Admits, but denies to the extent that this allegation suggests this action is timely under 28 U.S.C. § 2401(a).

8.      Denies.

**PARTIES**

9.      Admits.

10.     Admits.

2

**JURISDICTION AND VENUE**

11.     Denies.

12.     Admits.

**THE APPLICABLE STATUTE AND REGULATIONS**
**Section 482**

13.     Plaintiff's allegations in Paragraph 13 are legal statements or conclusions to which no response is required. To the extent a response is required, the United States admits.

14.     Plaintiff's allegations in Paragraph 14 are legal statements or conclusions to which no response is required. To the extent a response is required, the United States admits that Plaintiff correctly quoted the cases cited, but denies that Plaintiff has provided a complete and accurate description of those cases.

15.     Plaintiff's allegations in Paragraph 15 are legal statements or conclusions to which no response is required. To the extent a response is required, the United States admits that Plaintiff correctly quoted Treas. Reg. 86, art. 45-1(b).

16.     Admits.

17.     Admits.

18.     Admits.

19.     Plaintiff's allegations in Paragraph 19 are legal statements or conclusions to which no response is required. To the extent a response is required, the United States admits that Plaintiff correctly quoted the cases cited, but denies that Plaintiff has provided a complete and accurate description of those cases.

20.     Admits.

21.     Admits.

3

APP00207

**Treasury Regulations Regarding Stock-Based Compensation (the "SBC Rule")**

22. Admits.

23. Plaintiff's allegations in Paragraph 23 are legal conclusions to which no response is required. To the extent a response is required, the United States admits that Plaintiff correctly quoted Treas. Reg. § 1.482-7(a)(1) (1995), Treas. Reg. § 1.482-7(d)(1) (1995).

24. Plaintiff's allegations in Paragraph 24 are legal conclusions to which no response is required. To the extent a response is required, the United States denies that Plaintiff has provided a complete and accurate description of the government's litigating position in *Xilinx*.

25. Plaintiff's allegations in Paragraph 25 are legal conclusions to which no response is required. To the extent a response is required, the United States denies that Plaintiff has provided a complete and accurate description of the Tax Court's findings in *Xilinx*.

26. Admits.

27. Admits.

Fn. 6: Admits.

Fn. 7: Admits.

Fn. 8: Admits.

28. Denies.

29. Denies.

30. Lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 30.

31. Plaintiff's allegations in Paragraph 31 are legal conclusions to which no response is required. To the extent a response is required, the United States admits that Plaintiff correctly

quoted from the preamble, but denies that Plaintiff has provided a complete and accurate description of Treasury's position or the regulation.

32.     Plaintiff's allegations in Paragraph 31 are legal conclusions to which no response is required. To the extent a response is required, the United States admits that Plaintiff correctly quoted from the preamble, but denies the remaining allegations in Paragraph 32.

33.     Admits.

34.     Admits.

35.     Denies.

36.     Admits that Plaintiff correctly quoted 74 Fed. Reg. at 348; denies the remaining allegations in Paragraph 36.

37.     Admits that Treasury issued final regulations (the "2011 Final Regulations") in largely the same form as the 2009 Temporary Regulations and with no changes to the SBC Rule. *See* T.D. 9568, 76 Fed. Reg. 80082 (Dec. 22, 2011) (codified at Treas. Reg. § 1.482-7), and that the 2011 Final Regulations were generally effective on December 16, 2011. Denies the remaining allegations in Paragraph 37.

38.     Admits that Plaintiff correctly quoted 76 Fed. Reg. at 80087; denies the remaining allegations in Paragraph 38.

39.     Admits.

40.     Plaintiff's allegations in Paragraph 40 are legal statements or conclusions to which no response is required. To the extent a response is required, the United States admits that Plaintiff correctly quoted Tax Court's decision in *Altera*, but denies that Plaintiff has provided a complete and accurate description of the case.

