IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
Dallas Division

| | | |
|---|---|---|
| MCKESSON CORPORATION and SUBSIDIARIES, | ) | |
| | ) | Case No. 3:25-cv-1102 |
| Plaintiff, | ) | |
| | ) | Judge David C. Godbey |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**COMBINED MEMORANDUM IN SUPPORT OF DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

Dated: June 5, 2026

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General
Tax Litigation Branch

MOIRA E. GOODWIN
DC Bar No. 1780293
DANIEL B. CAUSEY, IV
SC Bar No. 104035
Trial Attorneys
Tax Litigation Branch
Civil Division, Department of Justice
P.O. Box 14198
Washington, D.C. 20044
202-718-7056 (MEG)
202-307-1427 (DBC)
202-514-6866 (fax)
moira.e.goodwin@usdoj.gov
daniel.b.causey@usdoj.gov

**Table of Contents**

I.    Introduction. ............................................................................................................ 1

II.   Background. ............................................................................................................. 3

    A.    Transfer pricing and I.R.C. § 482. .............................................................. 3

    B.    Cost sharing arrangements and stock-based compensation. ....................... 6

    C.    McKesson's refund claims. ....................................................................... 10

III.   Argument. ............................................................................................................. 14

    A.    The stock-based compensation rule is within Treasury's authority
        under I.R.C. § 482. ..................................................................................... 15

        1.    The statute does not require Treasury to consider evidence of
            comparable unrelated transactions. ....................................................... 17

        2.    Treasury regulations require application of an arm's length standard,
            but not a particular methodology. ......................................................... 26

        3.    There are no comparable unrelated transactions because, as relevant
            to the challenged rule, unrelated transactions are fundamentally not
            comparable. ............................................................................................ 29

        4.    In *Altera*, the Ninth Circuit recognized correctly that § 482 permits
            Treasury to require sharing of SBC costs, and its holding has been
            confirmed in cases after *Loper Bright*. ................................................. 31

    B.    On its merits, the stock-based compensation rule is valid because it is the
        product of reasoned decision making. ....................................................... 35

    C.    At all events, McKesson is not entitled to a § 162 deduction for the
        stock-based compensation paid to benefit its foreign subsidiary. ............. 39

        1.    Under I.R.C. § 162(a), business expenses must directly and proximately
            benefit the taxpayer, not another entity. ............................................... 39

         2.    McKesson cannot deduct stock-based compensation costs attributable
            to McKesson Ireland's reasonably anticipated benefit share. .............. 41

IV.   Conclusion. ........................................................................................................... 43

## Table of Authorities

**Page(s)**

**Cases**

*3M Co. v. Comm'r*,
154 F.4th 574 (8th Cir. 2025) ...................................................................................14

*Airlines for Am. v. Dep't of Transp.*,
127 F.4th 563 (5th Cir. 2025) .................................................................................17

*Alaska Dep't of Envtl. Conservation v. EPA*,
540 U.S. 461 (2004)..................................................................................................38

*Altera Corp. v. Comm'r*,
145 T.C. 91 (Tax Ct. 2015)................................................................................13, 38

*Altera Corp. v. Comm'r*,
926 F.3d 1061 (9th Cir. 2019) ........................................................................ *passim*

*Altera Corp. v. Comm'r*,
941 F.3d 1200 (Mem.) (9th Cir. 2019) ...................................................................12

*Austin Co. v. Comm'r*,
71 T.C. 955 (1979)....................................................................................................40

*Baker Hughes, Inc. v. United States*,
943 F.3d 255 (5th Cir. 2019) ...................................................................................40

*BMC Software, Inc. v. Comm'r*,
780 F.3d 669 (5th Cir. 2015) .....................................................................................4

*Cavanaugh v. Comm'r*,
766 F. App'x 98 (5th Cir. 2019) ..............................................................................40

*Clean Water Action v. U.S. EPA*,
936 F.3d 308 (5th Cir. 2019) ...................................................................................38

*Coca-Cola Co. v. Comm'r*,
155 T.C. 145 (2020)............................................................................................21, 35

*Comm'r v. First Sec. Bank of Utah, N.A.*,
405 U.S. 394 (1972)..................................................................................................20

*Comm'r v. Heininger*,
320 U.S. 467 (1943)..................................................................................................39

*Comm'r v. Lo Bue*,
   351 U.S. 243 (1956)..................................................................................................37

*Edmond v. United States*,
   520 U.S. 651 (1991)..................................................................................................27

*Est. of Hoensheid v. Comm'r*,
   T.C. Memo. 2023-34, 2023 WL 2519413 (Mar. 15, 2023) .......................................6

*Facebook, Inc. v. Comm'r*,
   164 T.C. 194 (2025)........................................................................................ *passim*

*Food Mktg. Inst. v. Argus Leader Media*,
   588 U.S. 427 (2019)..................................................................................................19

*Gregory v. Helvering*,
   293 U.S. 465 (1935)....................................................................................................9

*HIE Holdings, Inc. v. Comm'r*,
   T.C. Memo. 2009-130, 2009 WL 1586044 (2009 ..................................................40

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ...........................................................................36, 37, 38

*Humana Inc. v. Comm'r*,
   881 F.2d 247 (6th Cir. 1989) ...................................................................................40

*INDOPCO, Inc. v. Comm'r*,
   503 U.S. 79 (1992)....................................................................................................39

*Interstate Transit Lines v. Comm'r*,
   319 U.S. 590 (1943)............................................................................................40, 43

*Kampe v. Volta Inc.*,
   2024 WL 308262 (N.D. Cal. Jan. 26, 2024) ...........................................................12

*Lewis v. Reynolds*,
   284 U.S. 281 (1932)..................................................................................................39

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   591 U.S. 657 (2020)..................................................................................................19

*Lockheed Martin Corp. v. United States*,
   39 Fed. Cl. 197 (1997) .............................................................................................39

*Lohrke v. Comm'r*,
   48 T.C. 679 (1967)....................................................................................................40

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..................................................................................15, 18, 31, 33

*Mann Constr., Inc. v. United States*,
86 F.4th 1159,1162–63 (6th Cir. 2023) ...............................................................14

*Mayfield v. U.S. Dep't of Lab.*,
117 F.4th 611 (5th Cir. 2024) .........................................................................15, 18

*McGirt v. Oklahoma*,
591 U.S. 894 (2020)............................................................................................19

*Medtronic, Inc. v. Comm'r*,
153 F.4th 682 (8th Cir. 2025) ...............................................................21, 34, 35

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)..............................................................................................15

*Shenzhen Youme Info. Tech. Co. v. FDA*,
147 F.4th 502 (5th Cir. 2025) ........................................................................35, 36

*Sirius Sols., L.L.L.P. v. Comm'r*,
165 F.4th 374 (5th Cir. 2026) ........................................................................18, 23

*Summa Holdings, Inc. v. Comm'r*,
848 F.3d 779 (6th Cir. 2017) ................................................................................9

*Tulia Feedlot, Inc. v. United States*,
513 F.2d 800 (5th Cir. 1975) ..............................................................................39

*VanDerStok v. Garland*,
86 F.4th 179 (5th Cir. 2023................................................................................15

*Young & Rubicam, Inc. v. United States*,
410 F.2d 1233 (Fed. Cl. 1969)......................................................................40, 41

**Statutes**

5 U.S.C. § 706.......................................................................................13, 14, 35

28 U.S.C. § 2401(a) ..............................................................................................35

I.R.C. § 162 ............................................................................................... *passim*

I.R.C. § 482 ............................................................................................... *passim*

I.R.C. § 7701(a)(11)(B) .........................................................................................15

I.R.C. § 7805(a) ....................................................................................................17

v

**Regulations and Administrative Materials**

Treas. Reg. § 1.162-1(a) ..................................................................................................40

Treas. Reg. § 1.482-1(a)(1)..........................................................................................5, 20

Treas. Reg. § 1.482-1(b)(1)...................................................................................... *passim*

Treas. Reg. § 1.482-1(b)(2)(i)....................................................................................27, 28

Treas. Reg. § 1.482-1(c)(1).............................................................................................27

Treas. Reg. § 1.482-1(c)(2)(ii)(c) ...................................................................................30

Treas. Reg. § 1.482-1(f)(2)(v)..........................................................................................27

Treas. Reg. § 1.482-4(c) ..................................................................................................24

Treas. Reg. § 1.482-7(i)(2)(i)(A) .....................................................................................11

Treas. Reg. § 1.482-7(a) ..................................................................................................28

Treas. Reg. § 1.482-7(a)(4)....................................................................................... *passim*

Treas. Reg. § 1.482-7(b) ..................................................................................7, 8, 11, 28

Treas. Reg. § 1.482-7(c) ..................................................................................................28

Treas. Reg. § 1.482-7(d) ..............................................................................................9, 10

Treas. Reg. § 1.482-7(e) ..............................................................................................8, 41

Treas. Reg. § 1.482-7(j)(1)(i)...........................................................................................41

Treas. Reg. § 1.482-7(j)(3)(i).................................................................................8, 11, 12

Treas. Reg. § 1.482-7(k) ..................................................................................................28

Treas. Reg. § 1.482-7(m)(2) ..............................................................................................7

Treas. Reg. § 1.482-7A(d) .........................................................................................10, 14

*A Study of Intercompany Pricing Under Section 482 of the Code*, Notice 88-123,
   1988 WL 561206 (1988).....................................................................20, 22, 23, 27

Compensatory Stock Options Under Section 482, 68 Fed. Reg. 51,171
   (Aug. 26, 2003) ......................................................................16, 28, 29, 36, 37, 38

Section 482: Methods to Determine Taxable Income in Connection With a Cost
Sharing Arrangement,70 Fed. Reg. 51,116 (proposed Aug. 29, 2005) ....................................30

**Legislative Materials**

H.R. Rep. No. 87-1447 (1962)........................................................................................17

H.R. Rep. No. 87-2508 (1962)........................................................................................17

H.R. Rep. No. 99-426 (1985)....................................................3, 4, 8, 23, 24, 32, 34

H.R. Rep. No. 99-841, vol. II (1986) (Conf. Rep.)................................25, 28, 32, 33, 37

*Offshore Profit Shifting and the U.S. Tax Code—Part 2 (Apple Inc.): Hearing
Before the Subcomm. on Investigations of the S. Comm. on Homeland Sec. &
Foreign Affs.*, 113th Cong. 2 (2013) ..............................................................3, 10, 12

**Other Authorities**

Brian D. Lepard, *Is the United States Obligated to Drive on the Right? A
Multidisciplinary Inquiry in the Normative Authority of Contemporary
International Law Using the Arm's Length Standard as a Case Study*, 10
Duke J. of Compar. & Int'l L. 43, 119 (1999).............................................21, 23, 24

*EU Tax Observatory, Global Tax Evasion Report 2024* (Annette Alstadsæter,
Sarah Godar, Panayiotis Nicolaides & Gabriel Zucman eds., 2024)
(https://perma.cc/W546-YE35).......................................................................................3

FASB, *Statement of Financial Accounting Standards No. 123: Accounting for
Stock-Based Compensation* (rev. 2004)..................................................................12

