**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| MCKESSON CORPORATION and SUBSIDIARIES, <br><br> *Plaintiff,* <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> *Defendant.* | Case No. 3:25-CV-01102-N |

**COMBINED REPLY BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN OPPOSITION TO
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

I.   Introduction and Summary of Argument ............................................................. 1

II.  Argument ......................................................................................................... 6

    A.   The SBC Rule is Contrary to Section 482 ............................................. 9

        1.   Section 482 Requires Application of the Arm's-Length Standard to "Clearly Reflect Income" ....................................................... 9

        2.   The Arm's-Length Standard Requires Evidence of Arm's-Length Behavior ............................................................................... 11

        3.   The Government's View of Its Authority Under Section 482 is Impermissibly Broad And is Not The Best Reading Under Loper Bright ............................................................................ 18

            a)   The Government's Litigating Position is Conclusory And Has Been Rejected in *Xilinx* ...................................... 18

            b)   The Government's Position Would Lead to Arbitrary Results And Would Strain the Constitution ............................. 19

            c)   *Loper Bright* Requires Rejection of the Government's Position ...................................................... 21

        4.   The Government's Factual Assertions Regarding Comparability are Unsupported and Illogical ............................................... 22

        5.   The CWI Standard Cannot Justify the SBC Rule ................................. 26

        6.   Altera was Wrongly Decided and Remains an Aberration ..................... 29

    B.   The SBC Rule is Procedurally Invalid .................................................. 31

        1.   The Government May Not Defend the SBC Rule Through a New Reading of the Arm's-Length Standard ........................................ 31

        2.   The SBC Rule Was Not Promulgated in Compliance with the APA's Requirements ......................................................... 34

    C.   The Government's Only Preserved Affirmative Defense is Its Section 162 Argument and That Argument Fails ........................................ 38

        1.   The Government Has Waived or Abandoned Its First and Third Affirmative Defenses ....................................................... 39

2.    The Government Has Not Made Even a Threshold Showing That Any of McKesson's SBC Costs Were For the Benefit of IP3 ................... 40

    a)    RAB "Share" Has No Bearing On Whether a Particular Cost Was Incurred For the Benefit of Another Person or Entity ................................................................................... 42

    b)    The IRS Has Already Accepted That McKesson's SBC Costs are Deductible Under Section 162 ...................................... 44

3.    McKesson Did Not Concede the Government's Section 162 Defense By Not Addressing It in Its Principal Brief ............................... 46

III.    Conclusion ..................................................................................................... 48

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. Commissioner*,
154 F.4th 574 (8th Cir. 2025) ......................................................................................22

*Advance Cloak Co. v. Commissioner,*
B.T.A.M. (P–H) P 33,078, 1933 WL 4800 (1933) ......................................................10

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935)......................................................................................................20

*Altera Corp. v. Commissioner*,
145 T.C. 91 (2015)..........................................................................................................6

*Altera Corp. v. Commissioner*,
926 F.3d 1061 (9th Cir. 2019) ................................................................................ *passim*

*Bausch & Lomb Inc. v. Commissioner*,
933 F.2d 1084 (2d. Cir. 1991)................................................................................16, 25

*BNSF Ry. Co. v. Fed. R.R. Admin.*,
62 F.4th 905 (5th Cir. 2023) ........................................................................................35

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962)......................................................................................................40

*Burnley v. City of San Antonio*,
470 F.3d 189 (5th Cir. 2006) ........................................................................................46

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984)........................................................................................................6

*Coca–Cola Co. v. Commissioner*,
155 T.C. 145 (2020)......................................................................................................30

*Commissioner v. First Sec. Bank of Utah*,
405 U.S. 394 (1972)................................................................................................12, 16

*Consumers' Research v. FCC*,
109 F.4th 743 (5th Cir. 2024), *rev'd*, 606 U.S. 656 (2025) ........................................20

*Cont'l Equities, Inc. v. Commissioner,*
551 F.2d 74 (5th Cir. 1977) ..........................................................................................10

*Deprag, Inc. v. Mine Shield, LLC*,
No. 4:12–CV–320, 2014 WL 47414 (E.D. Tex. Jan. 3, 2014) ................................................39

*Dish Network Corp. v. NLRB*,
953 F.3d 370 (5th Cir. 2020) ..................................................................................................31

*Facebook v. Commissioner*,
164 T.C. 194 (2025)................................................................................................8, 24, 30

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)...............................................................................................19, 41

*Forsyth v. Barr*,
19 F.3d 1527 (5th Cir. 1994) ......................................................................................26, 44, 45

*Foster v. Commissioner*,
80 T.C. 34 (1983), *rev'd on other grounds*, 756 F.2d 1430 (9th Cir. 1985)............................21

*Frerck v. Pearson Educ., Inc.*,
63 F. Supp. 3d 882 (N.D. Ill. 2014) .......................................................................................47

*Goins v. Dir., Off. of Worker's Comp. Programs*,
436 F. App'x 366 (5th Cir. 2011) (per curiam) ........................................................................46

*Golsen v. Commissioner*,
54 T.C. 742 (1970)..............................................................................................................8, 30

*Gundy v. United States*,
588 U.S. 128 (2019)................................................................................................................20

*Jarkesy v. SEC*,
34 F.4th 446 (5th Cir. 2022), *aff'd and remanded*, 603 U.S. 109 (2024) ...............................20

*Keysight Technologies Inc. v. United States*,
No. 25–137, 2026 WL 1956959 (Fed. Cl. July 2, 2026) ...................................................21, 22

*Kinnison v. City of San Antonio*,
480 F. App'x 271 (5th Cir. 2012) ...........................................................................................39

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................................................................................................6, 20, 21

*Louisiana v. U.S. Dep't of Energy*,
90 F.4th 461 (5th Cir. 2024) ...........................................................................................36, 37

*Medtronic, Inc. v. Commissioner*,
153 F.4th 682 (8th Cir. 2025) ................................................................................................30

*Meta Platforms, Inc. v. Commissioner*,
  Docket No. 16081–25 ..............................................................................................40

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)............................................................................................31, 36

*NLRB v. Pioneer Nat. Gas Co.*,
  397 F.2d 573 (5th Cir. 1968) .................................................................................40

*Pandrol USA, LP v. Airboss Ry. Prods., Inc.*,
  320 F.3d 1354 (Fed. Cir. 2003)..............................................................................47

*Peck v. Commissioner*,
  752 F.2d 469 (9th Cir. 1985) .................................................................................16

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943)..................................................................................................31

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947).....................................................................................31, 33, 40

*Tex. Power & Light Co. v. FCC*,
  784 F.2d 1265 (5th Cir. 1986) ...............................................................................31

*Texaco, Inc. v. Commissioner*,
  98 F.3d 825 (5th Cir. 1996) ...................................................................................16

*Texas Oil & Gas Ass'n v. EPA*,
  161 F.3d 923 (5th Cir. 1998) .................................................................................36

*Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*,
  5 F.4th 666 (6th Cir. 2021) ...................................................................................20

*Topalian v. Ehrman*,
  954 F.2d 1125 (5th Cir. 1992) .................................................................................8

*United Cent. Bank v. Wells St. Apartments, LLC*,
  957 F. Supp. 2d 978 (E.D. Wis. 2013)....................................................................47

*United Mine Workers v. Pittston Co.*,
  984 F.2d 469 (D.C. Cir. 1993)................................................................................47

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates*,
  484 U.S. 365 (1988)................................................................................................20

*United States v. Charles*,
  469 F.3d 402 (5th Cir. 2006) .................................................................................39

*U.S. Steel Corp. v. Commissioner*,
617 F.2d 942 (2d Cir. 1980)..................................................................................16, 25

*Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*,
340 F.3d 233 (5th Cir. 2003) ........................................................................................26

*Wilson v. City of Mission*,
No. 7:18–cv–00399, 2020 WL 2079359 (S.D. Tex. Apr. 30, 2020) .......................................46

*Wood v. Milyard*,
566 U.S. 463 (2012)..................................................................................................39

*Woodmen of the World Life Ins. Co. v. Lewis*,
118 F. App'x 826 (5th Cir. 2004) ..................................................................................39

*Woodson v. Allstate Ins. Co.*,
855 F.3d 628 (4th Cir. 2017) ......................................................................................39

*Xilinx, Inc. v. Commissioner*,
125 T.C. 37 (2005)....................................................................................................33

*Xilinx, Inc. v. Commissioner*,
598 F.3d 1191 (9th Cir. 2010), *aff'g* 125 T.C. 37 (2005) ............................................... *passim*

**Statutes**

Internal Revenue Code (26 U.S.C.):
§ 83(h).................................................................................................................45
§ 162(a)(1) ..........................................................................................................44
§ 482..................................................................................................................12, 28

Judiciary and Judicial Procedure (28 U.S.C.)
§ 2401(a) .............................................................................................................38

**Regulations**

Treas Reg. (26 C.F.R.)
§ 1.482–1(a)(1) ....................................................................................................13
§ 1.482–1(b)(1) ....................................................................................................10, 13, 37
§ 1.482–1(c)(1) ....................................................................................................13
§ 1.482–1(c)(2) ....................................................................................................14, 23
§ 1.482–1(c)(2)(i)...................................................................................................14
§ 1.482–1(c)(2)(ii)..................................................................................................14
§ 1.482–1(c)(2)(ii)(B) .............................................................................................15
§ 1.482–6(c)(3) ....................................................................................................15
§ 1.482–6(c)(3)(ii)(D).............................................................................................15
§ 1.482–7(a)(1) ....................................................................................................42
§ 1.482–7(b)........................................................................................................24

§ 1.482–7(d)(1)(iii) ........................................................................................42
§ 1.482–7(d)(3)(iii)(A).................................................................................45
§ 1.482–7(e)(1)(i)..........................................................................................42
§ 1.482–8(a) ..................................................................................................15
§ 1.482–9(b) ..................................................................................................16

Treas. Reg. 86, art. 45–1(b) (1935)...................................................................10

**Other Authorities**

Brief for the Appellant (the IRS), *Altera Corp. v. Commissioner*,
      926 F.3d 1061 (9th Cir. 2019) (Nos. 16–70496, 16–70497), 2016 WL
      3537355.....................................................................................................27, 33

Brief for the Appellant (the IRS), *Xilinx, Inc. v. Commissioner*,
      598 F.3d 1191 (9th Cir. 2010) (Nos. 06–74246, 06–74269), 2007 WL
      708301...............................................................................................................18

Intercompany Transfer Pricing and Cost Sharing Regulations Under Section 482,
      57 Fed. Reg. 3,571, 3,576 (Jan. 30, 1992) ..................................................24

I.R.S. Notice 88–123, 1988–2 C.B. 458 .......................................................8, 24

Respondent's Motion for Partial Summary Judgment, *Meta Platforms, Inc. v.
      Commissioner*, Docket No. 16081–25 (May 12, 2026), 2026 TNTI 93–34............................40

T.D. 8552, 59 Fed. Reg. 34,971, 34,976 (July 8, 1994) .................................17

T.D. 9088, 2003–2 C.B. 841 ................................................................... *passim*

William H. Byrnes, 1 *Practical Guide: U.S. Transfer Pricing* § 13.01 (4th ed.
      2026) ...............................................................................................................24

## I.      Introduction and Summary of Argument

The Government's briefing makes clear what taxpayers have long feared:  the Government believes that the arm's-length standard only applies when it is convenient for the IRS.[1]  The significance of the Government's abandonment of the arm's-length standard in this case cannot be overstated.

