IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
Dallas Division

| | | |
|---|---|---|
| MCKESSON CORPORATION and SUBSIDIARIES, | ) ) ) | Case No. 3:25-cv-1102 |
| Plaintiff, | ) ) | Judge David C. Godbey |
| v. | ) ) ) | |
| UNITED STATES OF AMERICA | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**REPLY IN SUPPORT OF DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT**

Dated: August 14, 2026

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General
Tax Litigation Branch

MOIRA E. GOODWIN
DC Bar No. 1780293
DANIEL B. CAUSEY, IV
SC Bar No. 104035
Trial Attorneys
Tax Litigation Branch
Civil Division, Department of Justice
P.O. Box 14198
Washington, D.C. 20044
202-718-7056 (MEG)
202-307-1427 (DBC)
202-514-6866 (fax)
moira.e.goodwin@usdoj.gov
daniel.b.causey@usdoj.gov

**Table of Contents**

I.    Introduction. ........................................................................................................... 1

II.   Argument. ............................................................................................................... 3

    A.    The stock-based compensation rule does not conflict with § 482............................. 3

        1.    Section 482 does not require an arm's length analysis at all, let alone
McKesson's narrow version of the arm's length standard. .............................. 3

            i.    The first sentence of § 482 permits—but does not require—
application of an arm's length standard. ................................................ 4

            ii.   Even if § 482 required an arm's length standard, it would
not require the IRS and Treasury to consider unrelated party
behavior in every instance. .................................................................. 7

        2.    Even if the first sentence of § 482 generally required analysis of
unrelated party behavior, the second sentence would remove that
requirement for dash-seven cost sharing arrangements. ................................. 14

    B.    The stock-based compensation rule does not conflict with other Treasury
Regulations. ................................................................................................... 17

    C.    The stock-based compensation rule is not arbitrary or capricious. ......................... 18

        1.    The stock-based compensation rule is reasonable and reasonably
explained. ................................................................................................ 19

        2.    In *Xilinx*, the Ninth Circuit addressed a different question. ........................... 20

        3.    Treasury's primary rationale did not depend on its assumptions
about unrelated party behavior, so any defect is not significant. .................... 21

    D.    Alternatively, McKesson is not entitled to the tax refunds it seeks
because, to generate those refunds, it improperly claimed § 162
deductions for expenses incurred to benefit its Irish subsidiary.............................. 23

        1.    McKesson carries the burden of proof in a refund suit.................................. 25

        2.    The SBC at issue is related to intangible development activity...................... 26

        3.    McKesson cannot deduct SBC expenses incurred for the "direct
and proximate" benefit of McKesson Ireland. ............................................. 27

        4.    The RAB share is an appropriate measure of the portion of SBC
expenses incurred for the benefit of McKesson Ireland. ............................... 28

III.  Conclusion............................................................................................................. 30

## Table of Authorities

**Page(s)**

**Cases**

*Altera Corp. v. Comm'r*,
  926 F.3d 1061 (9th Cir. 2019) ...............................................................................16

*Am. Nat'l Ins. Co. v. Comm'r*,
  91 F.2d 705 (5th Cir. 1937) .....................................................................................6

*Bausch & Lomb Inc. v. Comm'r*,
  933 F.2d 1084 (2d Cir. 1991) ...................................................................................6

*Caldwell v. Comm'r*,
  202 F.2d 112 (2d Cir. 1953) .....................................................................................5

*Clean Water Action v. U.S. Env't Prot. Agency*,
  936 F.3d 308 (5th Cir. 2019) ..................................................................................19

*Comm'r v. Banks*,
  543 U.S. 426 (2005) ..................................................................................................5

*Comm'r v. Idaho Power Co.*,
  418 U.S. 1 (1974) ......................................................................................................5

*Cooper v. United States ex rel. Comm'r*,
  513 F. Supp. 2d 747 (N.D. Tex. 2007) ...................................................................25

*Coors v. Comm'r*,
  60 T.C. 368 (1973) ....................................................................................................5

*Deputy v. du Pont*,
  308 U.S. 488 (1940) ................................................................................................24

*FCC v. Consumers' Rsch.*,
  606 U.S. 656 (2025) ................................................................................................10

*Fleshman v. West*,
  138 F.3d 1429 (Fed. Cir. 1998) ........................................................................22, 23

*Foster v. Comm'r*,
  80 T.C. 34 (1983) ....................................................................................................10

*Freytag v. Comm'r*,
  904 F.2d 1011 (5th Cir. 1990) ..................................................................................5

*Helvering v. Horst*,
  311 U.S. 112 (1940) ..................................................................................................5

iii

*Huawei Techs. USA, Inc. v. FCC,*
    2 F.4th 421 (5th Cir. 2021) ............................................................................................22

*Indigenous Peoples of Coastal Bend v. U.S. Army Corps of Engrs.,*
    132 F.4th 872 (5th Cir. 2025) .........................................................................................17

*Interstate Transit Lines v. Comm'r,*
    319 U.S. 590 (1943).......................................................................................................24

*K Alain, L.L.L.P. v. Comm'r,*
    2026 WL 2333930, --- F.4th ---- (5th Cir. Aug. 12, 2026)..........................................7

*Little v. Liquid Air Corp.,*
    37 F.3d 1069 (5th Cir. 1994) .........................................................................................26

*Lucas v. Earl,*
    281 U.S. 111 (1930).........................................................................................................5

*Lufkin Foundry & Mach. Co. v. Comm'r,*
    468 F.2d 805 ....................................................................................................................6

*Medtronic, Inc. v. Comm'r,*
    153 F.4th 682 (8th Cir. 2025) ..........................................................................................9

*Miss. River Basin All. v. Westphal,*
    230 F.3d 170 (5th Cir. 2000) .........................................................................................25

*OTM Corp. v. United States,*
    572 F.2d 1046 (5th Cir. 1978) .......................................................................................24

*RT French Co. v. Comm'r,*
    60 T.C. 836 (1973).....................................................................................................23, 24

*Sirius Sols., L.L.L.P. v. Comm'r,*
    165 F.4th 374 (5th Cir. 2026) ..........................................................................................7

*Southgate Master Fund, L.L.C. v. United States,*
    659 F.3d 466 (5th Cir. 2011) ...........................................................................................5

*United States v. Janis,*
    428 U.S. 433 (1976).......................................................................................................24

*United States v. McFerrin,*
    570 F.3d 672 (5th Cir. 2009) .........................................................................................25

*Wycoff v. Comm'r,*
    T.C. Memo 2017-203, 2017 WL 4677657 (2017)..........................................................24

*Xilinx Inc. v. Comm'r*,
125 T.C. 37 (2005) .................................................................................................21

*Xilinx, Inc. v. Comm'r*,
598 F.3d 1191 (9th Cir. 2010) .........................................................................20, 21

*Young & Rubicam, Inc. v. United States*,
410 F.2d 1233 (Ct. Cl. 1969) ...........................................................24, 26, 27, 29

**Statutes**

I.R.C. § 83(h) .............................................................................................................27

I.R.C. § 162(a) ............................................................................................... *passim*

I.R.C. § 446(b) .............................................................................................................5

I.R.C. § 482 ..................................................................................................... *passim*

**Regulations and Administrative Materials**

Treas. Reg. § 1.162-1(a) .........................................................................................24

Treas. Reg. § 1.482-1 ...............................................................................................17

Treas. Reg. § 1.482-1(b)(1).................................................................................6, 18

Treas. Reg. § 1.482-1(b)(2)(i)............................................................................18, 21

Treas. Reg. § 1.482-4(c)(2)(ii).................................................................................9

Treas. Reg. § 1.482-4(g) .........................................................................................21

Treas. Reg. § 1.482-6.................................................................................................11

Treas. Reg. § 1.482-7(a)(4).................................................................................18, 21

Treas. Reg. § 1.482-7(b)(4)(i)..................................................................................16

Treas. Reg. § 1.482-7(d) .........................................................................................20