APP00209

41.     Plaintiff's allegations in Paragraph 41 are legal statements or conclusions to which no response is required. To the extent a response is required, the United States admits that the Ninth Circuit reversed the Tax Court's decision in *Altera*, but denies that Plaintiff has provided a complete and accurate description of the case.

42.     Admits.

## STATEMENT OF FACTS
### McKesson's Cost Sharing Arrangements and Stock-Based Compensation

43.     Lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 43.

44.     Lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 44.

45.     Lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 45.

46.     Lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 46.

### McKesson's FY07, FY08, and FY09 Tax Returns

47.     Admits.

48.     Admits.

49.     Admits.

50.     Admits, except denies that the IRS relied exclusively on the SBC rule.

51.     Admits.

52.     Admits.

53.     Admits.

54.     Admits.

APP00210

55.    Admits.

56.    Admits.

### McKesson's FY10, FY11, and FY12 Tax Returns

57.    Admits.

58.    Admits.

59.    Admits.

60.    Admits, except denies that the IRS relied exclusively on the SBC rule.

61.    Admits.

62.    Admits.

63.    Admits.

64.    Admits.

65.    Admits.

66.    Admits.

### The IRS's Action on McKesson's Refund Claims

67.    Plaintiff's allegations in Paragraph 67 are legal conclusions to which no response is required. To the extent a response is required, the United States admits that Plaintiff provides an accurate, general description of the refund suit process.

68.    Admits.

69.    Admits.

70.    Admits.

71.    Admits.

### THE SBC RULE IS INVALID

APP00211

72. Plaintiff's allegations in Paragraph 72 are legal conclusions to which no response is required. To the extent a response is required, the United States denies.

**The SBC Rule is Contrary to the Statute and is Substantively Invalid**

73. Plaintiff's allegations in Paragraph 73 are legal conclusions to which no response is required. To the extent a response is required, the United States admits that Plaintiff correctly quoted 5 U.S.C. § 706(2)(A), (C).

74. Plaintiff's allegations in Paragraph 74 are legal conclusions to which no response is required. To the extent a response is required, the United States admits that Plaintiff correctly quoted *Loper Bright*, but denies that Plaintiff has provided a complete and accurate description of the holdings of *Loper Bright* and *Chevron*.

75. Denies.

76. Plaintiff's allegations in Paragraph 76 are legal conclusions to which no response is required. To the extent a response is required, the United States admits that Plaintiff correctly quoted the authorities cited in Paragraph 76, but denies that Plaintiff has provided a complete and accurate description of those authorities.

77. Plaintiff's allegations in Paragraph 77 are legal conclusions to which no response is required. To the extent a response is required, the United States admits that plaintiff correctly quoted section 482, but denies the remaining allegations in Paragraph 77.

78. Plaintiff's allegations in Paragraph 78 are legal conclusions to which no response is required. To the extent a response is required, the United States admits that Plaintiff correctly quoted *Xilinx*, but denies the remaining allegations in Paragraph 78.

79. Denies.

FN 9: Denies.

8

**The SBC Rule Is Substantively and Procedurally Invalid Under the APA**

80.    Plaintiff's allegations in Paragraph 80 are legal conclusions to which no response is required. To the extent a response is required, the United States admits that Plaintiff correctly quoted the authorities cited, but the United States denies that Plaintiff has provided a complete and accurate description of those authorities.

81.    Denies.

82.    Denies.

83.    Denies.

84.    Denies.

       Fn. 10: Denies.

85.    Denies.

## COUNT I
## FY07 Refund

86.    The United States incorporates by reference the answers contained above in Paragraphs 1 through 85.

87.    Admits.

88.    Denies.

       Fn. 11: Admits.

89.    Denies.

90.    Denies.

91.    Denies.

92.    Admits.

93.    Admits.

9

APP00213

94.     Admits that that this action is within the period of limitations under I.R.C. §

6532(a), but denies to the extent that this allegation suggests this action is timely under all other

applicable statutes.