Ilan Benshalom, *Sourcing the "Unsourceable": The Cost Sharing Regulations
and the Sourcing of Affiliated Intangible-Related Transactions*, 26 Va. Tax
Rev. 631 (2007) ..............................................................................................6, 8, 30, 37

Michael McDonald, *Moving Beyond the IRS's Pyrrhic Victory on CWI*, TaxNotes
(https://perma.cc/5WLR-EPVX) ....................................................................................24

OECD, *Corporate Tax Statistics 2025*, (2025)
https://doi.org/10.1787/6a915941-en............................................................................3

Reuven S. Avi-Yonah, *The Rise and Fall of Arm's Length: A Study in the
Evolution of U.S. International Taxation*, 15 Va. Tax. Rev. 89 (1995).........................4, 20, 21

Ryan Finley, *In McKesson, the 'Divided' Altera Court Is Ancient History, Part 2*,
Tax Notes Int'l (https://perma.cc/4Z7Q-CV35) .............................................................30, 33

Tyler Johnson, Note, *Nobody's Stock Compares to Your Own: How Treasury Can
Revive Stock Compensation in Cost-Sharing Agreements*.......................................31

## I.    Introduction.

To prevent evasion of taxes and ensure businesses clearly reflect their actual income on their tax returns, § 482 empowers the IRS to adjust the income, deductions, credits, or allowances related to transactions between controlled parties to ensure their taxable income reflects the economic substance of their transactions.[1] Businesses, like McKesson, use cost sharing arrangements between their subsidiaries to shift income-producing intangibles into low tax jurisdictions, thus minimizing the tax burden to the parent entity. For the IRS to respect the tax consequences of such an arrangement, it must comply with the applicable regulations issued under § 482. Relevant here is Treasury Regulation § 1.482-7, which sets out the requirements a taxpayer must adhere with when entering cost sharing arrangements to avoid a § 482 adjustment to its income.[2] Otherwise, the IRS may make an adjustment under § 482 to ensure that income is clearly reflected between the parties.

McKesson's cost sharing arrangements violated that regulation because they excluded compensation paid to employees in the form of McKesson stock from shared development costs. That meant McKesson's Irish subsidiary did not reimburse its U.S. subsidiary for those stock-based compensation costs. As a result, McKesson claimed greater business expense deductions than it should have on its U.S. income tax returns for 2007 through 2012 (the "years at issue"). And so, following the directive from Congress in § 482, the IRS made an adjustment to allocate additional income to McKesson to correct the disparity. The IRS appropriately assessed and

---

[1] All references to "I.R.C." or "the Code" are to the Internal Revenue Code of 1986, codified at Title 26 of the United States Code (26 U.S.C.), as amended and in effect for the relevant period. Unless otherwise indicated, all section references are to the I.R.C.

[2] All references to "Treasury Regulation" or "Treas. Reg." refer to regulations promulgated under the Internal Revenue Code and codified in Title 26 of the Code of Federal Regulations (26 C.F.R.), as amended and in effect for the relevant period.

collected the shortfall for each of the years at issue, which McKesson paid and now seeks to have refunded.

McKesson contends Treasury cannot compel related parties to include stock-based compensation when pooling costs without evidence that unrelated parties acting at arm's length would share similar costs in similar circumstances. But § 482 and Treas. Reg. § 1.482-7 contain no requirement—either explicit or implicit—that the IRS must apply an arm's length standard based on comparable unrelated transactions to make adjustments to clearly reflect income. Indeed, § 482 authorizes the Secretary to make whatever adjustments are necessary to clearly reflect income or prevent tax evasion, not only the adjustments he can justify by reference to evidence of comparable unrelated transactions. Thus, the stock-based compensation rule—which is necessary for a cost sharing arrangement to reach an arm's length result—falls well within the bounds of the plain text of § 482.

McKesson's procedural challenge to the stock-based compensation rule also fails. Treasury employed reasoned decision making when it issued the stock-based compensation rule. Treasury explained that in the context of cost sharing arrangements, the arm's length standard is satisfied—and the resulting tax consequences clearly reflect income—when each party's share of the costs to develop the intangible correspond to that party's share of the benefit the parties reasonably anticipate the intangible to produce. For that analysis to hold, it follows that all costs must be included. That is true no matter how unrelated parties would treat purportedly similar costs in purportedly similar circumstances. Because evidence of unrelated party transactions are irrelevant to the analysis, Treasury was not required to respond to comments about unrelated parties' treatment of stock-based compensation.

But even if the stock-based compensation rule were substantively or procedurally invalid, McKesson is still not entitled to refunds for the years at issue. Section 162 provides an independent basis to deny McKesson's deduction for its stock-based compensation at issue. Under § 162, a taxpayer may deduct only those costs that are ordinary and necessary for its benefit. But McKesson included in its § 162 deduction stock-based compensation for work performed for the benefit of its Irish subsidiary. McKesson is not entitled to deduct those costs under normal principles of § 162, entirely apart from § 482.

Because McKesson is not entitled to the tax refunds it seeks, the United States' motion for summary judgment should be granted, and McKesson's motion for summary judgment should be denied.

## II.    Background.

### A.  Transfer pricing and I.R.C. § 482.

Because each country imposes a different rate on corporate income tax, multinational companies frequently attempt to shift profits from high-tax jurisdictions to low-tax jurisdictions.[3] H.R. Rep. No. 99-426, at 423 (1985) [hereinafter "1985 House Report"]. One mechanism by which companies move profits abroad is by transferring ownership of income producing assets to foreign subsidiaries. *Id.* Unlike physical assets (facilities, equipment, etc.) and employees, Companies can transfer intangible assets (patents, trademarks, software, etc.) with ease. *See Offshore Profit Shifting and the U.S. Tax Code—Part 2 (Apple Inc.): Hearing Before the*

---

[3] In the United States, most corporations are taxed on income at a rate of 21%. I.R.C. § 11(b). That is higher than many other countries' statutory corporate income tax rates. *See* OECD, *Corporate Tax Statistics 2025*, 24 (2025) https://doi.org/10.1787/6a915941-en. Income shifting is not a uniquely American problem, though—data suggests 35% of all foreign profits were shifted to tax havens in 2022. *See EU Tax Observatory, Global Tax Evasion Report 2024* 40 (Annette Alstadsæter, Sarah Godar, Panayiotis Nicolaides & Gabriel Zucman eds., 2024) (https://perma.cc/W546-YE35).

*Subcomm. on Investigations of the S. Comm. on Homeland Sec. & Foreign Affs.*, 113th Cong. 2 (2013) (statement of Sen. Levin, Chairman, S. Subcomm. on Investigations) ("Unlike more tangible, physical assets, [intangible property] can be transferred around the globe, often with just a few keystrokes.").

The Internal Revenue Code permits the transfer of income producing assets to foreign subsidiaries. But for the transfer to be respected under the Code, the receiving company must pay a price, which is called the "transfer price." *See BMC Software, Inc. v. Comm'r*, 780 F.3d 669, 672 (5th Cir. 2015). And that transfer price must reflect the asset's true economic value.

The reason the Code requires a transfer price reflecting true economic value is clear: absent oversight, related parties would not pay a transfer price reflecting economic reality. *See Altera Corp. v. Comm'r*, 926 F.3d 1061, 1068 (9th Cir. 2019). As the Ninth Circuit explained in *Altera*, in transactions between unrelated parties, the entities have "the incentive to maximize profit and thus to allocate costs and income consistent with economic realities." *Id.* But that incentive does not exist in transactions between related entities. Related entities share the same overall economic interest. And so, they have an incentive to allocate costs and income in a manner that most benefits the controlled group as a whole, rather than in a manner that reflects economic reality. *Id.* Multinational companies can thus manipulate transfer prices to avoid taxes. *See* 1985 House Report at 423. That is why, for nearly as long as Congress has imposed an income tax, it has delegated authority to Treasury to police transactions between related parties and reallocate income, deductions, and other tax items to align each party's income with economic reality. *See* Reuven S. Avi-Yonah, *The Rise and Fall of Arm's Length: A Study in the Evolution of U.S. International Taxation*, 15 Va. Tax. Rev. 89, 95 (1995) [hereinafter "*Rise and*

*Fall*"]. As relevant here, that delegation is codified at § 482, which consists of three total sentences, two of which are relevant to this dispute.[4]

The first sentence authorizes the Secretary to adjust tax items within related-party transactions as "necessary" to "prevent the evasion of taxes" or "clearly to reflect the income":

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

And the second sentence, added in 1986, prescribes a specific standard the Secretary must use when adjusting tax items arising from the transfer or license of intangible property:

> In the case of any transfer (or license) of intangible property (within the meaning of section 367(d)(4)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

Taking those broad instructions, Treasury has constructed a comprehensive transfer pricing regime, most of which this suit does not challenge. Consistent with Congress's delegation to the Secretary to adjust tax items between related parties to prevent tax evasion or clearly reflect income, the regulations generally aim to allocate costs and income between related parties to reflect each taxpayer's "true taxable income." *See* Treas. Reg. § 1.482-1(a)(1). The regulations explain that true taxable income should generally correspond to the hypothetical result were unrelated parties to enter the same transaction under the same circumstances. *See* Treas. Reg. § 1.482-1(b)(1). Thus, the regulations generally require application of the "arm's

---

[4] The third sentence, which Congress added in 2017, does not apply to the tax years at issue.

length standard," which focuses on an arm's length result. *Id.*; *see also* Treas. Reg. § 1.482-7(a)(4) (explaining how a cost sharing arrangement produces an arm's length result).

### B. Cost sharing arrangements and stock-based compensation.

While the universe of transfer pricing regulations is vast and complex, this dispute implicates only a narrow corner of that universe. Relevant here are the rules for cost sharing arrangements, in which related parties agree to share the research and development costs (including any initial investment) to develop an intangible in exchange for specified rights in the intangible ultimately developed. *See generally* Treas. Reg. § 1.482-7 ("dash-seven"); *Facebook, Inc. v. Comm'r*, 164 T.C. 194, 199–200 (2025).

Cost sharing arrangements provide a mechanism for related parties to locate income-producing intangibles in low tax jurisdictions. *See* Ilan Benshalom, *Sourcing the "Unsourceable": The Cost Sharing Regulations and the Sourcing of Affiliated Intangible-Related Transactions*, 26 Va. Tax Rev. 631, 660 (2007) [hereinafter "*Sourcing*"]. Take for example, Company A, which is a large U.S. Company and its subsidiaries, Company a-1, which operates in a high tax jurisdiction (say, the United States) and Company a-2, which operates in a low tax, foreign jurisdiction. Assume Company A intends to develop a new computer program, from which it may derive substantial income. Company A wants to minimize the tax it must pay on the income it may earn from its new computer program.

Company A understands that a first principle of the U.S. tax system is that income will be taxed to the entity that created the right to receive it. *Est. of Hoensheid v. Comm'r*, T.C. Memo. 2023-34, 2023 WL 2519413, at *15 (Mar. 15, 2023) (quoting *Helvering v. Horst*, 311 U.S. 112, 119 (1940)). Thus, if the program is developed and owned by Company a-1, Company A would (correctly) expect to pay U.S. tax on all income earned from its lucrative new program. To shift that income to the foreign jurisdiction, Company a-1 could develop the computer program then

sell (or license) it to Company a-2. But Company a-2 would have to pay Company a-1 a fair market transfer price (or arm's length royalties), which would result in the substantial U.S. income Company a-1 sought to avoid.