What other conclusion can be drawn from the Government's briefing?  To be sure, the Government "does not dispute that *an* arm's length standard" is a cornerstone of section 482, nor does it dispute that Congress's purpose in enacting section 482 is to "place[] a controlled taxpayer on a tax parity with an uncontrolled taxpayer."  Combined Mem. in Supp. of Def.'s Cross-Mot. for Summ. J. & Opp'n to Pl.'s Mot. for Summ. J., ECF No. 36 ("Def.'s Mem." or the "government's combined brief") at 19–20 (emphasis in original).  Not that it could dispute these items, as they are established in Supreme Court precedent and have been contained in Treasury regulations for nearly a century.  Instead, the Government argues that the "arms-length standard" does not require consideration of what parties might do at arm's length at all.  In the Government's view, so long as the IRS believes that an adjustment is necessary to reach an "arm's length result," even if such result would *never be reached by parties at arm's length*, the IRS can require it.

This is not the best reading of section 482.  The Government's litigating position appears to be that section 482 provides the IRS with near-limitless authority to define what it means to "clearly reflect income," and that the arm's-length standard, which defines when income is "clearly reflected" for this purpose, does not require an analysis of arm's-length behavior at all.  The better view is that income is "clearly reflected" when controlled taxpayers are placed in tax

---

[1] Unless otherwise indicated, the term "Government" refers to the Defendant.

1

parity with uncontrolled taxpayers, as measured by the arm's-length standard.  The "arm's-length standard," as its name implies, requires an analysis of what parties at arm's length do or would do in comparable circumstances.  Because McKesson's position is consistent with what parties at arm's length would do, it satisfies the arm's-length standard and thus clearly reflects income within the meaning of the statute.

The Government attempts to conceal the striking breadth of its position using the same sleight of hand it employed in *Altera*, arguing that McKesson invokes an "outdated understanding" of the arm's-length standard, Def.'s Mem. at 20, that requires the IRS to provide evidence of "comparable unrelated transactions to make adjustments to clearly reflect income." *Id.* at 2.  To be clear, McKesson <u>expressly</u> does not make this argument.  *See* Br. in Supp. of Pl.'s Mot. for Summ. J., ECF No. 33 ("Pl.'s Br." or "McKesson's principal brief") at 36 n.10 ("Transactional comparability is just one way to establish what parties at arm's length do or would do, but is not the only way.").  Instead, McKesson argues that to properly apply the arm's-length standard, some evidence – transactional or otherwise – of how parties at arm's length might act is required.  The Government's view is that no such analysis is required, so long as the Government asserts that its adjustment reaches an arm's length result.

It is telling that the Government does not argue that parties at arm's length might actually share SBC, and does not contest that parties do not, and would not, share these costs at arm's

2

length.[2]  This bears repeating:  in its principal brief defending the SBC rule,[3] the Government

nowhere argues that parties at arm's length would *ever* share SBC.  Instead, the Government

provides only a presumption to justify the rule:  it asserts that SBC is a "cost," that the cost-

sharing regulations require the sharing of "all costs" reasonably anticipated to contribute to

development of the cost-shared intangible, and thus SBC must be shared.  *See* Def.'s Mem. at

28–29.  But that argument skips the critical requisite step, just as Treasury did in issuing the SBC

rule in the first place.  The Government still does not explain why SBC is reasonably allocable to

cost-shared intangibles in the first place, much less why (at least in theory) unrelated parties,

dealing at arm's length, would ever agree to share it.

The Government does not make that showing because it cannot.  It tried to establish this

in *Xilinx* and lost.  *See Xilinx, Inc. v. Commissioner*, 598 F.3d 1191, 1196–97 (9th Cir. 2010),

*aff'g* 125 T.C. 37 (2005) (holding that "all costs" regulation did not require sharing SBC).  And

nothing has changed since *Xilinx* was decided.  The Government still has not identified any

evidence showing why SBC would be expected to lead to development of the cost-shared IP, and

thus why parties might, in theory, agree to share it at arm's length.

---

[2] In its Answer, the Government denied McKesson's allegations that, when Treasury promulgated the
SBC rule, Treasury lacked evidence that unrelated parties share SBC costs or would agree to do so.  *See*
Answer, ECF No. 21, at ¶¶ 28–29.  But that denial proved enigmatic.  In its combined brief, the
Government identifies no arm's-length agreement requiring the sharing of SBC costs, cites no empirical
evidence that unrelated parties share such costs, and points to no expert analysis, study, or other evidence
supporting such a proposition.  Nor does it argue that parties at arm's length would, in fact, share SBC
costs.  Instead, it defends the rule on the premise that SBC is a "cost" and that the cost-sharing regulations
require all relevant costs to be shared.  *See* Def.'s Mem. at 28–29.  Thus, to the extent the Government's
denials of paragraphs 28 and 29 of McKesson's Complaint implied some factual basis for the SBC rule,
the Government has neither identified nor defended that basis on the merits.

[3] Unless otherwise indicated, defined terms used but not otherwise defined herein shall have the same
meaning ascribed to them in McKesson's principal brief.

That failure to provide any supporting evidence – transactional or otherwise – should be fatal to the SBC rule even if this Court were to accept the Government's new litigating position on the scope of its authority under section 482.  For whatever the merits of that position may be today, it was not a rationale Treasury gave in 2003 when it issued the regulation.  The Government therefore may not invoke it now as a post hoc justification for agency action that must stand or fall on the basis the agency actually provided.  And because Treasury has never shown – not when it issued the SBC rule nor since – that parties at arm's length would share SBC in any circumstances, the SBC rule fails under the "reasoned decisionmaking" standard as well.

Unable to defend the SBC rule on its own terms, the Government turns to an alternative argument under section 162 of the Code, though the precise role of this argument is unclear.  At times, the Government suggests that section 162 provides an independent ground for denying McKesson's refund claims "even if" the SBC rule is invalid.  Def.'s Mem. at 3.  Elsewhere, it suggests this Court need not address the validity of the SBC rule at all because the section 162 issue is antecedent and dispositive.  *Id.* at 39.  Either way, the Government's argument is the same:  McKesson may not deduct part of its SBC costs in the United States (the portion in dispute in this litigation) because, according to the Government, those costs were incurred for the benefit of McKesson's Irish cost-sharing affiliate, McKesson Financial Holdings Limited ("IP3").

This argument merely repackages the Government's primary argument in defense of the SBC rule, this time using technical CSA terminology, and it fails just the same.  The Government contends that to properly reflect the parties' shares of "reasonably anticipated benefits" ("RAB"), McKesson must share SBC costs with IP3 (and, therefore, McKesson should not deduct those

4

shared costs in the US under section 162).  But the computation of RAB share does not answer the threshold question, and the Government's argument on this point reflects a fundamental misunderstanding of how the CSA rules work.  RAB share determines only the percentage *share* of "intangible development costs" ("IDCs") each CSA participant must bear once the relevant IDCs have been identified.  It does not determine which costs are IDCs in the first place and therefore must be included in the cost pool, and it says nothing about whether any particular cost was incurred for the benefit of another person or entity under section 162.

This argument illustrates why taxpayers have challenged the SBC rule (and the IRS's prior attempts to force taxpayers to share SBC) for decades, and confirms McKesson's position that the SBC rule is invalid.  Though it never argues that parties at arm's length would share SBC, the Government fails to consider *why* parties do not share it.  This question is fundamental to an arm's-length analysis, and the answer is straightforward:  parties do not share SBC because it is inherently different from other forms of compensation.  SBC is issued for the benefit of the issuer, and does not clearly benefit any other entity, much less any particular intangible.  Much as it does in attempting to justify the SBC rule, the Government simply *assumes* – without evidence (transactional or otherwise) – that the SBC at issue here is paid for the benefit of the foreign CSA participant.  That assumption cannot carry the Government's section 162 argument.  The argument fails for the same reason the SBC rule fails.  Parties dealing at arm's length simply would not share these costs.

McKesson reiterates the argument in its principal brief.  The SBC rule is agency overreach at its clearest.  As the Government acknowledges, section 482 requires application of an arm's-length inquiry.  That inquiry turns on what unrelated parties would do in comparable circumstances.  Yet parties at arm's length do not share SBC, and the Government has never

shown otherwise:  not when it issued the rule, not in prior litigation, and not here.  The SBC rule

thus abandons the very standard section 482 requires.  Under *Loper Bright Enters. v. Raimondo*,

603 U.S. 369 (2024), that is the end of the matter – the SBC rule conflicts with the best reading

of the statute and is invalid.

## II.    Argument

The Government's defense of the SBC rule rests on a reading of section 482 that cannot

be reconciled with the statute's text, its settled historical meaning, or Treasury's own

longstanding regulations.  As McKesson's principal brief correctly explains, the arm's-length

standard has been the interpretive cornerstone of section 482 and its predecessors for nearly a

century.  That standard requires an analysis of what parties do or would do at arm's length, and

Treasury has repeatedly incorporated these principles into its regulations.  That is why the Tax

Court in *Altera Corp. v. Commissioner*, 145 T.C. 91 (2015), held in a 15-0 decision that the SBC

rule was invalid.  There, the court properly understood the arm's-length standard to require an

analysis of arm's-length behavior, and held that Treasury could not require related parties to

share costs that unrelated parties would not share.  *Id.* at 117–18, 133–34.

The Government won on appeal in *Altera* only because a divided Ninth Circuit panel

deferred under *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), to the

Government's then-litigating position that CWI (the second sentence of section 482) justified the

SBC rule.  *Altera Corp. v. Commissioner*, 926 F.3d 1061, 1087 (9th Cir. 2019).  Now, with

*Chevron* gone, the Government offers a new and even broader theory.  It contends that:  (1) the

first sentence of section 482 requires application of the arm's-length standard, but Congress has

authorized Treasury to define it; (2) Treasury has defined the arm's-length standard by reference

to an "arm's length *result*;" (3) in determining whether an "arm's length result" has been reached,

6

Treasury need not consider evidence of arm's-length behavior; and (4) to satisfy the procedural requirements of the APA, Treasury is not required to consider arm's-length behavior or provide any analysis of its own once it determines that a regulation reaches an "arm's length result."

The Government's view, while convenient, is not correct.  First, while we agree with the Government that section 482 requires application of the arm's-length standard, that standard necessarily requires an analysis of how unrelated parties would behave in comparable circumstances.  That is the plain meaning of "arm's length," the only administrable reading of the statute, and the reading reflected in nearly a century of case law, Treasury rulemaking, and IRS enforcement practice.  In contrast, the Government's view reduces the arm's-length standard to mere tautology.  It would give the IRS nearly boundless rulemaking and enforcement authority under section 482, raise serious constitutional concerns, and leave taxpayers without a discernible standard to apply under section 482.  Second, even if the Government's expansive view of the IRS's authority under section 482 were correct, the SBC rule would still fail.  Treasury and the IRS have never shown that any party would share SBC at arm's length.  Nor have they supplied evidence or reasoned analysis explaining why SBC should be treated as a cost that unrelated parties would agree to share.  The APA requires more.  Treasury is required under the APA to show or at least explain why a rule is correct, and Treasury has never done so in the case of the SBC rule.  Thus, the SBC rule also fails on procedural grounds.

The Government tries to defend the SBC rule by asserting that "[t]here are no comparable unrelated transactions" to CSAs, and that in the context of SBC, related and unrelated parties are "fundamentally not comparable."  Def.'s Mem. at 29.  Though the Government must argue this point to address an obvious counterpoint (*i.e.*, if there are comparable transactions, why would the Government not be required to consider them?), it offers no evidence for these extraordinary

7

assertions.  This is odd given that Treasury and the IRS have previously maintained that arrangements similar to CSAs are common at arm's length, *see* I.R.S. Notice 88–123, "A Study of Intercompany Pricing under Section 482 of the Code," 1988–2 C.B. 458 (the "Treasury White Paper") ("Cost sharing arrangements have long existed at arm's length between unrelated parties"), and the Government certainly has not shown that related and unrelated parties are not comparable enough to apply the arm's-length standard in the context of SBC.  On motion for summary judgment, unsupported factual assertions do not suffice.  *See Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992) ("Mere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment.").