Treas. Reg. § 1.482-7(e)(2)(i)..................................................................................29

*A Study of Intercompany Pricing Under Section 482 of the Code*, Notice 88-123,
1988 WL 561206 (1988)................................................................................11

Compensatory Stock Options Under Section 482, 68 Fed. Reg. 51,171
(Aug. 26, 2003) ...........................................................................................19, 22

**Legislative Materials**

H.R. Rep. No. 99-426 (1985)..................................................................................6, 11, 17

H.R. Rep. No. 99-841, vol. II (1986)...........................................................11, 15, 19, 22

*Offshore Profit Shifting and the U.S. Tax Code—Part 2 (Apple Inc.): Hearing Before the Subcomm. on Investigations of the S. Comm. on Homeland Sec. & Foreign Affs.*, 113th Cong. (2013) ............................................................16

Staff of J. Comm. on Taxation, 111th Cong., *Present Law and Background Related to Possible Income Shifting and Transfer Pricing*, JCX-37-10 (2010) .....................13

Staff of J. Comm. on Taxation, 114th Cong., *Present Law and Recent Global Developments Related to Cross-Border Taxation*, JCX-8-16 (2016).......................16

**Other Authorities**

Mindy Herzfeld, *The Case Against BEPS: Lessons for Tax Coordination*, 21 Fl. Tax Rev. 1 (2017) ....................................................................................12

Paul Dau & Rod Donnelly, *Globalization of Intangibles-Based Businesses: Tax Aspects*, 9 Stan. J. L. Bus. Fin. 1 (2003) .................................................16

Reuven S. Avi-Yonah & Jeffrey M. Kadet, *Periodic Adjustments – Treaties and Other Issues* (https://perma.cc/N6FW-BNNT).........................................12

Reuven S. Avi-Yonah, *The Rise and Fall of Arm's Length*, 15 Va. Tax Rev. 89 (1995)..............................................................................................10, 12

## I.    Introduction.

In this suit, McKesson claims it is entitled to a $9 million tax refund on the theory that it may separate a substantial amount of its income from the costs it incurred to produce it. The Court should reject McKesson's claim and grant summary judgment to the United States because (1) its challenge to the stock-based compensation rule ("SBC rule") lacks merit; and (2) it cannot deduct the relevant costs as an ordinary and necessary business expense of its U.S. operations.

McKesson entered contracts with itself that allowed it to do all the work to create highly profitable intangibles in the United States but shift 99% of the future profits from those intangibles to Ireland. Treasury regulations, if followed, allow that—McKesson USA can perform all the activities to develop an intangible, and, by prior agreement, transfer rights to exploit or license that intangible to McKesson Ireland, without McKesson Ireland having to pay an arm's-length transfer price for those rights. But, consistent with Congress's intent, for McKesson to do that, the regulations require it to pool all the costs to develop the intangible and split them between McKesson USA and McKesson Ireland in the same proportion they expect to split the benefit.

McKesson USA uses McKesson stock to compensate many employees for their work developing intangibles under its cost sharing arrangements ("CSAs"). McKesson filed this suit because it does not want to include that stock-based compensation ("SBC") in its pool of intangible development costs ("IDCs"). If the SBC is not in the IDC pool, McKesson thinks it can deduct 100% of the SBC costs in the United States under § 162(a), offsetting other income and lowering its total U.S. tax liability. But that maneuver ignores economic realities.

Treasury has promulgated rules under § 482 to achieve tax results consistent with economic realities and to prevent entities from manipulating their true income. At issue here is the SBC rule, which clarifies that SBC is an IDC that must be included in the IDC pool to the

same extent it would be if paid in dollars. Thus, to have a valid CSA under Treas. Reg. § 1.482-7 ("dash-seven"), SBC costs must be included as an IDC and split in proportion to each participant's reasonably anticipated benefit ("RAB").

McKesson (mistakenly) believes the SBC rule is invalid. And so, it filed tax returns for the years at issue reflecting the tax consequences of its intentional exclusion of relevant SBC from its IDC pools. Specifically, because it did not receive cost sharing transaction payments for SBC (because the costs were excluded from the SBC pool), its returns sought to deduct 100% of the SBC costs in the United States. But this approach to SBC distorted McKesson's true U.S. taxable income—with its CSAs, it was able to shift 99% of future benefit (*i.e.*, income) to Ireland but keep significantly more than 1% of current costs (*i.e.*, deductions) in the United States. The IRS examined McKesson's returns, and, relying on the SBC rule, adjusted its U.S. income to correct the distortion. That ultimately resulted in an increase to McKesson's U.S. tax liability of approximately $9 million, which McKesson paid and now asks this Court to refund.

By claiming a refund for SBC paid to employees working on projects benefiting McKesson Ireland, McKesson seeks to have its cake and eat it too. McKesson certainly could deduct the SBC costs if it intended to include the income those costs ultimately led to on a future return. But by challenging the SBC rule, McKesson is trying to keep the costs while avoiding the income. In other words, McKesson aims to deduct the costs to earn income in the United States but treat that income as if it were earned outside the United States, thereby lowering its tax burden by over $9 million for the years at issue.

Neither § 482 nor § 162(a) permits that result. The first sentence of § 482 does not stop Treasury from requiring CSA participants to share SBC costs unless it can show that arm's-length parties would do so. Even if Treasury were limited in what it could do under the first

sentence of § 482, the SBC rule would be valid under the second. And the SBC rule is reasonable because it is exactly what Congress intended.

But even if McKesson successfully challenged the SBC rule, it would not be entitled to its refund. McKesson must separately prove it is entitled to deduct 100% of the relevant SBC costs under § 162(a), which it cannot do because one business cannot deduct a cost paid for another's benefit. There is no genuine dispute that 99% of the benefit McKesson's cost-shared intangibles are expected to produce will inure to McKesson Ireland. The compensation paid to the employees developing those intangibles is thus paid 99% for McKesson Ireland's benefit.

## II.    Argument.

### A.  The stock-based compensation rule does not conflict with § 482.

McKesson wrongly claims that Treasury could require participants to a dash-seven CSA to include SBC in their IDC pool only if it had evidence that parties at arm's length would share SBC costs in similar circumstances. The first sentence of § 482 does not contain that limitation. And even if it did, Treasury could still issue the SBC rule under the second sentence of § 482. McKesson's exceeds-authority challenge fails.

#### 1.  Section 482 does not require an arm's length analysis at all, let alone McKesson's narrow version of the arm's length standard.

McKesson claims the parties start from "common ground," the Government having "acknowledged" that "section 482 incorporates an arm's length standard." D.E. 41 at 17.[1] McKesson misreads the Government's position. The Government unequivocally contests that § 482—as opposed to the regulations promulgated under § 482—generally requires application of an arm's length standard. *See, e.g.*, D.E. 36 at 23 ("[W]hile the regulations (not the statute)

---

[1] If a document's internal pagination conflicts with the page number stamped by ECF, this brief uses the ECF page number.

generally require application of an arm's length standard . . ."); *id.* at 26 ("If Congress intended to codify an arm's length standard—or severely limit Treasury's ability to satisfy that standard— it would have said so explicitly.") *id.* at 28 ("[T]he regulations—which have always been the source of the 'arm's length standard' . . ."); *id.* ("Treasury could evolve from the original arm's length method to an arm's length result standard because Congress never codified either.").

McKesson claims the SBC rule conflicts with the statute, not other regulations. *E.g.*, D.E. 1 ¶ 75–79. So, for McKesson to prevail on its exceeds-authority challenge, the Court must interpret § 482 to codify an arm's length standard that the SBC rule violates. That requires the Court to *first* determine whether the text of § 482 incorporates an arm's-length-analysis requirement *at all*. Then, only if the Court answers the threshold question in McKesson's favor, the question becomes what specific arm's length standard the statute silently codifies.