95.     Denies.

**COUNT II**
**FY08 Refund**

96.     The United States incorporates by reference the answers contained above in

Paragraphs 1 through 95

97.     Admits.

98.     Denies.

99.     Denies.

100.    Denies.

101.    Denies.

102.    Admits.

103.    Admits.

104.    Admits that that this action is within the period of limitations under I.R.C. §

6532(a), but denies to the extent that this allegation suggests this action is timely under all other

applicable statutes.

105.    Denies.

**COUNT III**
**FY09 Refund**

106.    The United States incorporates by reference the answers contained above in

Paragraphs 1 through 105.

107.    Admits.

10

APP00214

108. Denies.

109. Denies.

110. Denies.

111. Denies.

112. Admits.

113. Admits.

114. Admits that that this action is within the period of limitations under I.R.C. § 6532(a), but denies to the extent that this allegation suggests this action is timely under all other applicable statutes.

115. Denies.

## COUNT IV
## FY10 Refund

116. The United States incorporates by reference the answers contained above in Paragraphs 1 through 115.

117. Admits.

118. Denies.

119. Denies

120. Denies.

121. Denies.

122. Admits.

123. Admits.

124. Admits that that this action is within the period of limitations under I.R.C. § 6532(a), but denies to the extent that this allegation suggests this action is timely under all other applicable statutes.

APP00215

125.    Denies.

## COUNT V
## FY11 Refund

126.    The United States incorporates by reference the answers contained above in

Paragraphs 1 through 125.

127.    Admits.

128.    Denies.

129.    Denies.

130.    Denies.

131.    Denies.

132.    Admits.

133.    Admits.

134.    Admits that that this action is within the period of limitations under I.R.C. §

6532(a), but denies to the extent that this allegation suggests this action is timely under all other

applicable statutes.

135.    Denies.

## COUNT VI
## FY12 Refund

136.    The United States incorporates by reference the answers contained above in

Paragraphs 1 through 135.

137.    Admits.

138.    Denies.

139.    Denies.

140.    Denies.

12

141. Denies.

142. Admits.

143. Admits.

144. Admits that that this action is within the period of limitations under I.R.C. § 6532(a), but denies to the extent that this allegation suggests this action is timely under all other applicable statutes.

145. Denies.

## United States' Affirmative Defenses

*First Affirmative Defense*: The Court lacks jurisdiction over Plaintiff's challenge to procedural validity of the three SBC Regulations because Plaintiff's suit is outside the six-year period of limitations for bringing an action set by 28 U.S.C. § 2401(a).

*Second Affirmative Defense*: Even if the three SBC Regulations were invalid, Plaintiff is not entitled to the refund it seeks because stock-based compensation costs that benefit Plaintiff's foreign subsidiaries are non-deductible under 26 U.S.C. § 162.

*Third Affirmative Defense*: Even if the three SBC Regulations were invalid, Plaintiff is not entitled to the refund it seeks under the plain meaning of I.R.C. § 482's authority to make "distribution[s], apportionment[s], or allocation[s] necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

## United States' Prayer For Relief

WHEREFORE, the United States of America prays that the Court deny the relief sought in the Complaint, dismiss Plaintiff's Complaint with prejudice, and grant such other and further relief as may be deemed appropriate under the circumstances, including costs.

APP00217

Dated: September 12, 2025                    Respectfully submitted,

                                            */s/ Daniel B. Causey, IV*
                                            Daniel B. Causey, IV
                                            DC Bar No. 240963
                                            Trial Attorney, Tax Division
                                            U.S. Department of Justice
                                            P.O. Box 14198
                                            Washington, D.C.  20044
                                            202-307-1427 (v)
                                            202-514-4963 (f)
                                            Daniel.B.Causey@usdoj.gov

                                            Of Counsel:

                                            Nancy Larson
                                            United States Attorney
                                            Northern District of Texas

APP00218

**Certificate of Service**

I certify that on September 12, 2025, a true and correct copy of the foregoing was filed

electronically through the Court's ECF filing system and was served upon counsel for Plaintiff.

*/s/ Daniel B. Causey, IV*
DANIEL B. CAUSEY, IV
Trial Attorney, Tax Division