If Company a-2 develops the program, however, (and thus acquires its ownership interest from the start), it will not have to pay a transfer price to Company a-1 later. But as is typically true, assume Company a-1 (in the United States) owns the software necessary to develop the program, employs the skilled programmers, and maintains the overhead and infrastructure for a large-scale development project (*i.e.*, the physical assets that cannot be easily transferred abroad). Enter the cost sharing arrangement, which Treasury will respect for U.S. income tax purposes only if it complies with the Code and regulations. In the scenario described, a cost sharing arrangement allows Company a-2 to "jointly develop" the program—notwithstanding Company a-1's exclusive contribution of software, labor, and overhead—by agreeing to pay its share of the software contributed by Company a-1 and all future development costs either party incurs. If they enter into a cost sharing arrangement that satisfies the dash-seven requirements, Company a-1 and Company a-2 will each ultimately enjoy separate ownership interests in the resulting intangible (in this example, the computer program), without any further obligation to compensate the other.[5] *See* Treas. Reg. § 1.482-7; *Facebook*, 164 T.C. at 199.

To make sure the resulting ownership interests accurately reflect each participant's contribution (and thus clearly reflect income), the dash-seven regulations explain that a cost sharing arrangement is considered to produce an arm's length result only if each participant's

---

[5] Under current dash-seven, each party's interest in the resulting intangible must be exclusive and non-overlapping. *See* Treas. Reg. § 1.482-7(b)(1)(iii), (b)(4), (k)(1)(ii)(D). We note that those requirements do not apply to the cost sharing arrangements McKesson's subsidiaries entered prior to 2009. *See* Treas. Reg. § 1.482-7(m)(2).

share of costs equals its share of reasonably anticipated benefits. Treas. Reg. § 1.482-7(a)(4). In our example, assume the arrangement would result in Company a-1 having the right to exploit the computer program in the United States and Company a-2 having that right in the rest of the world. Using the "most reliable estimate" under all the facts and circumstances, the parties will then determine each participant's share of "RAB" (reasonably anticipated benefit). Treas. Reg. § 1.482-7(e).

If, using the most reliable estimate, the parties estimated Company a-2 would enjoy 70% of the reasonably anticipated benefit, then the RAB share would be 30/70. In that scenario, assuming Company a-1 paid all relevant development costs, Company a-2 would need to reimburse Company a-1 for 70% of the costs incurred, because cost share must equal RAB share. Treas. Reg. § 1.482-7(a)(4). This reimbursement of the intangible development cost is a "cost sharing transaction payment." Treas. Reg. § 1.482-7(b)(1)(i). For tax purposes, when Company a-1 receives a cost sharing transaction payment from Company a-2, Company a-1 is not considered to receive additional income, it is considered to incur less cost. Treas. Reg. § 1.482-7(j)(3)(i). Thus, if Company a-1's intangible development costs were $10 million (and assuming those costs were otherwise deductible under the Code), it could take only a $3 million deduction. *Cf. id.*

Cost sharing arrangements can be used to avoid tax.[6] That is not inherently a problem—if a transaction complies with the law, the transaction is not necessarily illegitimate just because it

---

[6] Though cost sharing transaction payments should theoretically cause the same economic outcome as a normal transfer price, it is harder for the Government to scrutinize valuation projections before the intangible exists. *Cf. Sourcing*, 26 Va. Tax Rev. at 662 (observing that, before an asset becomes available to the market, a company has inside knowledge as to the actual value of that asset); 1985 House Report at 424 ("Taxpayers may transfer such intangibles to foreign related corporations or to possession corporations at an early stage, for a relatively low

(continued...)

was designed to minimize tax, *see Summa Holdings, Inc. v. Comm'r*, 848 F.3d 779, 787–88 (6th Cir. 2017). But if the transaction does *not* comply with all relevant statutes and regulations, legitimate tax planning becomes improper tax avoidance. *Cf. Gregory v. Helvering*, 293 U.S. 465, 469 (1935) ("The legal right of a taxpayer to decrease the amount of what would otherwise be his taxes, or altogether avoid them, *by means which the law permits*, cannot be doubted." (emphasis added)).

Treasury regulations respect the tax consequences of cost sharing arrangements, but only to the extent the arrangement satisfies all the requirements of dash-seven. *See generally* Treas. Reg. § 1.482-7. For a cost sharing arrangement to achieve an arm's length result, the cost share must equal the RAB share, *and* parties must have included *all* costs related to the development of the cost shared intangible when determining that cost share. *See* Treas. Reg. § 1.482-7(d)(1)(iii). The regulations make clear that parties must pool all costs allocable to the intangible development activity, which is defined to include "all . . . activities that could reasonably be anticipated to contribute to developing" the cost shared intangible. Treas. Reg. § 1.482-7(d)(1)(i). And the parties must include all "costs incurred in attempting to develop" a cost shared intangible, "regardless of whether such costs ultimately lead to the development of those intangibles." Treas. Reg. § 1.482-7(d)(1)(iii). Treasury requires related parties to pool all costs related to development of cost shared intangibles to ensure an ultimate tax result that reflects economic reality. *Cf.* AR 14248.[7] If a cost were excluded from the pool, the true cost share would no longer equal the RAB share. That would mean a participant would take a greater cost

---

royalty, and take the position that it was not possible at the time of the transfers to predict the subsequent success of the product.").

[7] All citations to "AR" are to the administrative record. At the close of briefing, the parties will jointly file on the public docket the cited portions of the administrative record. *See* D.E. 31.

deduction today without the expectation to receive a proportionate share of benefit (and therefore income) tomorrow. *Cf. Offshore Profit Shifting and the U.S. Tax Code—Part 2 (Apple Inc.): Hearing Before the Subcomm. on Investigations of the S. Comm. on Homeland Sec. & Foreign Affs.*, 113th Cong. 18 (2013) (statement of Mr. Shay, Professor, Harvard Law School) ("This is often referred to in exemption countries as 'deduction dumping'—in other words, you put your deductions in the home country, and you try and achieve low tax exempt income outside the home country.").

McKesson challenges none of the above. And that point bears emphasis: McKesson objects not to the transfer pricing regulations generally, nor the broader dash-seven cost sharing regulations specifically. McKesson challenges just one rule, which clarifies that "all of the costs" incurred to develop an intangible include compensation paid to the employees developing the intangible. *Cf.* Treas. Reg. § 1.482-7A(d)(1). More specifically, McKesson challenges a rule in which Treasury clarified that employee compensation must be included in the pool of intangible development costs, even if that compensation is paid in the form of stock. Treas. Reg. §§ 1.482-7(d)(1)(iii), (d)(3); 1.482-7A(d)(2)(i). That "stock-based compensation rule" lies at the center of McKesson's challenge.[8]

### C. McKesson's refund claims.

In each of the tax years at issue, McKesson ("McKesson USA") and McKesson Financial Holdings Limited ("McKesson Ireland") entered agreements to share all costs to develop certain

---

[8] In the same rulemaking that Treasury first adopted the stock-based compensation rule, Treasury also provided rules regarding the identification, measurement, and timing of stock-based compensation. *See* Treas. Reg. § 1.482-7A(d)(2)(iii). When McKesson refers to the "stock-based compensation rule," however, we understand it to refer only to the rulemaking's frontline interpretation that stock-based compensation qualifies as a "cost incurred" to develop an intangible, and must therefore be in the pool of development costs. McKesson accurately recounts that rule's various locations within the regulations at D.E. 1 at 2–3 n.5.

intangibles. D.E. 1 ¶ 43. Each year, McKesson Ireland made cost sharing transaction payments to McKesson USA.[9] *Cf.* Treas. Reg. § 1.482-7(b)(1). It did so because McKesson USA incurred the majority of the costs to develop the intangibles, but the cost sharing arrangement provided that McKesson Ireland would enjoy broad rights to exploit (or license) the intangibles. Thus, under the cost sharing regulations, McKesson USA and McKesson Ireland used the best available method and, in at least one instance, initially determined that McKesson Ireland expected to benefit from the cost shared intangible at a share of 99 to 1. *E.g.*, Sample McKesson Cost-Sharing Agreement (App. Ex. 1), at USA APP000007. That meant McKesson Ireland was required to reimburse McKesson USA for approximately 99% of the costs in the arrangement's cost pool. For each deductible cost McKesson Ireland reimbursed with its cost sharing transaction payments, McKesson decreased the deduction it could take to offset other amounts of current taxable income. *Cf.* Treas. Reg. § 1.482-7(j)(3)(i).

The IRS examined the income tax returns of McKesson for the years at issue and, for each year, adjusted McKesson's income under § 482 because McKesson USA and McKesson Ireland failed to include amounts paid for stock-based compensation in their cost pools. *Cf.* D.E. 1 ¶¶ 45, 50, 60; Treas. Reg. § 1.482-7(i)(2)(i)(A) (authorizing allocation resulting from adjustment to cost pool). The parties' failure to include all costs meant their cost sharing arrangement did not reach an arm's length result, because each party's cost share did not equal each party's RAB share. *Cf.* Treas. Reg. § 1.482-7(a)(4). As a technical matter, McKesson was able to improperly avoid tax in the current years by taking deductions for the stock-based

---

[9] The parties took no discovery in this case, so we offer the McKesson-specific factual assertions in this paragraph on information and belief. These facts help to understand the practical impact of the regulations but are not material to Plaintiff's legal challenge to the stock-based compensation rule.

11

compensation expense that should have been reimbursed by McKesson Ireland. *Cf.* Treas. Reg. § 1.482-7(j)(3)(i).

Without the IRS's adjustment, by excluding a large chunk of the intangible development costs from the cost sharing arrangement, the wider McKesson unit would successfully manipulate its related-party transfers to improperly avoid U.S. tax. McKesson, as an economic unit, would allocate more of its present-day deductions to its U.S. operations (where they are more valuable, because the tax rate is higher) but the corresponding future income to its Irish subsidiary.[10] That potential for improper tax avoidance is why the regulations explain that a cost sharing arrangement only achieves an arm's length result if the cost share equals the RAB share. Treas. Reg. § 1.482-7(a)(4). McKesson cannot receive the benefit of U.S. deductions today if its agreements do not contemplate its receipt of a proportionate amount of U.S. benefit (and income) tomorrow.

McKesson does not argue stock-based compensation is not a "cost."[11] It does not suggest its cost sharing arrangements, with stock-based compensation excluded, reflect the economic

---

[10] At the time McKesson entered the relevant cost sharing arrangements, Irish law considered a company an Irish resident for tax purposes only if the company was managed and controlled in Ireland (whereas U.S. tax law generally turns on the location of incorporation). *See Offshore Profit Shifting and the U.S. Tax Code—Part 2 (Apple Inc.): Hearing Before the Subcomm. on Investigations of the S. Comm. on Homeland Sec. & Foreign Affs.*, 113th Cong. 3 (2013) (statement of Sen. Levin, Chairman, S. Subcomm. on Investigations). Ireland has since taken steps to "prevent 'stateless' companies." *See Ireland*, Int'l Transfer Pricing O.E.C.D. Guidelines ¶ 14.5 (2026).