The Government also invokes *Altera* and several recent transfer pricing cases as though they have settled the validity of the SBC rule after *Loper Bright*.  They have not.  Only one of the cited cases, *Facebook v. Commissioner*, 164 T.C. 194 (2025), actually discusses *Altera*.  *See id.* at 314–20.  And *Facebook* would be appealable to the Ninth Circuit, where *Altera* remains binding, and thus the Tax Court would be required (under the *Golsen* rule) to follow the holding in *Altera* regardless of its wisdom.  *Golsen v. Commissioner*, 54 T.C. 742, 756–57 (1970) ("[I]t is our best judgment that better judicial administration requires us to follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone.").  In a case appealable outside the Ninth Circuit, the Tax Court's original, 15-0 decision finding the SBC rule invalid would be precedential.  The Ninth Circuit's *Altera* decision thus remains an outlier and not a foundation on which to sustain the rule here.

The Government's sole remaining affirmative defense fares no better, resting on the misguided argument that section 162 bars McKesson from deducting its own SBC expenses –

8

either as an independent ground for denying relief even if the SBC is invalid, or as an antecedent ground for avoiding the rule's validity altogether.  The Government's argument here is based on a fundamentally incorrect view of how its own CSA regulations operate.  The Government may not use the concept of RAB "share" to determine whether any particular cost is an IDC, and certainly cannot show that it would be proper to deny McKesson's deductions under the distinct framework of section 162.  This section 162 argument is not an independent answer to McKesson's claim; it is another post-hoc attempt to salvage the SBC rule.  The better – and required – answer is that the SBC rule is invalid.[4]

  A.  The SBC Rule is Contrary to Section 482

    *1. Section 482 Requires Application of the Arm's-Length Standard to "Clearly Reflect Income"*

The starting point is common ground.  The Government acknowledges, as it must, that section 482 incorporates "*an* arm's length standard" and that Congress's purpose in section 482 is to "place[] a controlled taxpayer on a tax parity with an uncontrolled taxpayer."  Def.'s Mem. at 19–20 (emphasis in original).  Thus, the Government confirms the settled understanding of section 482, and thus the proper interpretation of the term "clearly to reflect the income":  the arm's-length standard is the statute's interpretive cornerstone.  *See Altera*, 926 F.3d at 1098

---

[4] The Government's brief at various points refers to concepts such as "improper tax avoidance," "loopholes," and similar pejorative terms.  Def.'s Mem. at 1, 9, 12–13.  The Government further insinuates that McKesson's use of cost sharing was in furtherance of an improper tax avoidance objective.  *See, e.g., id.* at 1 ("Businesses, like McKesson, use cost sharing arrangements between their subsidiaries to shift income-producing intangibles into low tax jurisdictions, thus minimizing the tax burden to the parent entity.").  But the Government does not actually accuse McKesson of such conduct, and even acknowledges that "if a transaction complies with the law, the transaction is not necessarily illegitimate just because it was designed to minimize tax."  Def.'s Mem. at 8–9.  McKesson followed all applicable rules and regulations (save for the SBC rule, the subject of this challenge) and employed a transaction form – the CSA – that has been expressly blessed by Congress and the IRS.  The Government's pejorative characterizations of McKesson's actions are inappropriate and should be disregarded.

9

(O'Malley, J., dissenting) ("It is undisputed that the first sentence of the statute requires an arm's length analysis; even the majority agrees with that longstanding principle.").

The Government nevertheless devotes substantial discussion in its brief to the "clear statutory language" of section 482, but it ultimately does not contest that section 482 requires application of the arm's-length standard. Nor could it. As McKesson's principal brief explains, the arm's-length standard has been understood as the foundation of section 482 since its original enactment nearly a century ago. The statutory predecessor to section 482 was enacted in 1928, and from an early stage both the courts and Treasury understood it to be directed at parity between controlled and uncontrolled taxpayers. *See Advance Cloak Co. v. Commissioner*, B.T.A.M. (P–H) P 33,078, 1933 WL 4800 (1933) (the purpose of section 482's original predecessor "is to place transactions between related trades or businesses owned or controlled by the same interests upon the same basis as if such businesses were dealing at arm's length with each other"); *see also Cont'l Equities, Inc. v. Commissioner*, 551 F.2d 74, 80 (5th Cir. 1977) (holding that the purpose of section 482 "is to place controlled taxpayers in the same position as uncontrolled taxpayers"). Treasury codified that understanding in the 1935 regulations, which stated expressly that "the standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." Treas. Reg. 86, art. 45–1(b) (1935). That same formulation remains in Treasury regulations today. Treas. Reg. § 1.482–1(b)(1).

Whatever the Government's motivations may be in attempting to cast doubt on the viability of the arm's-length standard, there is simply no serious contention that section 482 does not require its application.

10

2.      *The Arm's-Length Standard Requires Evidence of Arm's-Length Behavior*

Though the Government concedes, as it must, that section 482 requires application of the arm's-length standard, it insists that this standard does not mandate a narrow reference to comparable uncontrolled transactions ("CUTs").

To be clear, we agree.  We said exactly this in our principal brief.  *See* Pl.'s Br. at 36 n.10 ("Transactional comparability is just one way to establish what parties at arm's length do or would do, but is not the only way.").  But just as in *Altera*, the Government's argument here is a strawman.  McKesson does not contend that the arm's-length standard requires a CUT analysis; it contends that the arm's-length standard, to be properly applied, requires analysis of what parties at arm's length might actually do in comparable circumstances.  This does not require evidence of "transactional comparables," as the Government incorrectly characterizes McKesson as arguing, but it does require evidence of arm's-length behavior.  Treasury and the IRS have never provided evidence, transactional or otherwise, that parties at arm's length would share SBC, and they have ignored the substantial evidence provided to them in the rulemaking process.  The Government does not attempt to provide any new evidence in its combined brief.

Having knocked down an argument McKesson does not make, the Government offers its alternative:  the arm's-length standard only requires that the IRS reach an "arm's length *result*."  The Government chides McKesson for "invok[ing] an outdated understanding of the arm's length standard," stating that "since at least 1994, when Treasury has referred to an arm's length standard, it refers to an arm's length *result*."  Def.'s Mem. at 20 (emphasis in original).  But the Government never defines this phrase other than to offer that an arm's length result "is a result that clearly reflects income," and one that does not require a narrow search for CUTs.  *Id*. at 26.  From there, the Government leaps to the remarkable conclusion that, in moving to the concept of an arm's length result, the arm's-length standard "evolve[d]" from a standard that not only does

11

not mandate a narrow reference to CUTs, but does not mandate any analysis of arm's length

behavior whatsoever. *Id.* at 21. That is not an evolution of the arm's-length standard. It is an

abandonment of it.

The significance of the Government's position is best understood by walking through the

governing statute and regulations. The Government asks this Court to apply the "best reading"

of the "plain and unambiguous" text of section 482, the first sentence of which reads as follows:

> In any case of two or more organizations, trades, or businesses
> (whether or not incorporated, whether or not organized in the United
> States, and whether or not affiliated) owned or controlled directly or
> indirectly by the same interests, the Secretary may distribute,
> apportion, or allocate gross income, deductions, credits, or
> allowances between or among such organizations, trades, or
> businesses, if he determines that such distribution, apportionment,
> or allocation is necessary in order to prevent evasion of taxes or
> clearly to reflect the income of any of such organizations, trades, or
> businesses.

26 U.S.C. § 482.

Though perhaps not as "plain and unambiguous" as the government suggests, we agree

that the section applies to related parties, and the IRS is permitted to make adjustments between

or among those related parties where, as relevant here, such adjustment is necessary "clearly to

reflect the income." *Id*. These two requirements together set up a two-step analysis: to make an

allocation under section 482, the IRS must first determine the "income" of two or more related

parties, and then divvy up that income between or among the parties to ensure it is "clearly

reflected." Though not stated in the text, such division is done, the Government acknowledges,

pursuant to the arm's-length standard. The arm's-length standard serves a specific purpose: to

"place a controlled taxpayer on a tax parity with an uncontrolled taxpayer . . . ." *Commissioner

v. First Sec. Bank of Utah*, 405 U.S. 394, 400 (1972). In other words, the only purpose of section

12

482 is to divide income between or among controlled taxpayers such that it places those taxpayers on "a tax parity" with uncontrolled parties.

How that tax parity is achieved is the subject of this case. McKesson's position follows from the statute and regulations: tax parity can be achieved only if Treasury and the IRS can show that an adjustment would comport with how unrelated parties would behave in comparable circumstances. The Government's current position is far broader and would allow the IRS to assume, without evidence, that its preferred allocation produces an "arm's length result," regardless of whether unrelated parties would ever reach such a result.

That is a "litigating position," not how Treasury and the IRS have traditionally viewed their authority under section 482. Treasury's regulations under section 482 evidence this. Starting with the general statement that section 482 "places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer," Treas. Reg. § 1.482–1(a)(1), the regulations set forth the oft-quoted principle that, in determining a controlled taxpayer's "true taxable income," the arm's-length standard must be applied "in every case." Treas. Reg. § 1.482–1(b)(1).

The regulations also explain how to determine whether an arm's length result has been reached. That determination "is made pursuant to a method selected under the best method rule." *Id*. The regulations set forth a number of methods that may be employed to measure whether an arm's-length result has been reached, but provide that the "best method," and thus the one required to be used, is the method that "provides the most reliable measure of an arm's length result." Treas. Reg. § 1.482–1(c)(1). In determining the best method, the regulations provide the following guidance:

> Data based on the results of transactions between unrelated parties provides the most objective basis for determining whether the

13

> results of a controlled transaction are arm's length. **Thus, in determining which of two or more available methods (or applications of a single method) provides the most reliable measure of an arm's length result, the two primary factors to take into account are the degree of comparability between the controlled transaction (or taxpayer) and any uncontrolled comparables, and the quality of the data and assumptions used in the analysis.** In addition, in certain circumstances, it also may be relevant to consider whether the results of an analysis are consistent with the results of an analysis under another method. These factors are explained in paragraphs (c)(2)(i), (ii), and (iii) of this section.

Treas. Reg. § 1.482–1(c)(2) (emphasis added).

To recap, section 482, in order to "clearly reflect income," seeks to divide income earned by at least two controlled taxpayers pursuant to the arm's-length standard, which seeks to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer. "Parity" is achieved by ensuring that a controlled transaction comports as nearly as possible with how unrelated parties would behave in comparable circumstances. Determining whether this tax parity has been reached is done under the "best method rule." For transfer pricing purposes, a "method" is simply a means prescribed by regulation to reliably ensure that the results of a controlled transaction match how that transaction would have been reflected by uncontrolled parties. To perform this exercise, the regulations provide that the "best method rule" looks to: (1) the results of uncontrolled comparables, and (2) data and assumptions employed under the method.

Regarding comparability, whether an uncontrolled transaction is comparable under the best method rule "depends on the degree of comparability between the controlled transaction or taxpayers and the uncontrolled comparables . . . after making adjustments for differences." Treas. Reg. § 1.482–1(c)(2)(i). Regarding the use of data and assumptions, reliability likewise depends on evidence, not assertion. A method's reliability "depends upon the completeness and accuracy of the underlying data," Treas. Reg. § 1.482–1(c)(2)(ii), and where a method relies on any assumptions, "the reliability of the results derived from a method depends on the soundness

14

of such assumptions." Treas. Reg. § 1.482–1(c)(2)(ii)(B). Indeed, Treasury regulation section 1.482-8 ("Examples of the best method rule") states that "a method may be applied in a particular case only if the comparability, quality of data, and reliability of assumptions under that method make it more reliable than any other available measure of the arm's length result." Treas. Reg. § 1.482–8(a). Nothing in the regulations permits the IRS or a taxpayer to simply assume, without evidence, an arm's length result based on an assertion that market comparables are absent.