The Government contests both steps of McKesson's statutory analysis. First, the first sentence of § 482 *permits* Treasury to require application of the arm's length standard (as outlined in the regulations), because that standard achieves clear reflection of income. But the first sentence does not *require* application of that standard (or any other). And second, even if the first sentence were read to require some type of arm's length inquiry, it does not require comparison to unrelated party behavior in every instance.

      i.    **The first sentence of § 482 permits—but does not require— application of an arm's length standard.**

In § 482, Congress set out the statute's objective but left the Secretary wide flexibility to develop methods and standards to achieve that objective. The statute says the IRS "may" adjust tax items between related parties as "necessary" to "clearly reflect . . . income." I.R.C. § 482. The Government interprets the words to mean what they say: the IRS has the statutory authority to make any allocation necessary to achieve clear reflection of income.

McKesson contends the best reading of "clearly . . . reflect[ed]" is "satisfies the arm's-length standard." *Cf.* D.E. 41 at 10. That is wrong. McKesson mistakes one useful tool to achieve clear reflection of income for clear reflection itself.

Clear reflection of income is its own concept in tax law, not a synonym for "arm's length standard." For instance, taxpayers must use a method of accounting that "clearly reflect[s] income," I.R.C. § 446(b), which means "income should be reflected with as much accuracy as standard methods of accounting practice permit," *Caldwell v. Comm'r*, 202 F.2d 112, 115 (2d Cir. 1953). Tax items are accurately reflected when they "comport[] with accounting and taxation realities." *Comm'r v. Idaho Power Co.*, 418 U.S. 1, 10 (1974). For example, cost deductions should generally "correlate with the production of income," which is why income would not be clearly reflected if capital construction costs were deducted as current expense. *Id.*; *see also Coors v. Comm'r*, 60 T.C. 368, 398 (1973).

In fact, no matter whether the specific words appear in a statute, clear reflection of income is *always* an animating principle of tax law. *Helvering v. Horst*, 311 U.S. 112, 119 (1940) ("The dominant purpose of the revenue laws is the taxation of income to those who earn or otherwise create the right to receive it and enjoy the benefit of it when paid."). For tax items, accuracy is determined by substance, not form. *See Freytag v. Comm'r*, 904 F.2d 1011, 1015 (5th Cir. 1990). That is why courts apply numerous common-law doctrines to ensure a taxpayer's treatment of an item reflects economic reality—to ensure clear reflection of income.[2] *E.g., Southgate Master Fund, L.L.C. v. United States*, 659 F.3d 466, 480–92 (5th Cir. 2011).

---

[2] One such "first principle" requires income be taxed to the taxpayer that earned the right to receive it, even if he does not, in fact, receive it. *Comm'r v. Banks*, 543 U.S. 426, 433–34 (2005); *Lucas v. Earl*, 281 U.S. 111 (1930). This "anticipatory assignment" doctrine ensures "[a] taxpayer cannot exclude an economic gain from gross income by assigning the gain in advance to another party." *Banks*, 543 U.S. at 433.

5

In § 482, as across the Code, income is clearly reflected when tax items resulting from an event correspond with the economic realities of the event. *Cf.* H.R. Rep. No. 99-426, at 425 (1985) (explaining a cost sharing participant is not "allocate[d] sufficient income" if the "sharing of costs" are "insufficiently related to the highly profitable intangible actually transferred") [hereinafter "1985 House Report"]. *That* concept is what § 482 requires—not an arm's length standard. To be sure, the regulatory arm's-length-result standard *achieves* clear reflection of income, which is why Treasury can validly require its application in every case. *See* Treas. Reg. § 1.482-1(b)(1). But the arm's length standard is Treasury's chosen "means" to achieve the clear-reflection-of-income "end." *Cf. Lufkin Foundry & Mach. Co. v. Comm'r*, 468 F.2d 805, 807 n.2 ("[The Commissioner's] *object* is to arrive at the true net income of each controlled taxpayer and the *technique* used is the application of the standard of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." (emphases added)).

To the extent McKesson implies an arm's length standard is the only possible method Treasury could have selected to achieve clear reflection of income between related entities, McKesson is wrong. Treasury could have implemented—but did not implement—a different theoretical framework to achieve clear reflection of income without using arm's-length transactions.[3] *See Bausch & Lomb Inc. v. Comm'r*, 933 F.2d 1084, 1089 (2d Cir. 1991) (describing various frameworks). That Treasury chose an arm's-length-result standard over other possibilities does not silently codify an arm's length requirement into the statute. *Am. Nat'l Ins. Co. v. Comm'r*, 91 F.2d 705, 707 (5th Cir. 1937) ("[W]hile Treasury Regulations are authoritative as administrative interpretations, they cannot amend or change the law.").

---

[3] When we say Treasury "could have" taken a different approach under § 482, we refer only to Treasury's authority under the text of the statute. We imply nothing about whether alternative conceptual approaches were practically available or could have been as effective.

6

In sum, the statute requires clear reflection of income, not application of an arm's length standard. Those two concepts are not synonyms. Because the text controls, this is an easy case.[4] The first sentence of § 482 does not *require* the use of *any* arm's length standard. The statute authorizes the IRS and Treasury to use any method that clearly reflects income. An arm's length standard is one method to achieve that outcome. Indeed, Treasury's arm's-length-result standard consistently achieves clear reflection of income, which is why the regulations can validly require its application in every case. But just because the statute permits the IRS and Treasury's use of the arm's length standard does not mean the statute requires it. The Court need go no further to resolve this case; § 482 does not require application of any arm's length standard, so McKesson's challenge—which requires *the statute* to contain an arm's length requirement to succeed—fails.

> ii.    **Even if § 482 required an arm's length standard, it would not require the IRS and Treasury to consider unrelated party behavior in every instance.**

As explained, the text of § 482 does not require Treasury to take an arm's length approach to allocating income between related parties. But it is true that Treasury, through regulation, adopted an arm's length standard to achieve clear reflection of income between related parties. Given Treasury's longstanding commitment to an arm's length standard, the statute could conceivably (but incorrectly) be thought to have implicitly codified that general framework at some point along the way.

---

[4] In its opening brief, the Government cited *Sirius Sols., L.L.L.P. v. Comm'r*, 165 F.4th 374, 378 (5th Cir. 2026) for the proposition that interpretation of the Internal Revenue Code starts with the text, just as it does for any other statute. D.E. 36 at 25. Since that filing, the Fifth Circuit panel withdrew that opinion. *See K Alain, L.L.L.P. v. Comm'r*, 2026 WL 2333930, --- F.4th ---- (5th Cir. Aug. 12, 2026) (per curiam). The substituted opinion equally supports the assertion for which the Government cited the withdrawn opinion. *Id.* at *2–3; *see also id.* at *4 ("[E]ven years of consistent practice cannot vindicate an interpretation that is inconsistent with a statute's plain text.").

Even under that incorrect reading of § 482, McKesson still loses. For McKesson to prevail, the Court must hold the first sentence of § 482 allows the IRS and Treasury to make "only" adjustments (and rules) the Government "can show . . . would comport with how unrelated parties would behave in comparable circumstances." D.E. 41 at 21. That is not the best reading of the first sentence of § 482. To read that limitation into § 482, McKesson must ignore the text of the statute, forty years of developments, and the absurdity of making that argument while enjoying tax benefits resulting from its CSAs with a "cash box entity" that unrelated parties would never enter.