[11] In its brief, McKesson references a three-decades-old debates over whether stock-based compensation even constitutes a cost for tax or accounting purposes. *See* D.E. 33 at 25–28. In doing so, McKesson suggests the question remains open. *See id.* But the appropriate treatment of stock-based compensation as a cost is well-settled. *See* FASB, *Statement of Financial Accounting Standards No. 123: Accounting for Stock-Based Compensation* (rev. 2004); *cf. Kampe v. Volta Inc.*, 2024 WL 308262, at *21 (N.D. Cal. Jan. 26, 2024) (discussing stock-based compensation as a cost for accounting purposes); *Altera Corp. v. Comm'r*, 941 F.3d 1200, 1203 (Mem.) (9th Cir. 2019) (op. dissenting to denial of en banc review) (describing stock-based

(continued...)

12

reality of the total costs McKesson USA incurred to develop its cost shared intangibles. Nor does it provide a non-tax, rational business reason for its U.S. subsidiary to cover more costs today with no expectation of more income tomorrow. In other words, to its credit, McKesson does not attempt to hide the ball: the tax avoidance is the point.

Instead, with some irony, McKesson believes it has found a loophole in Treasury's authority to prevent related parties from exploiting loopholes. McKesson contends that § 482 silently codifies a specific arm's length standard based exclusively on real-world, unrelated-party, comparable transactions. D.E. 33 at 35–41.[12] And, McKesson says, the available evidence suggests that when unrelated parties enter arrangements to jointly develop intangibles, they do not contract to compensate one another for costs of stock-based compensation. *Id.* at 41–44. From there, McKesson reasons that Treasury exceeded the bounds of Congress's delegation in § 482 by adopting a rule for stock-based compensation designed to promote an arm's length *result*, rather than a rule that mirrors unrelated parties' treatment of stock-based compensation specifically. *Id.* at 44–48. Alternatively, McKesson contends that even if § 482 delegates sufficiently broad authority to permit the rule, Treasury failed to adequately explain it as required under the Administrative Procedure Act. *Id.* at 48–52.

While the merits of the parties' arguments sound in the APA, this is a tax refund suit. McKesson asks the Court to "set aside" the stock-based compensation rule under 5 U.S.C.

---

compensation as a "type of cost" or "cost" on fifteen separate occasions); *see also Altera*, 926 F.3d at 1076 (describing stock-based compensation as a "cost-shared intangible[]" for tax purposes); *Altera Corp. v. Comm'r*, 145 T.C. 91, 123–24 (Tax Ct. 2015) (decision referencing "stock-based compensation costs" in its analysis). McKesson evidently recognized compensation is a cost even if it is paid in stock—if stock-based compensation were not a cost, McKesson could not have taken the § 162 deduction in the first place.

[12] If a document's internal pagination conflicts with the page number stamped by ECF, this brief uses the ECF page number.

§ 706(2), which, in the context of a tax refund suit, means McKesson's entitlement to its claimed tax refunds would be redetermined without regard to the set-aside rule. *E.g.*, *3M Co. v. Comm'r*, 154 F.4th 574, 584 (8th Cir. 2025) (remanding to the Tax Court to redetermine the taxes owed without vacating the challenged blocked-income regulation). Were the Court to side with McKesson on both the challenge to the stock-based compensation rule and the § 162 deduction, McKesson would be entitled to one—and only one—remedy: a monetary judgment for the requested tax refunds (with interest). *See Mann Constr., Inc. v. United States*, 86 F.4th 1159,1162–63 (6th Cir. 2023). In its complaint, McKesson appropriately includes no request for prospective vacatur of Treas. Reg. § 1.482-7A(d)(2) or any other regulation, or relief extending to any party beyond itself. *See* D.E. 1 at 29.

### III.    Argument.

In a tax refund suit, the taxpayer bears the burden to prove its entitlement to the refund. In its motion, McKesson contends it can meet that burden because the stock-based compensation rule should be set aside under 5 U.S.C. § 706. Even accepting McKesson's premise, the United States is entitled to summary judgment because: (A) the stock-based compensation rule falls within Treasury's authority under § 482; and (B) the rule is reasonable and reasonably explained. But, to be clear, McKesson's premise is wrong. To prove its entitlement to the refunds it seeks, McKesson *also* needs to show it was entitled to the § 162 deductions that lowered its tax liability in the first place. Thus, the Court could grant judgment for the United States without addressing the validity of the stock-based compensation rule at all, because: (C) McKesson is not entitled to deduct under § 162 the stock-based compensation it paid for the benefit of its Irish subsidiary.

### A. The stock-based compensation rule is within Treasury's authority under I.R.C. § 482.

McKesson first contends that Treasury exceeds its authority under § 482 by requiring related parties to include stock-based compensation when pooling costs to jointly develop intangibles. D.E. 33 at 35–48. To determine whether an agency exceeded its statutory authority, courts look to the "plain language" of the "statute under which the agency purports to act." *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023), *rev'd on other grounds*, *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025). When the authorizing statute includes an express delegation of discretionary authority, "the question is whether the Rule is within the outer boundaries of that delegation."[13] *Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 617 (5th Cir. 2024).

Treasury issued the stock-based compensation rule under the first sentence of § 482, which authorizes the IRS to adjust tax items between related parties if it determines an adjustment is "necessary in order to prevent evasion of taxes or clearly to reflect the income of" the related parties.[14] The rule requires related parties to include stock-based compensation in their cost pools to avoid § 482 adjustments related to cost sharing arrangements. In the rule's preamble, Treasury determined that a cost sharing arrangement must account for *all* relevant

---

[13] In its opening brief, McKesson improperly injects *Chenery* principles into its exceeds-authority challenge. *E.g.*, D.E. 33 at 14, 47–48 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). Whether Treasury exceeded its authority under § 482 requires this Court to exercise its independent judgment to determine the "best" reading of the statute, then determine whether the stock-based compensation rule fits within the statute's bounds. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). While the reasonableness of Treasury's decisionmaking must be judged only on the grounds Treasury invoked, the United States can defend Treasury's *authority* to have made that decision on any basis supported by law.

[14] Section 482 delegates authority to the Secretary. In Title 26, "the Secretary" means "the Secretary of the Treasury or his delegate." I.R.C. § 7701(a)(11)(B). The IRS exercises authority delegated by the Secretary when it adjusts tax items under § 482, as does Treasury when it promulgates the rules necessary for the IRS to do so. In this brief, we refer to either the IRS or Treasury as context requires.

15

costs, "including such critical elements of cost as the cost of compensating employees for providing services related to the development of the intangibles," for an arrangement to capture the "actual economic activity undertaken" by each party, and thus, ultimately to clearly reflect each participant's income. *See* Compensatory Stock Options Under Section 482, 68 Fed. Reg. 51,171, 51,172 (Aug. 26, 2003) [hereinafter "Final Rule"].

To put the two together: § 482 authorizes the IRS to adjust tax items between related parties when the Secretary determines such adjustment is necessary to reflect each party's true income. And when it adopted the stock-based compensation rule, Treasury determined (and explained) that the rule is necessary to ensure cost sharing arrangements do not allow related parties to distort their true incomes. In other words, with the adoption of the stock-based compensation rule, Treasury exercised its authority consistently with the first sentence's only express condition.

Yet McKesson claims the stock-based compensation rule exceeds Treasury's statutory authority under § 482 because the statute's first sentence contains another *implicit* condition—an arm's length standard dependent on a comparability analysis—which the stock-based compensation rule violates. McKesson's theory is wrong for four reasons. First, McKesson's central premise is wrong: § 482 does not implicitly require Treasury to use a particular method to determine whether allocations between related parties clearly reflect each party's income. The statute delegates broad authority to Treasury, subject only to the condition that related-party adjustments (and the rules to make such adjustments) be necessary to prevent tax evasion or clearly reflect income. *See Facebook*, 164 T.C. at 315. Second, while the regulations (not the statute) generally require application of an arm's length standard, those regulations clarify that the requirement refers to an arm's length *result*, not a specific comparability method. And the

16

(unchallenged) regulations further provide that in the context of a cost sharing arrangement, a transaction achieves an arm's length result only if each party's share of costs equals its share of reasonably anticipated benefits. So under the applicable method, evidence of unrelated parties' treatment of stock-based compensation is neither necessary nor relevant. Third, McKesson has no evidence of how unrelated parties would treat *comparable* stock-based compensation in a transaction *comparable* to a dash-seven cost sharing arrangement because unrelated parties would not rationally enter a contract like McKesson's cost sharing agreements, nor could unrelated parties use stock-based compensation issued by one company in the same way related parties use stock issued by both parties' parent corporation. And fourth, McKesson's argument was correctly rejected by the Ninth Circuit in *Altera Corp. v. Comm'r*, 926 F.3d 1061 (9th Cir. 2019).

### 1. The statute does not require Treasury to consider evidence of comparable unrelated transactions.

In § 482, Congress authorized the IRS to make all related-party adjustments "necessary in order to prevent evasion of taxes or clearly to reflect the income." I.R.C. § 482. With that delegation of adjudicatory authority, Congress necessarily authorized Treasury to prescribe the rules necessary for the IRS to exercise that authority in a fair and administrable way.[15] *Cf. Airlines for Am. v. Dep't of Transp.*, 127 F.4th 563, 573 (5th Cir. 2025), *vacated on other grounds*, 166 F.4th 487 (5th Cir. 2026) (en banc). Section 482's broad delegation dictates no

---

[15] Congress made clear it intended to empower Treasury to promulgate regulations under § 482 by expressly inviting Treasury to "explore the possibility of developing and promulgating regulations . . . which would provide additional guidelines and formulas for the allocation of income and deductions" under § 482. H.R. Rep. No. 87-1447, at 28 (1962); H.R. Rep. No. 87-2508, at 19 (1962) (Conf. Rep.). McKesson does not challenge the stock-based compensation rule on the basis that § 482 does not delegate rulemaking authority. *See also* I.R.C. § 7805(a) (authorizing the Secretary to "prescribe all needful rules and regulations for the enforcement of [Title 26]").

17

specific methodology the IRS must use to make related-party adjustments, instead leaving Treasury with flexibility to develop proper methods to achieve the statute's purpose. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (quoting *Michigan v. EPA*, 576 U.S. 743, 752 (2015)); *see also Facebook*, 164 T.C. at 318. Because the stock-based compensation rule is necessary to clearly reflect income or prevent tax evasion, the rule is "within the outer boundaries of [§ 482's] delegation," and does not exceed the scope of Treasury's authority. *Mayfield*, 117 F.4th at 617–18.

We start with the statute's text. *Cf. Sirius Sols., L.L.L.P. v. Comm'r*, 165 F.4th 374, 378 (5th Cir. 2026) ("The language in the Tax Code, just as in any statute, is to be given its ordinary meaning at the time of enactment." (internal quotations omitted)). Section 482 applies "[i]n any case of two or more organizations, trades, or businesses . . . owned or controlled directly or indirectly by the same interests." I.R.C. § 482. In other words, § 482 applies to any arrangement entered into by two or more related parties. The statute then directs that "the Secretary may distribute, apportion, or allocate gross income, deductions, credits or allowances between or among such organizations, trades, or businesses"—meaning the IRS can adjust tax items between the related parties—"if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." I.R.C. § 482. Those phrases comprise the entirety of the first sentence of § 482.