The regulations prescribe a number of specific methods, all of which embrace two basic principles: (1) in most cases, a method is applied on the basis of comparability, and (2) where no market comparables are available, other evidence of likely arm's-length behavior must be shown.[5] The regulations do not support the Government's litigating position that, when no CUTs

---

[5] For example, the "comparable uncontrolled transaction" ("CUT") method and the "comparable profits method" ("CPM") evaluate the pricing of intangibles transactions by reference to either comparable uncontrolled transactions (under the CUT method) or by reference to objective measures of profitability derived from uncontrolled taxpayers (under the CPM). Under either method, where acceptable comparables cannot be located, the chosen method is not the most reliable method and another method should be employed.

Similarly, the "profit split method" employs transactional comparables, adjusted appropriately, or (in the case of the "residual profit split" method in Treasury regulation section 1.482–6(c)(3)), benchmarks that reliably estimate the value of both parties' contributions. The regulations explicitly note that "external market benchmarks" provide the most reliable estimates of relative value, and the reliability of any analysis that does not rely on external market benchmarks "will be decreased in relation to an analysis under a method that relies on market benchmarks." Treas. Reg. § 1.482–6(c)(3)(ii)(D). In other words, the regulations acknowledge that (1) transactional evidence of arm's length behavior is more reliable than assumptions about such behavior, but (2) where transactional comparables are not employed, the reliability of any resulting analysis *depends on comparing the method to one that employs market comparables*.

Other methods, including those provided under Treasury regulation section 1.482–7, apply similarly. The Government has not pointed to any method that would permit the IRS to assert a lack of comparables and therefore assume, without evidence, an arm's-length result.

15

are available (let alone any other market-based evidence), the IRS is permitted to simply assume another result and declare it to be arm's length. [6]

Courts have applied section 482 the same way.  They have looked to actual uncontrolled conduct, reliable comparables, or evidence-based analysis – not unsupported assumptions about what result the IRS prefers.  *See*, *e.g.*, *First Sec. Bank of Utah*, 405 U.S. at 406–07 (comparing controlled taxpayers to actual (not assumed) uncontrolled taxpayers in assessing whether "tax parity" had been achieved); *Texaco, Inc. v. Commissioner*, 98 F.3d 825, 830–31 (5th Cir. 1996) (comparing taxpayer's controlled and uncontrolled sales to determine whether the IRS's proposed allocation would achieve "tax parity between controlled and uncontrolled taxpayers"); *Bausch & Lomb Inc. v. Commissioner*, 933 F.2d 1084, 1090–91 (2d. Cir. 1991) (rejecting IRS's unfounded theory of how taxpayers *might* behave in favor of comparable evidence); *Peck v. Commissioner*, 752 F.2d 469, 472 (9th Cir. 1985) (rejecting taxpayers' contention because the taxpayers had "not come forward with any reliable evidence" that their result would have been reached at arm's length); *U.S. Steel Corp. v. Commissioner*, 617 F.2d 942, 947 (2d Cir. 1980) (rejecting the IRS's proposed allocation where the taxpayer showed that its controlled prices matched amounts "actually charged" in similar transactions with unrelated buyers).  Even the Ninth Circuit in *Altera* did not find the IRS's authority to be so broad, since its holding was based on the CWI standard and not, as the Government argues here, solely on the first sentence of section 482.  926 F.3d at 1076.

---

[6] Even the Services Cost Method of Treasury Regulation section 1.482–9(b), which prescribes formulary markup amounts for relatively low-margin and routine services, applies only to "support services common among taxpayers in a variety of industry sectors" – in other words, to services that are *highly comparable* to services routinely priced in the market.  Moreover, this method is elective, and taxpayers wishing to employ another method to value services may do so.

In contrast to the Government's current view of its authority under section 482, Treasury took a far more measured view when it adopted the 1994 regulations, stating in the preamble to those regulations that:

> Section 1.482-1(b)(1) states that the governing principle under section 482 is the arm's length standard. **Under this standard controlled taxpayers are expected to realize from their controlled transactions the results that would have been realized if uncontrolled taxpayers had engaged in the same transactions under the same circumstances.** This expression of the arm's length standard differs from that set forth in the 1993 regulations, which stated that the arm's length standard was satisfied if the results of a controlled transaction were consistent with the results of "comparable transactions between uncontrolled taxpayers." The latter definition has been replaced because it is inconsistent with the notion underlying the arm's length standard that controlled and uncontrolled taxpayers should be placed on the same (rather than a merely similar) footing. **However, this provision recognizes that in most cases identical transactions between unrelated parties will not be located, and it therefore will be appropriate to consider uncontrolled transactions that are comparable rather than identical**.

T.D. 8552, 59 Fed. Reg. 34,971, 34,976 (July 8, 1994) (emphasis added).

This language refutes the Government's current position. Treasury did not say that under its updated framework the IRS could ignore what uncontrolled taxpayers would or would not do. It said the opposite. To properly apply the arm's-length standard, courts, Treasury, and the IRS have always considered it necessary to ask what parties at arm's length would do in comparable circumstances. The Government's view that Treasury walked away from this approach in 1994 simply does not match the facts. The Government's position would transform the arm's-length standard from a constraint on IRS authority into a label for whatever result the IRS chooses. Section 482, Treasury's regulations, and governing case law do not permit that result.

17

       3.      *The Government's View of Its Authority Under Section 482 is Impermissibly Broad And is Not The Best Reading Under Loper Bright*

            a)      The Government's Litigating Position is Conclusory And Has Been Rejected in *Xilinx*

The Government never explains what it means to reach an "arm's length result," simply asserting that the SBC rule reaches one. Its reasoning is conclusory: citing only the preamble to the 2003 Regulations and the SBC rule itself, SBC is a "cost," all costs "incurred with respect to the intangible development" must be shared by CSA participants, and thus SBC must be shared. *See* Def.'s Mem. at 28–29.

If that argument sounds familiar, it is because the IRS made the same argument in *Xilinx*. There, the IRS failed to prove that SBC was a cost that parties might share at arm's length and acknowledged on appeal that the "arm's length result" of requiring SBC to be shared was determined "on the basis of an economic assumption" rather than on evidence of how parties at arm's length behave. *See* Brief for the Appellant (the IRS) at 29, *Xilinx, Inc. v. Commissioner*, 598 F.3d 1191 (9th Cir. 2010) (Nos. 06–74246, 06–74269), 2007 WL 708301 (admitting that "clearly, this is an instance in which the arm's-length result is determined on the basis of an economic assumption rather than comparability analysis"). The Ninth Circuit rejected that theory. Because the IRS could not show that SBC would ever be shared at arm's length, it could not require it to be shared under the arm's-length standard. *See Xilinx*, 598 F.3d at 1196.

The Government here offers nothing new. It provides no evidence or factual analysis to support its view. Instead, it doubles down on the same legal justification it unsuccessfully employed in *Xilinx*: whether anyone would share SBC at arm's length, and whether it can be shown that SBC is a cost "incurred with respect to intangible development," are irrelevant. Instead, Treasury may simply declare that sharing SBC is necessary to reach an "arm's length result," and the issue of proving it goes away.

18

      b)       The Government's Position Would Lead to Arbitrary Results And Would Strain the Constitution

The Government's position cannot be the best reading of the IRS's authority under section 482. Under the Government's litigating position, the arm's-length standard, which underpins section 482 and all of transfer pricing practice, would be replaced with a vague and arbitrary framework – the "*sometimes* arm's-length standard." Under that standard, where Treasury and the IRS view it as appropriate to consider evidence of arm's-length behavior, taxpayers and the IRS will be expected to do so. But when Treasury and the IRS decide that no such analysis is needed, all bets are off. Taxpayers will be required to adopt the view that, in the IRS's sole discretion, reaches an "arm's length result." This would turn transfer pricing from a practicable (if complicated) pursuit into an impracticable free-for-all. It is no wonder that the court in *Xilinx* found that the purpose of section 482, which is "parity between taxpayers in uncontrolled transactions and taxpayers in controlled transactions," would be frustrated by requiring related parties to share costs that unrelated parties would never share. 598 F.3d at 1196.

The Government's interpretation also creates the kind of inconsistency courts typically seek to avoid. Courts generally presume that Congress legislates coherently, and therefore courts construe statutory provisions to operate harmoniously within an overall statutory scheme rather than to create internal contradiction, redundancy, or self-defeating results. *See*, *e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) (rejecting an agency's interpretation of its authority where such view would produce internal inconsistencies in the statutory scheme); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 371 (1988) (stating that statutory construction is a "holistic endeavor," and rejecting an "isolated" reading that would conflict with the remainder of the statutory scheme). The Government's

19

interpretation here would create an internal and self-defeating inconsistency by requiring arm's-length analysis in some inquiries under section 482 but not in others, seemingly subject only to the discretion of the IRS.  This Court should reject such an unsound interpretation.

Even more concerning are the Constitutional implications of the Government's position. Congress may not delegate rulemaking authority to an executive agency without providing an "intelligible principle" to guide and constrain the agency's discretion.  *See*, *e.g.*, *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).  Though this "nondelegation doctrine" has been rarely invoked in recent decades, it has been applied in recent Fifth Circuit jurisprudence. *See Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022), *aff'd and remanded*, 603 U.S. 109 (2024), *and adhered to*, 132 F.4th 745 (5th Cir. 2024) ("If the intelligible principle standard means anything, it must mean that a total absence of guidance is impermissible under the Constitution."); *see also Consumers' Research v. FCC*, 109 F.4th 743 (5th Cir. 2024), *rev'd*, 606 U.S. 656 (2025).  Likewise, while courts are hesitant to invalidate statutes on nondelegation grounds, they routinely reject statutory interpretations that raise nondelegation concerns.  *See*, *e.g.*, *Gundy v. United States*, 588 U.S. 128, 136 (2019) (finding that if a statute were read to give the Attorney General "unguided" and "unchecked" authority, the Court "would face a nondelegation question.") (Kagan, J.); *Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 672 (6th Cir. 2021) (finding unreasonable the Government's interpretation of a statute that would "grant the CDC director near-dictatorial power" to avoid violation of the nondelegation doctrine).  Properly understood, section 482 presents no such difficulty.  The arm's-length standard supplies the requisite "intelligible principle" that cabins Treasury's authority by requiring the agency to measure controlled-party transactions against the conduct of unrelated parties dealing at arm's length.  *See Foster v. Commissioner*, 80 T.C. 34, 141–42

20

(1983), *rev'd on other grounds*, 756 F.2d 1430 (9th Cir. 1985) (finding that section 482's clear reflection of income standard provides a necessary intelligible principle for nondelegation doctrine purposes).  The Government's litigating position would eliminate that statutory constraint.  If Treasury may dispense with any inquiry into arm's-length conduct whenever it asserts a preferred outcome produces an "arm's length result," then the arm's-length standard no longer operates as a meaningful limitation on the agency's discretion.  This Court should reject an interpretation that reads section 482 to remove the very constraint that cabins Treasury's delegated authority.

           c)       *Loper Bright* Requires Rejection of the Government's Position

Adopting the Government's litigating position would require the Court to make precisely the interpretive leap *Loper Bright* forbids:  treating statutory ambiguity as a grant of agency power.  And while such a leap may have been permitted under *Chevron*, it is not permitted now.  *Cf. Keysight Technologies Inc. v. United States*, No. 25–137, 2026 WL 1956959, at *1 (Fed. Cl. July 2, 2026) ("When *Chevron* fell, so too did the presumption that statutory ambiguity favors the agency.").  This Court must determine the best reading of section 482 and give effect to the limits Congress imposed on Treasury's discretion.  *See Loper Bright*, 603 U.S. at 395, 404.  Here, the relevant limit is the one that has defined section 482 since its enactment:  income is "clearly reflected" when controlled taxpayers are placed in tax parity with uncontrolled taxpayers, as measured by the arm's-length standard.  The Government does not deny that this standard applies.  It instead asks this Court to hold that the standard imposes no requirement to consider how parties at arm's-length behave.  But once section 482 is read, as the Government agrees it must be, to require an arm's-length standard, Treasury cannot satisfy that standard by adopting a rule untethered to arm's-length conduct and then declaring the resulting allocation to be "arm's length."  That would erase the statutory limit, rather than apply it.