First, a point on terminology. McKesson insists it does not argue the statute requires the Government to use comparable-unrelated-transaction-based methods. *See* D.E. 41 at 19 (seemingly objecting to *e.g.*, D.E. 36 at 27–31). It says it does not contend the Government needs evidence of how unrelated parties have *structured transactions* in comparable circumstances. Rather, the Government must analyze "what parties at arm's length *might actually do* in comparable circumstances." *Id.* (emphasis added). We fail to appreciate the distinction. McKesson says the Government can consider any "evidence of arm's-length behavior," not just "evidence of 'transactional comparables.'" *Id.* But for arm's-length-behavior evidence to be relevant, McKesson concedes such behavior must occur "in comparable circumstances." *Id.* In other words, the unrelated parties must be engaged in a transaction that is comparable—a comparable unrelated transaction ("CUT")—for it to matter what those parties "might actually do." That is why the Government (appropriately) employed "CUT-based methods" as shorthand for McKesson's position. In any event, the dispute is one of terminology. In its opening brief, as here, the Government responds to the substance of McKesson's argument, not a "strawman." *Id.*

Turning to the text, McKesson still confuses a means for an end. Even if clear reflection of income were construed to mean income as it would be reflected if the parties had been transacting at arm's length, transactional comparables (*i.e.*, "what parties do or would do at arm's length," D.E. 41 at 14), would remain only one potential tool for the job. To be sure, in the right circumstances, transactional comparables can be a great tool for the job. For instance, if Company A consistently charges $5 per-widget to Companies B, C, and D, that provides strong evidence for the arm's-length price Company A should charge its subsidiary for those same widgets. *See* Treas. Reg. § 1.482-4(c)(2)(ii).

But the statute does not require comparison to unrelated party behavior; it requires "clear[] . . . "reflect[ion]" of "income." I.R.C. § 482. That means evidence of unrelated party behavior should be considered only to the extent it helps the IRS determine whether a tax outcome manufactured by related parties clearly reflects income (*i.e.* reflects economic reality). So, when comparison to transactions between unrelated parties would result in tax allocations out of line with economic reality, unrelated party evidence does not control. *See, e.g.*, *Medtronic, Inc. v. Comm'r*, 153 F.4th 682, 689, 691–92 (8th Cir. 2025). Dash-seven CSAs present one such situation. As explained previously (and again below), if McKesson excludes SBC from its IDC pool, its CSA produces tax consequences out of line with economic reality. Because McKesson's reading of the first sentence requires the Government to consider "what parties at arm's length might actually do in comparable circumstances" in every instance—even when doing so results in tax consequences inconsistent with economic reality—it conflicts with the statute's plain language and cannot be the best reading.

McKesson attempts to justify its departure from the text with the nondelegation doctrine. D.E. 41 at 28. According to McKesson, only the arm's length standard—more specifically, its

specific articulation of the arm's length standard—provides a principle sufficiently intelligible for the delegation in § 482 to stand. *Id.* McKesson's own citation refutes its argument. Congress can delegate discretionary authority to an executive agency to implement and enforce a broad statute if the statute provides "an 'intelligible principle' to guide what it has given the agency to do." *See FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). The first sentence of § 482 contains the requisite intelligible principle—clear reflection of income. As McKesson's citation explains, "section 482 does not delegate authority to [the Commissioner] to reallocate income at his whim." D.E. 41 at 28–29 (citing *Foster v. Comm'r*, 80 T.C. 34, 141–42 (1983) *rev'd in part on other grounds*, 756 F.2d 1430 (9th Cir. 1985)). Instead, the Commissioner "may do so only if he first determines that such reallocation is 'necessary in order to prevent evasion of taxes or clearly to reflect the income' of two or more" related parties. *Foster*, 80 T.C. at 142 (quoting I.R.C. § 482). The plain text of § 482 contains all the principles necessary for a valid delegation.

Beyond its incompatibility with the text, McKesson's articulation of the arm's length standard also ignores the transfer pricing developments of the last forty years. As the Government explained in its opening brief, McKesson articulates the comparables-based arm's length standard, which dominated transfer pricing for much of the twentieth century. *See* D.E. 36 at 27–28. "The traditional [arm's length standard] refers primarily to a process by which the transfer price between affiliated taxpayers is determined by using comparables." *See* Reuven S. Avi-Yonah, *The Rise and Fall of Arm's Length*, 15 Va. Tax Rev. 89, 91 (1995) [hereinafter "Rise and Fall"]. The problem for McKesson is that "this narrow conception of the standard was already obsolete by 1988 in the large majority of cases, insofar as the United States' approach to international taxation was concerned." *Id.* at 95.

By 1985, Congress had grown frustrated with the comparables-centric arm's length standard outlined in Treasury's then-regulations. 1985 House Report at 423–24 ("Many observers have questioned the effectiveness of the 'arm's length' approach of the regulations under section 482."). Congress criticized "[c]ertain judicial interpretations of 482," which "unduly emphasize the concept of comparables." *Id.* at 424. That dissatisfaction with the comparables-centric arm's length standard caused Congress to add the second sentence to § 482, which mandates application of the commensurate-with-income standard if the transaction involves the transfer or license of intangible property. *Id.* Congress explained that it limited the statutory fix to intangibles because that was the context in which the comparables-centric arm's length standard had proven "sufficiently troublesome." *Id.* But it clarified that its misgivings with the comparables-centric arm's length standard extended "even in situations involving highly standardized commodities or services." *Id.* Congress thus directed the IRS to undertake "a comprehensive study of intercompany pricing rules," with "careful consideration . . . given to whether the existing regulations could be modified in any respect." H.R. Rep. No. 99-841, vol. II, at 638 (1986) (Conf. Rep.) [hereinafter "1986 House Report"].

In response, the IRS and Treasury produced the White Paper, which defended the arm's length framework but acknowledged the limitations of the comparables-centric arm's length standard. *See generally A Study of Intercompany Pricing Under Section 482 of the Code*, Notice 88-123, 1988 WL 561206 (1988). The paper recommended the inquiry shift from "arm's length prices" to "arm's length returns." *Id.* at *55. Even with that adjustment, the paper noted that "there are situations in which [the arm's-length-returns method] alone will clearly be inadequate." *Id.* at *59. It thus proposed a new "profit-split method"—a version of which would eventually become Treas. Reg. § 1.482-6—that could operate in the "many cases" for which

11

"there will be little or no unrelated party information that will be useful." *Id.* at 60. After the White Paper, Treasury overhauled its § 482 regulations, officially shifting the governing standard from what parties would do at arm's length to the results parties would reach at arm's length. *See Rise and Fall*, 15 Va. Tax Rev. at 145–46.

McKesson acknowledges none of this. It cites a string of cases decided before the regulations changed, cherry-picks one sentence from the preamble to the 1994 regulations, then declares that the Government's citation-supported summary of the last forty years "simply does not match the facts." D.E. 41 at 24–25. That response is unpersuasive.

Finally, McKesson fails to acknowledge the absurdity of its position. It claims Treasury can promulgate § 482 rules based only on "what parties at arm's length do or would do in comparable circumstances." D.E. 41 at 10. But offers no argument that parties at arm's length would ever enter its CSAs, which are expected to cause 99% of future benefit to inure to a "cash-box entity," despite that entity paying less than 99% of the costs (if SBC is excluded).[5] McKesson envisions a world in which the Court asks only—devoid of any context—whether Treasury can prove that unrelated parties would share the cost of SBC. Then somehow never asks whether parties at arm's length would have entered the McKesson CSAs in the first place. *See* Reuven S. Avi-Yonah & Jeffrey M. Kadet, *Periodic Adjustments – Treaties and Other Issues*, at 9 (https://perma.cc/N6FW-BNNT) (explaining the "intellectual[] dishonest[y]" in "arbitrarily isolating one element (stock option costs)"). That does not work. McKesson cannot credibly claim the statute silently codifies a standard its own arrangements would fail.

---

[5] A "cash box entity" generally refers to a member of a controlled group that performs few or no functions but is contractually allocated risk. In a cash box arrangement, "a U.S. company funds development of intellectual property through a subsidiary resident in a low-tax jurisdiction." Mindy Herzfeld, *The Case Against BEPS: Lessons for Tax Coordination*, 21 Fl. Tax Rev. 1, 54 (2017).

McKesson never contends that a rational entity would enter a deal with an arm's-length party comparable to the deal McKesson USA repeatedly entered with McKesson Ireland. True, in response to a different argument, it says, "arrangements similar to CSAs are common at arm's length." D.E. 41 at 32. But that is the wrong level of generality. Sales of property are common at arm's length; so are licensing agreements. When the IRS (and the courts) employ a comparables-centric method to analyze, for example, a sale of goods between related parties, the inquiry does not stop at the conclusion that "sales" are common at arm's length. Under the standard McKesson claims the statute codifies, the relevant elements of a transaction, *e.g.*, the terms and prices, must "comport with how unrelated parties would behave in comparable circumstances." *Id.* at 21. McKesson does not attempt to defend its CSAs under that standard, nor could it.