In sum, the first sentence of § 482 includes: (1) an express delegation of authority—the IRS can adjust tax items between related parties (and Treasury can issue the rules the IRS will use), and (2) a condition—Treasury or the IRS must determine the adjustment (or rule) is necessary to prevent tax evasion or clearly reflect income. Nothing in the first sentence

18

prescribes a specific method or limits how the IRS must adjust items to prevent tax evasion or clearly reflect income. *See Facebook*, 164 T.C. at 318 ("Section 482 does not contain the words 'arm's length'; rather, its focus is on clear reflecting of income and preventing tax evasion in controlled transactions.").

McKesson argues the Court should ignore the plain and unambiguous text of § 482 because—even though the statute does not say it—the statute "has been uniformly understood to embody a simple rule: when controlled parties engage in a transaction, to 'clearly reflect the income' of such controlled parties, their income and expenses should be allocated in the same way that they would have been allocated between parties dealing at arm's length." D.E. 33 at 35. And through its brief, McKesson adds another unwritten addendum to that rule, assuming that Treasury can satisfy the arm's length standard only with "evidence of what parties operating at arm's length would do under similar circumstances." D.E. 33 at 39.

But the statute says neither. So even if McKesson's representation were true, it would not justify disregard of "clear statutory language." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). Statutory interpretation precedents emphasize that "extratextual sources" should never be permitted to overcome plain text. *E.g.*, *McGirt v. Oklahoma*, 591 U.S. 894, 916 (2020). If Congress intended to codify an arm's length standard—or severely limit Treasury's ability to satisfy that standard—it would have said so explicitly. *Cf. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020).

Regardless, McKesson misidentifies both the source and contours of the "arm's length standard." To be clear, the Government does not dispute that *an* arm's length standard provides a transfer pricing cornerstone. Nor does the Government dispute that Treasury has consistently understood Congress's purpose in § 482 to be to "place[] a controlled taxpayer on a tax parity

19

with an uncontrolled taxpayer." Treas. Reg. § 1.482-1(a)(1); *cf.* AR 14245–26 (House Report explaining that the purpose of related-party adjustments is to "prevent evasion (by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of 'milking')"). But "tax parity" refers to the ultimate, aggregate tax consequences of a transaction, not parity across each specific term within that transaction. *Cf. Comm'r v. First Sec. Bank of Utah, N.A.*, 405 U.S. 394, 400–01 (1972) (defining the relevant question under § 482 as "whether there was a shifting or distorting of the Banks' true net income"). That is why, under the current regulations, § 482 adjustments appropriately aim to align the tax result of a related-party transaction with the tax result that would have occurred if the same transaction were entered into by unrelated parties. *See* Treas. Reg. § 1.482-1(b)(1). Thus, since at least 1994, when Treasury has referred to an arm's length standard, it refers to an arm's length *result*. *See* Treas. Reg. § 1.482-1(b)(1). And the Government agrees *that* version of the arm's length standard has endured from Congress's first adoption of a § 482-type provision to the present. *See* Avi-Yonah, *Rise and Fall*, 15 Va. Tax. Rev. at 91.

McKesson, however, invokes an outdated understanding of the arm's length standard. For much of the twentieth century, when the international economy was fundamentally different, Treasury regulations prescribed the application of a narrower arm's length standard, which "refer[red] to *methods* of determining transfer prices by using comparables." *Id.* at 94; *see also A Study of Intercompany Pricing Under Section 482 of the Code*, Notice 88-123, 1988 WL 561206, at *5–7 (1988) (AR 14285–87) [hereinafter "IRS White Paper"]. For that reason, much of transfer pricing law developed around concepts of comparability, with particular focus on CUTs (comparable unrelated transactions). The theory is that using all the same *terms* as a transaction between unrelated parties will generally achieve the *result* of an unrelated party transaction.

20

While the theory is generally accurate, time and experience revealed that CUT methods are not inherently necessary to achieve tax parity between related parties and unrelated parties for all transactions. *Coca-Cola Co. v. Comm'r*, 155 T.C. 145, 213 (2020) (discussing difficulty of finding comparable transactions when transaction involves intangible property); *Medtronic, Inc. v. Comm'r*, 153 F.4th 682, 690 (8th Cir. 2025) (rejecting use of comparables as best method for valuing royalty rate associated with intangibles). In fact, in some circumstances, a focus on comparables *prevents* a result that clearly reflects income. *E.g.*, *Medtronic*, 153 F.4th at 690. Thus, the regulations—which have always been the source of the "arm's length standard," *see* Avi-Yonah, *Rise and Fall*, 15 Va. Tax. Rev. at 97–100—shifted the focus from comparability in terms to comparability in result, *see Altera*, 926 F.3d. at 1071 (explaining that the 1994 and 1995 regulations "defined the arm's length standard as result-oriented, meaning that the goal is parity in *taxable income* rather than parity in the method of allocation itself" (emphasis in original)).

Treasury could evolve from the original arm's length method to an arm's length result standard because Congress never codified either, opting instead for a broad delegation to Treasury. *See* Brian D. Lepard, *Is the United States Obligated to Drive on the Right? A Multidisciplinary Inquiry in the Normative Authority of Contemporary International Law Using the Arm's Length Standard as a Case Study*, 10 Duke J. of Compar. & Int'l L. 43, 119 (1999) (discussing historical sources that suggest Congress left § 482 intentionally vague to preserve flexibility). But McKesson suggests Congress implicitly codified the original arm's length method through some combination of statutory construction canon and doctrine. *See* D.E. 33 at 38–39 n.8. Congress foreclosed McKesson's misreading of § 482's first sentence with the adoption of its second sentence in 1986.

21

The second sentence instructs that when Treasury adjusts tax items resulting from a transfer or license of intangible property, "the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." I.R.C. § 482. Thus, when Treasury adjusts tax items in the case of a transfer or license of intangible property, the statute requires Treasury to apply a commensurate-with-income standard, which generally means the transfer price should be reviewed with an eye toward the income that actually resulted.

The plain text of the second sentence confirms that when Congress intends to require a particular method, it knows how to say so. When it comes to transfers of intangibles, Congress clarified that the IRS cannot adjust tax items using any method that clearly reflects income—the IRS *must* use a method that complies with the commensurate-with-income standard, which means the method must account for the actual profit attributable to the intangible. *See Facebook*, 164 T.C. at 318 (explaining that the second sentence "requires compensation commensurate with the income earned in the transaction at issue, not what unrelated parties operating at arm's length might have agreed"); IRS White Paper, 1988 WL 561206, at *26 (1988) (AR 14322–23). If Congress intended the first sentence to place a similar emphasis on comparability for all other transactions, it would have said so.

To summarize: on its face, the first sentence of § 482 does not expressly cabin the IRS's authority to make adjustments (or Treasury's authority to issue rules) to circumstances in which the IRS (or Treasury) can prove unrelated parties would have agreed to different terms in comparable circumstances. Instead, the statute provides an aim—clear reflection of income—and delegates authority to Treasury and the IRS to develop and apply methods to achieve that aim. To argue that the statute implicitly imposes the limitation it imagines, McKesson offers string cites of cases that emphasize the applicability of an arm's length standard based on comparables,

22

as if those cases prove that the *statute* requires application of an arm's length standard based on comparables. But the logic does not work—those cases imply nothing about the statute, because they were decided under regulations, which, until the end of last century, required application of an arm's length standard based on comparables. Finally, in adopting a second sentence that, on *its* face, requires Treasury and the IRS to apply a standard not dependent on comparables, Congress foreclosed any misapplication of the prior-construction canon or related concepts.

In other words, the Court need look no further than the plain text of sentence one—informed, if necessary, by the plain text of sentence two—to resolve McKesson's exceeds-authority challenge. "[I]f Congress wished to [codify a CUT requirement], it could have easily written the [statute] to do so." *Sirius Sols, L.L.L.P. v. Comm'r*, 165 F.4th 374, 382 (5th Cir. 2026). Instead, Congress intentionally (and repeatedly) declined to prescribe any particular transfer pricing method, delegating authority to Treasury to implement and apply the specific rules necessary to achieve Congress's broad goals. *See* Lepard, *Is the United States Obligated to Drive on the Right?*, 10 Duke J. of Compar. & Int'l L. at 119. But were the Court willing to look beyond the statute's plain text (as McKesson asks it to do), the legislative history behind the second sentence would remove any remaining doubt as to whether Congress intended the first sentence to require comparison to a CUT in every case.

The legislative history reveals that the impetus for the addition of the second sentence was Congress's frustration that courts had been over-relying on comparability analyses, which, Congress said, prevented § 482 from "operating to assure adequate allocations to the U.S. taxable entity of income attributable to intangibles." 1985 House Report at 423–26; *see also Altera*, 926 F.3d at 1070; IRS White Paper, 1988 WL 561206, at *26 (1988) (AR 14322) ("Congress determined that the existing regime, which depends heavily upon the use of

23

comparables and provides little clear guidance in the absence of comparables, was not in all cases achieving the statutory goal of reflecting the true taxable income of related parties."). If, as McKesson contends, Congress always intended the first sentence of § 482 to require comparability analyses, then court decisions insisting on comparable unrelated transactions would further the statute's purpose, not frustrate it.

And lest one think Congress enacted the second sentence to carve intangible transfers out of a rule that otherwise implicitly required a comparability analysis in every case, Congress expressly clarified that it was not concerned only with application of CUT-based methods to transactions involving intangibles. *See* 1985 House Report at 423–26. It explained that even though its statutory modification was limited to the transfers of intangibles, its concern extended to all the circumstances in which the courts were unduly emphasizing "the concept of comparables," including "in situations involving highly standardized commodities or services." *Id.* 424. In fact, it suggested that CUT-based methods may have a fundamental problem because "the relationship between related parties is different from that of unrelated parties."[16] *Id.* at 424. This is not a circumstance in which Congress's intent is difficult to divine—Congress did not intend to require the one transfer pricing method it has expressly criticized.

To be clear, Treasury asks for no deference, just the best reading of the statute. Under the best reading of § 482's first sentence, the IRS can adjust tax items between related parties as necessary to prevent tax evasion or clearly reflect income (and Treasury can promulgate rules to govern those adjustments). And Treasury reasonably determined that for a cost sharing

---

[16] Treasury declined Congress's invitation to abandon comparables altogether, but tightened the comparability criteria, particularly in the intangible property context. *See* Treas. Reg. § 1.482-4(c); Michael McDonald, *Moving Beyond the IRS's Pyrrhic Victory on CWI*, TaxNotes 6 (https://perma.cc/5WLR-EPVX) (describing the changes Treasury made to the regulations to address Congress's overarching concerns with comparability analyses).

arrangement to clearly reflect income, the parties must pool all costs related to intangible development, including costs for stock-based compensation. Thus, the stock-based compensation rule is within § 482's express delegation, and Treasury did not exceed its statutory authority.