21

Courts have rejected the IRS's attempts to ignore tax statutory requirements post-*Loper Bright*. As discussed in McKesson's principal brief, the Eighth Circuit in *3M Co. v. Commissioner* rejected an IRS argument that was "breathtaking in its potential reach," finding that the IRS's broad assertion of authority would "distort" the true income of controlled taxpayers rather than "truly reflect" them. 154 F.4th 574, 584 (8th Cir. 2025). Similarly, in the recent case of *Keysight Technologies*, the Court of Federal Claims rejected the IRS's attempt to "read ambiguity into the Tax Code and then resolve the ambiguity without constraint." Finding that such attempt would be "antithetical to the very core of *Loper Bright*" and would "confer[] unfettered discretion to administrative agencies," the court relied on the "ordinary" reading of the statute in context rather than the "lacking" definition provided by the IRS. 2026 WL 1956959, at *7. This Court would therefore not be breaking new ground. It would be applying *Loper Bright* as it was intended: by identifying the best reading of the statute and enforcing the limits Congress imposed. Section 482 requires the arm's-length standard. That standard requires some evidence of arm's-length behavior. Because the SBC rule indisputably lacked any such evidence, the rule exceeds Treasury's authority to promulgate.

> 4.    *The Government's Factual Assertions Regarding Comparability are Unsupported and Illogical*

As discussed, the Government's current litigating position regarding its authority under section 482 is as follows: (1) the first sentence of section 482 requires application of the arm's length standard, but Congress has authorized Treasury to define it; (2) Treasury has defined the arm's-length standard by reference to an "arm's length result;" and (3) in determining whether an "arm's length result" has been reached, Treasury need not consider evidence of arm's-length behavior. The Government explains that moving to this concept of an "arm's length result"

22

removed strict reliance on CUTs and addressed situations in which, in the IRS's view, limited or no comparable transactions exist.

As explained above, that view of section 482 is impermissibly broad.  But even if it were correct, it begs the question:  when evidence of comparable arm's-length behavior exists, must Treasury and the IRS consider it?  The answer, of course, is yes.  Such evidence would be relevant to the question of whether an "arm's length result" has been reached.  Treasury's own "best method rule" provides that "[d]ata based on the results of transactions between unrelated parties provides the most objective basis for determining whether the results of a controlled transaction are arm's length."  Treas. Reg. § 1.482–1(c)(2).  As McKesson explained in its principal brief, Treasury and the IRS have been presented with substantial evidence – transactional and otherwise – that parties at arm's length would never share SBC.  That evidence is plainly relevant to whether the SBC rule satisfies the arm's-length standard.

Perhaps anticipating that problem, the Government asserts that "there are no comparable unrelated transactions" relevant to the SBC rule, repeating a statement made in the preamble to the 2003 Regulations.  Def.'s Mem. at 29–30.  But the Government substantiates that assertion no more here than Treasury did in 2003.  The Government goes so far as to say that "transactions comparable to a dash-seven cost sharing arrangement – at least when the cost-shared intangible has significant profit potential (as is true for McKesson) – simply do not occur in normal business settings."  *Id*. at 30.  One would expect that such a sweeping proposition – that there can *never* be transactions comparable to a CSA, at least not with respect to intangibles with significant profit potential – would be supported by substantial evidence.  Instead, the Government cites to (1) unsupported dicta from the *Facebook* decision, (2) an opinion article by a frequent Tax Notes columnist, published one week before the Government filed its brief, that

23

provides no citations or analysis for the proposition, and (3) the preamble to the 2003

Regulations.  The Government's assertion therefore remains just that – an assertion.

This failure to substantiate such an important argument is particularly striking given that

Treasury and the IRS have previously maintained that arrangements similar to CSAs are

common at arm's length.  In the Treasury White Paper, for example, Treasury stated that "Cost

sharing arrangements have long existed at arm's length between unrelated parties."  Treasury

White Paper at 493.  Likewise, the QCSA requirements under Treasury regulation section 1.482–

7(b) were designed in large part to ensure that CSAs reasonably resemble arrangements that

would be entered at arm's length.  *See* Intercompany Transfer Pricing and Cost Sharing

Regulations Under Section 482, 57 Fed. Reg. 3,571, 3,576 (Jan. 30, 1992) (describing certain

CSA form requirements as "necessary to place the arrangement on an arm's-length basis").

While Treasury and the IRS have previously questioned whether there are good comparables for

certain *transactions* that occur within CSAs (for example, PCT or buy-in payments relating to

high-profit-potential intangibles), *see* Treasury White Paper at 472, that is a far cry from saying

that CSAs as a whole are fundamentally not comparable to arm's length arrangements.  CSAs

closely resemble joint ventures, joint development agreements, and other types of common

arm's-length business transactions.  *See*, *e.g.*, William H. Byrnes, 1 *Practical Guide: U.S.

Transfer Pricing* § 13.01 (4th ed. 2026) (stating that, as an example, the pharmaceutical industry

has for decades entered into arrangements similar to CSAs "to share the costs, risks, expertise,

and exploitation rights of the development of new drugs, medical devices, and treatments.").  It

is therefore not surprising that the Government fails to substantiate this point; it likely cannot.

In addition to arguing that no comparables can exist for many or most CSAs, the

Government goes a step further and argues that "in the context of stock-based compensation,

24

related parties and unrelated parties are fundamentally not comparable because of substantial differences in risk."[7] Def.'s Mem. at 29–30. This assertion is startling and illogical. It implies that – at least in the context of SBC – controlled taxpayers can *never* be placed on a "tax parity" with uncontrolled taxpayers. It would also mean that the results of a controlled transaction can *never* be tested against "the results that would have been realized if uncontrolled taxpayers had engaged in the same transactions under the same circumstances." Courts have rejected the IRS's attempts to make similar arguments. *See Bausch & Lomb*, 933 F.2d at 1091; *U.S. Steel Corp.*, 617 F.2d at 947. In *Bausch & Lomb*, the Second Circuit rejected the IRS's argument that uncontrolled sales were not "comparable" to those made by the taxpayers in question because, among other things, the sales were not "identical" on account of the different relationships between controlled and uncontrolled parties. The court stated that "[t]he [IRS's] position . . . would preclude comparability precisely because the relationship between [the taxpayer and its foreign subsidiary] was different from that between independent buyers and sellers . . . . This, however, will always be the case when transactions between commonly controlled entities are compared to transactions between independent entities." 933 F.2d at 1091. The Government's attempt here to resuscitate this failed argument should be similarly rejected.

The Government's position also creates an obvious circularity. If controlled and uncontrolled taxpayers are "not comparable" with respect to SBC, then requiring controlled taxpayers to share SBC cannot be justified by reference to what uncontrolled taxpayers would do in comparable circumstances. Under the Government's theory, there are no such circumstances. The result is that the IRS would apply the arm's-length standard not by looking to arm's-length behavior, but by assuming the result it prefers for controlled parties and calling that result

---

[7] As its only support for this novel argument, the Government here cites a 2017 law review student note.

25

"arm's-length." Worse yet, the Government's view could in theory be extended to any controlled transaction, because in all cases related parties to a transaction differ in some respects from unrelated parties. The goal of transfer pricing is to correct for these differences using the arm's-length standard. If the mere existence of differences between controlled and uncontrolled parties defeated comparability, then the arm's-length standard would never apply. The Government's position here is a repudiation of transfer pricing as a concept.

In addition, the Government's argument rests on several unsupported factual propositions: that CSAs are fundamentally not comparable to arm's length dealing, that McKesson's IP had "significant profit potential" within the meaning of relevant authorities, and that, with respect to the sharing of SBC, related and unrelated parties can never be sufficiently comparable for the arm's-length standard to apply. Those are factual assertions. To the best of our knowledge, the Government offers them for the first time here, without any evidence on cross motions for summary judgment. But it is black letter law that "unsubstantiated assertions[,] conclusory allegations, improbable inferences, and unsupported speculation . . . are not competent summary judgment evidence." *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994); *see also Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 237–38 (5th Cir. 2003) ("conclusory, unsupported assertions are insufficient to defeat a motion for summary judgment"). The Government itself insists that summary judgment is appropriate because "[t]his case does not present any factual disputes." Def.'s Mem. at 43. Having chosen that posture, the Government cannot inject unsubstantiated factual premises into the case and ask the Court to treat them as established. Accordingly, its comparability assertions should be disregarded.

### 5. *The CWI Standard Cannot Justify the SBC Rule*

In contrast to its briefing in *Altera*, the Government does not primarily justify the SBC rule by reference to the "commensurate-with-income" ("CWI") standard set forth in the second

26

sentence of section 482.  This represents a marked change in position since *Altera*.  There, the Government appeared to view the question presented as whether CWI could supplant the arm's-length standard incorporated into the first sentence of section 482.  *See* Brief for the Appellant (the IRS) at 50, *Altera Corp. v. Commissioner*, 926 F.3d 1061 (9th Cir. 2019) (Nos. 16–70496, 16–70497), 2016 WL 3537355, at *50 ("The issue here is whether, based on the introduction of [CWI] . . . § 482 can be permissibly construed as authorizing a regulation . . . based solely on [an] internal benchmark . . . [rather than] on evidence of what unrelated parties do. . . .").  Now, the Government appears to think that it has all the authority it needs under the first sentence of section 482 – and that the first sentence's "arm's-length standard" no longer requires any sort of arm's-length analysis.

Perhaps this change in position reflects that the Government no longer believes that CWI is the best justification for the SBC rule.  This would be reasonable, as CWI does not naturally apply to the allocation of costs in a CSA, as discussed in McKesson's principal brief.  Pl.'s Br. at 35–37.  For one, by the express terms of the statute, CWI applies only in the case of a "transfer or license" of an intangible, and CSAs do not inherently involve transfers or licenses.  While "transfers" can occur within CSAs (*e.g.*, a platform contribution), the normal-course sharing of costs in a CSA does not involve a transfer at all, as the parties simply agree to share a percentage of costs and therefore are permitted to earn a percentage of any resulting income.  The Government's quotation from *Altera*, that parties entering into a CSA are "*transferring* future distribution rights to intangibles, albeit intangibles that have yet to be developed," Def.'s Mem. at 25, is illogical.  Intangibles that have yet to be developed in a CSA do not belong to anyone at the time a CSA is entered into, and thus they are not "transferred" by operation of the CSA.

27

But even if CWI could apply, the Government does not argue, and Treasury and the IRS have never shown, that as a factual matter sharing SBC would be "commensurate with the *income attributable to the intangible.*"  26 U.S.C. § 482 (emphasis added).  By its plain terms, an adjustment under CWI applies only if it would match (or be "commensurate with") the "income" of the particular cost-shared intangible.  Thus, to apply CWI in the case of SBC, the IRS would be required to show that SBC cost would be taken into account in measuring the "income" of a particular intangible.