Under the relevant arrangements, McKesson USA agreed to use the talented employees it pays a premium to keep from its competitors; the infrastructure it maintains at great cost; and the valuable IP it spent substantial time, money, and resources creating; to develop new intangible products with significant profit potential. Even though, under the deal, McKesson USA would incur the costs, provide the labor, and employ its IP, McKesson USA simultaneously agreed to split ownership of the resulting intangibles with a separate entity under terms that McKesson USA predicts will cause the other entity to reap 99% of the eventual profit. *See* D.E. 37 at 10, USA APP000007. And it will receive that profit even though it will not have covered 99% of the costs (if SBC is excluded). McKesson USA did not enter that lopsided deal because the other entity offered a skill or asset the intangible could not be developed without. The entity provided only cash—McKesson's own cash, at the end of the day—the prototypical "cash-box entity." *Cf.* Staff of J. Comm. on Taxation, 111th Cong., *Present Law and Background Related to Possible Income Shifting and Transfer Pricing*, JCX-37-10, at 113 (2010).

13

We explain the McKesson CSAs to keep the Court's eyes clear of wool, not to suggest the arrangements are improper. As long as McKesson pools all IDCs (and otherwise complies with dash-seven's requirements), the IRS will respect the tax consequences of its arrangements. But no one should pretend that a 99-to-1 split with a cash-box entity reflects "how parties at arm's length might act." D.E. 41 at 10. McKesson calls for strict application of its comparability-evidence standard in only one regard, which, incidentally, would allow it to improperly avoid tax by divorcing today's deductions from tomorrow's income. That is not a credible attack. McKesson throws stones at the SBC rule, insisting that the rule must be invalid if parties at arm's length would not share SBC costs. But it does so from within a glass house: CSAs unrelated parties would never enter.

In sum, analyzing only the first sentence of § 482, McKesson has no answer to the text, no answer for the last forty years of developments, and no answer for the absurdity of its position. With the statute's first sentence, Congress directed the IRS to apply methods that achieve clear reflection of income. Comparability-based methods sometimes achieve that goal, but sometimes do not. Because comparability-based methods do not always achieve the statute's objective, the first sentence of § 482 cannot be read to require them in every instance. Thus, Treasury did not exceed its authority by requiring related parties to include SBC in their IDC pools, even if unrelated parties would not share comparable costs in comparable situations.

### 2. Even if the first sentence of § 482 generally required analysis of unrelated party behavior, the second sentence would remove that requirement for dash-seven cost sharing arrangements.

Even if the Court agreed with McKesson on the first sentence, McKesson should lose on the second: "In the case of any transfer (or license) of intangible property . . . the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." I.R.C. § 482. When related parties transfer intangibles, Congress does not want the

14

IRS to determine the arm's-length price by comparing the terms of the related-party transaction to what unrelated parties would do. Congress wants the price to reflect the intangible's actual value, which must be set based on the income it will actually produce. A dash-seven CSA transfers the future rights to the to-be-developed intangibles, so CSAs are also governed by sentence two, not just sentence one.

McKesson does not attempt to argue the commensurate-with-income standard requires consideration of unrelated party behavior. *Cf.* D.E. 41 at 34–37. So if sentence two applies to CSAs, McKesson's exceeds-authority challenge to the SBC rule fails. Thus, the question is whether CSAs qualify as "any transfer (or license) of intangible property." I.R.C. § 482.

The Court need not guess whether Congress intended the commensurate-with-income standard to apply to CSAs; it told us. *See* 1986 House Report at 637 ("This standard [commensurate-with-income] also applies to determine the minimum cost-sharing payment with respect to intangibles treated as owned by a U.S. possessions corporation that elects the cost-sharing option."). Congress clarified that "certain bona fide research and development cost-sharing arrangements" remained "an appropriate method of allcoating income attributable to intangibles among related parties, *if and to the extent* such agreements are consistent with the purposes of *this provision*"—meaning the second sentence of § 482. *Id.* at 638 (emphases added). McKesson offers no response at all to this clear evidence of Congress's intent.

Rather, McKesson relies on the text, arguing that no matter what Congress intended to say, it used the word "transfer," and a CSA does not "transfer" rights to co-developed intangibles. It reasons that "[i]ntangibles that have yet to be developed in a CSA do not belong to anyone at the time a CSA is entered into, and thus they are not 'transferred by operation of the CSA.'" D.E. 41 at 35. McKesson offers no citation for that assertion.

15

But a CSA does transfer the future interests of its participants in the to-be-developed property. *See* Treas. Reg. § 1.482-7(b)(4)(i); Paul Dau & Rod Donnelly, *Globalization of Intangibles-Based Businesses: Tax Aspects*, 9 Stan. J. L. Bus. Fin. 1, 15 (2003) (explaining that CSAs "are, in essence, a vehicle for migrating interests in domestically developed intangibles outside of the United States"); *Offshore Profit Shifting and the U.S. Tax Code—Part 2 (Apple Inc.): Hearing Before the Subcomm. on Investigations of the S. Comm. on Homeland Sec. & Foreign Affs.*, 113th Cong. 5 (2013) (statement of Sen. Levin, Chairman, S. Subcomm. on Investigations) (explaining that a CSA "shift[s] intellectual property rights to offshore affiliates," and thus shifts the eventual "taxable income that would otherwise flow to the United States where the intellectual property was developed"). Indeed, the transfer is the point. As the *Altera* panel acknowledged, the "present-day transfer" of "future distribution rights . . . provides the main incentive for entering into a [CSA]." *Altera Corp. v. Comm'r*, 926 F.3d 1061, 1076 (9th Cir. 2019). And the statute says the commensurate-with-income standard should apply to "*any* transfer (or license) of intangible property." I.R.C. § 482 (emphasis added); *see also* Staff of J. Comm. on Taxation, 114th Cong., *Present Law and Recent Global Developments Related to Cross-Border Taxation*, JCX-8-16, at 52 (2016) (identifying CSAs as "one of four ways" that "[a] U.S. person may *transfer* intangible property to a related person" (emphasis added)).

McKesson attempts one other response on sentence two. D.E. 41 at 36–37. It claims the IRS can make a commensurate-with-income adjustment "only if [the adjustment] would match (or be 'commensurate with') the 'income' of the particular cost-shared intangible." *Id.* at 36. From there, McKesson reasons that the statute necessarily creates a tracing requirement between the price of the parent company's stock at the time the cost of the SBC is determined and a "particular cost-shared intangible." *Id.*

16

That is not what sentence two means. It says the "income with respect to such transfer" must be "commensurate with the income attributable to the intangible." I.R.C. § 482. That means the CSA—the vehicle for the transfer—must, on the whole, result in tax allocations today consistent with the actual income the intangibles developed under the CSA produce tomorrow. *Cf.* 1985 House Report at 425 ("The committee intends that consideration also be given the actual profit experience realized as a consequence of the transfer."); *id.* at 426 ("[T]he profit or income stream generated by or associated with intangible property is to be given primary weight."). The statute does not require each intangible development cost to be "closely related" to a "particular cost shared intangible." *Cf.* D.E. 41 at 36.

In sum, Treasury did not exceed its authority under § 482 with the SBC rule, no matter how parties at arm's length treat SBC. The statute does not require Treasury to consider arm's length behavior; the statute authorizes Treasury to issue any rule that clearly reflects income, which the SBC rule does. Regardless, CSAs transfer rights to intangibles, which means the SBC rule must be consistent with sentence two. As McKesson does not dispute, the second sentence's commensurate-with-income standard affords no relevance to arm's length behavior. Thus, under either line of analysis, McKesson's conflict-with-§482 challenge fails.