As the first sentence of § 482 does not *require* application of a CUT-based method in *any* case, the Court need not decide whether a dash-seven cost sharing arrangement qualifies under the second sentence as a transfer or license of an intangible. To be clear, it does. The commensurate with income requirement applies to "*any* transfer (or license) of intangible property." I.R.C. § 482 (emphasis added). When parties enter into a cost sharing arrangement, "they are *transferring* future distribution rights to intangibles, albeit intangibles that have yet to be developed." *Altera,* 926 F.3d at 1076 (emphasis in original); *see also id.* ("The right to distribute intangibles to be developed later is, itself, one right in the bundle of property rights that exists at the time that parties enter into a [cost sharing arrangement]."). And, again, Congress offered helpful insight into its intent. In adopting the second sentence, Congress expressly stated its expectation that cost sharing arrangements would be subject to the commensurate-with-income standard. H.R. Rep. No. 99-841, vol. II, at 637 (1986) (Conf. Rep.) [hereinafter "1986 House Report"].

On one side, the Government has the second sentence's broad language and Congress's plainly expressed intent. On the other, McKesson offers no persuasive explanation why Congress would require application of the commensurate-with-income standard where income is shifted from the United States through a sale or license of an income-producing intangible but not if the income is shifted as a result of a dash-seven cost sharing arrangement. Indeed, the reasons Congress adopted the standard for the former—the lack of true CUTs and unpredictability in profit potential—applies with equal (if not greater) force to the latter.

25

So even if the first sentence of § 482 otherwise required comparison to CUTs (which it does not), cost sharing arrangements are governed by the second sentence, which unquestionably does not require such consideration. And as explained below, the stock-based compensation rule is necessary to produce an outcome in which tax items resulting from the arrangement correspond to the economic benefits that each participant will ultimately enjoy. Thus, while the Court does not need to reach sentence two to reject McKesson's exceeds-authority challenge, it would independently justify the challenged rule.

### 2. Treasury regulations require application of an arm's length standard, but not a particular methodology.

McKesson argues only that the stock-based compensation rule violates the narrow arm's length method it contends is implicit in the statute, not the arm's length standard expressly required by the regulations. To be clear, the stock-based compensation rule does not conflict with the latter, either. The regulations require application of a transfer pricing method that achieves an arm's length *result*, which is a result that clearly reflects income. Treas. Reg. § 1.482-1(b)(1). Cost sharing arrangements achieve an arm's length result only if each participant's cost share equals its RAB share (assuming all other dash-seven requirements are met). Treas. Reg. § 1.482-7(a)(4). That standard requires no analysis of comparable unrelated transactions, only consideration of cost share to RAB share. Thus, the stock-based compensation rule is consistent with existing Treasury regulations, regardless of whether Treasury had evidence of unrelated parties' approach to stock-based compensation in comparable circumstances.

To start, as explained above, the regulations require application of the arm's length standard in every case. Treas. Reg. § 1.482-1(b)(1). The arm's length standard is satisfied "if the results of the transaction are consistent with the results that would have been realized if

26

uncontrolled taxpayers had engaged in the same transaction under the same circumstances" ("arm's length result"). *Id.*

The regulations clarify that no one methodology always achieves an arm's length result. Treas. Reg. § 1.482-1(c)(1); IRS White Paper, 1988 WL 561206, at *5 (1988) (AR 14282) ("The regulations set forth the arm's length standard as the fundamental principle underlying section 482 . . . They did not, however, mandate the use of any particular allocation method."). In general, parties must use whichever methodology produces the "most reliable measure" of an arm's length result "under the facts and circumstances." Treas. Reg. § 1.482-1(c)(1).

McKesson emphasizes the regulation that provides "general principles applicable in determining arm's length results," Treas. Reg. § 1.482-1(b)(2)(i), which explains that "whether a transaction produces an arm's length result *generally* will be determined by reference to the results of comparable transactions under comparable circumstances." Treas. Reg. § 1.482-1(b)(1) (emphasis added). McKesson cites that regulation to support its statement that the regulations are "largely dedicated to prescribing guidance for comparability analysis." So, McKesson argues, the regulation's recognition of the general usefulness of comparables *requires* analysis of comparables in *every* situation.[17] *Cf.* D.E. 33 at 39–40. But a "general" rule does not control in every instance. Indeed, a general rule must yield to a more specific provision. *Cf. Edmond v. United States*, 520 U.S. 651, 657 (1991).

---

[17] The regulations disprove McKesson's thesis as to cost sharing arrangements, as explained below. But even where the arm's length result is determined by reference to the results of comparable transactions under comparable circumstances, specific "evidence of what unrelated parties *do* in comparable circumstances" is not always required. *Cf.* D.E. 33 at 40 (emphasis added). Arm's-length review focuses on "the result achieved rather than the method the taxpayer used to determine its prices." Treas. Reg. § 1.482-1(f)(2)(v).

Such is the case here. Section 1.482-1(b)(1) provides a *general* rule to determine true taxable income under § 482. And Treas. Reg. § 1.482-7 provides a *specific* rule applicable to cost sharing arrangements. Treas. Reg. § 1.482-1(b)(2)(i). Each regulation confirms that the specific provisions in Treas. Reg. § 1.482-7 govern over the general rule in Treas. Reg. § 1.482-1(b)(1). *See* Treas. Reg. § 1.482-1(b)(2)(i) (stating that the dash-seven regulation provides specific methods to determine arm's length result for cost sharing arrangements); Treas. Reg. § 1.482-7(a) (explaining that the provisions of § 1.482-1 apply, "except as those provisions are modified" in the dash-seven regulation). And under Treas. Reg. § 1.482-7(a)(4)'s specific rule, a cost sharing arrangement "produces results that are consistent with an arm's length result . . . if, and only if," each party's share of intangible development costs equals its share of reasonably anticipated benefits.[18] *See Facebook*, 164 T.C. at 248.

The stock-based compensation rule is necessary for cost sharing arrangements under Treas. Reg. § 1.482-7 to achieve an arm's length result because if the cost pool does not include all costs, then the share of costs the stock-paying party *actually* bears will exceed its share of reasonably anticipated benefit. *See* Final Rule at 51,172. The (unchallenged) dash-seven regulation requires equality between cost and benefit to effectuate Congress's intent. *See* Final Rule at 51,172. As noted above, when it amended § 482 to add the second sentence, Congress instructed that cost sharing arrangements should be subject to the commensurate-with-income standard, *see* 1986 House Report at 637, which, Congress explained, means income resulting from such arrangements must be allocated to "reasonably reflect the actual economic activity

---

[18] The cost-to-benefit ratio must also account for all platform contributions, *see* Treas. Reg. § 1.482-7(c), and all other requirements of the regulation must be satisfied, *e.g.*, Treas. Reg. § 1.482-7(b)(1) (substantive requirements); Treas. Reg. § 1.482-7(k) (administrative requirements).

undertaken by each," *id.* at 638. In its regulation, Treasury thus used "costs incurred by each controlled participant with respect to the intangible development as a proxy for actual economic activity undertaken." Final Rule at 51,172.

And stock-based compensation is a cost incurred with respect to the intangible development. *Id.* As Treasury explained:

> In order for the costs incurred by a participant to reasonably reflect its actual economic activity, the costs must be determined on a comprehensive basis. Therefore, in order for a [cost sharing arrangement] to reach an arm's length result consistent with legislative intent, the [cost sharing arrangement] must reflect all relevant costs, including such critical elements of cost as the cost of compensating employees for providing services related to the development of the intangibles pursuant to the [cost sharing arrangement]. Treasury and the IRS do not believe there is any basis for distinguishing between stock-based compensation and other forms of compensation in this context.

*Id.* Thus, the stock-based compensation rule is consistent with the arm's length *result* standard in Treas. Reg. § 1.482-1(b)(1).

### 3. There are no comparable unrelated transactions because, as relevant to the challenged rule, unrelated transactions are fundamentally not comparable.

As explained above, when Treasury issued the stock-based compensation rule, nothing in the text of § 482 (or the relevant Treasury regulations) required Treasury to analyze whether unrelated parties typically share stock-based compensation costs in comparable circumstances. Because that analysis is not a statutory requirement, McKesson's exceeds-authority challenge fails. But even if the statute or regulations could be read to require analysis of CUTs, that requirement could only possibly apply to the extent truly *comparable* unrelated transactions exist. Here, the challenged rule applies when one (or more) of the parties to a dash-seven cost sharing arrangement compensates employees with the stock of the parties' parent corporation.

Unrelated parties would never find themselves in a sufficiently comparable situation for at least two reasons.

First, transactions comparable to a dash-seven cost sharing arrangement—at least when the cost-shared intangible has significant profit potential (as is true for McKesson)—"simply do not occur in normal business settings." *Facebook*, 164 at 246. A dash-seven cost sharing arrangement "confers development rights that unrelated parties wouldn't relinquish, allocates development costs with a method unrelated parties wouldn't use, and often involves cash-box participants that would never be viable partners in a joint development project." Ryan Finley, *In McKesson, the 'Divided' Altera Court Is Ancient History, Part 2*, TaxNotes Int'l 1 (https://perma.cc/4Z7Q-CV35). As Treasury has explained, "superficially similar arrangements . . . typically involve a materially different division of costs, risks, and benefits." *See* Section 482: Methods to Determine Taxable Income in Connection With a Cost Sharing Arrangement, 70 Fed. Reg. 51,116, 51,117 (proposed Aug. 29, 2005). When unrelated parties enter arrangements to co-develop intangibles, those ventures typically "contemplate joint, rather than separate, exploitation of results, or may tie the division of actual results to the magnitude of each party's contributions." *Id.* Additionally, co-development projects typically require sharing of informational products, such as research data, source code, technical know-how, trade secrets, and other proprietary information, which rarely makes sense for unrelated parties. *Sourcing*, 26 Va. Tax. Rev. at 645–47.

Second, in the context of stock-based compensation, related parties and unrelated parties are fundamentally not comparable because of substantial differences in risk. *Cf.* Treas. Reg. § 1.482-1(c)(2)(ii)(c) (emphasizing risk as a key factor in analyzing comparability). A company has some control of the price of its own stock: it can alter management practices, employ

30

"earnings management techniques," and set terms of options or stock grants. Tyler Johnson, Note, *Nobody's Stock Compares to Your Own: How Treasury Can Revive Stock Compensation in Cost-Sharing Agreements*, 111 Nw. Univ. L. Rev. 793, 823–25 (2017). But a company has no meaningful way to affect the stock price of an unrelated company. *Id.* One arm's length party would not rationally agree to reimburse a cost the other party can manipulate. *See* AR 14544 (comment explaining that unrelated parties would not share stock-based compensation costs because the value of stock-based compensation is speculative, potentially large, and completely outside the control of the parties). In contrast, neither McKesson USA nor McKesson Ireland has the motive to manipulate the price of McKesson stock, because all costs are ultimately borne by the McKesson economic unit.

In other words, even if McKesson's statutory argument were right, Treasury still would not have exceeded its authority under § 482 with the stock-based compensation rule. Treasury could be required to review CUT evidence only to the extent true comparables exist, and the nature of cost sharing arrangements generally and stock-based compensation specifically preclude true CUTs. And so even if the statute or regulations limited Treasury's ability to disregard evidence of comparable transactions to the extent such evidence is available (which they do not), McKesson's challenge would still fail.