Based on evidence provided to Treasury in the rulemaking process, it is not clear that the IRS could ever make this showing, because SBC cost is generally not closely related to any particular cost shared intangible.  *See* William J. Baumol & Burton G. Malkiel, Status of Stock Options in Shared-Cost Contracts, at 9 (Apr. 8, 2002) ("Baumol & Malkiel Report"), in Baker & McKenzie LLP, Comment Letter on behalf of Software Finance and Tax Executives Council (Nov. 5, 2002) (App. Ex. 2) ("There is simply no logical or economic basis" for "trying to connect the spread on exercise of options granted in prior years to current year development efforts."); American Electronics Association, Comment Letter, at 4 (Oct. 28, 2002) (App. Ex. 1) ("Independent parties would not agree to use exercise-date valuation for cost sharing purposes because the payments would be . . . not directly related to the joint development activity").  In the typical case, SBC is comprised of stock in a corporate group parent.  The price of that stock is determined by many factors, including the overall performance of the group, expectations for future growth, and general market factors.  *See* Baumol & Malkiel Report at 6–7 ("It is widely accepted by economists that the stock prices generally incorporate all pertinent and publicly known information.").  Particularly for a large multinational like McKesson, stock price is rarely – if ever – closely linked to the value of any particular asset owned or developed by the

28

company.  Thus, unlike salary costs and other expenses, SBC is not closely tied to the income of any particular intangible, and thus cannot be required to be shared on the view that such sharing is "commensurate with the income attributable to the intangible."  In the normal course, SBC and the "income" attributable to any particular intangible have next to nothing to do with one another.

In sum, CWI is an inappropriate source of justification for the SBC rule, since CSAs do not involve "transfers or licenses" in the ordinary course, and SBC is not closely associated with, and thus is not "commensurate with" the income of any particular cost-shared intangible.  Thus, it cannot justify the SBC rule, and the Government was right to drop it from its combined brief.

6.    *Altera was Wrongly Decided and Remains an Aberration*

McKesson's principal brief recounts the series of taxpayer challenges to the IRS's efforts to require SBC to be shared.  Pl.'s Br. at 18–23.  The Government failed in *Seagate*, failed twice in *Xilinx*, and failed before the Tax Court in *Altera* to prove that parties at arm's length should be required to share SBC.  Only a divided Ninth Circuit in *Altera* has ever held that controlled parties should be required to do so, and that decision rested on *Chevron* "step two" to defer to Treasury's SBC rule.  *Altera*, 926 F.3d at 1087 ("Treasury's understanding of its power to use methodologies other than a pure transactional comparability analysis was reasonable, and we defer to its interpretation under *Chevron*.").  The Government tries to recast *Altera* as a decision about unambiguous statutory text.  It is not.  Though the *Altera* majority discussed the text of section 482 and the historical interpretations of the arm's-length standard, that discussion was the foundation for the court's holding that, while the Government's view "may not have been the only possible interpretation of Congress's intent, it proves a reasonable one . . . [and is] therefore permissible under *Chevron*."  *Id.* at 1078.  If *Altera* had held, as the government now suggests, that section 482 "unambiguously" authorizes the SBC rule, Def.'s Mem. at 33, the case might

29

have been decided under *Chevron* step one.  It was not, and nothing in the *Altera* decision suggests that the court viewed the statute as "unambiguous" in any respect.  Instead, the decision turned on the very deference regime that no longer governs.

The Government also implies that *Altera's* reasoning, and therefore the *Altera* decision itself, has been upheld in subsequent cases.  But of the cases the Government cites, only *Facebook* even mentions *Altera*, and *Facebook* did not involve the SBC rule.  Moreover, the Tax Court's *Facebook* decision is appealable to the Ninth Circuit, where *Altera* remains binding precedent.  Thus, the Tax Court in *Facebook* was required to apply the holding of *Altera* under the Tax Court's *Golsen* rule.  *See Golsen*, 54 T.C. at 757 (holding that the Tax Court is required to follow the decision of a Court of Appeals to which the case would be appealable).  In addition, neither *Medtronic, Inc. v. Commissioner*, 153 F.4th 682 (8th Cir. 2025), nor *Coca–Cola Co. v. Commissioner*, 155 T.C. 145 (2020), cite *Altera* at all, and to the extent either could be read as supporting *Altera's* reasoning, it is only for the unremarkable proposition that the arm's-length standard does not always require the use of CUTs.  As noted above, McKesson agrees that the arm's-length standard is not limited to CUTs, but it does require some analysis of how unrelated parties do or would behave at arm's length.  The Government identifies no case holding otherwise.

*Altera* thus remains what it has always been:  an outlier.  It is the *only* decision to uphold the SBC rule, and it did so only by deferring under *Chevron* to Treasury's interpretation.  After *Loper Bright*, that lifeline is gone.  This Court should not extend *Altera* beyond its Ninth Circuit home, much less treat it as persuasive authority for sustaining a rule that Treasury never justified under the arm's-length standard.

30

B.      The SBC Rule is Procedurally Invalid

The SBC rule is procedurally invalid for two independent reasons.  First, the Government now defends the rule through a reading of the arm's-length standard that Treasury did not adopt when it issued the rule, and under *Chenery* that post hoc rationale cannot sustain the rule.  Second, Treasury's stated rationale was itself deficient under the reasoned decisionmaking standard set forth in longstanding Supreme Court jurisprudence, *see Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co*, 463 U.S. 29 (1983), and under the APA.

1.      *The Government May Not Defend the SBC Rule Through a New Reading of the Arm's-Length Standard*

The Government's current defense of the SBC rule rests on an interpretation of the arm's-length standard that Treasury did not articulate when it issued the rule.  That is not permitted.  Under *Chenery*, "[A] reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency," *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), and such action "cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."  *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943); *see also Dish Network Corp. v. NLRB*, 953 F.3d 370 (5th Cir. 2020) (following *Chenery* in a collective bargaining case).  That is, Treasury's "'action must be measured by what [it] did, not by what it might have done.'"  *Tex. Power & Light Co. v. FCC*, 784 F.2d 1265, 1269–70 (5th Cir. 1986) (quoting *Chenery*, 318 U.S. at 93–94).

As McKesson explained in its principal brief, Treasury defended the SBC rule in the preamble to the 2003 Regulations on the grounds that taking SBC into account in the QCSA context "is consistent with the legislative intent underlying section 482 and with the arm's length standard."  Pl.'s Br. at 20–21 (citing T.D. 9088, 2003–2 C.B. 841, 842).  Regarding the arm's-length standard, Treasury argued that evidence of actual transactions between unrelated parties

31

involving the sharing of SBC costs was not required, and asserted that unrelated parties entering into a cost-sharing contract would bargain to share all relevant development costs, including SBC, and would not distinguish SBC from other forms of employee compensation.  T.D. 9088, 2003–2 C.B. 841, 842–43.

Treasury did not say in the preamble that the arm's-length standard could be satisfied without any evidence – transactional or otherwise – of arm's-length behavior, nor that Treasury could require sharing of SBC costs simply because it deemed that result necessary to "clearly reflect income."  Instead, Treasury offered a series of conclusory assumptions about unrelated party behavior in an attempt to justify the SBC rule under the arm's-length standard.  First, Treasury asserted that unrelated parties would "ensure through bargaining that the arrangement reflected all relevant costs," among which it included SBC costs.  *Id.* at 843.  Next, it offered its belief that unrelated parties who agree to share the costs of developing intangibles "generally would not distinguish between [SBC] and other forms of compensation."  *Id.*  Finally, Treasury claimed that, in cases where a significant element of compensation consists of SBC, "the party committing employees to the arrangement generally would not agree to do so on terms that ignore the [SBC]."  *Id.*  Although each of these statements was made without evidentiary support, they reflected Treasury's desire to justify the SBC rule under the arm's-length standard.

Yet, the Government now argues that the arm's-length standard means nothing more than achieving an "arm's length result," and that in determining whether an "arm's length result" has been reached, Treasury need not consider evidence of arm's length behavior.  Def.'s Mem. at 20.  That is not a defense of Treasury's stated reasoning; it is a substitute for it.  *Chenery* does not permit the Government to defend the SBC rule by offering in litigation a broader and different justification than the one Treasury actually gave when it issued the rule.

32

The history and evolution of the Government's position since the promulgation of the SBC rule highlights the Government's inconsistent attitude towards the arm's-length standard. At the rulemaking stage, Treasury proceeded on the premise that SBC costs should be treated like other development costs and that requiring their inclusion in the cost pool was "consistent with" the arm's-length standard.  When the Government was later forced to defend that premise in litigation, it tried and failed to prove that unrelated parties would share SBC costs.  In *Xilinx*, the Tax Court found that unrelated parties "would not share" SBC costs and that the IRS's contrary allocation therefore did not comply with the arm's-length standard.  125 T.C. at 62, *aff'd* 598 F.3d 1191.  The Government then shifted ground in *Altera*, relying primarily on CWI and arguing that section 482 permitted an internal method untethered to evidence of uncontrolled party behavior.  *See* Brief for the Appellant (the IRS) at 50, *Altera Corp. v. Commissioner*, 926 F.3d 1061 (9th Cir. 2019) (Nos. 16–70496, 16–70497), 2016 WL 3537355, at *50 ("The issue here is whether, based on the introduction of [CWI] . . . § 482 can be permissibly construed as authorizing a regulation . . . based solely on [an] internal benchmark . . . without providing taxpayers an 'escape hatch' based on evidence of what unrelated parties do (or do not do)."). The Government's position here goes still further, suggesting that Treasury may dispense with arm's-length analysis altogether whenever it asserts that a rule reaches an "arm's length result," Def.'s Mem. at 16–17, regardless of whether CWI applies.  *Id.* at 25.

This progression highlights why *Chenery* is applicable here.  This Court must of course exercise its own judgment as to the best reading of section 482 under *Loper Bright*, but the Government cannot use that principle to erase the separate rule that an agency action must rely on the reasoning the agency actually adopted.  *Chenery*, 332 U.S. at 196.  If Treasury believed in 2003 that uncontrolled party evidence was immaterial, or that Treasury could require sharing of

33

SBC costs without regard to what parties at arm's length would do, Treasury had to say so then and explain why. It did not. Instead, Treasury said the opposite: it told the public that it believed the rule was "consistent with . . . the arm's-length standard." T.D. 9088, 2003–2 C.B. 841, 842. The Government should not now be permitted to defend the rule on a materially different theory that emerged only after it lost in *Xilinx*, relied on *Chevron* in *Altera*, and then reformulated its position again for the current litigation. Under *Chenery* and its progeny, that new theory is unavailing.

> ### 2.    *The SBC Rule Was Not Promulgated in Compliance with the APA's Requirements*

In response to McKesson's principal brief, the Government asserts that Treasury complied with the reasoned decisionmaking requirements of the APA because the SBC rule is "reasonable and reasonably explained." Def.'s Mem. at 36. But the Government's defense does not answer the APA defects McKesson identified, which concern Treasury's unsupported assertions regarding the arm's-length standard. The Government's combined brief cites and relies on portions of the preamble to the 2003 Regulations that explained that, because SBC is a cost, and because the cost-sharing regulations require all costs to be shared in proportion to RAB share, Treasury reasonably required SBC to be included in the cost pool. *See* Def.'s Mem. at 36–37. The Government then states that this rationale meant Treasury was "performing an analysis that does not require consideration of transactions between unrelated parties," so public comments addressing unrelated party treatment of SBC costs "were not significant and did not require a response." *Id.* at 37–38.

The Government's argument does not answer McKesson's challenge to the SBC rule as arbitrary, capricious, and unreasonable. As explained under the previous heading, Treasury defended the SBC rule in 2003 *both* on the basis that (1) section 482's legislative history

permitted Treasury to require "all costs" to be included in the cost pool, and (2) taking SBC into account in QCSAs "is consistent with . . . the arm's length standard."  T.D. 9088, 2003–2 C.B. 841, 842.  Treasury also asserted (without evidence) that (1) unrelated parties would "ensure through bargaining" that their arrangement included SBC costs, (2) unrelated parties generally would not distinguish SBC from other forms of employee compensation, and (3) in cases where SBC constituted a significant element of the compensation, the party committing employees to the arrangement generally would not agree to do so on terms that ignored the SBC.  *Id.* at 843. Those assertions were Treasury's answer to public comments arguing that the rule was inconsistent with the arm's-length standard because unrelated parties do not share SBC costs in similar circumstances.  *Id.* at 842.