### B. The stock-based compensation rule does not conflict with other Treasury Regulations.

McKesson contends the SBC rule is inconsistent with the statute, not other regulations. *E.g.*, D.E. 1 ¶ 2. Yet at times, McKesson implies inconsistency between the SBC rule and Treas. Reg. § 1.482-1 ("dash-one"). *E.g.*, D.E. 41 at 21–24. McKesson forfeited any conflict-with-regulations argument by failing to raise it in its complaint or opening brief. *See Indigenous Peoples of Coastal Bend v. U.S. Army Corps of Engrs.*, 132 F.4th 872, 882 (5th Cir. 2025).

Regardless, there is no conflict. While dash-one generally requires an "arm's length result" in every case, Treas. Reg. § 1.482-1(b)(1), dash-seven sets forth a specific standard to achieve an arm's length result for CSAs, Treas. Reg. § 1.482-7(a)(4).

In its brief, McKesson acknowledges only dash-one. *Cf.* D.E. 41 at 21–23. It explains that dash-one requires parties to use the "best method" to achieve an "arm's length result." *Id.* at 21. After surveying dash-one, McKesson concludes: "Nothing in the regulations permits the IRS or a taxpayer to simply assume, without evidence, an arm's length result based on an assertion that market comparables are absent." D.E. 41 at 23. But dash-seven—the regulation directly on point to this dispute, which McKesson conspicuously declines to analyze—states categorically that a CSA achieves an arm's length result so long as the cost share equals the RAB share and all IDCs are included. Treas. Reg. § 1.482-7(a)(4). For its part, dash-one confirms that dash-seven "provides the specific methods to be used to evaluate whether a [dash-seven CSA] produces results consistent with an arm's length result." Treas. Reg. § 1.482-1(b)(2)(i).

McKesson dedicates pages to describing the comparability and reliability analyses taxpayers and the IRS generally employ to select the "best method" to value a related-party arrangement. But those analyses do not control whether a CSA produces an arm's length result. For CSAs, the "best method" is built into dash-seven. And it has nothing to do with comparables, whether comparables exist in the market or not.

### C. The stock-based compensation rule is not arbitrary or capricious.

Treasury did not exceed its authority with the SBC rule because Treasury could issue the rule no matter how parties at arm's length treat SBC. McKesson counters that even if that is true, the SBC rule is still arbitrary and capricious because, even if it was not required to do so, Treasury *did* speculate about how parties at arm's length treat SBC. D.E. 41 at 42–43.

18

Regardless of whether Treasury's arm's-length assumptions were unreasonable, the rule survives McKesson's challenge. The agency did not need to give a perfect explanation; a decision is not arbitrary or capricious if an agency's path to it can be reasonably discerned. *Clean Water Action v. U.S. Env't Prot. Agency*, 936 F.3d 308, 312 (5th Cir. 2019). Treasury's explanation for the SBC rule clears that bar, so McKesson's arbitrary-and-capricious challenge must fail.

### 1. The stock-based compensation rule is reasonable and reasonably explained.

Treasury explained why CSA participants need to pool SBC costs in the preamble to the Final Rule. *See* Compensatory Stock Options Under Section 482, 68 Fed. Reg. 51,171 (Aug. 26, 2003) [hereinafter "Final Rule"]. In the legislative history to the sentence-two amendment, Congress confirmed CSAs could satisfy the new commensurate-with-income standard "if and to the extent such agreements are consistent with the purposes of this provision that the income allocated among the parties reasonably reflect the economic activity undertaken by each." *Id.* at 51,172 (quoting 1986 House Report at II-638). From that language, Treasury understood Congress to endorse its general approach: to respect CSAs (and their tax consequences) if and only if cost share ("economic activity undertaken by each") equals RAB share ("income allocated among the parties"). *Id.*

Once established that cost share must equal RAB share to have a valid CSA, it follows that all IDCs must be included in the pool. *Id.* If any were excluded, then each participant's cost share would not "reasonably reflect its actual economic activity." *Id.* Thus, "the costs must be determined on a comprehensive basis." *Id.* Employee compensation—to the extent the employee is working on a relevant intangible development activity—is a "cost related to the development of the intangibles." *Id.* That is true whether the compensation is paid in stock or dollars. *Id.* Thus,

19

the cost of SBC must be included in an IDC pool in the same manner as any other form of compensation. *Id.*

Throughout its response brief, McKesson attacks the SBC rule for a conclusion it does not make, complaining that the Government fails to "explain why SBC is reasonably allocable to cost-shared intangibles in the first place." D.E. 41 at 11; *see also id.* at 13, 49–51. But the SBC rule does not establish that any particular SBC is reasonably allocable to any particular cost-shared intangibles. McKesson misrepresents the facts that trigger application of the SBC rule as "assumptions" that the rule is making. To be clear: costs of SBC need only be included *to the extent* they are allocable to a particular intangible development activity. As with compensation paid in dollars, SBC must be included in the pool of IDCs only if (and only to the extent) the compensation is "reasonably allocable" to a relevant cost shared intangible. Treas. Reg. § 1.482-7(d)(1)–(2); *see infra* Section II.D.2. If the employee is not working to develop a cost-shared intangible, his compensation need not be included in the pool of IDCs, whether it is paid in stock or in dollars.

### 2. In *Xilinx*, the Ninth Circuit addressed a different question.

McKesson contends the Ninth Circuit rejected similar logic in *Xilinx*. D.E. 41 at 26 (citing *Xilinx, Inc. v. Comm'r*, 598 F.3d 1191 (9th Cir. 2010)); *see also id.* at 43. That is not true. In *Xilinx*, the Ninth Circuit perceived a conflict between dash-one's requirement to apply an arm's length standard "in every case," and dash-seven's mandate to pool all costs without regard to whether that pooling would produce an arm's length result. At the time, the regulations failed to reconcile that conflict. The issue in *Xilinx* was thus which rule would control, which required the Ninth Circuit to determine what Treasury intended. *Xilinx*, 598 F.3d at 1194–97.

The Ninth Circuit held dash-one should take precedence, which meant Treasury would have to show a cost would be shared at arm's length before it could require that cost to be shared

20

in a CSA. *Id.* The Ninth Circuit reasoned that the "purpose of the regulations is parity between taxpayers in uncontrolled transactions and taxpayers in controlled transactions." *Id.* at 1196. The Ninth Circuit held the dash-one rule appeared to better serve that purpose, so the "all costs" language in dash-seven should be limited by the arm's length language in dash-one.

The Ninth Circuit thus asked whether unrelated parties would share SBC costs because it interpreted the regulations to require that inquiry. And because Treasury could not produce evidence that the costs would be shared by parties at arm's length, the Ninth Circuit held Treasury would violate dash-one by construing dash-seven to include costs of SBC.

*Xilinx* no longer controls because it depended on an ambiguity in the regulations that Treasury has since resolved. *Cf. Xilinx Inc. v. Comm'r*, 125 T.C. 37, 58 (2005) ("Treasury has the authority to modify its regulations to resolve any conflict within the regulatory scheme."). In its regulations, Treasury has expressly clarified that the general rule in dash-one is satisfied if and only if the specific rules in dash-seven are satisfied—related parties must share all costs reasonably allocable to intangible development activity, not just costs parties at arm's length would share. *See* Treas. Reg. § 1.482-7(a)(4); *see also* Treas. Reg. § 1.482-1(b)(2)(i); Treas. Reg. § 1.482-4(g). McKesson has not challenged the regulation resolving that conflict. *Cf.* D.E. 36 at 17 n.8 (confirming the Government's unrefuted understanding that McKesson challenges "only" the "frontline interpretation that SBC qualifies as a 'cost incurred' to develop an intangible, and must therefore be in the pool of development costs"); *id.* at 16–17 (observing that "McKesson challenges none of the above," which "above" included Treas. Reg. § 1.482-7(a)(4)).

### 3. Treasury's primary rationale did not depend on its assumptions about unrelated party behavior, so any defect is not significant.