### 4. In *Altera*, the Ninth Circuit recognized correctly that § 482 permits Treasury to require sharing of stock-based compensation costs, and its holding has been confirmed in cases after *Loper Bright*.

Finally, in *Altera*, the Ninth Circuit addressed a similar challenge to the stock-based compensation rule's requirement that participants in dash-seven cost-sharing arrangements share stock-based compensation costs. 926 F.3d 1061. The court upheld the stock-based compensation rule, concluding that Treasury reasonably determined that including stock-based compensation costs in the cost-sharing pool was necessary to clearly reflect income consistent with § 482. *Id.*

31

As the Ninth Circuit explained, Congress amended § 482 "to ensure that income follows economic activity," and, in the context of transfers of intangible property, required a "purely internal" standard reflecting the economic contributions of the controlled parties themselves. *Id*. at 1077 (citing 1986 House Report at 638). Consistent with that objective, the court recognized that comparable transactions did "not provide helpful guidance regarding allocations of employee stock compensation" because of "the difficulties associated with finding and using data involving high-profit intangibles" and employee stock compensation for unrelated companies. *Id*. (citing 1985 House Report at 425). And so, it made sense for "Congress [to grant] Treasury authority to develop methods that did not rely on analysis of these problematic comparable transactions." *Id*. In rejecting the taxpayer's argument that there can only be one methodology for the arm's length standard, the Ninth Circuit explained that the definition of arm's length standard had historically been "fluid" and "explicitly permitted" the "use of flexible methodology in order to achieve an arm's length result." *Id*. at 1078. Thus, the court held that § 482 authorized Treasury to require "internal allocation methods" to ensure costs and income were "proportionate to the economic activity of the related parties." *Id*.

McKesson claims that the Ninth Circuit was able to reach its holding in *Altera* only "by giving undue deference to the IRS's regulatory maneuver." D.E. 33 at 2. Not so. To be sure, *Chevron* was binding Supreme Court precedent when *Altera* was decided, and the *Altera* panel framed its decision using the nomenclature of the then-binding precedent. *Altera*, 926 F.3d at 1075–78 (applying *Chevron U.S.A. Inc. v. Natural Res. Def. Council Inc.*, 467 U.S. 837 (1984)). But the court repeatedly emphasized the role of the statutory text, described the stock-based compensation rule as "necessary for Treasury to fulfill its obligation under § 482," and observed that that "the rise in employee stock compensation is an economic development that Treasury

32

cannot ignore without rejecting its obligations under § 482." *Id.* at 1086, 1087. Under § 482, the IRS must make adjustments to clearly reflect income (or prevent tax evasion). Those words unambiguously do not codify or restrict the IRS to a single transfer pricing method. *Cf.* Ryan Finley, *In McKesson, the 'Divided' Altera Court Is Ancient History, Part 2*, TaxNotes Int'l 2 (https://perma.cc/4Z7Q-CV35) ("If section 482 remains shackled to transactional comparables, then the statute has the unique property of being impervious to legislative amendment.").

The Supreme Court's decision in *Loper Bright* does not change this analysis. If anything, *Loper Bright* strengthens the Government's position by reaffirming Congress's ability to delegate discretionary authority to an agency using "a term of phrase that 'leaves agencies with flexibility.'" 603 U.S. at 395. Here, Congress made such an express delegation in § 482, directing the IRS to adjust income and deductions based on its determination of whether such adjustments are necessary to "clearly reflect the income" of commonly owned taxpayers. *See* Finley, *Part 2*, TaxNotes Int'l 6 ("If the statute imposes an affirmative obligation on Treasury and the IRS to issue the regulations, *Chevron* deference clearly wasn't necessary to uphold them.") And the *Altera* court rejected the taxpayer's statutory interpretation argument that Treasury must use a comparability analysis to meet the arm's length standard, holding that "the text of the statute does not limit its application to preexisting intangibles in the way Altera's argument suggests," and the taxpayer's "narrow reading of § 482 is not supported by the text or history of the 1986 amendment." *Altera*, 926 F.3d at 1076, 1079.

The legislative history is further confirmation that the Government's interpretation of the text is correct. *See Loper Bright*, 603 U.S. at 403 (holding courts still use the "traditional tools of statutory construction" to determine a statute's meaning, and drawing on the legislative history

33

of the APA). The House Ways and Means Committee Report clarifies that the amendment of

§ 482 was designed to depart from a comparables-centric approach:

> Certain judicial interpretations of section 482 suggest that pricing arrangements between unrelated parties for items of the same apparent general category as those involved in the related party transfer may in some circumstances be considered a "safe harbor" for related party pricing arrangements. . . . While the committee is concerned that such decisions may unduly emphasize the concept of comparables even in situations involving highly standardized commodities or services, it believes that such an approach is sufficiently troublesome where transfers of intangibles are concerned that a statutory modification to the intercompany pricing rules regarding transfers of intangibles is necessary.

1985 House Report at 424.

Because the Ninth Circuit reached its decision in *Altera* using its full "interpretive toolkit to analyze the meaning of the statute"—rather than merely deferring to the Government's interpretation—the decision continues to hold persuasive value. *See Facebook,* 164 T.C. at 314 n.118.

Nor is *Altera* the "aberrational" decision that McKesson portrays it to be. *Cf.* D.E. 33 at 15. Following *Altera*, multiple courts have confirmed that it is untenable to read § 482 as requiring a comparables-based analysis in every circumstance to meet the arm's length standard. In *Facebook*, the Tax Court recently held that "nothing in the text of section 482 bars Treasury from prescribing what arm's length means when no comparable transactions can be identified." 164 T.C. at 318. Indeed, the Court held the amendment to § 482 moved "the statute away from, not toward, an arm's length standard" based on comparables, and "requires compensation commensurate with the income earned in the transaction at issue, not what unrelated parties operating at arm's length might have agreed." *Id*. (internal quotations omitted).

The Eighth Circuit's holding in *Medtronic* similarly shows that § 482 does not mandate the use of a comparable uncontrolled transaction method—a holding that would be impossible

34

under McKesson's interpretation of § 482. 153 F.4th at 686. In evaluating whether a controlled transfer of intangible property meets the arm's length standard, the court found "the transaction must be evaluated under the best method—that is, the method that, under the facts and circumstances, provides the most reliable measure of an arm's length result." *Id*. (citing Treas. Reg. §§ 1.482-4(a), 1.482-1(c)(1) (internal quotations omitted)). Similarly, in *Coca-Cola*, the Tax Court determined comparable profits method was more reliable than "direct valuation" of taxpayer's core intangible property using comparable uncontrolled transaction method. 155 T.C. at 218. The Tax Court noted that it is inherently difficult for any party to reliably estimate profits attributable to the unique, high-profit-potential intangible property, because such intangibles "derive their high value from their ability to exclude comparable external transactions." *Id*. Thus, contrary to McKesson's argument, the use of uncontrolled transactions cannot be the only valuation method allowed to meet the arm's length standard under § 482.

### B. On its merits, the stock-based compensation rule is valid because it is the product of reasoned decision making.

McKesson's procedural challenges to the stock-based compensation rule are also unavailing.[19] The Court must uphold the stock-based compensation rule unless it finds it "arbitrary, capricious, or an abuse of discretion." 5 U.S.C. § 706(2). Agency action can be set aside only if it "fails to account for relevant factors or evinces a clear error of judgment." *Shenzhen Youme Info. Tech. Co. v. FDA*, 147 F.4th 502, 509 (5th Cir. 2025). The Court's role is to "ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus*

---

[19] All civil actions against the United States are barred unless "filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). While the United States does not concede that McKesson's challenge to the procedural validity of the stock-based compensation rule is timely, the United States is not advancing that argument as a defense in this case.

*Radio Project*, 592 U.S. at 423. Thus, courts should ensure the agency "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021). But "the scope of review is narrow," and courts "must exercise appropriate deference to agency decisionmaking." *Shenzhen Youme Info. Tech. Co.*, 147 F.4th at 509.

McKesson argues the stock-based compensation rule is arbitrary and capricious because Treasury: "(1) reached an irrational, unfounded conclusion regarding arm's-length conduct; (2) rejected the contrary evidence provided by commenters in the absence of any factual basis for its own view; and (3) failed to respond to significant comments." D.E. 33 at 48.

Each of these supposed defects presumes Treasury was required to examine unrelated parties' treatment of stock-based compensation. As explained above, however, consistent with Congress's intent, cost sharing arrangements are analyzed without regard to (purportedly) comparable unrelated transactions. Thus, Treasury's hypotheses about unrelated parties— reasonable or not—are immaterial. *Cf. Huawei Techs.*, 2 F.4th at 452 (holding agencies must consider "relevant and significant" comments). And Treasury was not required to respond to comments (and thus analyze the commentor's evidence) premised on a misbelief that unrelated parties' treatment of stock-based compensation would be relevant to Treasury's reasoning. *Id*.

All that matters is that the stock-based compensation rule is reasonable and reasonably explained. *Prometheus Radio Project*, 592 U.S. at 423. First, the stock-based compensation rule is reasonable. The unchallenged dash-seven regulations require cost sharing arrangements to share *all* costs in proportion to each participant's share of reasonably anticipated benefits. *See* Final Rule at 51,172. And as Treasury explained when it adopted the stock-based compensation rule, employee compensation is a cost to develop a shared intangible, no matter if the

36

compensation is paid in stock or dollars. *See id.* ("Treasury and the IRS do not believe that there is any basis for distinguishing between stock-based compensation and other forms of compensation in this context."); *see also Comm'r v. Lo Bue*, 351 U.S. 243, 247 (1956) ("When assets are transferred by an employer to an employee to secure better services they are plainly compensation. It makes no difference that the compensation is paid in stock rather than in money."); *Sourcing*, 26 Va. Tax Rev. at 677 ("Employee stock ownership compensation is an integral part of payroll. As such, if one is to determine where the true value of the R&D has been generated, it should be included in the CSRs' cost calculations."). Thus, because stock-based compensation is a cost and the regulations require all costs to be pooled to achieve an arm's length result, it was reasonable for Treasury to conclude stock-based compensation must be included in cost sharing arrangements' cost pools. *See Altera*, 926 F.3d at 1082.

Second, the stock-based compensation rule is reasonably explained. The preamble explains that Congress intended that cost sharing arrangements should be respected "if and to the extent that the participants' shares of income 'reasonably reflect the actual economic activity undertaken by each.'" Final Rule at 51,172 (citing 1986 House Report at 638). And it explains that the dash-seven regulations implement that intent "by using costs incurred by each controlled participant with respect to the intangible development as a proxy for actual economic activity undertaken by each, and by requiring each controlled participant to share these costs in proportion to its anticipated economic benefit from intangibles developed pursuant to the arrangement." *Id.* Treasury thus reasonably explained it was performing an analysis that does not require consideration of transactions between unrelated parties. Therefore, comments invoking treatment of stock-based compensation by unrelated parties were not significant and did not

37

require a response. *See Altera*, 926 F.3d at 1082 (holding that comments citing transactions between unrelated parties were not significant for the stock-based compensation rule).