The Government now attempts to reframe these assertions as merely "extraneous statements" about what unrelated parties would do in similar circumstances that "were not material to the explanation that actually mattered."  Def.'s Mem. at 38.  But these statements did matter materially.  In *Xilinx*, the Tax Court and the Ninth Circuit both expressly rejected the premise on which the Government now relies – that Treasury is permitted to require "all costs," and thus SBC, be taken into account in a CSA.  125 T.C. at 62, *aff'd*, 598 F.3d at 1196–97. Treasury therefore needed to argue that its regulation was consistent with the arm's-length standard, and the Government's attempt to revise its prior justification to better conform to its current litigating position is revisionist history.

McKesson reiterates the arguments in its principal brief.  First, Treasury lacked a factual basis for the central premise of the SBC rule.  An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 910 (5th

Cir. 2023) (quoting *State Farm*, 463 U.S. at 43).  In this case, Treasury adopted a rule requiring the sharing of SBC costs because it believed that parties dealing at arm's length would do the same in comparable cost-sharing contexts.  *See* T.D. 9088, 2003–2 C.B. 841, 843 ("These final regulations reflect that at arm's length the parties to an arrangement that is based on the sharing of costs to develop intangibles . . . would ensure through bargaining that the arrangement reflected all relevant costs, including all costs of compensating employees for providing services related to the arrangement.").  Treasury had no evidence supporting that belief.  It identified no actual agreement or transaction in which unrelated parties shared SBC.  Pl.'s Br. at 39.  It cited no study, no market data, no expert report, and no empirical analysis showing that arm's-length parties would agree to reimburse each other for SBC.  *Id.*  Instead, Treasury simply asserted that it "continue[d] to believe" the rule was consistent with the arm's-length standard.  T.D. 9088, 2003–2 C.B. 841, 842.  That absence of evidentiary support is itself fatal under the reasoned decisionmaking standard.  Reasoned decisionmaking requires more than declaratory verbiage.  *See* Pl.'s Br. at 40 (citing, *inter alia*, *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 477 (5th Cir. 2024 ) ("We cannot affirm agency action on the basis of 'conclusory' statements.")).  An agency cannot adopt a rule on the basis of an unsupported hunch, especially where the rule turns on an empirical proposition about arm's-length conduct.

Second, the SBC rule was contrary to the evidence that was before Treasury.  Agency action is arbitrary and capricious if the agency has "offered an explanation for its decision that runs counter to the evidence before the agency."  *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *State Farm*, 463 U.S. at 43).  Treasury did exactly that here.  The public comments submitted in response to the proposed rule did not merely note a lack of support for Treasury's position.  They supplied affirmative evidence that unrelated parties do not

36

share SBC in cost-sharing agreements, service agreements, collaboration agreements, government cost-reimbursement contracts, or other comparable arrangements. *See* Pl.'s Br. at 31–33, 40. They also explained why rational parties would not do so: SBC is difficult to value, subject to stock-price volatility unrelated to the underlying R&D activity, and outside the parties' control. *Id.* at 32. Treasury identified no actual transactions, no studies, no expert analysis, and no empirical evidence pointing in the other direction. *Id.* at 41.

The Government does not address this point. Its current position is that the evidence submitted by commenters was irrelevant because the proper inquiry was not what unrelated parties do, but whether Treasury could require "all costs" to be included in the cost pool. But that is not responsive to the second APA defect McKesson identified. As previously explained, Treasury itself chose to premise the rule on consistency with the arm's-length standard. *See* T.D. 9088, 2003–2 C.B. 841, 843. Once it did so, Treasury was required to confront the evidence showing that unrelated parties do not share SBC. The Government cannot transform that evidentiary failure into a non-issue by retreating to a different theory after the fact. And even if Treasury had wanted to say that evidence of arm's-length behavior was irrelevant, it would have had to explain why, especially in a regulatory regime that elsewhere insists that the arm's-length standard applies "in every case." Treas. Reg. § 1.482–1(b)(1).

Third, Treasury failed to respond meaningfully to significant comments. "[B]are acknowledgement" of concerns "is no substitute for reasoned consideration." *Louisiana*, 90 F.4th at 473. The comments here were plainly significant. They challenged Treasury's core factual premise, supplied contrary evidence, and explained why the proposed rule was unsound. If those comments were correct, and Treasury had no evidence showing they were not, then the proposed rule could not plausibly be described as consistent with the arm's-length standard. Yet

37

Treasury did not grapple with the comments in a meaningful way.  It did not explain why the cited agreements were insufficiently comparable under the regulations' own comparability framework.  It did not explain why the complete absence of any agreement providing for the sharing of SBC was not itself compelling evidence against the rule.  It merely reiterated its prior conclusion and dismissed the comments in conclusory fashion.

The Government's answer – that Treasury had no obligation to engage with the comments because they addressed the wrong question – only underscores the problem.  If Treasury believed that evidence of unrelated party behavior was immaterial, it should have said so in the rulemaking and explained why.  It did not.  Instead, Treasury purported to assess the comments on their own terms and responded by saying only that the cited agreements did not "share enough characteristics" with QCSAs to prove that arm's-length parties would not share SBC.  T.D. 9088, 2003–2 C.B. 841, 842.

At bottom, then, this case presents a straightforward failure of administrative procedure.  Treasury promulgated a rule that it said was consistent with the arm's-length standard.  But Treasury had no factual basis for that conclusion, the evidence before the agency affirmatively contradicted it, and Treasury failed to respond in any meaningful way to the comments demonstrating as much.  The Government now asks this Court to uphold the SBC rule on a different theory.  The APA does not permit that maneuver.  Because Treasury failed to justify its rule through reasoned decisionmaking at the time of its promulgation, the SBC rule was not promulgated in compliance with the APA's requirements and must be set aside.

C.    The Government's Only Preserved Affirmative Defense is Its Section 162 Argument and That Argument Fails

The Government's Answer asserted three affirmative defenses:  a limitations defense under 28 U.S.C. § 2401(a) ("§ 2401(a)"), a defense based on section 162, and a defense based on

38

what it called the "plain meaning" of section 482.  Answer, ECF No. 21, at 13.  But in its combined brief, the Government has deliberately waived the first, abandoned the third, and presses only the second, which fails on its own terms.

        *1.     The Government Has Waived or Abandoned Its First and Third Affirmative Defenses*

In its combined brief, the Government states that, although it "does not concede" timeliness under § 2401(a), it "is not advancing that argument as a defense in this case."  Def.'s Mem. at 35 n.19.  This statement constitutes a deliberate waiver of the § 2401(a) defense by the Government.  *See, e.g.*, *Wood v. Milyard*, 566 U.S. 463, 466–67, 472 (2012) (Respondents' statement in their answer that they "are not challenging, but do not concede, the timeliness of the petition" constituted a waiver of the statute-of-limitations defense); *Kinnison v. City of San Antonio*, 480 F. App'x 271, 274–75 (5th Cir. 2012) (finding that the defendant's "express[] disavow[al] at oral argument" of *Monell* defense constituted a "clear[] and unequivocal[] waive[r]") (citing *Wood*, 566 U.S. at 466); *see also Woodson v. Allstate Ins. Co.*, 855 F.3d 628, 635 (4th Cir. 2017) ("[T]he defense [of limitations] may be 'waived' by conscious and deliberate conduct indicating the wish not to present the defense or by the conscious and deliberate failure to present the defense . . . .") (citing *Wood*, 566 U.S. at 472–74).

The Government has also abandoned its third affirmative defense.  Although the Government did not expressly waive that defense in its combined brief, it also did not argue, or even mention, it.  Accordingly, the Government should be deemed to have waived this defense as well.  *See, e.g.*, *Deprag, Inc. v. Mine Shield, LLC*, No. 4:12–CV–320, 2014 WL 47414, at *3 (E.D. Tex. Jan. 3, 2014) (citing *United States v. Charles*, 469 F.3d 402, 408 (5th Cir. 2006) ("Inadequately briefed issues are deemed abandoned.")); *Woodmen of the World Life Ins. Co. v. Lewis*, 118 F. App'x 826, 831 (5th Cir. 2004).  Because the Government has deliberately waived

39

one affirmative defense and should be deemed to have waived another, the only affirmative defense properly before this Court is the section 162 defense discussed below.

### 2. The Government Has Not Made Even a Threshold Showing That Any of McKesson's SBC Costs Were For the Benefit of IP3

The Government's fallback argument under section 162 rests on a second sleight of hand. Having failed to justify the SBC rule under section 482, the Government now argues that McKesson cannot deduct its own SBC costs under section 162 because they were supposedly incurred "for the benefit" of its Irish cost-sharing affiliate, IP3. Def.'s Mem. at 39. The only basis offered by the Government for this argument is the parties' RAB shares under their CSA. Def.'s Mem. at 41 ("McKesson cannot deduct [SBC] costs attributable to [IP3's] [RAB] share.").

That argument is technically new, though in substance it merely repackages the same theory the Government uses to defend the SBC rule.[8] After all, the argument relies solely on the concept of RAB share (a CSA concept) for its factual basis and would disallow precisely the same expenses the Government argues should be shared under the SBC rule, but just under a different section of the Code. In that sense, the Government's section 162 theory operates less as an affirmative defense than as another effort to preserve the practical effect of the SBC rule through a rationale not previously advanced to justify that result. Many of the same policy justifications underlying *Chenery* should apply here – this is yet another "post hoc rationalization" for the SBC rule. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) (citing *Chenery*, 332 U.S. at 196); *see also NLRB v. Pioneer Nat. Gas Co.*,

---

[8] We note that the IRS recently advanced a similar fallback theory in another case involving SBC costs, *Meta Platforms, Inc. v. Commissioner*, Docket No. 16081–25. *See* Respondent's Motion for Partial Summary Judgment, *Meta Platforms, Inc. v. Commissioner*, Docket No. 16081–25 (May 12, 2026), 2026 TNTI 93–34.

397 F.2d 573, 576 (5th Cir. 1968) ("The court may not accept appellate counsel's post hoc rationalizations for agency action.").

As a practical matter, the likely reason the Government has never made this argument before is that it doesn't work.  Though the Government obscures its argument using technical CSA terminology, its central argument is just a rehash of its primary argument, discussed above: to properly reflect the "RAB share" as between the parties, McKesson must share SBC costs with IP3 (and, therefore, McKesson should not deduct those shared costs under section 162).  But the Government's argument here fails just the same.  The computation of RAB share determines only the percentage *share* of IDCs that must be borne by the participants in a CSA.  It does not determine which costs themselves are IDCs, and therefore must be included in the cost pool.  And it certainly does not establish that any particular cost was incurred for the benefit of another person or entity under section 162.  The Government does not even attempt to show that SBC is a cost "allocable to" the intangible development activity, let alone that it should be disallowed under the deductibility rules of section 162.

Treasury's own regulations confirm that section 162 cannot address the transfer pricing question at issue here.  The text of the SBC rule measures SBC costs – and thus the amount of SBC that must be shared under the SBC rule – by the amount of a CSA participant's section 162 deduction for federal income tax purposes.  In other words, to uphold the Government's alternative section 162 argument, this Court would have to disregard the entire CSA framework that the Government asks to be applied in its primary argument.  Once again, this Court should reject an argument that would create internal contradiction and self-defeating results.  *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 126.

41

a)    RAB "Share" Has No Bearing On Whether a Particular Cost Was Incurred For the Benefit of Another Person or Entity

Here, we briefly examine the mechanics of the cost-sharing regulations, and the role of RAB share in this context.  Under the cost-sharing regulations, CSA participants are required to share certain development-related costs, which are termed IDCs, in proportion to their shares of projected benefits from exploiting any resulting intangible assets in their assigned areas, which are termed RAB shares.  *See* Treas. Reg. § 1.482–7(a)(1).  RAB share is computed first, and is determined by calculating each CSA participant's percentage share of the "reasonably anticipated benefits" expected to be derived from the cost-shared intangible.  Treas. Reg. § 1.482–7(e)(1)(i).  IDCs are determined next, and include all costs incurred in the ordinary course of business after the formation of a CSA and that are directly identified with or reasonably allocable to the intangible development activity.  Treas. Reg. § 1.482–7(d)(1)(iii).  As noted above, IDCs are shared between and among CSA participants in proportion to their RAB shares.  RAB share is used solely to determine the share of IDCs that each CSA participant must bear; it does not determine which IDCs are included in the cost pool.