Treasury acknowledged receiving comments asserting that the rule "would be inconsistent with the arm's length standard unless there is evidence that parties at arm's length

21

take SBC into account." Final Rule at 51,172. In response, Treasury rejected the premise that such evidence is needed. *Id.* (quoting 1986 House Report at II-638). McKesson claims "Treasury did not say in the preamble that the arm's-length standard could be satisfied without any evidence—transactional or otherwise—of arm's length behavior." D.E. 41 at 40. But Treasury *did* say as much when it explained that a CSA satisfies the arm's length standard if cost share equals RAB share and all costs are included. Final Rule at 51,172. That analysis does not require evidence of arm's length behavior.

After Treasury provided that consistent-with-legislative-intent rationale, it proceeded to speculate that parties at arm's length would share SBC costs in similar circumstances. Final Rule at 51,173. For purposes of this refund suit, we assume that the administrative record does not support that belief. It does not matter. A flaw in an agency's analysis can render a rulemaking arbitrary and capricious only if more thorough analysis "would have impacted" the agency's decision. *Cf. Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 451 (5th Cir. 2021) (agreeing the agency offered "off-point" responses to certain comments but rejecting the arbitrary-and-capricious challenge because those comments "were 'incapable of affecting' the rule the agency ultimately adopted"). Neither the statute nor the regulations required Treasury to consider evidence of unrelated party behavior. And Treasury's primary consistent-with-legislative-intent rationale does not depend in any way on Treasury's speculation. Thus, Treasury's extraneous conjectures about arm's length behavior are immaterial.

Finally, because Treasury offered all the explanation necessary to satisfy the reasonable decisionmaking standard with its consistent-with-legislative-intent rationale, the *Chenery* doctrine does not sink the rule either. *See Fleshman v. West*, 138 F.3d 1429, 1433 (Fed. Cir. 1998) ("As this court and others have noted, the *Chenery* doctrine is not applied inflexibly. In

22

particular, the doctrine does not prohibit a reviewing court from affirming an agency decision on a ground different from the one used by the agency if the new ground is not one that calls for 'a determination or judgment which an administrative agency alone is authorized to make.'"); *id.* ("While the Court of Veterans Appeals analyzed the defect in Mr. Fleshman's original claim under a different legal rubric, the Board's underlying findings demonstrate that the agency had already exercised its discretion in determining what information is required for an application to be in the proper form."). Treasury offered two rationales for the SBC rule, only one of which McKesson contends the administrative record does not support. In affirming the rule on one of the two bases Treasury offered at the time of its decision, the Court would not violate the *Chenery* doctrine.

### D.  Alternatively, McKesson is not entitled to the tax refunds it seeks because, to generate those refunds, it improperly claimed § 162 deductions for expenses incurred to benefit its Irish subsidiary.

The Code has two independent mechanisms to prevent McKesson's improper tax avoidance and disallow its refund through § 482 and § 162. The purpose underlying each provision is the same. *See RT French Co. v. Comm'r*, 60 T.C. 836, 849 (1973) ("[T]he 'arm's length' test commonly associated with section 482 is equally applicable in ascertaining the 'ordinary and necessary' character of a payment to a related entity."). Both statutes are intended to prevent related taxpayers from shifting expenses among themselves to artificially produce favorable tax outcomes. In other words, the statutes ensure tax outcomes consistent with economic realities.

During its audit, the IRS determined the amount of McKesson's SBC that is attributable to intangible development activity. The IRS then adjusted McKesson's income under § 482 as if that amount had been properly included in the IDC pool. (Had the amount been properly included in the IDC pool, McKesson Ireland would have been required to make cost sharing

23

transaction payments to reimburse 99% of the costs, thus decreasing the amount McKesson USA could deduct under § 162(a)). Section 162(a) achieves the same result by disallowing the deduction for SBC to the extent McKesson USA incurred those expenses for the benefit of McKesson Ireland. *Young & Rubicam, Inc. v. United States*, 410 F.2d 1233, 1238 (Ct. Cl. 1969) (holding the "direct and proximate benefit" of expenses must be attributable to the taxpayer paying such expenses); *see also* Treas. Reg. § 1.162-1(a); *Interstate Transit Lines v. Comm'r*, 319 U.S. 590, 593–94 (1943); *Deputy v. du Pont*, 308 U.S. 488, 493–94 (1940). Either way you slice it, the amount of the adjustment is the same.

McKesson did not engage with *any* of the caselaw cited by the Government or otherwise attempt to rebut § 162(a)'s fundamental principle that expenses must benefit the taxpayer to be deductible. McKesson's response instead attempts to dismiss the Government's § 162(a) defense as a "repackag[ing]" of its theory under § 482. D.E. 41 at 12, 48. But these Code sections are not mutually exclusive. *See OTM Corp. v. United States*, 572 F.2d 1046, 1048 (5th Cir. 1978) (clarifying that § 482 does not limit the IRS's ability to disallow expense deductions under § 162(a)); *see also R. T. French Co.*, 60 T.C. at 849 (1973); *Wycoff v. Comm'r*, T.C. Memo 2017-203, 2017 WL 4677657, at *12 (2017). And even if the Court concludes the IRS erred in relying on the SBC rule to adjust McKesson's income under § 482, McKesson still needed to prove it was entitled to the § 162(a) deduction it claimed for SBC costs. *See United States v. Janis*, 428 U.S. 433, 440 (1976) ("In a refund suit the taxpayer bears the burden of proving the amount he is entitled to recover. It is not enough for him to demonstrate that the assessment of the tax for which refund is sought was erroneous in some respects."). The burden is on McKesson to prove it is entitled to a $9 million refund, not on the Government to prove otherwise.

McKesson has not identified any evidence showing that the costs it seeks to deduct were incurred for the "direct and proximate" benefit of McKesson USA. Because it cannot. The SBC paid to employees developing intangibles under the CSAs directly benefits McKesson Ireland. And McKesson provides the appropriate measure for allocating SBC through the RAB share. Thus, the Government's arguments under § 162(a) and § 482 are not incompatible; they provide independent paths to the same economic result: McKesson is not entitled to the refunds it seeks.

### 1.   McKesson carries the burden of proof in a refund suit.

McKesson's arguments that the Government has not "shown[n] that SBC is a cost 'allocable to' the intangible development activity, let alone that it should be disallowed under the deductibility rules of section 162" misapplies the burden in a refund suit. *Cf.* D.E. 41 at 49. It is the taxpayer's burden to prove its entitlement to a refund. *Cooper v. United States ex rel. Comm'r*, 513 F. Supp. 2d 747, 750 (N.D. Tex. 2007) ("In a refund suit the taxpayer bears the burden of proving the amount he is entitled to recover.") (quoting *Janis*, 428 U.S. at 440). And tax deductions, like tax credits, "are a matter of legislative grace, are only allowed as clearly provided for by statute, and are narrowly construed." *United States v. McFerrin*, 570 F.3d 672, 675 (5th Cir. 2009).

Because the burden rests on McKesson ("the non-movant," for purposes of the Government's cross motion for summary judgment), the Government needed "merely demonstrate an absence of evidentiary support in the record for the non-movant's case." *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The Government met its summary judgment burden for its § 162(a) defense by relying on McKesson's own evidence: its Forms 1120X (in which McKesson re-claimed deductions for SBC expenses effectively disallowed by the IRS) and its CSAs (showing the RAB share between the parent and subsidiary entities). *See* D.E. 1-1 through 1-6 (McKesson's Refund Claims); D.E. 37 at 10, USA

APP000007 (McKesson CSA). The burden thus shifted to McKesson to "designate specific facts showing there is a genuine issue" as to the amount of SBC costs for which it sought a § 162(a) deduction but incurred for McKesson Ireland's benefit. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

So, McKesson, not the Government, bore the burden of proving that its claimed expenses were for the "direct and proximate benefit" of McKesson USA, not McKesson Ireland. *Young & Rubicam*, 410 F.2d at 1238. As discussed below, McKesson offered no evidence to show that the SBC at issue was not paid to employees working on intangible development projects, or that its RAB share is an incorrect measure for the portion of the work benefitting McKesson USA as opposed to McKesson Ireland. McKesson thus failed to create a genuine dispute of material fact.