To be sure, Treasury then went on to make assertions about what unrelated parties would do in similar circumstances. *E.g.*, Final Rule at 51,173 ("Parties dealing at arm's length in such an arrangement based on the sharing of costs and benefits generally would not distinguish between stock-based compensation and other forms of compensation."). In the previous challenge to the stock-based compensation rule, the Tax Court centered its criticisms on those contentions (and Treasury's lack of evidence to support them). *Altera Corp v. Comm'r*, 145 T.C. 91, 123–31 (2015), *rev'd*, 926 F.3d 1061 (9th Cir. 2019). But the Tax Court's focus on Treasury's conjecture was misplaced because the extraneous statements were not material to the explanation that actually mattered. As the Ninth Circuit explained in reversing the Tax Court, Treasury made the "decision to do away with analysis of comparable transactions in the first place." 926 F.3d at 1082. Thus, the question is whether that decision was reasonable. And the Ninth Circuit found it was because it implemented Congress's intent. *Id.* at 1082.

A Court should uphold a "decision [of] less than ideal clarity… if the agency's path may reasonably be discerned." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004); *accord Clean Water Action v. U.S. EPA*, 936 F.3d 308, 312 (5th Cir. 2019). When it first adopted the stock-based compensation rule, Treasury explained its understanding that Congress intended for cost sharing arrangements to be respected only if shares of income reasonably reflect each party's actual economic activity. Final Rule at 51,172. And that inquiry places no relevance on purportedly comparable unrelated transactions. Thus, Treasury's rationale is reasonably discernable from the administrative record and survives the APA's "narrow and highly deferential standard of review," *Huawei Techs.*, 2 F.4th at 449.

38

### C. At all events, McKesson is not entitled to a § 162 deduction for the stock-based compensation paid to benefit its foreign subsidiary.

For the reasons explained above, the stock-based compensation rule is valid. But the Court need not address the validity of the stock-based compensation rule to resolve this case. As with all refund suits, the Court will determine McKesson's entitlement to its claimed tax refund de novo. *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932). In defending a tax refund suit, the Government is not limited to the reasons the IRS gave in its notice of disallowance and can rely on new grounds. *Lockheed Martin Corp. v. United States,* 39 Fed. Cl. 197, 204 (1997).

Here, the United States asserts as an affirmative defense that McKesson's deduction for stock-based compensation paid for the benefit of its foreign subsidiary is not deductible under § 162(a). *See* D.E. 21 at 13 ("Second Affirmative Defense").[20] And because income tax deductions are a matter of legislative grace, "the burden of clearly showing the right to the claimed [§ 162] deduction is on" McKesson. *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992). McKesson cannot meet this burden. Indeed, McKesson effectively concedes this point by failing to address the United States' § 162 defense in its opening brief.

### 1. Under I.R.C. § 162(a), business expenses must directly and proximately benefit the taxpayer, not another entity.

Section 162(a) allows a business to deduct the "ordinary and necessary" costs of doing its business. An expense is "necessary" if it is "appropriate and helpful" to the business. *Comm'r v. Heininger*, 320 U.S. 467, 471 (1943); *Tulia Feedlot, Inc. v. United States*, 513 F.2d 800, 804 (5th

---

[20] "Because § 482 is concerned with distortions of income, it necessarily overlaps with all provisions governing the computation of true taxable income. Given this relationship, some § 482 adjustments could rest solely on the governing substantive provisions. … A parent's deduction of salaries and other expenses properly attributable to the business of a subsidiary can also be disallowed under § 162 without reference to § 482." Bittker & Loken, Federal Taxation of Income, Estates and Gifts, ¶ 79.13 (March 2026).

Cir. 1975). To be deductible, the expense must be "directly connected with or pertaining to the *taxpayer's* trade or business." Treas. Reg. § 1.162-1(a) (emphasis added); s*ee also Cavanaugh v. Comm'r*, 766 F. App'x 98, 101–02 (5th Cir. 2019) (holding corporation's payment to resolve lawsuit against its shareholder was not deductible because it was not paid in furtherance of the corporation's business). A taxpayer may not deduct expenses incurred on behalf of another business because the benefit from those expenses usually flows to that other business rather than to the taxpayer. *See Interstate Transit Lines v. Comm'r*, 319 U.S. 590, 593–94 (1943); *Baker Hughes, Inc. v. United State*s, 943 F.3d 255, 263 (5th Cir. 2019). This rule also applies in the context of parent and subsidiary entities, which the Code treats as separate corporate entities. *Humana Inc. v. Comm'r*, 881 F.2d 247, 252 (6th Cir. 1989).

For a parent taxpayer to deduct expenses paid for its subsidiary, it must show the expenses were for the "direct and proximate benefit" of the parent. *Young & Rubicam, Inc. v. United States*, 410 F.2d 1233, 1238 (Fed. Cl. 1969); *see also Lohrke v. Comm'r*, 48 T.C. 679, 685 (1967) (acknowledging rule that a taxpayer may deduct a payment made to cover another's business expense under § 162 if "the expenditures were made by a taxpayer to protect or promote his own business"). This is a "narrow exception" to the general rule that payment of another's expenses is not deductible. *Austin Co. v. Comm'r*, 71 T.C. 955, 967 (1979). An "indirect and incidental benefit" to the taxpayer is insufficient to justify a deduction. *Id.*; *accord HIE Holdings, Inc. v. Comm'r*, T.C. Memo. 2009-130, 2009 WL 1586044, at *95 (2009) (noting that a taxpayer's payment of another business's expenses must be "primarily to benefit" the taxpayer's business, "with the receipt by the other person of any benefit from the payment being merely incidental"), *aff'd*, 521 F. App'x 602 (9th Cir. 2013).

40

In *Young & Rubicam*, the plaintiff was an advertising firm that owned several overseas subsidiaries. 410 F.2d at 1235. The plaintiff sent several of its employees abroad to perform management services for its subsidiaries, and the plaintiff continued to pay for all or part of those employees' compensation. *Id.* at 1241. The plaintiff sued to challenge the IRS's disallowance of deductions for the compensation it paid to those employees as its own § 162 expense. *Id*. at 1234. The court held that a parent corporation was not entitled to business expense deductions under § 162 for salaries, bonuses, profit sharing, and other sums paid to its employees for services rendered primarily for its subsidiaries. As the court explained, "[t]he general and indirect benefit which obviously inures to a parent corporation when one of its subsidiaries successfully performs its functions does not satisfy the requirements of section 162." *Id*. at 1238. The court limited the plaintiff's deduction to the percentage of compensation reflective of work performed for the plaintiff's direct benefit.

### 2. McKesson cannot deduct stock-based compensation costs attributable to McKesson Ireland's reasonably anticipated benefit share.

Here, McKesson cannot deduct the portion of the compensation its U.S. subsidiary paid employees that "directly and proximately" benefitted McKesson Ireland. *Id*. During the years at issue, McKesson USA paid its employees, in the form of stock-based compensation, for research and development projects to jointly design and develop intangible assets with its foreign subsidiary under cost sharing arrangements. As explained above, under a dash-seven cost sharing arrangement, a participant's "share of reasonably anticipated benefits," (*i.e.*, its RAB share), is "equal to its reasonably anticipated benefits divided by the sum of the reasonably anticipated benefits … of all the controlled participants." Treas. Reg. § 1.482-7(e)(1)(i). Under Treas. Reg. § 1.482-7(j)(1)(i), "a controlled participant's reasonably anticipated benefits mean the benefits that reasonably may be anticipated to be derived from exploiting cost shared intangibles."

41

Each participant's RAB share estimates the benefit and, accordingly, dictates the costs allocable to that participant. Treas. Reg. § 1.482-7. To achieve that balance for tax purposes, the participants must make cost sharing transaction payments that redistribute development costs among them in proportion to their RAB shares. So, if one participant incurs development costs in excess of its RAB share, the other participant must make a cost-sharing payment to restore the required allocation. This payment has the effect of decreasing the recipient participant's costs incurred for income tax deduction purposes.

There is no dispute of fact as to the portion of McKesson USA's employees' work that "directly and proximately" benefited McKesson Ireland—McKesson quantified the benefit in writing in each of its cost sharing arrangements. A RAB share definitionally determines the respective costs and benefits attributable to each cost share participant. Thus, the costs determined to be attributable to one cost share participant in accordance with its RAB share do not proximately and directly benefit another participant. In other words, the costs allocated to one participant in a cost sharing arrangement necessarily cannot overlap as an ordinary and necessary expense of another participant.

Therefore, McKesson cannot deduct the stock-based compensation costs attributable to work performed for the benefit of its subsidiary, McKesson Ireland. The amount of stock-based compensation that is not deductible under § 162 is the same amount of income allocated to McKesson under the § 482 adjustment. The IRS makes the § 482 adjustment by including stock-based compensation costs into the intangible development cost pool and allocating those costs based on the RAB share reported under the parties' cost sharing arrangements. Under the cost sharing arrangements, McKesson computed its RAB share and determined the portion of the development activity expected to benefit McKesson Ireland's exploitation of the resulting

42

intangibles.[21] Accordingly, the amount of the § 482 adjustment also reflects the costs attributable to McKesson Ireland that would not be deductible by McKesson under § 162. Meaning, even if, as McKesson contends, stock-based compensation costs were not required to be included in the cost pool under McKesson's cost-sharing agreement, McKesson still incurred the expense for the benefit of its subsidiary and would not be able to deduct this amount as a business expense under § 162. *See Interstate Transit Lines*, 319 U.S. at 594 ("The mere fact that the expense was incurred under contractual obligation does not of course make it the equivalent of a rightful deduction under [the predecessor of section 162(a)] . . . The origin and nature, and not the legal form, of the expense sought to be deducted, determines the applicability of the words of [the predecessor of § 162(a)]."). Thus, as a matter of law, and entirely independent of § 482, McKesson is not entitled to the claimed refunds.

**IV.    Conclusion.**

This case does not present any factual disputes. It concerns only three separate legal issues. And the United States is entitled to summary judgment on each issue. First, the stock-based compensation rule is within Treasury's authority under § 482. Indeed, § 482 is a broad grant of authority to Treasury, and contrary to McKesson's claims, it does not require an analysis of comparable unrelated transactions. Second, the stock-based compensation rule is procedurally valid because it is the product of reasoned decision making. And, at all events, McKesson is not entitled to deduct the stock-based compensation it paid for the benefit of McKesson Ireland under § 162.

---

[21] McKesson, under its own computation of its initial RAB share, had a 99-1 RAB split for many of the cost sharing arrangements at issue. Meaning, *under McKesson's own computation*, McKesson Ireland would receive 99% of the reasonably anticipated benefits from the exploitation of the intangibles. *See* App. Ex. 1 at USA APP000007.

43

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General
Tax Litigation Branch

*/s/ Moira E. Goodwin*
MOIRA E. GOODWIN
DC Bar No. 1780293
DANIEL B. CAUSEY, IV
SC Bar No. 104035
Trial Attorneys
Tax Litigation Branch
Civil Division, Department of Justice
P.O. Box 14198
Washington, D.C. 20044
202-718-7056 (MEG)
202-307-1427 (DBC)
202-514-6866 (fax)
moira.e.goodwin@usdoj.gov
daniel.b.causey@usdoj.gov

*Counsel for Defendant*