This principle proves fatal to the Government's argument.  The Government asks this Court to assume that RAB share determines not only the percentage of IDCs that each participant must bear, but also which costs are allocable to the cost-shared intangibles (and thus should be treated as IDCs) in the first place.  That is fundamentally not how the CSA rules work.  A simple example may be illustrative.  Assume two parties, A and B, enter into a CSA to develop undiscovered intangible Y, and neither contributes other intangibles.  After deciding the scope of the development activity, A and B first estimate the "reasonably anticipated benefits" share that each party expects to receive from exploiting Y once developed.  The regulations provide several estimation methods for determining RAB share, but the goal is the same – to determine the

42

approximate percentage benefit that either party expects from exploiting Y once developed. Assume A's RAB share is estimated to be 60% and B's 40%. Once this share is developed, A and B agree to share IDCs in proportion to their RAB shares. First, the parties agree on *which* costs are either directly identified with or reasonably allocable to the intangibles to be developed in the CSA. Assume A and B agree that total IDCs for a given year are equal to 100x, determined by adding the total costs incurred by A and B together that the parties agree are IDCs. Then, the RAB share percentage is applied to that pool of costs to ensure the parties share costs in proportion to their expected benefits – *i.e.*, for the year in question, A bears 60x and B bears 40x of the total cost.

The Government's argument here is that by computing RAB share, McKesson also computed the IDCs that are identified with or allocable to the CSA activity. But RAB share is not used for this purpose. Continuing the example above, suppose that instead of the RAB shares computed above, A's RAB share was determined to be 70%, and B's 30%. The total IDCs, however, remain equal to 100x. While the *share* of IDCs borne by the parties (here, 70x by A and 30x by B) may change, whether any particular cost is included as an IDC, and thus the total amount of IDCs, is unchanged.

By comparison, suppose it was determined that the total amount of IDCs between A and B was 80x rather than 100x. This would have no impact on RAB share (which remains 70% to A and 30% to B), but what would change are the IDCs that A and B are required to share under the CSA. This scenario is McKesson's position – McKesson argues that the IDC pool should not include SBC, and therefore it should not be shared between the CSA participants. This question has nothing to do, however, with how RAB share is computed, and the Government's argument here reflects an extraordinary misunderstanding of the CSA rules.

43

The argument is, however, reflective of the theory of the case that the Government presents in its primary argument in defense of the SBC rule. There, the Government asks this Court to uphold the SBC rule because – although no party at arm's length would share SBC – SBC is a "cost" and parties in a CSA are required to share "all costs" allocable to cost-shared intangibles. But in making this argument, the Government has seemingly never asked *why* unrelated parties do not share these costs. As commenters and prior litigants have explained (and as McKesson summarized in its principal brief), unrelated parties do not share SBC because such costs are not clearly related to the parties' joint development activity.

The Government does not attempt to prove this in its briefing, and instead tries a shortcut that would flip the CSA rules on their head. It asks this Court to assume that RAB "share" is relevant to whether SBC is a cost that might benefit another party, and further asks the Court to assume that this is relevant to deductibility under section 162. The Government's arguments here are wrong as a matter of law, and "unsubstantiated assertions[,] conclusory allegations, improbable inferences, and unsupported speculation . . . are not competent summary judgment evidence," *Forsyth*, 19 F.3d at 1533.

> b)   The IRS Has Already Accepted That McKesson's SBC Costs are Deductible Under Section 162

Though the Government's RAB share argument does not make even a threshold showing that section 162 should apply to disallow McKesson's SBC deductions in this case, we briefly summarize that standard for completeness. Section 162(a) allows a deduction for ordinary and necessary business expenses, including "a reasonable allowance for salaries or other compensation for personal services actually rendered." 26 U.S.C. § 162(a)(1). When an employer compensates an employee not with cash but with property, section 83(h) adds a restriction to the general section 162 deduction test. Under section 83(h), an employer may take

a deduction for non-cash compensation under section 162 only in an amount that is equal to the amount included as gross income by the employee with respect to the property transferred.  26 U.S.C. § 83(h).

The question of whether an expense is deductible under this standard is subject to well-established jurisprudence, some of which the Government discusses in its combined brief, but it has not made even a threshold showing that this standard should be invoked.  The Government's RAB share argument, discussed above, says nothing about whether a particular cost should be considered an IDC, and thus whether such cost could – in theory – be considered to benefit another person or entity under the separate standard of section 162.  Once again, the Government's arguments here amount to unsubstantiated assertions.  *Forsyth*, 19 F.3d at 1533.

In fact, the question of whether McKesson satisfies this jurisprudence has already been answered – in the affirmative – by the IRS.  For SBC expense to be shared under the SBC rule in the first place, it must be an "amount allowable to the [CSA] participant as a deduction for federal income tax purposes . . . ."  Treas. Reg. § 1.482–7(d)(3)(iii)(A).  SBC is permitted as a deduction under section 162 where it satisfies the requirements of section 83(h).  Thus, by requiring McKesson to share SBC under the SBC rule, the IRS has conceded that such amounts must be deductible under section 162.

As the prior paragraph shows, the Government's argument here is incompatible with its affirmative argument that McKesson must share SBC pursuant to the SBC rule, and shows why the Government's new argument must be rejected.  For its primary argument to be true – that McKesson incurred SBC cost that must be shared under the SBC rule – McKesson's SBC cost must in the first instance be deductible under section 162.  But for its alternative, section 162-based argument to be true, the Government must show that under precisely the same facts that

are relevant to its affirmative position, McKesson's SBC cost would not be deductible. Ironically, though the Government argues, albeit inconsistently, that this Court "need not address the validity" of the SBC rule because it could simply adopt the Government's section 162 argument, adopting that argument would necessarily require finding that none of McKesson's SBC would be eligible to be shared under the SBC rule, thus rendering that rule practically invalid.

The better reading is straightforward. Sections 162 and 83(h) determine whether, and in what amount, McKesson is entitled to a deduction for SBC paid to its own employees. If that deduction is allowable, the SBC rule – assuming it applies – uses that deductible amount as the measure of SBC cost for cost-sharing purposes. If the deduction were not allowable, then under the rule's own formula, the amount of SBC cost taken into account would correspondingly be reduced. What the Government cannot do is collapse those two steps into one and use a deemed section 482 allocation of projected benefits to negate the predicate deduction on which the rule itself depends.

### 3.   McKesson Did Not Concede the Government's Section 162 Defense By Not Addressing It in Its Principal Brief

In a single sentence without citing any authority, the Government also argues that McKesson "effectively concede[d]" the Government's section 162 defense by not addressing it in its principal brief. Def.'s Mem. at 39. The Government's analysis is completely deficient and this Court should consider the issue inadequately briefed, *Goins v. Dir., Off. of Worker's Comp. Programs*, 436 F. App'x 366, 369 (5th Cir. 2011) (per curiam) (describing the adequate briefing standard as a "low hurdle," but finding arguments waived when plaintiff's brief lacked any citations to the record or legal authority), and therefore waived. *See, e.g., Wilson v. City of Mission*, No. 7:18–cv–00399, 2020 WL 2079359, at *10 (S.D. Tex. Apr. 30, 2020)

46

("[A]rguments asserted without citation to authority or left undeveloped are waived."); *Burnley v. City of San Antonio*, 470 F.3d 189, 200 n.10 (5th Cir. 2006) (holding that argument was waived for inadequate briefing where appellee sought an award of attorney's fees but "provide[d] neither legal authority nor evidence in support"). As such, this Court need not even consider it.

But even if this Court were to consider the Government's argument on the merits, the Government is wrong to suggest that McKesson "effectively concede[d]" the Government's section 162 defense. Courts have consistently rejected the proposition that a party moving for summary judgment must preemptively rebut every affirmative defense raised by the non-movant in its pleadings. In *Frerck v. Pearson Educ., Inc.*, the court expressly declined to require the movant to "preemptively tackle all of [the non-movant's] affirmative defenses," and instead agreed with decisions holding that a non-movant must raise and support the defenses on which it actually intends to rely in its opposition to summary judgment. 63 F. Supp. 3d 882, 886 (N.D. Ill. 2014); *see also Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1366 (Fed. Cir. 2003) (holding that a party asserting an affirmative defense must raise it "in response to a motion for summary judgment"); *United Mine Workers v. Pittston Co.*, 984 F.2d 469, 478 (D.C. Cir. 1993) (same); *United Cent. Bank v. Wells St. Apartments, LLC*, 957 F. Supp. 2d 978, 987–88 (E.D. Wis. 2013) (rejecting the argument that plaintiff had to disprove the defendant's affirmative defenses in its motion for summary judgment).

As *Frerck* explained, "when—as here—the defendant takes a shotgun approach to affirmative defenses, judicial economy is best served by forcing it to identify and argue only those defenses that matter." 63 F. Supp. 3d at 886–87. That is precisely this case: the Government pleaded three affirmative defenses, but in its own affirmative motion and combined brief chose to pursue only one. It would have been wasteful to require McKesson to devote

47

space in its principal brief to rebutting every pleaded defense on the chance that the Government might later decide to rely on one or more of them.  Nor does the Government seriously argue waiver; it says only that McKesson "effectively" conceded the point.  But under the authorities discussed above, McKesson did not concede anything by waiting to respond until the Government actually pressed its section 162 defense.

## III.    Conclusion

This case begins and ends with a simple point:  parties at arm's length do not share SBC, and the Government has never shown otherwise.  The arm's-length standard is satisfied, and therefore income is "clearly reflected," only if controlled parties are placed at "tax parity" with uncontrolled parties.  The SBC rule therefore conflicts with the arm's-length standard, and under the guidance of *Loper Bright*, it conflicts with the best reading of section 482 and is invalid.  The Government's attempt to redefine the arm's-length standard as an "arm's length result" that it may simply declare, without evidence – transactional or otherwise – of arm's-length behavior, fails for the same reason.  The SBC rule also fails as a matter of reasoned decisionmaking because Treasury never explained why related parties should be required to share costs that the evidence showed unrelated parties would not share.  The Government's section 162 defense likewise provides no independent basis to deny McKesson's deductions for SBC costs incurred by McKesson.  Accordingly, McKesson respectfully requests that this Court grant its motion for summary judgment, deny the Government's cross-motion for summary judgment, and enter judgment in favor of McKesson and against the Government.

Dated: July 10, 2026.


**COVINGTON & BURLING LLP**


Kevin Otero*
N.Y. Bar No. 4325114
kotero@cov.com
30 Hudson Yards
New York, NY 10001
Tel: (212) 841-1000
Fax: (212) 841-1010


Joseph Sullivan*
D.C. Bar No. 1644205
jsullivan@cov.com
One CityCenter
850 Tenth Street
Washington, DC 20001
Tel: (202) 662-6000
Fax: (202) 662-6302


*admitted pro hac vice


**NORTON ROSE FULBRIGHT LLP**

Elizabeth "Ellie" Norris
State Bar No. 24099138
ellie.norris@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
Tel: (214) 855-8074
Fax: (214) 855-8200

*Attorneys for Plaintiff*
*McKesson Corporation and Subsidiaries*

## CERTIFICATE OF SERVICE

I certify that, on July 10, 2026, I caused the foregoing document to be filed with the Clerk of Court of the United States District Court for the Northern District of Texas using the Court's CM/ECF system.

Dated: July 10, 2026.

_____

Kevin Otero*

*admitted pro hac vice