### 2.   The SBC at issue is related to intangible development activity.

McKesson cannot manufacture a factual dispute over whether the SBC at issue relates to intangible development activity. In the Notices of Proposed Adjustment ("NOPAs") for the years at issue, the IRS disallowed McKesson's SBC deductions only to the extent the SBC related to intangible development activity and therefore should have been included in the IDC pools under its CSAs. The adjustment was for workers engaged only in intangible development activity; McKesson has never alleged that the NOPAs swept in compensation paid to employees who worked on unrelated projects. Instead, McKesson makes the illogical argument that the SBC costs are wholly unrelated to the intangible development.

The Government's argument is based on the common-sense proposition that the compensation paid to workers is related to the work done by those workers. The work done by McKesson's employees is certainly related to the intangible development area. After all, McKesson agreed to provide SBC as a part of a compensation package for its workers in exchange for their labor on intangible development projects. McKesson agrees that the non-SBC,

26

such as cash wages, paid to its employees developing intangibles covered under the CSAs are costs that must be included in the IDC pool. There is no reason to treat SBC differently: that compensation is attributable to the work done by those employees and thus is related to the intangible development area. And the amount of those SBC expenses are readily discernible from McKesson's own Complaint because they are the expenses for which McKesson now seeks a deduction: $3,897,842 for FY07, $5,257,797 for FY08, $4,260,093 for FY09, $5,835,258 for FY10, $8,543,689 for FY11, and $10,234,901 for FY12. D.E. 1, at ¶¶ 50, 60; D.E. 21 ¶¶ 50, 60.

### 3. McKesson cannot deduct SBC expenses incurred for the "direct and proximate" benefit of McKesson Ireland.

While McKesson USA paid the SBC compensation to its employees, it incurred the expense for the benefit of McKesson Ireland. That is, the SBC costs were attributable to the activities of McKesson USA's employees who developed the cost shared intangibles that McKesson Ireland owns and earns income from. *See* D.E. 37 at 11, USA APPP000008. The sample CSA attached as an exhibit to the Government's motion demonstrates that McKesson USA and McKesson Ireland were engaged in a joint intangible development activity. Under this arrangement, workers from McKesson USA performed research and development activities to develop intangibles. And McKesson Ireland expects to receive 99% of the economic benefit from exploiting any developed intangibles. Thus, § 162(a) bars McKesson from claiming a deduction for the portion of its SBC expenses incurred for the benefit of McKesson Ireland.

To be sure, SBC is a "permitted deduction" under § 162(a). *Id*. at 45. The timing of the deduction is determined under § 83(h). But recognizing SBC as a potentially deductible compensation expense does not establish that McKesson USA may deduct the entire expense. Section 162 allows a deduction only for the portion of the expense incurred for the taxpayer's "direct and proximate" benefit. *Young & Rubicam*, 410 F.2d at 1238. McKesson mistakes

27

Treasury's recognition that SBC constitutes deductible compensation for a concession that McKesson USA may deduct 100% of that expense regardless of the portion that benefitted McKesson Ireland. Mckesson argues that "by requiring McKesson to share SBC under the SBC rule, the IRS has conceded that such amounts must be deductible under section 162," citing Treas. Reg. § 1.482–7(d)(3)(iii)(A). D.E. 41, at 53. But the regulation does not confer an unconditional right to deduct SBC. It provides for SBC to be taken into account in the cost-sharing regime when the taxpayer complies with that regime, including the requirement to include the relevant SBC in its cost pool. McKesson cannot have it both ways by invoking the regulation to establish its entitlement to a deduction while simultaneously disregarding the regulatory framework governing that deduction.

Instead of letting the full § 162(a) deduction stand and allocating income under § 482, the IRS can reach the same result by disallowing 99% of the § 162(a) deduction McKesson took for SBC costs. Even if arm's length behavior tied the IRS's hands under § 482 as McKesson argues, there is no dispute that § 162(a) contains no similar limitation.

#### 4.   The RAB share is an appropriate measure of the portion of SBC expenses incurred for the benefit of McKesson Ireland.

The RAB share projected in the CSAs precludes any genuine dispute of fact as to the proportion of the SBC costs expected to benefit McKesson USA, and the proportion of the costs expected to benefit McKesson Ireland. In a CSA, parties calculate their respective RAB shares, which is the ratio that represents each party's expected economic benefits from the use of the resulting intangibles. *See* D.E. 37 at 9, USA APP000006 (acknowledging that "reasonably anticipated benefits are best measured by the ratio ("Cost Sharing Ratio") of (i) Gross Revenue derived from the business activities in which the Developed Intangibles are exploited by a party hereto bears to (ii) the total Gross Revenue derived from the business activities in which

28

Developed Intangibles are exploited by both parties"). CSA participants then use this RAB share to share all IDCs related to the CSA. Therefore, the RAB share represents the parties' own determination of the relative economic benefits each anticipates to receive from the development activities and is thus an appropriate measure for the direct-and-proximate benefit test under § 162(a).[6] *See* Treas. Reg. § 1.482-7(e)(2)(i) ("Reasonably anticipated benefits are measured . . . by reference to estimated benefits to be generated by the use of cost shared intangibles . . .").

The only evidence in the record shows that McKesson set up an arrangement designed to result in 99% of the benefit accruing to its Irish subsidiary. *See* D.E. 37 at 10, USA APP000007. So, 99% of the costs McKesson USA incurred under that arrangement were incurred to benefit McKesson Ireland. Compensation paid to employees working within that arrangement is a cost incurred under that arrangement, whatever form the compensation takes. Thus, McKesson is not entitled to 99% of the § 162(a) deduction it took for SBC paid to employees working on relevant activities. Disallowing that amount produces the same tax outcome as the audit adjustment.

Rather than challenging the Government's § 162(a) caselaw or attempting to prove it paid some amount of relevant SBC to employees *not* working on projects where 99% of the expected economic benefit flows to McKesson Ireland, McKesson responded only that RAB share does not dictate whether a cost is an IDC. D.E. 41 at 49. But the Government does not rely on the RAB share to identify the amount of the SBC expenses or to establish that the expenses are related to intangible development—those amounts are taken from McKesson's own claims, as described above. *See supra* Section II.D.2. The RAB share ratio, as determined by McKesson

---

[6] Indirect or derivative benefits back to the parent company do not make an expense deductible under § 162(a). *Young & Rubicam*, 410 F.2d at 1238 ("The general and indirect benefit which obviously inures to a parent corporation when one of its subsidiaries successfully performs its functions does not satisfy the requirements of section 162.").

29

USA and McKesson Ireland, is a proxy to demonstrate the direct and proximate benefit to each party under § 162(a) because the RAB share ratio allocates the SBC expenses according to each party's expected economic benefit. The ratio can be applied to the SBC expenses claimed by McKesson on its Forms 1120X.

There is no genuine dispute that 99% of the relevant SBC costs were incurred for the direct and proximate benefit of McKesson Ireland, which means, as a matter of law, McKesson cannot deduct that amount under § 162(a) in the United States. Thus, McKesson is not entitled to any refund of its income taxes and the Court should enter judgment for the Government.

## III.   Conclusion.

McKesson paid income taxes consistent with the economic realities of its transactions. It should not receive a refund. The Court should grant summary judgment to the United States.

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General
Tax Litigation Branch

*/s/ Moira E. Goodwin*
MOIRA E. GOODWIN
DC Bar No. 1780293
DANIEL B. CAUSEY, IV
SC Bar No. 104035
Trial Attorneys
Tax Litigation Branch
Civil Division, Department of Justice
P.O. Box 14198
Washington, D.C. 20044
202-718-7056 (MEG)
202-307-1427 (DBC)
202-514-6866 (fax)
moira.e.goodwin@usdoj.gov
daniel.b.causey@usdoj.gov

*Counsel for Defendant*